UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                    Plaintiff,

        v.                                                    **DECISION AND ORDER**

ACQUEST TRANSIT LLC,                                          09-CV-055S

                                    Defendant.

# I.  INTRODUCTION

Plaintiff United States of America ("Plaintiff" or "the Government") commenced this

action on January 15, 2009, and alleges that Defendant Acquest Transit LLC ("Defendant"

or "Acquest") violated sections 301 and 309(d) of the Clean Water Act ("CWA") when it

engaged in various ditching, earthmoving and fill activities on tax parcel 16.00-5-23 ("the

Property"), which is approximately 96.6 acres in size and located in the Town of Amherst,

New York.

Presently before the Court is the Government's motion, filed on March 4, 2009, to

enjoin Acquest from placing additional fill or performing additional earthmoving work at the

Property during the pendency of this action.  Briefing on the preliminary injunction motion

was complete on May 8, 2009.[1]  The Court held a status conference on May 11, 2009, to

---

[1]  The Government submitted a Memorandum in Support of Motion for Preliminary Injunction (Pl. Memo); Declaration of Mary Anne Thiesing, dated March 3, 2009, with exhibits; Declaration of David G. Pohle, dated February 26, 2009, with exhibits; Reply Memorandum Law (Pl. Reply); Supplemental Declaration of David G. Pohle, dated April 30, 2009, with exhibits; and Supplemental Declaration of Mary Anne Thiesing, dated May 3, 2009, with exhibit.
        Aquest filed a Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (Def. Memo.); Declaration of Paul Cambria, Jr., Esq., undated, with exhibits; Affidavit of Craig S. Duff, dated April 17, 2009; Affidavit of John Kelkenberg, dated April 17, 2009; and Affidavit of Steven I. Apfelbaum, dated April 20, 2009, with exhibits.

1

clarify the parties' positions on the scope of issues to be addressed and the necessity for a hearing. After review of the memoranda, supporting documents and counsels' positions, the Court determined that a hearing is unnecessary. For the reasons stated below, the Government's motion for a preliminary injunction is granted.

## II. DISCUSSION

### A.    Jurisdiction and Standard of Review

The purpose of the CWA is to restore and maintain the integrity of the Nation's waters. 33 U.S.C. § 1251. The CWA expressly authorizes district courts to grant injunctive relief to enforce its provisions. *Id.* §§ 1251 and 1319(b).

"[T]he function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants." United States v. Diapulse Corp. of America, 457 F.2d 25, 27 (2d Cir. 1972). When the movant is the United States, the government need only show that a defendant has violated a federal statute and that there is some reasonable likelihood that the violation may recur. United States v. Blue Ribbon Smoked Fish, Inc., 179 F. Supp. 2d 30, 50 (E.D.N.Y. 2001) (citations omitted). Where the government seeks to enforce a statute designed to protect the public interest, it may obtain injunctive relief without a showing of irreparable harm. Diapulse, 457 F.2d at 27-28; New York v. Operation Rescue Nat'l, 99-CV-209A, 2000 U.S. Dist. LEXIS 20059, at *103 n.33 (W.D.N.Y. July 26, 2000). The statute's enactment constitutes Congress's "implied finding that violations will harm the public and ought, if necessary, be restrained." Diapulse, 457 F.2d at 28 (citing United States v. City and County of San Francisco, 310

2

U.S. 16, 60 S. Ct. 749, 84 L. Ed. 1050 (1940)).

A defendant cannot defeat such a motion by arguing that the injunction is impermissible because it will have a negative financial impact or put him out of business. The defendant "can have no vested interest in a business activity found to be illegal." United States v. Ellis Research Laboratories, Inc., 300 F.2d 550, 554 (7th Cir. 1962) (citing United States v. Walsh, 331 U.S. 432, 67 S. Ct. 1283, 91 L. Ed. 1585 (1947)).

