UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                              Plaintiff,

          v.

ACQUEST TRANSIT LLC,

                           Defendant.

_____

**REPORT**
**and**
**RECOMMENDATION**

**09-CV-00055S(F)**

APPEARANCES:         ERIC H. HOLDER, JR.
                         UNITED STATES ATTORNEY GENERAL
                         Attorney for Plaintiff
                         IGNACIA S. MORENA
                         Assistant Attorney General
                         Environmental and Natural Resources Division
                         ERIC G. HOSTETLER,
                         CHRISTINA L. RICHMOND, and
                         MADELINE FLEISHER, Trial Attorneys
                         Environmental Defense Section
                         P.O. Box 23986
                         Washington, District of Columbia  20026-3986

                         SCOTT BAUER, and
                         MYRIAH JAWORSKI, Trial Attorneys
                         Environmental Enforcement Section
                         P.O. Box 7611
                         Washington, District of Columbia  20044-7611

                         CHRIS SAPORITA, Assistant Regional Counsel
                         United States Environmental Protection Agency
                         Region 2
                         290 Broadway, 16th Floor
                         New York, New York  10007-1866, of Counsel

                         WILLIAM J. HOCHUL, JR.
                         UNITED STATES ATTORNEY
                         Attorney for Plaintiff
                         JANE B. WOLFF
                         Assistant United States Attorney, of Counsel
                         Federal Centre
                         138 Delaware Avenue
                         Buffalo, New York 14202

LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant
PAUL J. CAMBRIA, JR.,
DIANE MARIE ROBERTS, and
JOSEPH J. MANNA, of Counsel
42 Delaware Avenue
Suite 120
Buffalo, New York  14202

HARTER, SECREST AND EMERY LLP
Attorneys for Defendant
CRAIG A. SLATER, and
JOHN G. HORN, of Counsel
Twelve Fountain Plaza
Suite 400
Buffalo, New York  14202-2293

## JURISDICTION

This case was referred to the undersigned by Honorable William M. Skretny on June 10, 2010, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) for all pretrial matters, including preparation of a report and recommendation on dispositive motions.  The matter is presently before the court on Plaintiff's motion (Doc. No. 40) to enforce a preliminary injunction, filed May 28, 2010.

## BACKGROUND

Plaintiff United States of America ("Plaintiff") commenced this action on January 15, 2009, alleging Defendant Acquest Transit LLC ("Defendant" or "Acquest"), violated Sections 301 and 309(d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., and seeking injunctive relief and civil penalties.  In particular, Plaintiff alleges Defendant discharged pollutants into the waters of the United States, without obtaining the

requisite permits, when Defendant engaged in various ditching, earthmoving and fill activities on tax parcel 16.00-5-23 ("the Property"), a 96.6 acre piece of real property located in the Town of Amherst, New York, and owned by Defendant.

On July 15, 2009, District Judge Skretny entered a Decision and Order (Doc. No. 26) ("Preliminary Injunction Order") granting Plaintiff's motion for a preliminary injunction, enjoining Defendant and others acting in concert "from placing additional fill or performing any earthmoving work at the Property . . . ."  Preliminary Injunction Order at 20.  Defendant had argued in opposition to the motion that the Property fell within an exemption to the CWA because it is, and has always been, farm land, and the activities to which Plaintiff objected are normal farming activities.  *Id*. at 3.  In issuing the injunction, Judge Skretny specifically found Defendant had failed to meet its burden in opposing Plaintiff's motion "of demonstrating that the Clean Water Act's provisions do not apply to the Property," *id.* at 20, thereby rejecting Defendant's opposing arguments.

On May 28, 2010, Plaintiff filed the instant motion (Doc. No. 40) ("Plaintiff's Motion"), seeking to enforce the Preliminary Injunction Order, attached to which are the Memorandum of Law in Support of United States' Motion to Enforce Preliminary Injunction (Doc. No. 40-2) ("Plaintiff's Memorandum"), and the Declaration of Robert Conway (Doc. No. 40-3) ("Conway Declaration").  An order filed June 9, 2010 (Doc. No. 43), established deadlines of June 11, 2010 for Defendant to file a response, and June 15, 2010 for Plaintiff to file any reply, scheduled oral argument on Plaintiff's Motion for June 16, 2010, and dismissed as moot a motion (Doc. No. 41) filed by Plaintiff on May 28, 2010, seeking expedited consideration of Plaintiff's Motion.

In response to Plaintiff's Motion, Defendant, on June 11, 2010, filed a cross-

motion for summary judgment (Doc. No. 46) ("Defendant's Motion"),[1] seeking a modification of the Preliminary Injunction Order and dismissal of the CWA claims, and also filed supporting papers including the Declaration of Craig A. Slater in Support of Defendant's Motion, Esq. (Doc. No. 46) ("Slater Declaration Supporting Defendant's Motion"),[2] with attached exhibits A through M (Doc. Nos. 46-2 - 46-14) ("Defendant's Ex(s). __"),[3] the Declaration of Craig A. Slater in Opposition to Plaintiff's Motion (Doc. No. 46-16) ("Slater Declaration Opposing Plaintiff's Motion"),[4] the Affidavit of Chris Santora (Doc. No. 46-17) ("Santora Affidavit"), the Memorandum in Support of Defendant's Cross-Motion for Partial Summary Judgment (Doc. No. 46-18) ("Defendant's Memorandum"),[5] and Acquest Transit, LLC's Local Rule 56.1(a) Statement of Undisputed Material Facts (Doc. No. 46-19) ("Defendant's Statement of Facts").[6] Although Defendant did not file a separate response to Plaintiff's Motion, the motion papers filed in support of Defendant's Motion contain arguments opposing

---

[1] Defendant's Motion, without the supporting papers, was refiled on June 14, 2010 (Doc. No. 50), to correct co-counsel's name.

[2] The Slater Declaration Supporting Defendant's Motion was refiled on June 14, 2010 (Docs. Nos. 49 and 49-2), to correct typographical errors in the original filed document.

[3] Defendant's Exh. M, with attachment A, was refiled on June 14, 2010 (Docs. Nos. 49-4 and 49-5).

[4] The Slater Declaration Opposing Plaintiff's Motion was refiled on June 15, 2010 (Doc. No. 53), to correct typographical errors in the original filed document.

[5] Defendant's Memorandum was refiled on June 14, 2010 (Doc. No. 49-3), to correct a signature error with the original filed document.

[6] Defendant's Statement of Facts was refiled on June 15, 2010 (Doc. No. 53-2), to correct typographical errors in the original filed document.

