UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                        Plaintiff,                **DECISION**
            v.                                                         **and**
                                                                    **ORDER**
ACQUEST TRANSIT LLC,
ACQUEST DEVELOPMENT, LLC,                          **09-CV-55S(F)**
MR. WILLIAM L. HUNTRESS,


                                        Defendants.
_____

APPEARANCES:   JEFF SESSIONS
               UNITED STATES ATTORNEY GENERAL
               Attorney for Plaintiff
               BRADLEY L. LEVINE, SCOTT BAUER,
               MEGHAN GREENFIELD, and
               ELIZABETH YU, Trial Attorneys
               Environmental and Natural Resources Division
               U.S. Department of Justice
               601 D Street, NW
               Washington, DC 20530-0001

               SNELL & WILMER, LLP
               Attorneys for Defendants
               BRADLEY R. CAHOON, of Counsel
               15 W. South Temple, Suite 1200
               Salt Lake City, Utah   84101

               RUPP BAASE PFALZGRAF CUNNINGHAM LLC
               Attorneys for Defendants
               MATTHEW D. MILLER,
               ROBERT SINGER, of Counsel
               424 Main Street, Suite 1600
               Buffalo, New York   14202

## JURISDICTION

This matter, in which Plaintiff alleges violations of the Clean Water Act, was

referred to the undersigned by Hon. William M. Skretny by Order filed April 6, 2010 (Dkt.

44) for all pretrial matters.  It is presently before the court on Defendants' motion to compel and for an expedited hearing filed October 14, 2016 (Dkt. 232).

## BACKGROUND

On October 14, 2016, Defendants filed Defendants' Notice of Motion To Compel (Dkt. 232) together with the Attorney Declaration of Matthew D. Miller, Esq. (Dkt. 232-1) ("Miller Declaration") attaching Exhibits 1-11 ("Exh(s). __ to Miller Declaration"), and Defendants' Notice of Motion For Expedited Ruling On Defendants' Motion To Compel (Dkt. 233), and the Attorney Declaration of Matthew D. Miller, Esq. ("Miller Declaration II") attaching Exhibits 1 (Dkt. 233-1) and 2 (Dkt. 233-2) ("Exhs. __ to Miller Declaration II").  Also on October 14, 2016, Defendants filed Memorandum of Law In Support Of Defendants' Motion To Compel Discovery (Dkt. 232-3) ("Defendants' Memorandum"). On November 14, 2015, Plaintiff filed United States' Memorandum In Opposition To Motion To Compel (Dkt. 239) ("Plaintiff's Memorandum") together with Exhibits 1-6 (Dkt. 239-1-6) ("Exh(s). __ to Plaintiff's Memorandum").  In a telephone conference call with the parties on October 17, 2016 (*see* Dkt. 235), the parties agreed to postpone the deposition of Mary Anne Thiesing, a United States environmental expert, scheduled for October 27, 2016 in Seattle, and David Pohle, an Environmental Scientist with the United States Environmental Protection Agency ("EPA"), then scheduled for November 10, 2016, in New York City, pending the outcome of Defendants' motion.   On December 2, 2016, Defendants filed Reply Memorandum In Further Support Of Defendants' Motion To Compel Discovery (Dkt. 240) ("Defendants' Reply").  Oral argument was deemed unnecessary.

2

**FACTS[1]**

The property, located at 10880 Transit Road, Town of Amherst, New York ("Amherst"), which is the subject of the instant action to enforce the Clean Water Act, 33 U.S.C. § 1251, *et seq.* ("Clean Water Act" or "the Act"), is a 96.6 acre parcel of undeveloped land purchased by Defendant Acquest Transit, LLC ("Acquest") in January 2006 ("the property").  A consultant hired by Acquest determined that 44 acres of the property contained wetlands.  The Acquest purchase price included a substantial discount to account for the presence of protected wetlands on the property.  Defendant Huntress is an officer of Acquest and its principal owner.  Acquest had earlier acquired a small parcel of undeveloped land, also in Amherst, located at 2190 and 2220 Wehrle Drive which is also the subject of a  Clean Water Act action by Plaintiff in this court ("the Wehrle Drive property") (*United States of America v. Acquest Wehrle, LLC*, 09-CV-637V(F)).  At some point, prior to commencement of the instant action, the Army Corps of Engineers ("the Corps") and the United States Environmental Agency ("EPA") (together "the agencies") began to investigate development activity at the Wehrle Drive property for which no permits required under the Act had been issued.  In late October 2006, Acquest obtained a permit from the New York State Department of Environmental Conservation ("the DEC") to allow for storm water discharges in connection with a planned development of a commercial nursery to be constructed by Defendants and completed August 1, 2007, on approximately four acres of the property at its northeast

---

[1]   Taken from the pleadings and papers filed in this action and in the related criminal action against Defendants.  *See Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1389 (2d Cir. 1992) (taking judicial notice of indictment but expressing no opinion as to whether the indicted were guilty or innocent of the charges).

corner facing Transit Road, a major north-south thorough fare.  The permit was issued

by the DEC pursuant to the Act, specifically 33 U.S.C. § 1251(b), which authorizes a

state to issue permits for discharges of pollutants, including storm water runoff

otherwise prohibited by Section 402 of the Act, 33 U.S.C. § 1341 ("the October 2006

Section 402 permit").  In April 2007, a Corps employee observed earthmoving activities,

including construction of a long gravel access road, on the western side of the property

in an area adjacent to Millersport Highway, a heavily travelled road running parallel to

the property, in a north-west-south easterly direction, on its northern (north-west)

boundary line of the property, then believed by the Corps to constitute wetlands and

waters of the United States, and a nearby sign on the property stating "Clean Fill

Wanted" a considerable distance from and well outside the construction area for the

nursery, construction of which was the subject of the October 2006 § 402 permit.  In

August 2007, the EPA conducted an inspection of the nursery site to determine

compliance with the October 2006 § 402 permit which revealed several instances of

non-compliance ("the August 2007 Inspection").  During the August 2007 Inspection, an

Acquest representative informed the EPA inspector that other than in connection with

Defendants' development of the nursery no earthmoving activity had occurred in any

other area of the property which, according to the representative, was then being used

for farming, and which the EPA was later informed by Acquest involved growing corn.

Despite Acquest's representations and assurances, the EPA requested on October 2,

2007, Acquest's permission to enter the property to further investigate the matter

particularly the observed construction activity in the western portion of the property,

including building of the access road, which measured 24 feet wide and 1500 feet long,

and the trucks dumping and spreading loads of fill on that area of the property.  During this period the agencies learned Acquest had, through various contractors, hydro-axed brush and small trees on the property, created small ditches sidecasting excavated material into wetland areas on the property, dumped hundreds of truckloads of fill on the property, and bulldozed and graded the fill.  On October 10, 2007, Acquest through its attorney, refused the EPA's request.