## B.  The Violation of a Federal Statute

### 1.  The Parties' Respective Arguments

The United States contends that the Property's entire 96.6 acres constitute wetlands or surface waters that are "waters of the United States." The Government further asserts that since at least April 2007, Acquest and/or its agents have used earthmoving equipment to remove vegetation, construct a road, parking area, and retail building site, and deposit fill and dredged materials over certain wetland acreage. Acquest violated the CWA, the Government urges, when it engaged in these activities without acquiring the requisite permit.

Acquest does not oppose the Government's motion on the ground that the Property is not a wetland,[2] or on the ground that it did not engage in earthmoving and fill activities on the Property. Rather, it urges that the Property falls within an exemption to the CWA's provisions because it is and always has been farm land, and all the activities the Government objects to are normal farming activities. According to Acquest, because the

---

[2] Acquest's counsel clearly states an intent to ultimately challenge the CWA's applicability on the ground the Property does not have a significant or substantial nexus to a navigable body of water, but states that Acquest's expert did not have sufficient time to investigate and opine on this issue in response to the preliminary injunction motion. (Docket No. 17-2, ¶ 4.)

CWA is inapplicable here, the Government cannot demonstrate that Acquest violated the statute, and its request for preliminary injunctive relief must be denied.

The relevant statutory provisions, and the findings of fact and conclusions of law with respect to the parties arguments, are set forth below.

### 2.     The CWA's Provisions

As noted above, the CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Section 301(a) of the CWA prohibits "the discharge of any pollutant by any person," unless the discharge is authorized by a permit.  *Id.* § 1311(a).  "Discharge of any pollutant" includes "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12). The term "pollutant" is defined broadly to include traditional contaminants and also "dredged spoil, . . . rock, sand, [and] cellar dirt."  *Id.* § 1362(6).  A "point source" includes "any discernible, confined and discrete conveyance."  *Id.* § 1362(14).  And, finally, "navigable waters" is defined as encompassing all "waters of the United States, including the territorial seas."  *Id.* § 1362(7).

The U.S. Army Corps of Engineers ("COE") has issued regulations interpreting "waters of the United States"—*i.e.*, navigable waters—to include waters subject to use in interstate commerce, 33 C.F.R. § 328.3(1); "[a]ll interstate waters including interstate wetlands," § 328.3(a)(2); "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), . . . [or] wetlands, . . . the use, degradation or destruction of which could affect interstate or foreign commerce," § 328.3(a)(3); "[t]ributaries of [such] waters," § 328.3(a)(5); and "[w]etlands adjacent to [such] waters [and tributaries] (other than waters that are themselves wetlands)," § 328.3(a)(7).   "Wetlands" are defined as

"areas that are inundated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." *Id.* § 328.3(b). The regulation defines "adjacent" wetlands as those "bordering, contiguous [to], or neighboring" waters of the United States. *Id.* § 328.3(c).

Section 404 of the CWA authorizes the Secretary of the Army, acting through the COE, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* §§ 1344(a), (d); *see also*, 33 C.F.R. § 323.1. The COE and Environmental Protection Agency ("EPA") have promulgated regulations governing the COE's processing of such permits. 33 C.F.R. pts. 320-325; 40 C.F.R. pt. 230.

There are, however, a limited number of circumstances in which the discharge of dredged or fill materials is not prohibited by Section 301(a), so that no permit is required. Among them is where the discharge is "from normal farming . . . activities such as plowing, seeding, cultivating, minor drainage, [or] harvesting for the production of food, fiber, or forest products . . . ." 33 U.S.C. § 1344(f)(1)(A). The COE and EPA have interpreted the farming exemption as limited to activities that are "part of an established (*i.e.*, on-going) farming . . . operation." The exemption is not available for "activities which bring an area into farming . . . use." Furthermore, "[a]n operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations." 33 C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1(ii)(A), (B).

Even where Section 404(f)(1)(A) exempts a discharge from the permit requirement, the discharge may be "recaptured" under Section 404(f)(2), which states that:

> Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2). The governing regulation provides that "[a] conversion of a section 404 wetland to a non-wetland is a change in use of an area of waters of the United States." 33 C.F.R. § 323.4(c).