Plaintiff's Motion.[7]

By order filed June 14, 2010 (Doc. No. 48), the parties were directed to, *inter alia*, provide the court with lists of those witnesses expected to testify at the June 16, 2010 hearing on the pending motions, as well as prehearing memoranda stating the issues and applicable law relevant to resolution of the parties' respective motions, and any motions *in limine*. Plaintiff, on June 15, 2010, filed the United States' Anticipated Witnesses and Exhibits in Support of Motion to Enforce Preliminary Injunction (Doc. No. 52) ("Goverment's Prehearing Filing"), and the Reply Brief in Support of United States' Motion to Enforce Preliminary Injunction (Doc. No. 55) ("Plaintiff's Reply"). On June 16, 2010, Defendant filed Defendant's Witness and Exhibit List in Opposition to Plaintiff's Motion to Enforce Preliminary Injunction (Doc. No. 56) ("Defendant's Prehearing Filing"). Also on June 16, 2010, Plaintiff filed the United States Prehearing Memorandum (Doc. No. 57) ("Plaintiff's Prehearing Memorandum"),[8] and the Motion in Limine to Exclude Non-Relevant Evidence in Support of Defendant's Farming Exemption Defense at the Hearing to Enforce the Preliminary Injunction (Doc. No. 58) ("Plaintiff's *In Limine* Motion"). Oral argument on only Plaintiff's Motion was held on June 16, 2010. At the commencement of the oral argument, the undersigned advised that Defendant's motion seeking partial summary judgment would not be addressed at

---

[7] On July 30, 2010, Plaintiff filed a motion (Doc. No. 72), requesting Defendant's Motion be denied for lack of discovery or, alternatively, to stay Defendant's Motion to permit discovery relative to the motion.

[8] Plaintiff's Prehearing Memorandum was refiled on June 17, 2010 (Doc. No. 60).

that time. Hearing Tr.[9] at 22-23, 30-32. The undersigned also ruled that several of

Defendant's witnesses, including Anthony Cimato, Craig Duff, John Kelkenberg, Donald

Spoth, Omar Abu-Sitta, Ashok Kapoor, Louis Fessard, Esq., EPA Division of

Environmental Planning and Protection Director Walter Mugdan, Walter Andrews, U.S.

Army COE District Engineer Lt. Colonel John S. Hurley, EPA Regional Wetland

Ecologist Mary Anne Thiesing, and EPA Wetlands Enforcement Coordinator David G.

Pohle, would not be allowed to testify as their anticipated testimony was relevant only to

Defendant's motion seeking partial summary judgment. Hearing Tr. at 30-32.

Received into evidence at the hearing were Plaintiff's Exhibits 1 (ariel view of the entire

Property, dated April 2008, depicting locations of Millersport Highway, Transit Road,

and Greenview Nursery), 3A (three photographs taken on May 19, 2010, by Agent

COnway depicting earthmoving work at the Property, including recently dug ditch and

hole (first photograph), a recently dug hole and recently planted trees for retail sale

(second photograph), and recently planted trees for retail sale with new fill consisting of

wood chips (third photograph)), 4 (Affidavit of Chris Santora) and 5 (Affidavit of Donald

Spoth).

Defendant's Offer of Proof for Witnesses and Documents Excluded from Hearing

(Doc. No. 61) ("Defendant's Offer of Proof"), was filed June 21, 2010. Oral argument

on Plaintiff's Motion continued on June 23, 2010.[10] Following a telephone conference

---

[9] References to "Hearing Tr." are to the page number of the Evidentiary Hearing conducted on Plaintiff's Motion, filed on June 22, 2010 (Doc. No. 62) (June 16, 2010 proceedings) and on July 7, 2010 (Doc. No. 66) (June 23, 2010 proceedings).

[10] Prior to the July 16, 2010 hearing, the undersigned advised that oral argument would be limited to Plaintiff's Motion, and oral argument on Defendant's cross-motion seeking partial summary judgment (Doc. No. 50), would not be permitted at that time. Plaintiff also advised it intended to file a motion

conducted by the undersigned on June 30, 2010 (Minute Entry, Doc. No. 65), the parties were granted ten days to file post-hearing memoranda, and five additional days to file rebuttal post-hearing memoranda.  Accordingly, filed on July 12, 2010, were the Acquest Transit, LLC Post-Hearing Memorandum (Doc. No. 67) ("Defendant's Post-Hearing Memorandum"), and the Post-Hearing Brief in Support of United States' Motion to Enforce Preliminary Injunction (Doc. No. 68) ("Plaintiff's Post-Hearing Memorandum").  Filed on July 19, 2010, were the Reply to Plaintiff's Post-Hearing Brief in Support of United State's Motion to Enforce Preliminary Injunction (Doc. No. 69) ("Defendants' Post-Hearing Response Memorandum"), and the United States' Response to Acquest's Post-Hearing Brief (Doc. No. 70) ("Plaintiff's Post-Hearing Response Memorandum"), with the attached Declaration of Christina L. Richmond, Esq. (Doc. No. 70-2) ("Richmond Declaration").

Based on the following, Plaintiff's Motion should be GRANTED.


## FACTS[11]

In 2006, Defendant Acquest Transit, LLC ("Defendant" or "Acquest"), a New York Corporation, of which William Huntress ("Huntress") is a principal, purchased a 96.6 acre piece of real property identified as tax parcel 16.00-5-23 ("the Property"), located between and abutting Millersport Highway and Transit Road in the Town of Amherst, New York.  A retail nursery, "Gardens by Greenview" or "Greenview Nursery"

_____

pursuant to Fed. R. Civ. P. 56(f) seeking either denial of Defendant's Motion for lack of discovery, or to vacate the stay of discovery on the issues raised in Defendant's Motion.  On July 30, 2010, Plaintiff filed such motion (Doc. No. 72).

[11] Taken from the pleadings and motion papers filed in this action.

("Greenview Nursery" or "the nursery"), owned by Chris Santora ("Santora"), and occupying 2.6 acres of the Property, is located on the Property's eastern border, fronting Transit Road, with the street address 10880 Transit Road, Amherst, New York. Santora leases the portion of the Property on which the nursery is located from Acquest. At all times relevant to this action, Plaintiff has maintained that the Property constitutes wetlands or surface waters that are considered under the CWA as "waters of the United States" because of a continuous surface connection to permanent tributary waters of traditionally navigable waters and, thus, the use of the Property is subject to certain restrictions under the CWA, including a prohibition against discharging pollutants, in the form of both fill material and storm water runoff, without obtaining the requisite permits. In contrast, Defendant has continually maintained that the Property does not constitute wetlands or surface waters within the meaning of the CWA and, alternatively, that the continued use of the Property as farmland exempts it from the reach of the CWA.[12]

Plaintiff maintains that in January 2007, Defendant, or other person's acting on Defendant's behalf, and with Defendant's consent and knowledge, without obtaining the requisite permit from the Secretary of the Army acting through the Chief of Engineers, used mechanized land-clearing equipment to clear and grade portions of the Property by uprooting and removing trees and moving soil about the Property, and that such

---

[12] Pursuant to the CWA's "farming exemption," no permit is required for the discharge of dredged or fill materials onto wetlands where the discharge is "from normal farming . . . activities such as plowing, seeding, cultivating, minor drainage. [or] harvesting for the production of food, fibre, or forest products." 33 U.S.C. § 1344(f)(1)(A). The farming exemption has been limited to activities that are "part of an established (*i.e.*, on-going) farming . . . operation," but is not available for "activities which bring an area into farming use." 33 C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1)(ii)(A) and (B).

activity has caused storm water from the Property to be discharged via rivulets, channels, and ditches into Ransom Creek, a traditionally navigable water under the CWA. Plaintiff further maintains that Defendant has used or permitted use of land-clearing and earth-moving equipment to discharged dredged or fill material into wetlands and tributaries on the Property. On November 5, 2007, Defendant executed a lease agreement with a local farmer, John Kelkenberg ("Kelkenberg"), thereby permitting Kelkenberg to plant on 80 to 90 acres of the Property a crop of winter wheat.[13]

On February 21, 2008, the United States Environmental Protection Agency ("the EPA"), issued an administrative order directing Acquest to cease and desist from any earthmoving activity resulting in the discharge of fill into waters of the United States. A second cease and desist order was issued by the EPA on September 5, 2008. The alleged discharge and earthmoving activities, however, continued causing Plaintiff to move, on March 4, 2009, for a preliminary injunction enjoining Defendant from placing additional fill or performing further earthmoving work at the Property.