One week later, on October 17, 2007, Acquest applied for and received from the DEC a second § 402 permit covering storm water discharges relating to construction activity on four acres of vacant brush land adjacent to the nursery site to create useable drain paths from field space because, as stated by Acquest, such construction related storm water runoff could discharge into the local Tonawanda Creek but also stating that the runoff nevertheless does not enter any roadside drain, swales, ditches or culverts. On October 26, 2007, the EPA issued to Acquest a request, pursuant to § 308 of the Act, 33 U.S.C. § 1318(a), which authorizes the EPA to obtain information as an aid in determining whether a person has violated any effluent limitation ("the October 2007 § 308 Request"), seeking information, *inter alia*, regarding construction and earth-moving activity on the property.  Acquest's response to the October 2007 § 308 Request on November 27, 2007, was limited to asserting that portions of the western side of the property were then under lease to a local farmer for growing corn, that the road observed by the Corps was a farm road incident to such agricultural activity, and that the nursery remained under construction, but otherwise failed to respond to the October 2007 § 308 Request regarding the nature and dimensions of the property, details as to the observed earth-moving or construction activities, and the identity of persons

involved in these activities.  On December 12, 2007, EPA directed a second § 308

Request ("the December 2007 § 308 Request") to Defendants requesting evidence of

correction of deficiencies the EPA had noted in the August 2007 Inspection, and, based

on the apparent inconsistency between Acquest's representation that other than the

nursery project, no construction activity was taking place on the property, and the

Corps' observations of such activity despite Acquest's assurances to the contrary,  also

requested Defendants to fully explain such observed activity and any resulting storm

water discharges.  On December 27, 2007, EPA obtained low-level aerial photographs

of the property taken earlier that year purporting to show on-going earth-moving activity

on the property by mechanized earth-moving equipment, filling of forested wet-land

areas on the property, and construction of the gravel road into the property from

Millersport Highway larger than would be reasonably necessary to support any farming

activity on the property and a substantial distance from the area devoted to the nursery.

On January 9, 2008, the EPA issued a third § 308 Request ("the January 9, 2008 § 308

Request"), repeating its requests issued in the October 2007 § 308 Request, then

unanswered by Defendants, and requested information to support Defendants'

representation that some part of the property was used to grow corn and a description

of any dredging or filling activity on the property.  On the same date, staff of the Corps

observed further earth-moving activity on the Millersport Highway side of the property,

including the filling, grading, and excavation or widening of a ditch, and that the soil and

trees in that area of the property were consistent with the existence of wetlands.

Acquest responded to the December 2007 § 308 Request on January 25, 2008,

asserting, without documentation, it had remedied the deficiencies noted by the EPA by

the August 6, 2007 inspection, failed to produce as required a Storm Water Pollution Prevention Plan ("SWPP"), but again asserted that other activity on the property was limited to agriculture, not construction.  On February 8, 2008, Acquest responded to the January 9, 2008 § 308 Request stating the property, except for the nursery, was then leased to a business, a dairy farm, was being used for agriculture, *i.e.*, growing corn, and that the EPA lacked jurisdiction under the Act over the property.

On February 21, 2008, the EPA issued, pursuant to Section 309 of the Act, 33 U.S.C. § 1319(a), an order to Acquest directing Acquest to cease and desist all earth-moving activity on the property unless authorized by the Corps or obtaining a determination by the EPA that the property does not contain wetlands subject to the Act. The EPA issued another § 308 request for Acquest on February 26, 2008 ("February 26, 2008 § 308 Request") directing Acquest to provide information it had failed to provide in response to the December 2008 § 308 Request specifically, evidence of Acquest's compliance with the § 402 construction storm water permit, documentation with regard to unauthorized construction and earthmoving activities on the property which had been requested by the January 9, 2008 § 308 Request but not provided by Acquest, and a full explanation of all activity on the property other than necessary construction in connection with the nursery.  Acquest responded to the February 26, 2008 § 308 Request on March 14, 2008 and provided Acquest's SWPPPs stating that it had complied fully with the inspection deficiency report and reiterated that the rest of the property was devoted only to agriculture activity, admitted it had constructed a 24' x 1500' stone road on the property but failed to provide ownership or lessor identification for the western portion of the property as had been requested by the EPA.

The EPA then conducted roadside inspections of the property on June 9 and 10, 2008, observing fill and sidecast dredged material on wetland areas on the property, the large gravel road entering the property from Millersport Highway identified by a sign stating the road was for deliveries to the nursery, and water runoff from the property to Tonawanda Creek, a navigable waterway, from the point where such runoff flows through Black Creek into Ransom Creek located on the western side of Millersport Highway through a connecting ditch adjacent to the property and culverts under the highway.  On July 28, 2008, the EPA obtained an administrative search from Hon. Hugh B. Scott of this court and conducted a comprehensive inspection of the property on July 29-31, 2008 ("the July 2008 Inspection").  The result of the July 2008 Inspection confirmed the presence of wetlands over the entire property, consistent with Acquest's consultant's earlier determination and findings in 2005, based on the presence of wetland vegetation hydric soils, and wetlands hydrology.  The inspection also confirmed the EPA's observation of the water flow from the property into Tonawanda Creek through the adjacent ditch, culverts, Black Creek, and Ransom Creek.  The inspection further revealed large discharges of dredged and fill material into wetlands on the property which was used as fill material over 9.6 acres of the property plus an additional 2.6 acres of fill used as a pad for construction of the nursery, as well as smaller amounts of fill that had been discharged into a wetlands area immediately to the west of the nursery site, totaling over 13 acres of wetlands on the property into which fill had been discharged.  Upon completion of the inspection, an Acquest representative informed the EPA the discharges would continue.

Based on these findings, the EPA determined that Acquest failed to obtain a § 402 permit for storm water discharges resulting from Acquest's construction activities on the property, specifically, the clearing, grading or excavation on one or more acres on the western side, *i.e.*, some distance away from the nursery, of the property. Additionally, the EPA determined that Acquest had caused the discharge of dredged or fill material into wetlands on the property without obtaining from the Corps a permit as required by Section 404 of the Act, 33 U.S.C. § 1344 ("a § 404 permit").  As a result of Acquest's activities with respect to the property as described above, the EPA determined Acquest was in violation of Section 301 of the Act, 33 U.S.C. § 1311, for its unauthorized and unlawful discharge of construction related storm water into waters of the United States, specifically Tonawanda Creek, through smaller tributary creeks, and the unauthorized discharged of pollutants of earthen fill and dredged material into waters of the United States in violation of Section 404 of the Act, 33 U.S.C. § 1344.

On September 5, 2008, the EPA issued to Acquest a Cease and Desist Order, pursuant to 33 U.S.C. § 1319(a), in which the EPA recited the aforementioned factual background and, after noting the seriousness of Acquest's violations and lack of good faith efforts by Acquest to comply with the EPA's directions, directed Acquest to cease and desist from "all earth-moving work using mechanized earth-moving equipment in any portion of the property."  Dkt. 9 at ¶ 19, Exh. 6 ("the September 5, 2008 Cease and Desist Order").  The instant action was subsequently commenced by Plaintiff on January 15, 2009, and based on the affidavits of Ms. Thiesing and Mr. Pohle, which included the results of the July 2008 Inspection, Plaintiff sought and obtained from this court a preliminary injunction enjoining Defendants from placing additional fill or

performing any additional earthmoving work at the property designated as tax parcel 16.00-5-23 in the Town of Amherst, New York.  (Dkt. 26 at 20).  Defendants were subsequently found in violation of the court's preliminary injunction, *see* Dkt. 76 and 83; Dkt.105.  *See United States v. Acquest Transit LLC*, 2010 WL 6350470 (W.D.N.Y. Aug. 9, 2010) and 2010 WL 6350439 (W.D.N.Y. Aug. 25, 2010) (Reports and Recommendations) adopted by 2011 WL 1167754 (W.D.N.Y. Mar. 29, 2011).