### 3. The Government's Burden of Demonstrating a Violation

To establish the existence of a violation, the United States must demonstrate that (1) Acquest is a person within the meaning of the CWA, (2) Acquest's activities constituted a discharge of pollutants from a point source, (3) the site was a wetland at the time of the discharge, (4) the site constituted waters of the United States at the time of the discharge, and (5) the activities at the site were conducted without a permit. United States v. Brace, 41 F.3d 117, 120 (3d Cir. 1994).

#### *"Person" Within the Meaning of the CWA*

As used in the CWA, the term "'person' means an individual, corporation, [or] partnership . . . ." 33 U.S.C. § 1362(5). There is no basis on the record here to conclude that Acquest Transit LLC falls outside this definition, and Acquest does not contest this point.

#### *The Discharge of Pollutants from a Point Source*

Acquest purchased the Property in January 2006. (Pohle Supp. Decl. ¶ 11.) The evidence before this Court shows that Acquest and/or its agents engaged in the following

6

earthmoving activities on the Property.

In April 2007, COE staff observed the construction of a gravel road entering the property from Millersport Highway, and a sign on the Property stating "Clean Fill Wanted" and the name "Greenview Nursery." (Pohle Decl. ¶ 7; Thiesing Decl. ¶ 11.) The COE reported this activity to the EPA, which commenced an investigation. (Pohle Decl. ¶ 7.) The EPA requested access to the Property, but Acquest denied the request. (*Id.*, Ex. 4.) The EPA confirmed the new road construction and the presence of earthmoving equipment on the site through a review of low-level aerial photographs. (*Id.* ¶ 8, Ex. 2.) In December 2007, the COE photographically documented the continued presence of earthmoving equipment on the Property, the piling of soil and wood debris in a wooded area, and the excavation or widening of a ditch. (*Id.* ¶ 9, Exs. 3 and 4.)

In June 2008, EPA environmental scientist, David G. Pohle, inspected the Property from adjacent properties and roadways and observed the presence of construction equipment, fill, and piles of debris on the site, as well as the recent excavation of large ditches. (*Id.* ¶ 12.) Thereafter, the EPA obtained a search warrant to analyze the Property and conclusively determine whether it contains wetlands, whether dredged or fill material had been discharged into wetlands, and the relationship between any wetlands on the Property and other waters. (*Id.* ¶ 13, Ex. 5; Thiesing Decl. ¶ 6.)

The EPA and COE conducted an on-site inspection on July 29, 30, and 31, 2008. (Pohle Decl. ¶ 14*;* Thiesing Decl. ¶ 6.) The site inspection revealed that fill had been deposited over at least 13.3 acres of the Property, including: (1) a gravel road from Millersport Highway approximately 26 feet wide and 1800 feet long (approximately 0.8 acres), filled to an elevation of one to two feet above surrounding land and consisting of

gravel and stone; (2) a parking area at the terminus of the gravel road of approximately 0.3 acres where a bulldozer was parked; (3) a 3.2 acre area in the southwest corner of the property on which a bulldozer was parked and which had been filled to an elevation up to 7 feet above the surrounding land with sandy soil, construction debris, and chunks of asphalt; (4) a 6.4 acre area between two large, parallel ditches flowing from east to west across the property on which an excavator was parked and which had been filled with one to two feet of material that appeared to have been dredged from the ditches; and (5) a 2.6 acre rectangular area fronting Transit Road which had been filled and paved with asphalt and on which a newly-constructed retail nursery, called Gardens by Greenview, was operating. (Pohle Decl. ¶ 17; Thiesing Decl. ¶¶ 10-15.) In addition to these fill areas, vegetation and soil had been disturbed on almost all of the remaining Property within the previous year as a result of ditch excavation and plowing. (Thiesing Decl. ¶ 18.) Mary Anne Thiesing, an EPA wetland ecologist, observed a recent ditch excavation, denominated the "South Ditch," which she concluded, based on topography, soil structure, and hydrology, was a functionally new ditch. (Report at 9 ¶ 3, 10 ¶ 9, 11-12 ¶¶ 18-19, 14 ¶ 7; Thiesing Supp. Decl. ¶¶ 14-21, 48.)