Based on the submissions of the parties, Judge Skretny, issued on July 15, 2009, a Decision and Order (Doc. No. 26), granting Plaintiff's motion for a preliminary injunction. In granting the preliminary injunction motion, Judge Skretny specifically found Plaintiff had met its burden of demonstrating Defendant had violated the CWA by discharging pollutants from a point source[14] onto property that, at the time of the

---

[13] A copy of the lease (Doc. No. 17-4) was among the papers Defendant filed on April 20, 2009, in opposition to the Plaintiff's motion seeking the preliminary injunction.

[14] The CWA defines "point source" as including "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14).

discharge, constituted wetlands or waters of the United States, without first obtaining the requisite permit. Judge Skretny relied on the Plaintiff's evidence including, *inter alia*, that in April 2007, staff members with the U.S. Army Corps of Engineers ("COE"), charged with providing vital public engineering services, including issuance of regulations interpreting the CWA, observed the construction of a gravel road entering the Property from Millersport Highway, with a sign stating "Clean Fill Wanted" and the name "Greenview Nursery." Upon receiving a report of this information from the COE, the EPA commenced an investigation and, through review of low-level aerial photographs, confirmed new road construction and the presence of earthmoving equipment on the property, along with the piling of soil and wood debris in a wooded area and the excavation or widening of a ditch. These findings were photographically documented by the COE in December 2007.

In June 2008, EPA environmental scientist David G. Pohle ("Pohle"), visually inspected the Property from adjacent roadways and properties, observing the presence of construction equipment, fill and piles of debris on the Property, as well as recently excavated ditches. An on-site inspection of the Property conducted by the EPA and the COE in July 2008, revealed fill had been deposited on more than 13 acres, including for construction of a gravel road, a parking area at the gravel road's terminus where a bulldozer was parked (another bulldozer was parked in the Property's southwest corner), an area between two large, parallel ditches, flowing across the Property from east to west, on which an excavator was parked, and filled with material dredged from the ditches, and an area fronting Transit Road, filled and paved with asphalt on which the newly constructed Greenview Nursery was situated. Preliminary Injunction Order at

7-8. The filled areas of the Property were elevated between one and seven feet over the surrounding, unfilled areas. *Id*. As a result of the ditch excavation and plowing, vegetation and soil had been disturbed on most of the remaining property within the previous year. *Id*. at 8.

In September 2008, the COE observed and photographed backhoes and bulldozers moving earth on the Property and, based on an October 2008 aerial photograph, Pohle estimated that the portion of the Property covered by dredged or fill material had increased from 13 acres to 65 acres. *Id*. With regard to the initial 13 acres, Defendant did not contest that the filling and dredging activities as described by Plaintiff had occurred through use of heavy construction equipment, including a backhoe and bulldozer, but did contest that additional large areas of the Property were filled between July and October 2008, maintaining instead such areas had merely been "disked for planting." *Id*. at 9.

The July 2008 on-site inspection by the EPA and the COE included sampling and inspecting 46 locations to determine whether the characteristics of wetland hydrology, hydric soils, and wetland vegetation were met, and determined that all 46 sample points are wetlands or were wetlands prior to being filled, leading the EPA and COE to conclude the entire Property is wetlands. Preliminary Injunction Order at 10. With regard to the preliminary injunction motion, Defendant did not dispute the Property meets the federal criteria for wetlands and Judge Skretny, based on the evidence, found Plaintiff adequately demonstrated the Property constitutes wetlands. *Id*. at 11.

In support of its request for a preliminary injunction, Plaintiff also argued and presented evidence establishing that the Property not only is wetlands, but that the

wetlands constitute "waters of the United States," construed under the CWA as not only waters that are navigable in the traditional sense, but wetlands with a significant or substantial nexus to a traditional navigable waterway. Preliminary Injunction Order at 11-13. Although Defendant indicated it intended to argue at trial that the Property does not constitute waters of the United States, Defendant did not present any countervailing facts or legal analysis opposing the preliminary injunction motion, and the court found Plaintiff had sufficiently demonstrated the Property's wetlands are "waters of the United States." *Id*. at 14.

Defendant also did not dispute failing to obtain a discharge permit from the COE, arguing instead that the challenged activities on the Property are part of an established farming operation and, therefore, exempt under the CWA's farming exemption. Preliminary Injunction Order at 14-15. Although Defendant presented evidence establishing the Property's lengthy historical agricultural use, the evidence also showed all farming activity at the Property was abandoned between 1995 and 2007, when a portion was planted with corn, and that two new ditches were dug in 2008, that were lowering the Property's water table. *Id*. at 15-17. After the new ditch construction in 2008, much of the Property was planted with winter wheat. Plaintiff argued that the ditches established modifications to the Property's hydrological regime were necessary to resume farming operations such that the farming operations were not "ongoing" as required for application of the CWA's farming exemption. *Id*. at 17. Because Defendant was unable to demonstrate that the new ditches were not necessary to resume the Property's agricultural use, the court found Defendant had failed to meet its burden, and that the sequence of ditch construction that lowered the Property's water

table, followed by Kelkenberg's planting of winter wheat on 75 acres of the property suggested the dredging activities were necessary to resume farming on those acres. *Id*. at 17-18.  The court also found other uses of the Property do not constitute "established farming operations" including the retail nursery and the gravel roadway that met local zoning criteria for access to commercial, industrial and residential developments.  *Id*. at 18-19.

Because the record established that the newly excavated ditches modified the Property's hydrological regime, portions of the Property had been converted to non-farming use, and certain fill activities were outside the CWA's definition of "normal farming activities," Judge Skretny found Defendant failed to meet its burden of establishing the farming exemption applied to the Property, and that Defendant's failure to comply with the two cease and desist orders issued by the EPA suggested a reasonable likelihood the violations would recur. *Id*. at 19-20.  As such, Judge Skretny concluded

> For the reasons stated about, I find that the United States has satisfied its burden with regard to its preliminary injunction motion. Further, Acquest has failed to meet its burden of demonstrating that the Clean Water Act's provisions do not apply to the Property. Accordingly, the Motion for a Preliminary Injunction is granted.

Preliminary Injunction Order at 20.

Further, the Preliminary Injunction Order's decretal paragraph ("the decretal language"), specifically states

> Defendant Acquest Transit LLC, its officers, agents, successors, employees, and others acting in concert with it, are enjoined from placing additional fill or performing any additional earthmoving work at the Property designated as tax parcel 16.00-5-23 in the Town of Amherst, New York.

*Id*.