On June 13, 2011, Defendants served Defendants' First Set of Interrogatories and Document Requests.  Plaintiff responded to Defendants' requests on October 5, 2011, including a lengthy (352 pages) privilege log (Dkt. 232-1 ¶ 21) ("October 5, 2011 Privilege Log") referencing Miller Declaration Exh. 3, and September 6, 2013 privilege log (seven pages) (Miller Declaration Exh. 4) ("September 6, 2011 Privilege Log").  On November 17, 2011, the court stayed this action pending resolution of a criminal proceeding against Defendants Acquest Transit, LLC, Acquest Development, LLC, and Huntress based on charges of false statements, obstruction of justice and violation of the CWA, in connection with Defendants' activities on the property, representations to the EPA, and criminal contempt based on Defendants' violations of the preliminary injunction.  The stay was vacated on June 29, 2015 as a result of a guilty plea to the criminal contempt count of the Indictment, 13-CR-199, and payment of a $250,000 fine by Defendant Acquest Transit LLC (13-CR-199, Dkt. 196).  A new schedule for discovery in this action was set by the court on October 15, 2015 (Dkt. 203).

Thereafter, on March 4, 2016, Plaintiff served additional discovery response including a 40 page privilege log.  Dkt. 232, ¶ 21 ("March 4, 2016 Privilege Log").  At Defendants' request, Dkt. 232-1 ¶ 21; Dkt. 239 at 4, Plaintiff reviewed its prior privilege

logs in March 2016, and, following Defendants' letter to Plaintiff on March 17, 2016

detailing deficiencies asserted by Defendants in Plaintiff's prior logs, served a revised

privilege log consisting of 218 pages together with additional documents on August 26,

2016, Dkt. 232-1 referencing Miller Declaration Exh. 10 (218 pages); Dkt. 238 at 5 ("the

August 25, 2016 Privilege Log" or "Log").   Dkt. 232-12.   The Log describes in summary

form 1,179 documents protected as attorney work product or under the attorney-client

privilege, to which Defendants interposed objections to 320 entries.

By letter dated August 26, 2016, Defendants complained to Plaintiff regarding the

lateness of the August 25, 2016 Privilege Log advising Defendants would, as a result,

require additional time to review Plaintiff's recent extensive document production as well

as the extensive August 25, 2016 Privilege Log, and requested Plaintiff agree to extend

discovery and expert disclosures.   At the parties' request, a Seventh Amended

Scheduling Order was filed August 30, 2016 (Dkt. 228) extending the period for fact

discovery until October 31, 2016, with motions to compel to be filed by October 3, 2016.

By Text Order (Dkt. 230) filed October 3, 2016, the motion to compel date was extended

to October 14, 2016.   Until Defendants filed the instant motion to compel, Defendants

did not advise Plaintiff of any alleged deficiencies in the August 25, 2016 Privilege Log.

Dkt. 239 at 5.   Defendants' objections to the August 25, 2016 Privilege Log are

highlighted in several colors in the Miller Declaration Exh. 11 (*passim*).   The August 25,

2016 Privilege Log explains that the grounds for withholding responsive documents as

asserted in the October 5, 2011, September 6, 2013, and March 4, 2016 Privilege Logs,

which previous logs also asserted the deliberative process privilege and "litigation

agreement," is now limited to the attorney work product doctrine and attorney-client privilege.  Dkt. 232-1 ¶ 28.

Defendants' objections to the Log include that (1) several author fields lack identification that the author of the related document was an attorney, (2) for the bulk of any documents Plaintiff withheld or redacted the related Log entries demonstrate that the document was created at the direction of an attorney for Plaintiff prior to the time when any litigation in the case could reasonably have been anticipated and thus cannot constitute protected work-product, (3) the Log fails to establish the document was generated by an attorney for Plaintiff in this case and hence does not qualify as an attorney-client privileged communication, Dkt. 232-1 ¶ 29, (4) the Log fails to provide a statement of the date of document creation or that redacted documents were not produced, contrary to Plaintiff's assertion in the Log, to Defendants, or (5) failure to properly assert the privilege indicates the privilege was waived.  To assist in evaluating Defendants' objections, Defendants have, in Exh. 11, color highlighted Defendants' objections based on incomplete entries in purple, missing documents in red, defective attorney-work product claims in yellow, and improper anticipation of litigation claims in blue, and Defendants' objections to illegitimate claims of attorney-client privilege are outlined in red.  Dkt. 232-1 ¶ 31.  In opposition, Plaintiff maintains that despite Defendants' failure to meet and confer as a prerequisite to filing Defendants' motions pursuant to Fed.R.Civ.P. 37(a)(1) ("Rule 37(a)(1)"), Dkt. 239 at 5, as a result of discussions between Plaintiff and Defendants, *id.*, the number of issues requiring adjudication "has been substantially narrow[ed]." *Id.*  Plaintiff further argues all of Plaintiff's withholding of documents based on work product and attorney-client privilege

are valid.  In their reply, Defendants do not specifically address Plaintiff's assertions.

Defendants' Reply, Dkt. 240 (*passim*).

## DISCUSSION

A.    Rule 37(a)(1).

Plaintiff contends Defendants' motion should be dismissed because, prior to filing

the motion, Defendants failed to meet and confer in a good faith effort to avoid the need

for a motion to compel as Rule 37(a)(1) requires.  *See* Fed.R.Civ.P. 37(a)(1) (motion to

compel requires certification that movant has conferred or attempted to confer in good

faith with person or party failing to provide requested discovery in order to avoid court

action).  Such certification is, however, not required where the record shows an attempt

to confer would be futile.  *See Gibbons v. Smith*, 2010 WL 582354, at *2 (S.D.N.Y. Feb.

11, 2010).  Here, Defendants contend Plaintiff's objection to Defendants' motion that

Defendants' prior attempts to gain Plaintiff's compliance with Defendants' document

production requests in connection with Plaintiff's first three privilege logs, including

Defendants' March 17, 2016 letter and April 2, 2016 letter and April 2, 2016 conference

call, Dkt. 240 at 2, were ineffectual in that the August 25, 2016 Privilege Log includes

numerous identical deficiencies which Defendants previously pointed out in Plaintiff's

prior logs, specifically blank fields, *e.g.*, lack of dates as to the creation of the document

at issue, and non-identification of authoring attorneys and experts necessary to support

Plaintiff's asserted work-product protection and attorney-client privilege claims.  Dkt.

240 at 2.  Thus, Defendants argue, Defendants substantially complied with Rule

37(a)(1), further conferrals with Plaintiff would be futile, and judicial attention to

Defendants' objections to the August 25, 2016 Privilege Log is therefore required without further engagements by the parties to avoid the need for judicial determination.

In the circumstances, the court finds the present dispute with a history of prior attempts at resolution without resort to motion practice, and that despite several prior communications and service by Plaintiff of three privilege logs prior to the August 25, 2016 Privilege Log at issue, the parties remain at loggerheads with regard to Plaintiff's continued assertions that numerous documents covered by the Log to which Defendants have objected are either work-product or privileged.  Accordingly, while encouraging the parties to resolve issues raised by Defendants' objections, and to expedite completion of pre-trial discovery in this long-delayed matter, the court will address the merits of the parties' respective contentions regarding these issues.  The court therefore declines to dismiss Defendants' motion for failure to comply with Rule 37(a)(1).