On September 10 and 16, 2008, the COE observed and photographed backhoes and bulldozers moving earth on the Property. (Pohle Decl. ¶ 20, Ex. 7.) Based on an aerial photograph taken in October 2008, Pohle concluded that the portion of the Property covered by dredged and/or fill materials had increased from 13.3 acres to approximately 65 acres. (*Id.* ¶ 22.)

Theising returned to the Property on October 8 and 9, 2008. She observed that, since July 2008, vegetation that existed in an area north of the gravel road had since been

cleared, fresh earth appeared to cover much of that area, and a new ditch had been excavated through a wooded area to connect with an existing ditch running along the east side of Millersport Highway. (*Id.* ¶ 19; Thiesing Supp. Decl. ¶¶ 24-27, 32-34, 49; Pohle Decl. ¶ 22.)

Acquest does not dispute any of the Government's observations relative to the filling of the 13.3 acres, the depositing of dirt, chunks of asphalt, and construction debris on the Property, the removal of vegetation, or the dredging of existing ditches and the construction of at least two new ditches.[3] It does contest the Government's statement that additional large areas were filled between July 2008 and October 2008. According to Acquest, the disturbed areas to which the Government refers were simply disked for planting. (Apfelbaum Aff., ¶¶ 16-18.)

Acquest does not contest that it filled at least 13.3 acres of the Property with "dredged spoil, . . . rock, sand, [and/or] dirt;" materials that clearly fall within the CWA's broad definition of "pollutant."

Acquest does not dispute that these activities were carried out with heavy construction equipment such as a backhoe and bulldozer. As previously noted, the term "point source" means any discernable, confined and discrete conveyance from which pollutants may be discharged. 33 U.S.C. § 1362(14). Bulldozers, loaders, backhoes, or dump trucks that deposit or spread fill material are point sources. *See*, Avoyelles Sportsman League v. Marsh, 715 F.2d 897, 922 (5th Cir. 1983) (bulldozers and backhoes

---

[3] Acquest's Ecologist, Steven I. Apfelbaum inspected the Property and historical information on April 8, 2009. (Apfelbaum Aff., ¶ 4.) He states that "most" of the ditches existed on the Property prior to Acquest's ownership. (*Id.* ¶ 19.)

are point sources because they pile materials that may ultimately find their way into the waters); United States v. Tull, 615 F. Supp. 610, 622 (E.D. Va. 1983), *aff'd*, 769 F.2d 182 (1985), *rev'd on other grounds*, 481 U.S. 412, 107 S. Ct. 1831, 95 L. Ed. 2d 365 (1987) (bulldozers and dump truck are point sources); United States v. Robinson, 570 F. Supp. 1157, 1163 (M.D. Fla. 1983) (same); United States v. Larkins, 657 F. Supp. 76, 78-79 n. 2 (W.D. Ky. 1987), *cert. denied*, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (construction equipment, generally); *see also*, United States v. Earth Sciences, 599 F.2d 368, 373 (10th Cir. 1979) ("The concept of a point source was designed to further [the CWA's] scheme by embracing the broadest possible definition of any identifiable conveyance . . . . ").

Accordingly, on the current record, the Court finds the Government has adequately demonstrated that Acquest discharged a pollutant from a point source.