The Preliminary Injunction Order does not provide any exception for the portion of the property on which the nursery is located. Defendant never sought reargument of the preliminary injunction motion, or clarification of the Preliminary Injunction Order, nor did Defendant seek to appeal the Preliminary Injunction Order to the Second Circuit Court of Appeals.

On July 30, 2009, fifteen days after the Preliminary Injunction Order was issued, Defendant moved for partial relief from the Preliminary Injunction Order, asserting a provision was needed to permit harvesting of the winter wheat crop planted by Kelkenberg, Defendant's lessee, the previous fall. In response to the motion, Plaintiff, on July 31, 2009, agreed to permit the winter wheat to be harvested so long as the harvesting did not involve discharging dredged or fill material into wetlands on the Property. In an order filed July 31, 2009 (Doc. No. 30) ("July 31, 2009 Order"), Judge Skretny denied Defendant's motion as moot, and modified the Preliminary Injunction Order, directing that

> The Order entered by the Court on July 15, 2009 (Docket No. 26) shall not be construed to preclude Acquest's lessee, Mr. John Kelkenberg, and his agents, from harvesting the existing 75-acre crop of winter wheat, provided that such harvesting is performed without resulting in any discharge of dredged or fill material.

July 31, 2009 Order.

On November 4, 2009, Defendant requested discovery in this action be stayed pending resolution of a criminal investigation under the CWA initiated by Plaintiff against Defendant. On November 10, 2009, the motion was granted, and discovery in

this action remained stayed.[15]

On May 19, 2010, EPA Criminal Investigation Division ("CID") Special Agent Robert Conway ("Agent Conway"), while driving south on Transit Road, traveling adjacent to the Property, observed that new trees that appeared to be for retail sale, had been placed into the ground with new fill consisting of wood chips, near the nursery. Hearing Tr. at 46-51. Agent Conway pulled over just south of the nursery and, from the western shoulder of Transit Road, observed evidence of earthmoving, including new ditches and materials dredged from the ditches and holes dug into the ground on the Property's south side, into which the new trees had been placed, outside the nursery's "footprint," *i.e.*, that portion of the Property on which the nursery is located. Agent Conway also observed a trench-like drainage ditch, estimated at 75 to 80 feet long, and one to two feet deep, containing water, with cast dirt material to the side, and small, mechanized equipment tracks nearby. *Id*. at 51. When Agent Conway spoke with the nursery's manager, Jason Klapp ("Klapp") on May 20, 2010, Klapp advised that nursery personnel had excavated the ditch, conducted earthmoving work, and deposited wood chips and soil to display large shrubs and trees available for retail sale, and that more work of this type was planned for the nursery's north side. *Id*. at 61-63, 77. Agent Conway inquired as to whether Klapp was aware of the Preliminary Injunction Order, and Klapp responded he was not, to which Agent Conway replied that no more earthmoving work should be performed outside the nursery's footprint. *Id*. 63-

---

[15] At a Rule 16(b) conference conducted by the undersigned on August 4, 2010, in a related action, *USA v. Acquest Wehrle*, 09-CV-00637C(F), the stay, with the agreement of the parties, was vacated. The court is awaiting proposed scheduling orders on the conduct of discovery in that case.

64, 77-78.

On May 25, 2010, EPA CID Special Agents Conway and Daniel Lau ("Agent Lau"), while driving north on Millersport Highway, pulled to the side of Millersport Highway at the entrance of a gravel road leading onto the property. The agents exited their vehicle and, from the east shoulder of Millersport Highway, observed a dust cloud rising from the northeast side of the Property and Agent Conway, his view aided by binoculars, observed a tractor driving across the Property's northern field, pulling a discing unit,[16] a second trailer with a plowing instrument, and two utility trucks parked on the gravel road leading onto the Property from Millersport Highway. Hearing Tr. at 68, 76, 82-83. Two signs were located near the gravel road's entrance; one sign identified the road as an entrance for deliveries to Greenview Nursery, and the other was a "no trespassing" sign. *Id*. at 68-70, 76. Agents Conway and Lau, traveling by public roadway, then went to the nursery to speak with Klapp, reminding Klapp that no earthmoving work was to be performed on the Property. Hearing Tr. at 70. Before leaving the nursery, Agent Conway provided Klapp with his business card containing Conway's telephone number, and asked Klapp to call Conway with any questions about activities on the Property. Hearing Tr. at 63-64. On May 28, 2010, Plaintiff filed the instant motion for enforcement of the Preliminary Injunction Order.

On June 8, 2010, Agent Conway received an unsolicited telephone call on Conway's work cellular telephone, from someone who identified himself as Huntress,

---

[16] Agent Conway testified at the hearing that the discing implement consisted of a series of three-feet wide discs mounted in a row on a device measuring five to six feet in width, pulled behind a tractor, and used to break up soil for planting. Hearing Tr. at 65.

and who advised the next time Conway was at the Property, not to be surprised if Conway observed "little green plants popping out of the property." Hearing Tr. at 72. Agent Conway asked if the caller had planted the site himself, to which the caller responded he did not, but had someone else plant the site for him. *Id*. at 72-73. The caller then recommended a local restaurant to Agent Conway before ending the call. *Id*. at 73.

At the evidentiary hearing, Agent Conway testified on cross-examination that although he observed a tractor pulling a discing machine on the Property on May 25, 2010, Conway was unable to state whether the discing unit was touching the ground, or whether any discing was actually taking place. Hearing Tr. at 79-80. Agent Conway testified that he assumed, based on the cloud of dust emitted from the discing unit, that discing involving contact with the earth was occurring at that time. *Id*. at 80-81.

Klapp testified that the staged trees had been placed in holes measuring between six inches and one foot in depth. *Id*. at 103-04. The recent drainage ditch excavation, accomplished through use of a "mini backhoe," was intended to reroute an existing drainage ditch, that had drained onto the nursery portion of the Property into a "swale" measuring 15 by five feet, and that the swale was then filled with ten buckets of loose dirt lying to either side of the swale, and wood chips, leveling the swale to the surrounding area, to prevent nursery customers from falling into it. *Id*. at 104-08, 116-17. A small machine called a "Dingo," outfitted with an auger and a bucket, was used to fill the swale. *Id*. at 105-06, 116. Klapp testified he staged the trees along Transit Road at the direction of Santora, the nursery's owner and Klapp's boss, but that Santora was unaware Klapp dug holes to stage the trees, *id*. at 111-12, and that Huntress was

completely unaware that trees were being staged, and that holes were being dug to accommodate the staging. *Id*. at 113-14. According to Klapp, it was Klapp's decision to fill the rerouted ditch to protect the nursery's customers' safety. *Id*. at 114. Klapp testified that had he been aware of the Preliminary Injunction Order restricting earthmoving on the Property, Klapp would have "stop[ped] all work and contacted my boss [Santora]," and that prior to Klapp's conversation with Agent Conway, Klapp had intended to dig additional holes to stage trees to the north of the nursery. Hearing Tr. at 110-11.