B.    <u>Work-Product Protection</u>.

Defendants dispute Plaintiff's reliance on work-product protection available under Fed.R.Civ.P. 26(b)(3)(A) ("Rule 26(b)(3)(A)").  Particularly, Defendants contend that the August 25, 2016 Privilege Log is deficient because, *inter alia*, the Log fails to identify an attorney involved in the production of a withheld document (Dkt. 232-13 at 5; Dkt. 240 at 7-8), asserts work-product protection for documents created by non-attorney employees of the agencies, Dkt. 232-13 at 12; Dkt. 240 at 7-8, claims work-product protection for documents reflecting communications between the EPA and Corps staff members and the agencies' attorneys "regarding tasks not requested to be completed for purposes of litigation," Dkt. 232-13 at 13, and that no work-product protection is available for any

14

EPA or Corps documents relating to the property created at the request of the EPA or Corps counsel prior to September 8, 2008, the date the EPA issued (Dkt. 232-13 at 8-12; Dkt. 240 at 2-7) the September 5, 2008 Cease and Desist Order.  Based on Defendants' contention that until the EPA learned of Defendants' refusal to comply with the September 2008 Cease and Desist Order, "all" of the EPA's actions prior to the September 5, 2008 Cease and Desist Order could only constitute "regular business activities of the EPA," *i.e.*, routine regulatory activity, and therefore could not have been in contemplation of litigation, Defendants also argue any responsive documents cannot qualify as work-product as Plaintiff has failed to show they were created at the behest of counsel because of a reasonable anticipation of litigation with Defendants.  Dkt. 232-13 at 11.  Alternatively, Defendants maintain Plaintiff waived work-product protection for any documents, specifically those constituting the results of the July 2008 inspection of the property by Ms. Thiesing and Mr. Pohle, as Plaintiff's testifying experts, in support of Plaintiff's preliminary inspection request filed, *see* Dkt. 8 Exh. 2, and, in any event, Defendants have a "substantial need" for such materials as these witnesses are scheduled for deposition as experts designated by Defendants pursuant to Fed.R.Civ.P. 26(a)(2).  Dkt. 232-13 at 14.  Defendants point to no other facts to establish a substantial need for the numerous other requested documents as to which Plaintiff asserts work-product protection.  As Defendants misread Rule 26(b)(3)(A) and applicable caselaw, Defendants' work-product contentions are without merit.

Rule 26(b)(3)(A) provides, in relevant part, that "a party may not discover documents . . . prepared in anticipation of litigation . . . by or for . . . [a] party or its

representative (including a party's attorney)."[2]  Fed.R.Civ.P. 26(b)(3)(A).  However, if a

requesting party demonstrates the requested documents withheld as work-product are

relevant and the party has a "substantial need" for the documents in order "to prepare

its case" and "cannot without undue hardship obtain their substantial equivalent by other

means," the court may order production.  *Id.*  Such production must nevertheless protect

against disclosure of "mental impressions, conclusion, or 'legal theories'" of a party's

attorney or "other representative concerning the litigation."  Fed.R.Civ.P. 26(b)(3)(B).  In

*United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998), the Second Circuit held that, as

used in Rule 26(b)(3)(A), "in anticipation of litigation" extends work-product protection to

documents which "'in light of the nature of the document and the factual situation in the

particular case, the document can fairly be said to have been prepared or obtained

*because of* the prospect of litigation.'"  *Adlman*, 134 F.3d at 1202 (quoting Charles Alan

Wright, Arthur R. Miller, and Richard L. Marcus, 8 FEDERAL PRACTICE & PROCEDURE §

2024, at 343 (1994) (italics in original).  Moreover, although the document is "created

because of the prospect of litigation  . . . it does not lose [work-product] protection . . .

merely because it is created in order to assist with a business decision."  *Id.*  On the

other hand, a requested document "prepared in the ordinary course of business or that

would have been created in essentially similar form irrespective of the [anticipated or

actual] litigation" is not within the scope of work-product protection provided by Rule

26(b)(3)(A).  *Id.* (citing Advisory Committee Note to 1970 Amendments to Federal Rule

of Civil Procedure 26).  In *Adlman,* petitioner withheld a tax memorandum regarding a

proposed merger prepared by an outside accountant-attorney because of the

petitioner's belief there was a likelihood of an IRS challenge to petitioner's claim for a

---

[2]   Unless otherwise indicated underlining and bracketed material added.

significant refund as a result of the merger which challenge in fact occurred four years after petitioner claimed a substantial loss as a result of the merger. *Adlman*, 134 F.3d at 1195.

In this case, according to Defendants, all of the actions taken by the agencies prior to the September 5, 2008 Cease and Desist letter were directed to the question of whether the property was connected to waters of the United States, a prerequisite to enforcement of the Act against Defendants' alleged construction, dredging and filling activities resulting in unpermitted discharge of storm water and pollutants (fill and dredged material) onto protected wetlands located within the property.  Dkt. 232-13 at 10.  Thus, Defendants contend the inspection and requests for information issued by the EPA prior to September 5, 2008 constituted administrative actions carried out incident to the EPA and the Corps' routine regulatory functions to determine whether the agencies had authority to enforce the Act against Defendants for suspected unlawful activities affecting wetlands on the property, and any documents created during such period therefore could not have been created in anticipation of litigation as required for work-product protection.  *Id.*  However, Defendants' argument falls of its own weight as *Adlman* plainly held that even where a document is created by a party incident to "a business purpose," *Adlman*, 134 F.3d at 1202, or "as part of the ordinary course of business," *id.* at 1204, the documents are nonetheless protected if litigation is perceived as a likelihood unless the record shows the document would have been prepared in substantially the same form regardless of the party's anticipation of litigation.  Here, the record shows that following observations of suspected unlawful construction activity in the western portion of the property by the Corps as early as April 2007, the EPA

requested permission on October 2, 2007 to inspect the property for possible wetland violations under the Act – which, if allowed, could have resolved the EPA's suspicions regarding the property and Defendants' activities without litigation – but was refused by Defendants on October 10, 2007.

In the experience of Phyllis Feinmark, an EPA attorney and Chief of the regional EPA's Water and General Law branch, who had prior dealings with Defendants in connection with wetland protection problems at Defendants' Wehrle Road property, commencing in 2002, Dkt. 239-5 ¶ 4, when a property owner like Acquest refuses to cooperate with an EPA inspection request, "an adversarial proceeding – either administrative or judicial – will likely result."  *Id.* ¶ 8.  Ms. Feinmark further averred that the EPA would not have engaged in a detailed inspection and scientific evaluation of the property pursuant to the July 2008 search warrant and issued the three preceding requests for information on October 26, 2007, December 12, 2007 and January 9, 2008, had the EPA "not anticipated litigation with Defendants over the suspected CWA violations," following Defendants' refusal to cooperate on October 10, 2007.  Dkt. 239-5 ¶ 9.  Thus, even if the agency actions directed to the property were intended to confirm the EPA and Corps' suspicions that Defendants were damaging wetlands located on the property, the record sufficiently establishes such actions were primarily the result of the agencies' good faith belief, based on Defendants' refusal to permit a physical inspection of the property by the EPA and the agency's own prior observations of the wetland characteristics of the property and Defendants' activities, that litigation in some form with Defendants would be necessary to resolve the matter.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 268 F.R.D. 114, 117 (D.C.C. 2010) (as used in Rule

26(b)(3)(A) the term "litigation" includes both judicial and administrative proceedings where attorneys engage in representation of an adversarial nature); *see also Bristol-Meyers Co. v. F.T.C.*, 598 F.2d 18, 29 (D.C.Cir. 1978) (work production available to documents prepared by agency staff counsel in connection with administrative enforcement proceeding).  *See U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union Number 3, ALF-CIO*, 2002 WL 31093619, at **1-2 (S.D.N.Y. Sept. 17, 2002) (holding requested document did not lose work product protection that shielded documents from discovery in related NLRB administrative action once administrative proceeding was concluded) (citing cases); and *Quinn v. Department of Health & Human Services,* 838 F.Supp. 70, 75 (W.D.N.Y. 1993) (document prepared by agency counsel in anticipation of quasi-judicial administrative proceeding protected by work product doctrine from disclosure).