### *The Existence of Wetlands*

At the site inspection conducted by the EPA and COE on July 29, 30, and 31, 2008, 46 locations were sampled and inspected to determine whether they satisfied the characteristics of wetland hydrology, hydric soils, and wetland vegetation. (Thiesing Decl. ¶ 9, Ex. 2.) The inspection team's methodology, observations, analysis, and findings are detailed in a 25-page report prepared by Mary Anne Thiesing. (*Id.* Ex. 2, hereafter "Report.") Thiesing determined that all 46 sample points are wetlands or were wetlands prior to being filled. The 46 sample points are located throughout the Property, and include each area of the 13.3 acres that had been filled at that point. (Report, Ex. 3.) After finding wetlands characteristics present at each sample point, Thiesing concluded that the entire Property is wetlands. In addition, the inspection team observed wetlands on contiguous

properties to the north and south.  (Pohle Decl. ¶ 16.)

For purposes of this motion, Acquest does not dispute that the Property meets the federal criteria for wetlands.  Accordingly, on the record now before me, I find the Government has adequately demonstrated that the Property is wetlands.

### Waters of the United States

In addition to showing that the Property contains wetlands, the Government must show that the wetlands constitute "waters of the United States."

The United States Supreme Court most recently attempted to construe the term "waters of the United States" as used in the CWA in Rapanos v. United States, 547 U.S. 715, 126 S. Ct. 2208, 165 L. Ed. 2d 159 (2006).  Rapanos involved two cases in which the Sixth Circuit had concluded that the CWA applied to the placement of fill material in wetlands adjacent to nonnavigable tributaries of traditional navigable waters.  The Supreme Court issued a 5-4 decision, in which it determined that the Sixth Circuit's CWA analysis was incorrect, and remanded the cases for further proceedings.

While all Justices agreed that the term "waters of the United States" encompasses some waters that are not navigable in the traditional sense, id. at 730-31 (plurality opinion); 767-68 (Kennedy, J., concurring in the judgment); 792 (Stevens, J., dissenting), the Court split with respect to the proper standard for determining whether a wetland constitutes "navigable waters" covered by the CWA.  Justice Scalia and three others interpreted "waters of the United States" as incuding "relatively permanent, standing or continuously flowing bodies of water," id. at 739 (plurality opinion), that are connected to traditional navigable waters, as well as wetlands with a continuous surface connection to such water bodies, id. at 742.  They held that:

establishing that wetlands . . . are covered by the Act requires two findings: first that the adjacent channel contains a "wate[r] of the United States," (*i.e., a* relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Id*. at 742 (quotation marks and alteration in original). The plurality opinion expressed concern over "sweeping assertions of [CWA] jurisdiction over ephemeral channels and drains as 'tributaries.'" *Id.* at 726-27.

Justice Kennedy interpreted the term as encompassing wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Id. at 759 (Kennedy, J., concurring in the judgment); *see id*. at 780 (wetlands "possess the requisite nexus" if the wetlands "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable'"). The four dissenting Justices concluded that the term "waters of the United States" encompasses wetlands that satisfy either the plurality's standard or that of Justice Kennedy. *See id*. at 810 & n.14 (Stevens, J., dissenting).

The Government urges that the Property falls within the CWA's jurisdiction under either the plurality or the Kennedy standard. *See* Simsbury-Avon Soc'y LLC v. Metacon Gun Club, Inc., 472 F. Supp. 2d 219 (D. Conn. 2007) (applying both plurality and Kennedy standards to determine whether CWA jurisdiction existed).

With regard to the plurality standard, the Government contends that the Property has a continuous surface connection to traditionally navigable waters. In support, it notes that during the July 2008 inspection, Thiesing observed juvenile fish in a ditch on the