Santora testified that he contacted Huntress to request permission to stage the trees because the area in which Santora intended to stage the trees was not part of the nursery property leased from Acquest. Hearing Tr. at 143-44. Huntress gave Santora permission to stage the trees on the Property immediately adjacent to the nursery, provided no holes were dug. *Id*. Santora further testified he was unaware of any ditches on or adjacent to the portion of the Property occupied by the nursery, other than one just to the north of the nursery. *Id*. at 144-46. Santora denied directing Klapp to dig holes to stage the trees, asserting staging trees did not require digging holes, acknowledged being aware Klapp had filled a ditch, but that the ditch had been both rerouted and filled without Santora's permission. *Id*. at 149-52. Santora was not advised of the existence of the Preliminary Injunction Order, nor was he advised of its provisions or given a copy of it by Defendant or Huntress. Hearing Tr. at 153-57, 163-65.

## **DISCUSSION**

Plaintiff moves for an order enforcing the Preliminary Injunction Order, asserting violations of the Preliminary Injunction Order, including that Acquest, its officers, agents, successors, employees and others acting in concert with Acquest have placed additional fill and performed additional earthmoving work at the Property since the Preliminary Injunction Order was entered on July 15, 2009. Plaintiff's Memorandum at 6. In particular, Plaintiff maintains the earthmoving, ditching and filling activities observed by Agents Conway and Lau, occurring at the nursery and adjacent areas of the Property, establish violations of the Preliminary Injunction Order's prohibition against earthmoving and fill activities. *Id*. at 7. Plaintiff seeks an order directing Defendant's compliance with the Preliminary Injunction Order, and any additional judicial sanction the court finds the alleged violations support. *Id*. at 7-8.

In opposition to Plaintiff's Motion, Defendant essentially argues that because the Preliminary Injunction does not specifically forbid farming activities at the Property, the Preliminary Injunction does not preclude normal farming operations, including discing and plowing, that the discing and plowing activities on the Property do not constitute earthmoving, and that, in any event, it was Defendant's tenants who, without Defendant's knowledge or permission, engaged in the challenged earthmoving and fill activities, Defendant's Post-Hearing Memorandum at 7-11, 14-18; Defendant's Post-Hearing Response Memorandum at 4-10, and that Agent Conway failed to authenticate at the hearing that the caller who identified himself at Huntress was, in fact, Huntress. Defendant's Post-Hearing Memorandum at 19. Defendant also maintains Plaintiff cannot establish that Defendant, acting either alone or in concert with others, violated

19

the Preliminary Injunction Order, Defendant's Post-Hearing Memorandum at 11-14, or

that Defendant has not been reasonably diligent and energetic in attempting to comply

with the Preliminary Injunction Order. *Id*. at 19-20. Alternatively, Defendant seeks a

modification of the Preliminary Injunction Order to allow farming activities. Defendant's

Post-Hearing Memorandum at 20; Slater Declaration Opposing Plaintiff's Motion ¶ 1.

With regard to the contents of a preliminary injunction, the Federal Rules of Civil

Procedure provide that

> Every order granting an injunction and every restraining
> order must:
> (A) state the reasons why it issued;
> (B) state its terms specifically; and
> (C) describe in reasonable detail - - and not by referring to
> the complaint or other document - - the act or acts restrained
> or required.

Fed.R.Civ.P. 65(d)(1).

"A party may be held in civil contempt for failure to comply with a court order if '(1) the

order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently

attempted to comply in a reasonable manner.'" *Paramedics Electromedicina*

*Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)

(considering whether to grant motion to hold in civil contempt for failure to comply with

injunction and quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1985)

(motion to hold defendant in contempt for failure to comply with consent decree)). "It

need not be established that the violation was willful." *Id*. (citing *Donovan v. Sovereign*

*Sec. Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984)). In the instant case, Defendant's conduct

meets all three criteria supporting a finding of civil contempt.

With regard to the first element, "[t]o comply with the specificity and clarity requirements, an injunction must be specific enough to apprise those within its scope of the conduct that is being proscribed." *S.C. Johnson & Son, Inc. v. Clorox Company*, 241 F.3d 232, 240-41 (2d Cir. 2001) (internal quotation marks and citations omitted). "In determining specificity, the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Drywall Tapers and Pointers of Greater New York, Local 1973 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasters and Cement Masons International Association*, 889 F.2d 389, 395 (2d Cir. 1989) ("*Drywall Tapers*") (citing *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir. 1972)), *cert. denied*, 494 U.S. 1030 (1990). "This rule against broad, vague injunctions is designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed, and to be sure that the appellate court knows precisely what it is reviewing." *S.C. Johnson & Son, Inc.*, 241 F.3d at 241.

In the instant case, Defendant argues that the Preliminary Injunction Order does not specifically prohibit farming activities and, in any event, any discing, tilling or plowing activities Conway observed at the Property do not constitute "earthmoving." There is no merit to either argument.

First, Defendant's argument urges too narrow a reading of the Preliminary Injunction Order, limited only to the decretal clause, *i.e.*, "that Defendant Acquest Transit LLC, its officers, agents, successors, employees, and other acting in concert with it, are enjoined from placing additional fill or performing any additional earthmoving work at the Property designated as tax parcel 16.00-5-23 in the Town of Amherst, New York," without regard to the context of the entire order. Although "farming" is not

specifically mentioned in the decretal language, the Preliminary Injunction Order is

sufficiently specific when read in the context of its entirety. *See S.C. Johnson & Son,*

*Inc.*, 241 F.3d at 241 (holding order enjoining defendant manufacturer from

disseminating advertisements falsely depicting plaintiff competitor's products, and

stating that manufacturer had right to disseminate advertising that compared products

in a truthful way, was sufficiently specific when read in the context of two other opinions

relevant to the action, even though same words were not incorporated into the

injunction's decretal clause). *See also Catanzano by Catanzano v. Dowling*, 60 F.3d

113, 116-17, 120 (2d Cir. 1995) (affirming district judge's order denying motion to

amend preliminary injunction where district judge determined that the defendants'

narrow interpretation of the injunction, without regard to the entire decision, was done

"erroneously and contrary to both the letter and spirit of the decision and preliminary

injunction.").

      In particular, the Preliminary Injunction Order's preceding paragraph states

> For the reasons stated above, I [Judge Skretny] find that the United States
> has satisfied its burden with regard to its preliminary injunction motion.
> Further, Acquest has failed to meet its burden of demonstrating the Clean
> Water Act's provisions do not apply to the Property. Accordingly, the
> Motion for a Preliminary Injunction is granted.

Preliminary Injunction Order at 20.