Nor is there any merit in Defendants' contention that documents not prepared by agency counsel, or at the specific direction of agency counsel, but rather prepared by agency non-attorney staff such as investigators fall outside work-product protection. Where such staff are supervised by or acting at the direction of agency counsel, the relevant documents if prepared because of anticipated litigation are nonetheless protected.  *See SEC v. Strauss*, 2009 WL 3459204, at *6 (S.D.N.Y. Oct. 28, 2009) (interview notes prepared by agency staff as non-attorneys acting at the direction of agency attorney constituted work-product).  In this case, as noted, Discussion, *supra*, at 18, Ms. Feinmark either handled the instant investigation personally or supervised EPA staff, both attorneys and non-attorneys, working on the investigation since at least April 2007.  Moreover, even if the EPA and the Corps staff were not directly supervised by

agency counsel, direct supervision by an attorney of a party's non-attorney representative who in anticipation of litigation prepared a requested document or, in this case, agency staff members, is not a prerequisite to work-product protection under Rule 26(b)(3)(A).  *See Schaeffler v. United States*, 806 F.3d 34, 44 (2d Cir. 2015) (tax memorandum prepared by taxpayer's accountant at taxpayer's request subject to work-product protection).  As the rule itself makes clear, work-product protection extends to documents prepared in anticipation of litigation prepared "<u>by</u> or <u>for</u> another party or its representative (including the other party's . . . <u>agent</u>").  *See also* Advisory Committee Notes to 1970 Amendments to Rule 26(b)(3) (Subdivision (b)(3) protects "not merely . . . materials prepared by an attorney, but also . . . materials prepared in anticipation of litigation . . . by or for a party <u>or</u> <u>any</u> <u>representative</u> <u>acting</u> <u>on</u> [<u>its</u>] <u>behalf</u>"); *Fingerhut ex rel. Fingerhut v. Chautauqua Inst. Corp., Inc.*, 2014 WL 1572387, at *5 (W.D.N.Y. Apr. 18, 2014) (confidential communications between insurance agent and carrier assessing potential liability of insured prior to expected suit is work product).

Defendants' contention that the agencies' actions "would have been completed whether litigation was contemplated or not," Dkt. 232-12 at 11, ignores the probable, and predictable, effect of Defendants' October 10, 2007 refusal to permit the EPA's access to the property in order to confirm or negate its suspicions regarding Defendants' violations of the Act causing damage to protected wetlands located on the property.  *See Schaeffler*, 806 F.3d at 44 (taxpayer-petitioner's belief that it was "highly likely" that the need for restructuring and refinancing would lead to tax audit and subsequent litigation over resulting tax treatment supported finding that outside tax advisor's memorandum addressing tax implication of such proposed transaction

prepared at taxpayer's request was created in anticipation of litigation, commenced four years after preparation of requested memorandum,  extending work-product protection to the memorandum).  That, as Defendants argue, Dkt. 232-13, the EPA engaged in "regulatory investigations," *i.e.*, the three requests for information, in response to Defendants' refusal to cooperate in the agency's investigation of the property, does not sufficiently rebut the existence of the EPA's reasonable belief that either administrative or judicial litigation was likely after Defendants' October 2007 refusal.  Investigative activities by an administrative agency prior to a decision to initiate formal judicial or administrative proceedings are within the scope of work-product protection.  *See Strauss*, 2009 WL 3459204, at *5 (citing cases); *see also S.E.C. v. NIR Group, LLC*, 283 F.R.D. 127, 133 (E.D.N.Y. 2012) (staff attorney and accountant notes of witness interviews to aid in S.E.C. determination of whether to proceed with litigation against defendants protected as work-product); *Chemcentral/Grand Rapids Corp. v. EPA*, 1992 WL 281322, at *5 (N.D.Ill. Oct. 6, 1992) (EPA internal documents analyzing likely legal challenges to proposed toxic waste cleanup plans to be implemented by EPA constitute protected work-product).  "[I]f an agency was not just collecting background information, but had focused its attention on specific entities it believed may have violated the statute it was charged with enforcing, then the agency was contemplating litigation." *Chemcentral/Grand Rapids Corp.*, 1992 WL 281322, *5.  The record plainly establishes that the EPA's attention to Defendants' activities with respect to the property had come into sharp focus as to Defendants' October 10, 2007 refusal to permit the agencies access to the property.

Defendants' contention in this case that until the EPA learned whether Defendants would abide by the September 5, 2008 Cease and Desist Order, the EPA's beliefs as to the likelihood of the need for litigation to determine whether the property contained protected wetlands and whether Defendants' activities on the property violated the Act, were "speculative and not 'reasonable,'" ignores the obvious fact that Defendants' October 10, 2007 refusal to allow the EPA to inspect the property caused the EPA to reasonably, based on Defendants' responses to the EPA's investigation, believe litigation with Defendants regarding the property was inevitable; the record in this case amply supports that well-prior to this time, the EPA had focused its attention on Defendants as possible violators of the Act's protection of wet-lands on the property confirmed by Defendants' refusal to agree to an EPA inspection in October 2007.  Ms. Feinmark's experience with uncooperative landowners in similar circumstances is another relevant fact reinforcing the EPA's reasonable belief that after Defendants' refusal on October 10, 2007 to permit an administrative inspection of the property, enforcement action by EPA was a likelihood.  *See Schaeffler*, 806 F.3d at 44 (rejecting district court's analysis that taxpayer would have obtained tax advice at issue regardless of possible audit as "ignor[ing] reality").  Thus, Defendants' oppositional attitude toward the EPA's focus on the property, particularly demonstrated by Acquest's assertion in its February 8, 2008 response to the January 9, 2008 § 308 Request that the EPA lacked jurisdiction over the property, was, Facts, *supra*, at 7, plainly a significant factor that motivated Defendants' October 10, 2007 refusal thereby assuring the necessity, reasonably perceived by the EPA at that point, for administrative, if not judicial, litigation to resolve Acquest's assertion.  To conclude otherwise would be to contravene

*Schaeffler's* admonition that in determining work product claims involving administrative enforcement activity, courts should not overlook such a "reality." *Id.* Defendants' oppositional attitude in this case, confirming the correctness of the EPA's judgment, was repeated by Defendants' defiant assertion to the EPA following the July 2008 inspection that Defendants' dumping, filling, and earth removal on the property would continue despite the February 21, 2008 cease and desist order prohibiting such activity, Facts, *supra*, at 8, and by Acquest pleading guilty to criminal contempt for refusing to comply with the court's preliminary injunction. Facts, *supra*, at 9-10.

Defendants also contend that Plaintiff's reliance on Ms. Feinmark's opinion that Defendants' refusal to cooperate in the EPA's request to inspect the property for possible Clean Water Act violations supports a belief that future litigation concerning the matter was likely amounts to governmental overreaching, official "hubris." Dkt. 240 at 5. More specifically, according to Defendants, the absence of any such reasonable belief by the EPA in the likelihood of future litigation as of October 2007, is demonstrated by Plaintiff's delay until July 2008, in obtaining an administrative search warrant, Dkt. 240 at 6, confirming that in October 2007, Plaintiff lacked sufficient evidence that the EPA had jurisdiction to enforce the Act based on the presence of protected wetlands in the property, Dkt. 240 at 6-7, and as a result there was no evidence to support any belief by the EPA that there was a likelihood of litigation at that time. *Id.* Defendants' argument is predicated on flawed logic and irrelevant hyperbole.