Property, which she concluded demonstrates a continuous connection between waters in the wetlands and downstream waters. (Thiesing Decl. ¶ 17.) The Government documents the flow of water from the Property, to ditches, to "navigable waters" as follows. Surface water from the wetlands flow generally westward into ditches on the Property, including a ditch that borders its west boundary and runs south to north. (Pohle Decl. ¶ 16; Report at 1.) That ditch joins a roadside ditch at Millersport Highway. (*Id.*) The roadside ditch flows through three parallel 18-inch culverts to a channel, which the EPA terms a tributary, that travels approximately 1.4 miles to Ransom Creek. Ransom Creek flows approximately 2.5 miles to Tonawanda Creek/Erie Canal which, in turn, flows into the Niagara River. (Pohle Decl. ¶ 25, Ex. 10 at 6-7; Report at 1.) Based on direct observation in the Spring, Summer and Fall of 2008, and other evidence, the EPA concluded that the Property's west ditch and the Millersport Highway ditch flow year round. (Pohle Decl., Ex. 10 at 7-9.) The COE has determined that the section of Ransom Creek at issue here is a traditional navigable waterway. (Pohle Decl. Ex. 10 at 9, Report at 1.)

The Property also falls within the CWA's jurisdiction under the Kennedy standard, the Government argues, because the wetlands "either alone or in combination with similarly situated lands in the region, significantly affect[ ] the chemical, physical, and biological diversity" of Ransom Creek. Rapanos, 547 U.S. at 780. The EPA has concluded that the Property's wetlands provide flood water storage, filter pollutants, provide wildlife habitiat, and produce organic compounds which increase the quality of the habitat of downsteam waters. (Pohle Decl. ¶ 27, Ex. 10 at 9-13.) Thus, the wetlands serve an important water quality function for Ransom Creek by limiting flooding and filtering sediment and toxins, and they enhance the quality of the habitat within Ransom Creek.

(*Id.*)

Acquest states its intent to argue at trial that the Property does not have a significant or substantial nexus to a traditional navigable waterway. However, it presents no countervailing facts or legal analysis on this preliminary injunction motion. Based on the evidence currently before the Court, the Government has demonstrated sufficiently that the Property's wetlands are "waters of the United States" within the CWA's jurisdiction.

### The Absence of a Permit

There is no dispute that Acquest did not acquire a permit from the COE. Indeed Acquest takes the position that, because the Property is exempt from the CWA, no permit is required.

\* \* \* \* \*

In sum, I find that the United States has met its burden of demonstrating the existence of a violation for purposes of this preliminary injunction motion. However, its showing is for naught if Acquest succeeds in demonstrating that the property is exempt from the CWA's provisions.

### 4. Acquest's Burden of Demonstrating the Exception

The burden is on Acquest to demonstrate that the Property is exempt from the CWA. It must show that its activities both satisfy the requirements of Section 404(f)(1) and avoid the recapture provision of Section 404(f)(2). Brace, 41 F.3d at 124 (citing United States v. Akers, 785 F.2d 814, 819 (9th Cir.), *cert. denied*, 479 U.S. 828, 107 S. Ct. 107, 93 L. Ed. 2d 56 (1986) and United States v. Cumberland Farms, 67 F. Supp. 1166, 1176 (D. Mass. 1986), *aff'd*, 826 F.2d 1151 (1st Cir. 1987), *cert. denied*, 484 U.S. 1061, 108 S. Ct. 1016, 98 L. Ed. 2d 981 (1988)).

Acquest argues that all of the activities of which the Government complains are lawful due to the Property's "long history and current use as a farm." (Cambria Decl. ¶¶ 5, 9.) The entire record is considered in determining whether Acquest has met its burden of demonstrating that it falls within the farming exception to the CWA.

### *Historical Use of the Property*

As previously noted, the farming exemption is limited to activities that are "part of an established (*i.e.*, on-going) farming . . . operation. . . . An operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations." 33 C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1(ii)(A), (B).

Steven I. Apfelbaum, an Ecologist retained by Acquest's counsel, concluded from a review of historical aerial photographs that "most of the Property" was under agricultural production in 1927. (Apfelbaum Aff. ¶¶ 5-6.) He states that "most" of the Property was still in agricultural use in 1978 (*id.* ¶ 7), and also in 1995 (*id.* ¶ 8.) Pohle disputes the latter assertion, and interprets the 1995 photograph to which Apfelbaum refers as depicting only scattered crop plantings. (Pohle Supp. Decl. ¶ 7.)