In the Preliminary Injunction Order's Discussion, Judge Skretny explains that Plaintiff

had submitted sufficient evidence establishing Defendant had violated the CWA by

discharging pollutants from a point source onto property that, at the time of the

discharge, constituted wetlands and waters of the United States, without first obtaining

the requisite permit. Preliminary Injunction Order at 6-14. Significantly, Defendant did

not dispute or submit any evidence that the Property meets the federal criteria for wetlands and constitutes waters of the United States, onto which Defendant had discharged pollutants from a point source. *Id*. Instead, Defendant's opposition to the requested injunctive relief was limited to challenging Plaintiff's assertion that between July and October 2008, the portion of the Property filled with dredged material increased from 13 to 65 acres, maintaining instead such areas had merely been "disked for planting," *id*. at 9, and argued that the challenged activities on the Property are part of an established farming operation and, therefore, exempt under the CWA's farming exemption. Preliminary Injunction Order at 14-15. Because sufficient evidence in the record established that newly excavated ditches modifying the Property's hydrological regime were necessary to resume farming operations at the Property, that portions of the Property had been converted to non-farming use, and certain fill activities were outside the CWA's definition of "normal farming activities," Judge Skretny found Defendant failed to meet its burden of establishing the farming exemption applied to the Property. *Id*. at 19. As such, Judge Skretny's conclusion granting the preliminary injunction based on Defendant's "fail[ure] to meet its burden of demonstrating that the Clean Water Act's provisions do not apply to the Property," *id*. at 20, read in the context of the entire Preliminary Injunction Order, enabled Defendant "to ascertain from the four corners of the order," *Drywall Tapers*, 889 F.2d at 395, that the Property is not exempt under the farming exemption from the CWA's provisions, such that even normal farming activities at the Property, including discing, tilling and plowing, regardless of whether or not such activities qualify as "earthmoving," are prohibited absent the requisite permit, or explicit permission from Judge Skretny, which Defendant has never obtained.

23

Defendant's motion, filed July 30, 2009, seeking partial relief under the Preliminary Injunction Order to permit Kelkenberg to harvest a crop of winter wheat demonstrates that Defendant understood the Preliminary Injunction Order prohibited farming activity, even though not stated as such in the decretal language. Significantly, there is no evidence in the record that the harvesting of the winter wheat crop by Kelkenberg involved even minimal earthmoving.[17]

Moreover, Defendant's argument that the discing, tilling, and plowing activities used in normal farming operations do not qualify as "earthmoving," Slater Declaration Opposing Plaintiff's Motion ¶ 12, a term that is more appropriately applied to large scale activities performed by heavy construction equipment such as backhoes, excavators, and bulldozers, Defendant's Post-Hearing Memorandum at 15-16; Defendant's Post-Hearing Reply Memorandum at 9-11, too narrowly defines the term. In support, Defendant asserts that the "earthmoving," as defined in Webster's New Universal Unabridged Dictions, defines "earthmoving" as "of or pertaining to earthmovers," and an "earthmover" is defined as "a vehicle, as a bulldozer, for pushing or carrying excavated earth from place to place." Defendant's Post-Hearing Memorandum at 15 (citing Webster's New Universal Unabridged Dictionary at 614 (containing definitions of

---

[17] The court notes that in the Affidavit of John Kelkenberg (Doc. No. 17-4) Defendants filed on April 20, 2009, in opposition to the Plaintiff's motion seeking the preliminary injunction, Kelkenberg explains that on November 5, 2007, Kelkenberg entered in to a lease with Acquest for the Property with the intention of planting winter wheat on the property, and that "the lease renews annually unless it is terminated." Kelkenberg Affidavit ¶¶ 3-5 (referencing November 5, 2007 Lease, attached as Exhibit A to the Kelkenberg Affidavit). According to the Lease, the Landlord (Acquest), reserved the right to enter the Property to, *inter alia*, "make inspections . . . ." November 5, 2007 Lease § 11.D. Nothing in the record indicates that Kelkenberg planted any crops on the Property after harvesting the winter wheat in the summer of 2009. That Kelkenberg planted no further crops on the Property strongly implies it was the understanding of at least one of the parties to the lease that the Preliminary Injunction Order forbade further farming on the Property.

"earthmoving" and "earthmover").

The definition of "earthmoving" urged by Defendant, however, does not preclude defining earthmoving as including such activities as plowing, tilling and discing. That the word "bulldozer" appears in the definition for "earthmover" only as an example of an earthmover is evident from the use of the preceding phrase "as an" and the absence of any indication within the definition that only a bulldozer qualifies as an "earthmover." Further, while it may be that "earthmoving" is the term often applied to that category of equipment used in heavy construction, that fact alone does not constrain the court to apply the same definition when "earthmoving" is used in the context of the CWA. Rather, caselaw supports construing the CWA as prohibiting any activity, including small scale, that results in changing the landscape, including leveling, grading, and trenching. *See*, *e.g.*, *United States v. Akers*, 785 F.2d 814, 822 (9th Cir. 1986) ("While the exemptions and regulations do not distinguish major and minor changes, the intent of Congress in enacting the [Clean Water] Act was to prevent conversion of wetlands to dry lands."). Moreover, at least one court has held that such activities also constitute "placing additional fill," an enjoined activity specifically named in the Preliminary Injunction Order. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 924-25 (5th Cir. 1983) (holding removal of vegetation, burying of material cleared from land, and discing activity that "had the effect of filling in the sloughs and leveling the land," all constituted the "discharge of fill material" in violation of the CWA).

. In short, Defendant's opposition to Plaintiff's motion essentially is an attempt to place before the court arguments that Defendant should have made in opposition to Plaintiff's motion seeking a preliminary injunction. Although Defendant may ultimately

successfully make such arguments on summary judgment or at trial, the presentation of such arguments in opposition to the instant motion is misplaced. Accordingly, the first element for civil contempt has been met.

As for the second element, the party seeking a civil contempt sanction, Plaintiff in the instant action, bears the burden of establishing the offense by clear and convincing evidence. *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009). The "clear and convincing evidence" standard imposes a higher burden of proof than a "preponderance of the evidence" but is less than "beyond a reasonable doubt." *U.S. v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (citing *Addington v. Texas*, 441 U.S. 418, 431 (1989)).

In support of this element, Plaintiff asserts that it produced at the hearing "clear and convincing evidence" establishing Defendant engaged in earthmoving and fill activities at the Property in violation of the Preliminary Injunction Order, including discing. Government's Post-Hearing Memorandum at 4-9. Defendant, in opposition, maintains that any discing or plowing observed at the Property constitute normal farming activities, which are not specifically prohibited by the Preliminary Injunction Order, Defendant's Post-Hearing Memorandum at 7-11; Defendants' Post-Hearing Response Memorandum at 4-5, that the only evidence of discing activity at the Property was presented by Agent Conway who was unable to testify that he observed the discing unit actually "touch the ground," Defendant's Post-Hearing Memorandum at 16-19; Defendant's Post-Hearing Response Memorandum at 2-3, and that, in any event, Plaintiff is unable to establish that the challenged activity at the Property, including the digging of holes to plant trees and rerouting a drainage ditch, was undertaken with

Defendant's knowledge and consent, Defendant's Post-Hearing Memorandum at 8, 12-14; Defendant's Post-Hearing Response Memorandum at 9. In further support of Plaintiff's Motion, Plaintiff maintains Defendant's characterization of the Preliminary Injunction Order as "impermissibly vague" rings hollow given that Defendant never moved for clarification or modification, Plaintiff's Post-Hearing Response Memorandum at 3, that Plaintiff has submitted sufficient evidence that a discing implement was used to break up the Property's soil, and that Defendant's assertions to the contrary "strain credulity" given Agent Conway's subsequent observation of young plants growing on the Property and Huntress's admission in the unsolicited telephone call to Agent that Huntress had arranged for the Property to be planted, *id*. at 3-5, that Defendant's objection to the authentication of Huntress's call is belated given that at the hearing Defendant never objected to such testimony nor cross-examined Conway regarding the call, *id.* at 5-6, and that Defendant is responsible for the actions of its tenants with regard to the Preliminary Injunction Order. *Id*. at 6-8.