The issue raised by Defendants' motion is not whether the EPA had enforcement jurisdiction over the property but whether the agency reasonably entertained the view that there was a likelihood of litigation against Defendants with respect to these matters,

particularly including the question of the EPA's so-called jurisdiction under the Act to engage in enforcement activities against Defendants regarding the presence of wetlands on the property and Defendants' wrongful actions.  *See Schaeffler*, 806 F.3d at 43-44 (document protected if "nature" of document and "factual situation of the particular case" show its preparation was based on party's belief in likelihood of litigation as to subjects discussed in document).  To insist that a determination of the EPA's jurisdiction under the Act to support the EPA's enforcement activity is prerequisite to any reasonable belief by the EPA that litigation was likely for purposes of Rule 26(b)(3)(A) at that time ignores this distinction as well as the other indicia of the likely need for litigation present in the record, either administrative or judicial, to resolve the issue including knowledge by the Corps of the existence of hydric soils, indicative of wetlands, on the property, and mapping of the property by the Federal Emergency Management Agency, the DEC, and the United States Fish and Wildlife Service also showing the property containing wetlands, all of which the EPA was aware when Acquest refused access on October 10, 2007.

The agencies were also informed that Defendants claimed the observed construction activity on the western side of the property, including a 24 by 1500 foot access gravel road with signs seeking fill, was to facilitate growing of corn in that location.  These assertions, by Defendant Acquest, a major local developer of commercial property that had recently acquired the property despite the preacquisition findings of Defendants' consultant that the property contained a significant percentage of wetland acreage, in order to merely grow corn, appear implausible on their face and instead intended to divert the EPA's attention away from Defendants' wetland damaging

activities on the property.  Such implausibility, coupled with the apparent inconsistencies

in Defendants' representations regarding the purposes of the observed construction

activity, including the construction of a large-scale access road and a public solicitation

for fill resulting in the dumping and spreading of hundreds of truckloads of fill on the

western area of the property (conduct not obviously consistent with or necessary to any

alleged authorized agricultural activity such as growing corn) reasonably caused the

EPA to conclude Defendants had engaged in unlawfully destroying protected wetlands

on the property.  Taken together with Defendants' refusal to cooperate in any on-site

investigation, which could have easily negated such beliefs if the results had warranted,

strongly supports that the EPA reasonably expected that some form of litigation with

Defendants would be required to resolve these matters and was likely to arise in the

reasonably foreseeable future, a fact confirmed by issuance of the EPA's February

2008 cease and desist order, the July 2008 search warrant, and the commencement of

this action in January 2009.  That the EPA delayed obtaining the administrative warrant

is not inconsistent with such a reasonably objective expectation of prospective litigation

as of October 2007; investigators often do not obtain a warrant immediately upon

developing probable cause but, rather, await further investigative results in order not to

alert the target and unnecessarily compromise the investigation.  In short, anticipated

litigation over the question of the EPA's authority under the Act with respect to

protection of wetlands on the property is nevertheless a form of "anticipated litigation"

within the scope of Rule 26(b)(3)(A).  Defendants' reliance, Dkt. 240 at 7, on *Lolongo-

Gedeon v. Child & Family Services*, 2012 WL 1714914, at **8-9 (W.D.N.Y. May 15,

2012) is unavailing.  In that case, the court held that work-product protection did not

extend to preliminary communications between defendant and its insurer because generally such communications prior to a coverage determination and in the absence of any indication that litigation of the putative claim was imminent, were not protected work-product. *Id.* In contrast, in the instant case the evidence of Defendants' suspect actions on the property and improbable explanations of such conduct coupled with Defendants' refusal to cooperate with the EPA supported that as of the date of such refusal, litigation with Defendants was a strong likelihood. *See Fingerhut ex rel. Fingerhut*, 2014 WL 1572387, at *5 (insurance agent report was work product where notice of alleged negligence – a fallen rotted tree – severely injured plaintiff and established immediacy of claim). Defendants cite to no authority requiring a different conclusion on this record.

The court therefore finds that work-product protection attached to documents prepared by Plaintiff not later than October 10, 2007 when the EPA was refused access to the property. Applying this threshold determination, the court turns to an examination of the Log to determine whether the described documents withheld by Plaintiff qualify as work-product.

At the outset the court notes the Log consists of 1,179 entries covering 218 pages. Many of the 320 objections asserted by Defendants involve disputed work product entries have as an author Chris Saporita who Defendants do not dispute is an EPA attorney and was assigned to the case on December 10, 2007 (Dkt. 239-5 ¶ 12). In the absence of a request by either party the court has not engaged an *in camera* inspection of the disputed documents. Based on the court's review of the summary descriptions of the disputed items for work-product protection as Plaintiff asserts, the

court finds that the respective Log entries describing, albeit in summary form, the

particular documents at issue, when considered against Defendants' objections, provide

sufficient indicia as to the nature of the document to enable the court to determine with

a reasonable degree of certainty whether the documents qualifies for work product

protection.  *See Bristol-Meyers Company*, 598 F.2d at 29 (applying work-product

protection to documents based on summary descriptions provided in defendant

agency's index).  Further, the court finds that as Defendants' objections relate to

discernible groupings of documents, a single rationale for granting or withholding work-

product protection avoids the need to decide each disputed document separately.  For

example, Defendants object to 15 documents, Bates Range USEPAT0000632 – 646

appearing in the Log (Dkt. 232-12 at 3-4) on the ground that because the Log failed to

include a corresponding date for each document Defendants were unable to assess the

validity of Plaintiff's asserted work-product protection.  However, as the court has

determined that all documents created by the EPA after October 10, 2007 are subject to

work product protection in this action, *see* Discussion*, supra*, at 14-26, and it is

undisputed that the author of such documents, Chris Saporita entered the case on

December 10, 2007, the court rejects Defendants' corresponding objections based on

the lack of a date of creation in the Log.  Turning to the Log's stated nature of the

documents the Log description indicates each such document was a "to do item memo

re: litigation preparation."  That Plaintiff included a description of each of these

documents in the Log is strong evidence that the "to do" memoranda by Saporita

pertained to the instant litigation requiring Plaintiff to reference the documents, and

Defendants do not argue otherwise.  Accordingly, the court finds such documents were

prepared in anticipation of the litigation in this case, and given they were created by an EPA attorney assigned to the case after October 10, 2007, the documents are highly likely to reveal attorney mental impressions, conclusions, opinions and theories, entitled to special protection under Rule 26(b)(3)(B); such documents thus may be withheld by Plaintiff as protected work-product.  Another large (41) group of referenced documents to which Defendants object on similar grounds, appears at Dkt. 232-12 at 5-9.  As noted, given that Defendants contend that Defendants have complied with Fed.R.Civ.P. 26(b)(3)(A)(i) and (ii) (party may obtain disclosure if party demonstrates "substantial need") only with respect to documents pertaining to Ms. Thiesing and Mr. Pohle's expected expert deposition testimony, *see* Dkt. 232-13 at 14, and such documents have been provided by Plaintiff to Defendants pursuant to Fed.R.Civ.P. 26(b)(4), *see* Dkt. 239 at 12-13, Defendants fail to show any substantial need with respect to Saporita's "to do" memoranda.  As such, Defendants' objections to Plaintiff's assertions of work product protection as to these documents are overruled.