Craig S. Duff, who lived on the Property with his grandparents, attests that they actively farmed the Property until 1980. A group of farmers later planted crops on "fields scattered around the Property . . . until sometime in the early 1990's [sic]." (Duff Aff. ¶¶ 11-15.) Thereafter, no crops were planted for some time. An aerial photograph taken in 2002 shows shrub/scrub growth on "much of the Property." (Apfelbaum Aff. ¶ 9; Pohle Supp. Decl. ¶ 8.) In 2007, an unspecified portion of the Property was planted with corn. (Duff Aff., ¶ 19; Cambria Decl., Ex. D.) In July 2008, Thiesing observed corn cob remnants on

"a very small portion (less than one acre) of the site just north of the Gravel Road." (Report at 15 ¶ 12.) Seventy-five acres of winter wheat were planted in Fall 2008. (Duff Aff. ¶ 19; Kelkenberg Aff. ¶¶ 3-5.)

Taken together, the record reflects that the Property was historically used for crop production until approximately 1995, after which such activity was abandoned for roughly twelve years, until 2007.

The Government suggests the fact that the land lay fallow for a decade or more, standing alone, renders the subsequent planting a new farming operation, rather than an ongoing one. It cites no authority for this conclusion, which does not appear to be supported by the plain language of the CWA and governing regulations.

### *Excavation and Maintenance of Agricultural Ditches*

According to Apfelbaum, the Property contains agricultural ditches "most of [which] were observable and have existed at the Property" prior to Acquest's ownership. (*Id.* ¶ 19.) Apfelbaum also states that those ditches were recently maintained. (*Id.*) The Government contests Apfelbaum's assertion that certain features on historical aerial photographs can be definitively characterized as agricultural ditches. According to the Government, those features may represent drainage ditches or hedge rows or boundaries of fields, or any combination of these three. (Pohle Supp. Decl. ¶ 13; Thiesing Supp. Decl. ¶ 34.) Craig Duff, the only affiant with personal historical knowledge of the Property, says nothing about the prior existence of drainage ditches.

The record reflects that at least two new ditches have been created, one in or about July 2008, and another in or about October 2008. Apfelbaum does not dispute the Government's conclusion that new ditches have been excavated on the Property. Acquest

also does not dispute the Government's finding that these new ditches are lowering the water table on the Property. (Report at 20 ¶ 14; Thiesing Supp. Decl. ¶ 35.)

Apfelbaum goes on to state his understanding that a corn crop was planted and grew before there was any "substantial maintenance to the agricultural drainage ditches" on the Property. From that "understanding," he concludes that no changes to the hydrological regime were required to resume farming operations. (Apfelbaum Aff. ¶ 10.) The Government contends that the record here suggests otherwise. If modifications to the hydrological regime were necessary to resume operations, the farming operation is not "ongoing."

On this record, Acquest had not met its burden of demonstrating that its "substantial maintenance" of ditches and new ditching were not necessary for farming to resume. While Acquest vaguely references the planting of corn in 2007, it does not identify who planted the corn, where on the property it was planted, or how much was planted. In 2008, Theising observed indications of a prior corn crop on an area of less than one acre. I find the fact that approximately one percent of the Property may have been cultivated without hydrological changes is not determinative here in light of subsequent activity.

The COE and EPA documented the occurring of ditch widening and new ditch construction in Summer 2008. No crops were planted or growing during that time. Much of the Property (75 acres) was planted with winter wheat thereafter. This sequence suggests that the dredging activities, which lowered the water table, were necessary to resume farming on these 75 acres. Acquest has not, at this juncture, offered any evidence to the contrary, and so has not met its burden of demonstrating that farming could have resumed on these 75 acres without modifications to the hydrological regime. *See, e.g.*,

17

Brace, 41 F.3d at 124-29 (even assuming acreage at issue had been a prior "established farming operation," operation was not "ongoing" where owner modified the hydrological regime by installing new drainage prior to planting crops); Larkins, 657 F. Supp. at 86 n.23 (even if land had history of farm use, such use was no longer "established" where defendants built dikes and levees that altered hydrology of property to bring land under cultivation).