At the hearing, Plaintiff presented clear and convincing evidence establishing Defendant violated the Preliminary Injunction Order. In particular, there was unrefuted testimony concerning holes being dug for tree staging and the rerouting of a drainage ditch at or near that portion of the property occupied by the nursery. Hearing Tr. at 103-08 (Klapp) and 144-52 (Santora). Despite Conway's inability to conclusively testify he observed that the discing unit Conway observed on May 19, 2010, being pulled across the property was actually touching the ground, Agent Conway's testimony that the tractor and discing unit were surrounded, as they moved over the surface of the Property, by a large cloud of dust is strong circumstantial evidence that the discing

27

implement was engaged, and is consistent with Conway's testimony that a few weeks later he observed rows of young plants in the same area as the discing unit. Such testimony is also consistent with Agent Conway's testimony regarding an unsolicited telephone call Conway received June 8, 2010, on his work cellular telephone, from Huntress advising that Huntress had arranged to have the Property planted. It is significant that the business card Conway left with the nursery manager, Klapp, on May 25, 2010, contained Conway's work telephone number.[18] Hearing Tr. at 63-64, 71-72. Defendant, by failing to raise an authenticity objection to this testimony, has waived such objection. *See Davila v. Goya Foods, Inc.*, 2007 WL 415147, at * 4 (S.D.N.Y. Feb. 7, 2007) (holding plaintiff's failure to submit any response challenging the authenticity of documents on which defendant relied in opposing summary judgment "reflects a waiver of any objection to the use of this documentary evidence, at least for purposes of the motion.").

Further such a statement qualifies as a statement against interest which is one of the separately enumerated hearsay exceptions. Fed.R.Evid. 804(b)(3) ("A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."). Defendant's failure to call Huntress to deny placing the telephone call permits the court to draw an inference pursuant to the missing witness rule that Huntress was,

---

[18] That Conway received the unsolicited telephone call on his work cellular telephone strongly implies that the caller obtained the number for that telephone from Conway's business card.

in fact, the caller who advised Agent Conway that he had arranged to have the Property planted. *See United States v. Myerson*, 18 F.3d 153, 158 (2d Cir. 1994) ("It is well settled that when a party has it peculiarly within its power to produce witnesses and fails to do so, 'the jury may infer that the testimony, if produced, would be unfavorable to that party.'" (quoting *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988))). As such, the court is permitted to accept as credible Conway's testimony attributing the unsolicited telephone call to Huntress, and Defendant's failure to call Huntress as a rebuttal witness permits the inference that Huntress did, in fact, place the call. Finally, the general access road to the Property was gated and posted with a no trespassing sign. Hearing Tr. at 69. As such, it is not credible that the discing activity Conway observed was conducted by a trespasser; rather, the only plausible inference is that it was specifically authorized by Defendant, as Mr. Huntress's telephone call confirmed. Moreover, at no time has Defendant specifically denied authorizing discing operations on the Property. This evidence, taken together, constitutes clear and convincing evidence that the Preliminary Injunction Order was violated. The second element for a civil contempt order is thus met.

The third element, requiring a showing of the alleged contemnor's failure to diligently comply with the order in a reasonable manner, is also satisfied. Defendant's argument on this point is that any violation of the Preliminary Injunction Order was committed by tenants of the Property, rather than by Acquest, such that Defendant cannot be held responsible for the conduct of a tenant even if such conduct violated the Preliminary Injunction Order because there is no proof the tenant acted in concert with Defendant. Defendant's Post-Hearing Memorandum at 11-14; Defendant's Post-

Hearing Response Memorandum at 2-4.  Defendant is, however, incorrect.

Undisputed evidence at trial established that although portions of the Property were leased for the operation of the nursery, Defendant never provided anyone at the nursery with a copy of the Preliminary Injunction Order, or took any affirmative steps to advise anyone at the nursery, including the owner and the manager, of the Preliminary Injunction Order or the activities prohibited under the Order.  *See* Hearing Tr. at 110 (nursery manager Klapp), and 153, 156-57 (nursery owner Santora).

Further, although in the papers filed in opposition to Plaintiff's Motion, Defendant repeatedly emphasizes that there is no evidence that any work conducted by the nursery was done while "acting in concert" with Defendant, and that Defendant was not obliged to provide anyone at the nursery with a copy of the Preliminary Injunction Order, Defendant's Post-Hearing Memorandum at 12-14; Defendant's Post-Hearing Response Memorandum at 3, 5-8, this argument is a little more than a red herring.  Specifically, Defendant does not argue that the lease by which the nursery was permitted on the Property contains any provision preventing Defendant from exercising, as the landlord, ultimate control over the nursery portion of the Property.[19]  Further, regardless of whether Klapp or Santora acted in concert with Defendant in digging holes to stage trees and rerouting a drainage ditch on the Property, the record establishes that Defendant failed to provide anyone at the nursery with a copy of or to advise of the existence of the Preliminary Injunctive Order.

Although Defendant's argument, Defendant's Post-Hearing Response

---

[19] No copy of the lease pursuant to which Santora's nursery was permitted on the Property is in the record.

Memorandum at 6, that New York Real Property Law § 231[2] (McKinney's 2010), renders a landlord liable for his tenant's use of the leased premises in violation of the law only when the landlord has knowledge of such use, is correct, that does not permit Defendant to avoid responsibility for conduct in violation of the Preliminary Injunction Order by failing to inspect the Property to assure compliance with the Order. Significantly, nowhere within the four corners of the Preliminary Injunction Order is the portion of the Property on which the nursery is located excepted from the Order's reach and Defendant was specifically informed by Santora of the plan to stage trees on the Property. Thus, it is not correct that Defendant was unaware the nursery intended to engage in conduct which Defendant, as the Property's owner, could control and that was likely to violate the Preliminary Injunction Order. Moreover, evidence in the record establishes both Klapp's and Santora's likely would have complied with the Preliminary Injunction Order had Klapp and Santora been made aware of its existence. For example, Klapp testified he was personally involved with the staging of the trees and rerouting the drainage ditch at the nursery, which included using a Dingo machine to dig a new ditch and filling in the old ditch, Hearing Tr. at 99-110, but that had he been aware that a court order restricted earthmoving activity at the Property, Klapp would not have undertaken such work until speaking with Santora about it. *Id*. at 110.