The next category of disputed documents listed in the Log to which Defendants object include numerous documents authored by Saporita and sent to other agency attorneys and staff members, or authored by such staff employees and sent to Saporita. *See, e.g.*, Bates Range USEPAT0000413, Dkt. 232-12 at 2.  As the Log states, these documents included a request by counsel to the EPA for a search for documents regarding Defendant Acquest Transit.  Defendants' objection asserts it does not constitute work product "in anticipation of litigation because it was created 18 months after the instant action was filed."  However, such objection ignores that work product protection under Rule 26(b)(3)(A) also extends to documents prepared "in anticipation

of litigation or for trial." It is well-settled that attorney-work product created after an action is commenced is also within the scope of Rule 26(b)(3)(A). *See Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp.*, 2002 WL 31729693 at *4 (S.D.N.Y. Dec. 5, 2002) ("Certainly, documents created after litigation has already commenced, . . . are likely to be covered by the work-product doctrine." (citing *Magee v. Paul Revere Life, Ins. Co.,* 172 F.R.D. 627, 640 (E.D.N.Y. 1997))).   Thus, all documents created by the EPA or the Corps either by agency counsel or the agencies' staff, in connection with the investigation of Defendants after October 10, 2007, including those prepared after the filing of the Complaint on January 9, 2009, are protected as work-product.  As such, Defendants' numerous objections to this category of documents as described in the Log are also without merit.  Defendants do not contend that Plaintiff's reliance on work-product protection as of October 10, 2007 is negated by the later commencement of this action in January 2009.

Nor is there any indication in the descriptions of the disputed documents as provided by the Log that given the nature of the documents and circumstances of their creation the form of the documents would have remained the same if litigation had not been anticipated.  *See NIR Group, LLC,* 283 F.R.D. at 131.  "*Adlman* established a test of actual causation for this determination:  where a document would not have been prepared in substantially the same form but for the prospect of litigation privilege [work-product] applies; where the document would have been prepared in the same fashion in any event, it goes unprotected."  *Id.* (citing *Adlman* 134 F.3d at 1198).  For example, in this case, document USEPAT0006084 (Dkt. 232-12 at 20) to which Defendants object, lists an e-mail communication dated September 2, 2008 between EPA counsel and

David Pohle, an EPA staff member, "discussing potential consent orders in Acquest Transit Enforcement action."  It is difficult to conceive how a proposed consent order would have been discussed by the EPA, let alone drafted, unless litigation over the September 5, 2008 Cease and Desist Order was not then anticipated by the EPA.  Yet, Defendants' objection asserts that this communication somehow consisted of "[r]egulatory business rather than legal function."  *Id.*  True, when an agency initiates enforcement activity it is acting pursuant to its regulatory authority, but *Adlman* makes clear such duality of function does not remove work-product protection.  *See Schaeffler,* 806 F.3d at 43 ("Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings.") (citing *Adlman*, 134 F.3d at 1204).  Thus, although preparation of a consent order following issuance of an administrative cease and desist order represents the exercise of an agency's regulatory authority, it also represents an activity that by its nature and the circumstances of this case, *Schaeffler,* 806 F.3d at 43-44, demonstrate it also was created incident to the near-certain prospect of at least administrative litigation with Defendants concerning the property.  Significantly, Defendants do not argue any of the disputed documents would have been created in the same form even if such litigation had not been anticipated by the EPA, and it would offend common sense to conclude otherwise with respect to this group of documents.  In any event, Defendants' objection to this and similar documents described in the Log are without merit.

Another category of disputed documents reflected in the Log are those among EPA non-lawyer staff members.  *See, e.g.*, USEPAT00006298-299 (Dkt. 232-12 at 21) (covering an August 12, 2008 e-mail between two EPA non-attorney staff members

"regarding investigations conducted at the request of counsel about possible CWA violations at the Transit property").   As discussed, Discussion, *supra*, at 19-20, documents created by a party's non-attorney employees or agents, as well as those between counsel and party's non-attorney representatives, are protected by Rule 26(b)(3)(A).  Additionally, Ms. Feinmark averred that as EPA Regional Counsel she "supervised" EPA staff in connection with this matter since April 2007 when the Corps referred the matter to the EPA to "conduct an investigation."  Dkt. 239-5 ¶ 1.  Ms. Feinmark's involvement in the EPA's interactions with Defendants commenced in 2002 when the agencies investigated Defendants' potential CWA violations with respect to wetlands located at Defendants' Wehrle Drive property.  Defendants do not dispute Feinmark's statement with regard to such supervision.  Thus, all communications between and among the EPA and Corps' non-attorney agency staff after October 10, 2007 in this case are within the scope of work-product protection.  "The work product privilege protects documents produced by staff working at an attorney's direction, in addition to those prepared by the attorney herself."  *NIR Group, LLC*, 283 F.R.D. at 134 (citing cases).  Moreover, Rule 26(b)(3)(A) does not limit its scope to non-attorney representatives of a party who are supervised by an attorney for the party.  *See Proctor & Gamble Co. v. Ultreo, Inc.*, 574 F.Supp.2d 334, 336 (S.D.N.Y. 2008) ("The work product privilege applies not only to lawyers, but also to 'other types of representatives including, for example, investigators seeking factual information.'") (quoting *Doe v. United States (In re Grand Jury Subpoena Dated October 22, 2001)*).

The same analysis applies to Defendants' objections to the June 17, 2010 e-mail from Assistant U.S. Attorney Aaron Mango to the EPA and Department of Justice

attorneys regarding the status of a related criminal case against Defendants arising

from Defendants' actions with regard to the property.   *See* USEPAT0008412-0008414

(Dkt. 232-12) at 39.   As the pendency of the related criminal case against Defendants

could significantly affect the progress of Plaintiff's investigation of Defendants' activities

through assertions of privilege in the instant civil litigation, it cannot be said that such a

communication would have been provided regardless of the pendency of the instant

case.   Moreover, communications between federal prosecutors and federal

administrative agencies involved in parallel investigations and litigation regarding the

same parties are also within the scope of Rule 26(b)(3)(A).   *See United States v.*

*Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004) ("The work-product privilege applies to

many other discussions between prosecutors and investigating agents both state and

federal.") (citing *FTC v. Grolier, Inc.*, 462 U.S. 19 (1983)).   *See also Cohen v. City of*

*New York*, 255 F.R.D. 110, 124 (S.D.N.Y 2008) (same), and *Atlantic Richfield Company*

*v. Current Controls, Inc.*, 1997 WL 538876, at *2 n. 3 (W.D.N.Y. Aug. 21, 2997) (same).

Therefore, the need for Plaintiff's counsel to be appraised of developments in the

related criminal case and for the prosecutor to be aware of developments in this civil

action places this e-mail within the scope of work-product protection whether in

anticipation of litigation or for trial after the action was commenced.   *See NIR Group,*

*LLC*, 283 F.R.D. at 134 (stating in *dicta*, that preparation of document may qualify for

work-product protection, which protection is not lost during commencement or

conclusion of parallel criminal proceedings).   This conclusion applies to other similar

communications between Pohle and Mango such as Nos. 20659-60, 20661-61, 20662-

63, and 20694-95 (Dkt. 232-12) at 98-100 to which Defendants also object.   Thus, none

of Defendants' objections to any documents created by non-attorney agency staff members withheld as work-product after October 10, 2007 have merit.