### *Current Use of the Property*

Land that was previously farmed, but has been converted to another use also is not part of an "established farming operation."

There is no dispute that Acquest filled a 2.6 acre area on which a retail nursery, which engages in no on-site farming activities, was constructed. That acreage has been paved with asphalt.

Acquest has stated that the 26' wide gravel roadway it installed is "related to farming" (Cambria Decl. Ex. D), and Apfelbaum opines that the roadway is "suitable only for use as a farm road" (Apfelbaum Aff. ¶ 20). However, the roadway is marked with a sign stating "Greenview Nursery Delivery Entrance." (Pohle Supp. Decl. ¶ 20, Ex. E.) It is undisputed that the nursery is a retail—*i.e.*, non-farming—operation. Moreover, the Government has proffered evidence that the roadway base meets local zoning criteria for access to commercial, industrial, and residential developments. (Pohle Supp. Decl. ¶¶ 16-17, Ex. A.) Although the roadway has been used by the farmer currently growing wheat on the Property, the record evidence suggests it was constructed and is being used for a non-farming purpose, as well.

Acquest has also filled a 3.2 acre section of the Property with non-native fill

18

materials to an elevation up to seven feet above the surrounding land. (Thiesing Decl. ¶ 13.) This fill activity does not fall within the discharges from normal farming permitted by 33 U.S.C. § 1344(f)(1)(A) ("activities such as plowing, seeding, cultivating, minor drainage").

\* \* \* \* \*

Because it is undisputed, on this record, that new ditches were excavated on portions of the Property which modified the hydrological regime, other portions of the Property have been converted to a non-farming use, and certain fill activities do not fall within the statutory definition of "normal farming activities," I find that Acquest has not met its burden of demonstrating that the farming exception applies to the Property.

## C.     The Likelihood of Recurrence

On February 21, 2008, the EPA issued a Cease and Desist order, pursuant to Section 309(a) of the CWA, directing that Acquest and its agents cease all earthmoving work in any portion of the Property unless or until the activities are authorized by the COE, or the EPA determines in writing that either the Property does not contain wetlands or that Acquest's activities are otherwise exempt from the CWA. (Pohle Decl., ¶ 10, Ex. 4.) Earthmoving activities continued thereafter. (*See, e.g.,* Thiesing Decl. ¶ 14.)

On September 5, 2008, the EPA issued a Second Cease and Desist Order, reiterating the prohibition on earthmoving work on any portion of the Property. (Pohle Decl. ¶ 19, Ex. 6.) Earthmoving activities, including the excavation of a new ditch, continued thereafter. (*Id.* ¶¶ 20, 22; Thiesing Decl. ¶ 19.)

Based on the Government's showing that Acquest has twice failed to adhere to EPA Cease and Desist Orders, I find there is some reasonable likelihood that the violation may

recur.  Accordingly, the Government has met the second prong of its burden.

## III.  CONCLUSION

For the reasons stated above, I find that the United States has satisfied its burden with regard to its preliminary injunction motion.  Further, Acquest has failed to meet its burden of demonstrating that the Clean Water Act's provisions do not apply to the Property.  Accordingly, the Motion for a Preliminary Injunction is granted.

## ORDERS

IT HEREBY IS ORDERED, that the United States of America's Motion for Preliminary Injunction (Docket No. 6) is GRANTED.

FURTHER, that Defendant Acquest Transit LLC, its officers, agents, successors, employees, and others acting in concert with it, are enjoined from placing additional fill or performing any additional earthmoving work at the Property designated as tax parcel 16.00-5-23 in the Town of Amherst, New York.

SO ORDERED.

Dated:      July 15, 2009
            Buffalo, New York


                                    /s/William M. Skretny
                                    WILLIAM M. SKRETNY
                                    United States District Judge