Similarly, Santora states he never advised Huntress about the holes that were dug on the property, the rerouting of the drainage ditch, or the use of mulch to protect the tree root balls because Santora did not know that his employees intended to dig holes to stage trees, Santora Affidavit ¶ 6, and to reroute the drainage ditch for the protection of customers, *id.* ¶¶ 10-12, or that the use of mulch to keep the trees' root

balls moist were important. *Id*. ¶ 8. Santora's hearing testimony was consistent with these statements. Hearing Tr. at 153-57. Santora also testified that Huntress never advised Santora not to conduct any fill activity at the Property, Hearing Tr. at 163, and that Santora planted corn, *id*. at 163-65. In fact, Santora's hearing testimony revealed that staging trees generally involves leveling the ground, weed whacking or brush hogging, and placing mulch to hold in moisture for the trees, *id*. at 165-66, all activities which can adversely affect a wetlands' water level and, thus, prohibited by the Preliminary Injunction Order. That Santora's employees did not advise Santora of their intention to dig shallow holes into which to place and "stage" the trees does not establish that Santora was not aware that the process of staging trees would likely involve activities prohibited under the Preliminary Injunction Order, such that were Santora aware of the Order, Santora might not have permitted his employees to dig holes for the trees to be staged. Furthermore, Santora's testimony that upon advising Huntress of the desire to stage trees on a portion of the Property outside of the nursery's footprint, Huntress granted permission to do so provided no holes were dug to accommodate the tree staging, establishes the nursery employees staged the trees with Huntress's permission and, thus, acted in concert with Huntress. As such, it cannot be said that Huntress, or anyone working on behalf of Defendant, took the necessary steps to ensure diligent compliance with the Preliminary Injunction Order, and Defendant cannot avoid responsibility by the conscious failure to inform Santora and Klapp of the existence and restrictions of the Preliminary Injunction Order. As discussed, Discussion, *supra*, at 31, that the New York statute is inapplicable here cannot render Defendant's conduct in diligent compliance with the Preliminary

Injunction Order.

Nor is there any merit to Defendant's argument, Defendant's Post-Hearing Response Memorandum at 5-9, that Defendant had no legal obligation to affirmatively inform its tenants of the Preliminary Injunction Order and cannot be held responsible for any actions of its tenant that violated the Preliminary Injunction Order. In fact, the case law on which Defendant relies in support of this argument, Defendant's Post-Hearing Response Memorandum at 5-8, is inapposite because the issue before the court in those cases was not, as in the instant case, whether a defendant landlord could be held in contempt for the actions of its tenant on real property that violated the terms of a preliminary injunction with regard to the property; rather, at issue in such cases was whether a nonparty to an action could be held in contempt for conduct undertaken in violation of a preliminary injunction. *See Garcia v. Yonkers School District*, 561 F.3d 97, 104 (2d Cir. 2009) (stating, in dicta, that Rule 65(d) "is designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed, and to be sure that the appellate court knows precisely what it is reviewing." (internal quotation marks and citation omitted)); *Petrelo v. White*, 533 F.3d 110, 114 (2d Cir. 2008) (holding preliminary injunction must sufficiently specify what conduct is forbidden by the enjoined parties); *Marshall v. National Ass'n of Letter Carriers BR36*, 2003 WL 22119882, at * 1 (S.D.N.Y. Sep. 15, 2003) (holding court is unable to grant a preliminary injunction against parties not before the court); and *Paramount Pictures Corporation v. Carol Publishing Group, Inc.*, 25 F.Supp.2d 372 (S.D.N.Y. 1998) (holding nonparty can be held in contempt for violating preliminary injunction only upon establishing nonparty either aided and abetted or is legally identified with defendant).

In short, in none of the cases on which Defendant relies was the issue before the court whether the Defendant landlord could be held in contempt for the conduct of its tenant based on the Defendant's failure to advise its tenant that a preliminary injunction prohibited certain activity at the leased property or take reasonable precautions to prevent such prohibited activity.  In contrast, here, Plaintiff does not seek to hold anyone at the nursery, including Santora and Klapp, in contempt for conduct in violation of the Preliminary Injunction Order; instead, Plaintiff seeks to hold Defendant in contempt based on Defendant's failure to diligently comply with the terms of the Preliminary Injunction Order, including taking all necessary steps to ensure Defendant's tenants did not engage in any prohibited activity on the Property.  Accordingly, the third element necessary for civil contempt sanctions is satisfied, and Plaintiff's Motion seeking an order of contempt should be GRANTED.

The court thus considers what sanction to impose on Defendant.  "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Paramedics Electrodedicina Comercial, Ltda*., 369 F.3d at 657 (citing cases).  "Such sanctions may not be imposed as a purely punitive measure. *Id*.  "To the extent that a contempt sanction is coercive, the court has 'broad discretion to design a remedy that will bring about compliance.'" *Id*. (quoting *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, 673 F.2d 53, 57 (2d Cir. 1982))   In contrast, when the purpose is compensatory, the fine is to be paid directly to the injured party, rather than to the court, and "'the sanction should correspond at least to some degree with the amount of damages.'" *Id*. (quoting *King*, 65 F.3d at 1062).  In the instant case, the propose of the

sanction to be imposed is coercive, rather than compensatory, such that the court has broad discretion to establish the proper sanction.

In exercising its broad discretion in setting the amount of a coercive fine, several factors to be considered include "the 'character and magnitude of the harm threatened by continued contumacy,' the 'probable effectiveness of any suggested sanction in bringing about [compliance],' and the contemnor's ability to pay." *Paramedics Electrodedicina Comercial, Ltda.*, 369 F.3d at 658 (quoting *Perfect Fit Industries, Inc.*, 673 F.2d at 56). Because a civil contempt order is designed to be coercive rather than punitive, "a party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of contempt. *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (citation omitted). The burden of establishing an inability to pay is on the contemnor, and he must establish this inability "clearly, plainly, and unmistakably." *Id*. Furthermore, "the credibility of his [the contemnor's] denial is to be weighed in light of his present circumstances. Conclusory statements are inadequate to carry this burden." *Id*. (internal quotation marks and citation omitted).

In the instant case, a sanction ordering Defendant to restore the Property to its condition prior to the instant violations is not necessarily ideal given that the work necessary to accomplish such task could further upset the Property's hydrological state. *See Avoyelles Sportsmen's League, Inc.*, 715 F.2d at 921, 923-24 (holding efforts necessary to restore dredged wetlands would further alter ecological function of

wetlands).  There has, however, been no evidence submitted on this issue.[20]  Nor has Plaintiff asserted any monetary loss resulting from Defendant's failure to comply with the Preliminary Injunction Order such that compensatory damages are not required.  As such, the court contemplates a monetary sanction designed to coerce Defendant's compliance with the Preliminary Injunction Order.

Accordingly, Defendant is ORDERED to submit to the court the following financial documents of Acquest to permit the court to design a sufficient sanction to coerce Defendant's compliance with the Preliminary Injunction Order:

(i)     audited income statements for Defendant's past three fiscal years;
(ii)    audited profit and loss statements for Defendant's past three fiscal years;
(iii)   audited balance sheets for Defendant's past three fiscal years;
(iv)   audited cash flow statements for Defendant's past three fiscal years; and
(v)    current trial balance sheet for Defendant's current fiscal year.

Defendant is directed to produce such documents, along with any explanatory memoranda or affidavits, under seal at Defendant's option, **within ten (10) days** of service of this Report and Recommendation.

---

[20] Should Plaintiff believe such restorative actions to be necessary and efficacious, Plaintiff shall promptly inform the court by affidavit of a person competent to support such a request.

## **CONCLUSION**

Based on the foregoing, Plaintiff's Motion (Doc. No. 40), seeking to enforce this court's Preliminary Injunction Order, should be GRANTED.  Defendants are ORDERED to submit the requested financial information to the court **within ten (10) days** of receipt of this Report and Recommendation.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

SO ORDERED, at to the requested
financial information to be provided
by Defendant.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       August 9, 2010
                     Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 9, 2010
              Buffalo, New York