In several instances, *see, e.g.*, Dkt. 232-12 at 66, Plaintiff failed to provide a date for a document's creation, which Defendants contend prevents Defendants from formulating a possible objection.  However, in the context of the related entries, it is fair to find such undated Log documents were created after October 10, 2007. Notwithstanding, as Bates No. 15070-72 was prepared on June 5, 2007 prior to October 10, 2007, it should be produced as should No. 15532-38, dated August 1, 2007, No. 15216-23, created August 6, 2007, 15230-32, 15436-38, and 17762-64, dated September 21, 2007, and 15313-17, dated October 1, 2007.  In addition, the Log also contains several entries referencing documents created prior to October 2007 from or to David Pohle or as to which Mr. Pohle received a copy, who has been designated by Plaintiff as a testifying expert and for whom Plaintiff has provided to Defendants all "contested documents that reflect factual materials Ms. Thiesing and Mr. Pohle considered in drafting scientific reports."  Dkt. 293 at 7.  *See also* Dkt. 293 at 12-13.  If such production, as Plaintiff states, does not include all of the documents regarding Pohle enumerated in the Log dated prior to October 2007, the documents are not work-product, and should also be produced to Defendants.  If this is not the case, Plaintiff shall <u>within 10 days</u> advise the court with specifics and support for such refusal to produce so that the court may make further rulings on any such remaining issues.

In some instances, Defendants object that copies of the described documents, redacted based on an asserted attorney-client privilege, were not produced.  *See, e.g.*, Log at 128-29; 136-37.  Plaintiff is directed to provide the redacted copies to

Defendants.  Additionally, Plaintiff shall, <u>within</u> <u>10</u> <u>days</u>, provide to Defendants a supplemental privilege log stating the date of creation for any documents to which Defendant objected to Plaintiff's assertions of attorney work-product and attorney-client privilege.  Defendants may file a further motion to compel <u>within</u> <u>10</u> <u>days</u> <u>thereafter</u> should Defendants disagree with Plaintiff's respective assertions of attorney-client privilege or attorney work-product as to these disputed items.

In other instances, *see, e.g.*, Log at 133, Dkt. 232-12 at 134 (Bates Nos. 29515-43, 29544-80, 29581-97) the dates of creation of the described documents (2005, 1999 and 1998) substantially predate October 2007 thereby making it unlikely such documents could reasonably be considered as having been created by the agencies in contemplation of litigation, *i.e.*, after October 10, 2007, with respect to the property. Although the Log indicates these documents were prepared at the direction of counsel in connection with "on-going litigation," the Log fails to provide an indication as to the nature, administrative or judicial, of such asserted litigation sufficient to support Plaintiff's attorney work-product claim.  Accordingly, such documents shall be produced to Defendants.

In two instances, *see* Log at 172, Dkt. 232-12 at 173, Defendants object that the document at issue, (Bates No. 3191-92) and Log at 125, Dkt. 232-12 at 126 (Bates No. 26132-33), was disclosed to Defendants and therefore Plaintiff's asserted work product protection was waived.  If Plaintiff believes, contrary to Defendants' assertion, no waiver occurred, Plaintiff shall promptly advise the court so that a separate briefing schedule directed to the issue of waiver as to these documents can be established by the court. Alternatively, the parties may also submit a proposed joint briefing schedule.

In sum, except as indicated otherwise, all of Plaintiff's documents which the August 25, 2016 Privilege Log indicates were created after October 10, 2007, regardless of whether created by the agencies' counsel, at the direction or under supervision of the agencies' counsel, or by the staff of such agencies, are entitled to work-product protection and as all documents withheld by Plaintiff are asserted to be withheld under both work-product protection and attorney-client privilege, and as Defendants have, except as discussed, failed to comply with Rule 26(b)(3)(A)(i) and (ii), it is unnecessary for the court to separately address the merits of Plaintiff's alternatively asserted attorney-client privilege covering the documents in response to Defendants' numerous objections.

C.    Attorney-Client Privilege.

Plaintiff also asserts only attorney-client privilege for seven documents, specifically Log at 89, Dkt. 232-12 at 90 (Bates No. 18458-64), 101, Dkt. 232-12 at 102 (Bates No. 20878-80), 103, Dkt. 232-12 at 104 (Bates No. 21380), 110, Dkt. 232-12 at 111 (Bates No. 22513), 111, Dkt. 232-12 at 112 (Bates No. 22616), 122, Dkt. 232-12 at 123 (Bates No. 23901-02), and 124, Dkt. 232-12 at 125 (Bates No. 24246).

As to Bates No. 18458-64, the Log indicates this document was created by one Daniel Montella for one Murray Lantner on August 1, 2007, and is an e-mail among EPA staff and counsel in connection with potential CWA violations at the property.  However, neither person is described as an EPA attorney, *see* Dkt. 239 at 15 (listing six EPA attorneys who may have been involved in the investigation and subsequent litigation of this case).  If Plaintiff wishes to continue to assert this document as privileged, it shall provide further supporting documentation within 10 days of this Decision and Order.

Defendants may file any response within 10 days thereafter.  If Plaintiff fails to do so, the document shall be provided to Defendants.  As to Bates No. 20878-80, although Ms. Feinmark is copied on the e-mail created August 1, 2007, regarding potential CWA violations on the property, neither the author, David Pohle, nor the recipient is indicated as an EPA attorney.  Should Plaintiff wish to maintain the asserted privilege, supporting documentation shall be filed within 10 days.   Defendants may respond within 10 days thereafter.  Should Plaintiff fail to do so, the document shall be produced to Defendants. As to Bates No. 21380, the same analysis and ruling shall apply.  As to Bates No. 22513, the Log indicates this e-mail is from an EPA staff investigator and expert, David Pohle, to Aaron Mango, the assistant United States attorney responsible for prosecution of Defendants in the related criminal proceeding.  Such communications are within the scope of the attorney-client privilege because the communications relate to the EPA's common interest in enforcement of the CWA both civilly and criminally against Defendants as prosecuted by the United States Attorney for this district during the pendency of this action, *see Zingsheim*, 384 F.3d at 871-72 ("attorney-client privilege covers conversations between prosecutors (as attorneys) and client agencies within the government"), because attorney-client relationship exists between the Department of Justice and the agencies.  *See Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1457 (1st Cir. 1992).  Moreover, such communications on pending legal matters are well-within the scope of the privilege, *see In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005) (citing *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) ("consultation with government lawyers" within privilege); Defendants' objection as to this document is therefore overruled.

As to Bates No. 22616, because the Log fails to indicate any attorney was involved in the creation or receipt of the described e-mail, the court finds it necessary to apply the same ruling as stated with regards to Bates No. 1845-864, *supra*.  As to Bates No. 23901-02, as this is another e-mail from Mr. Pohle to AUSA Mango, the same reasoning and ruling as regards to Bates No. 22513, Discussion, *supra*, at 36, applies.

As to Bates No. 24246, because the Log fails to indicate that either of the listed addressees, Laurie Dubriel and Robert Conway, are federal prosecutors assigned to the related criminal proceeding, *see* Discussion, *supra*, as to Bates Nos. 22513, 23901-02, Plaintiff shall provide supplementary documents within 10 days to support Plaintiff's assertions of the privilege for this document; otherwise, the document shall be produced within 10 days.  Defendants may file any response within 10 days after Plaintiff's filing.

## CONCLUSION

Based on the foregoing, Defendants' motion (Dkt. 232) is GRANTED in part, and DENIED in part.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated:  February 21, 2017
       Buffalo, New York