UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                              Plaintiff,

                  v.

ACQUEST TRANSIT LLC,
ACQUEST DEVELOPMENT, LLC., and
MR. WILLIAM L. HUNTRESS,

                              Defendants.
_____

REPORT
and
RECOMMENDATION
-----------------------------
DECISION
and
ORDER[1]

09-CV-00055S(F)


APPEARANCES:        JEFFREY B. SESSIONS
                    UNITED STATES ATTORNEY GENERAL
                    Attorney for Plaintiff
                    JESSIE K. LIU
                    UNITED STATES ATTORNEY, DISTRICT OF COLUMBIA
                    TSUKI HOSHIJIMA, and
                    ELIZABETH YU
                    Assistant United States Attorneys, of Counsel
                    601 D Street NW
                    Washington, District of Columbia  20535
                              and
                    BRADLEY L. LEVINE,
                    JOHN EDWARD SULLIVAN, and
                    MEGHAN ELIZABETH GREENFIELD, Trial Attorneys
                    Environmental Enforcement Section
                    P.O. Box 7611
                    Ben Franklin Station
                    Washington, District of Columbia  20044-7611
                              and

---

[1] Motions to strike expert reports as well as motions to strike motions are non-positive. *See Advanced Analytics, Inc. v. Citigroup Global Markets, Inc.*, 301 F.R.D. 47, 50-51 (S.D.N.Y. 2014) (considering magistrate judge's order striking plaintiff's expert evidence as non-dispositive and reviewing it for clear error); *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 2005 WL 1074320, at *1 n. 1 (W.D.N.Y. Feb. 9, 2005) (motion to disqualify prospective testifying expert is non-dispositive).  Here, because resolution of Plaintiff's and Defendants' pending non-dispositive motions to strike requires application of the same law as the pending summary judgment motions, the court addresses all pending motions together in this combined Report and Recommendation/Decision and Order.

CHRIS SAPORITA, Assistant Regional Counsel
United States Environmental Protection Agency
Water and General Law Branch, of Counsel
Region 2
290 Broadway, 16th Floor
New York, New York  10007-1866

JAMES P. KENNEDY
UNITED STATES ATTORNEY
Attorney for Plaintiff
MARY K. ROACH
Assistant United States Attorney, of Counsel
Federal Centre
138 Delaware Avenue
Buffalo, New York  14202

RUPP BAASE PFALZGRAF CUNNINGHAM LLC
Attorneys for Defendants
ANNE KATHERINE BOWLING,
DAVID ROSS PFALZGRAF, JR.,
MATTHEW D. MILLER, and
R. ANTHONY RUPP, III, of Counsel
424 Main Street
Suite 1600
Buffalo, New York  14202

DURHAM JONES & PINEGAR, P.C.
Attorneys for Defendants
BRADLEY R. CAHOON, of Counsel
111 S. Main Street
Suite 2400
Salt Lake City, Utah  84111

THE CORNWELL LAW FIRM
Attorneys for Defendants
GARY TYLER CORNWELL, of Counsel
900 N. Rainbow Ranch Road
Wimberly, Texas  78676

## **JURISDICTION**

Honorable William M. Skretny referred this case to the undersigned pursuant to

28 U.S.C. § 636(b)(1)(A) and (B), for all pretrial matters including preparation of a report

and recommendation on dispositive motions, initially on June 10, 2010 (Dkt. 44), and again on June 29, 2015 (Dkt. 196). The matter is presently before the court on motions for summary judgment filed October 16, 2017, by Defendants (Dkt. 267), and Plaintiff (Dkt. 269), and on motions to strike filed by Plaintiff on January 31, 2018, (Dkts. 293, 294, and 296), and by Defendants on June 12, 2018 (Dkts. 320 and 321).

## BACKGROUND

Plaintiff United States of America ("Plaintiff" or "the Government"), commenced this action on January 15, 2009, asserting three claims for relief against Defendant Acquest Transit LLC ("Acquest"), for violations of §§ 301 and 309(d) of the Clean Water Act of 1972 ("CWA"), 33 U.S.C. § 1251 *et seq.*, by engaging in various ditching, earthmoving, and fill activities on tax parcel 16.00-5-23, located in the Town of Amherst, New York ("the Site" or "the Property"), and seeking injunctive relief and civil penalties. Plaintiff's motion filed March 4, 2009, for a preliminary injunction against Acquest "placing additional fill or performing any additional earth-moving work at the Property" pending resolution of the instant litigation (Dkt. 6), was granted by District Judge Skretny on July 15, 2009 (Dkt. 26). An amended complaint filed April 6, 2011 (Dkt. 112) ("Amended Complaint"),[2] is essentially identical to the original Complaint, asserting the same three claims for relief against Acquest and newly-added Defendants Acquest Development, LLC ("Acquest Development"), and William L. Huntress ("Huntress") (together, "Defendants"). In particular, Plaintiff alleges Defendants (1) discharged pollutants into navigable waters of the United States without obtaining the requisite

---

[2] The Amended Complaint initially was filed April 5, 2011 (Dkt. 111), but was refiled to correct a signature error.

permit in violation of CWA §§ 301 and 404, 33 U.S.C. §§ 1311 and 1344, Amended Complaint ¶¶ 45-53 ("First Claim" or "the § 404 violation"); (2) discharged storm water associated with industrial activity into the navigable waters of the United States without obtaining the requisite permit in violation of CWA §§ 301, 402, and 502(12), respectively, 33 U.S.C. § 1311 and 1362(12), *id.* ¶¶ 54-63 ("Second Claim" or "the § 402 violation"); and (3) continued the alleged unlawful discharge of pollutants into navigable waters of the United States without the requisite § 404 permit in contravention of an administrative order issued by the Environmental Protection Agency ("EPA"), in February 2009, in violation of CWA § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, *id.* ¶¶ 64-67 ("Third Claim" or "the administrative order violation").

On October 16, 2017, Defendants filed a motion for summary judgment (Dkt. 267) ("Defendants' Summary Judgment Motion"), supported by Defendants' Memorandum in Support of Motion for Summary Judgment (Dkt. 267-1) ("Defendants' Memorandum"), Local Rule 56 Statement of Undisputed Material Facts (Dkt. 267-2) ("Defendants' Statement of Facts"), the Affidavit of Bradley R. Cahoon, Esq. (Dkt. 267-3) ("Cahoon Affidavit"), attaching exhibits 1 through 11 (Dkts. 267-4 through 267-14) ("Cahoon Exh(s). __"), and the Affidavit of William L. Huntress (Dkt. 267-15) ("Huntress Affidavit"). Also filed on October 16, 2017, was Plaintiff's motion for summary judgment on liability (Dkt. 269) ("Plaintiff's Summary Judgment Motion"), supported by the United States' Memorandum in Support of Motion for Summary Judgment on Liability (Dkt. 269-1) ("Plaintiff's Memorandum"), United States' Statement of Undisputed Material Facts (Dkt. 269-2) ("Plaintiff's Statement of Facts"), the Declaration of John Sullivan,

Esq. (Dkt. 269-3) ("Sullivan Declaration"), and four volumes of exhibits (Dkts. 271-274) ("Plaintiff's Exh(s). __").

On December 8, 2017, Plaintiff filed United States' Opposition to Defendants' Motion for Summary Judgment (Dkt. 278) ("Plaintiff's Response"), United States' Opposing Statement to Defendants' Statement of Undisputed Material Facts (Dkt. 278-1) ("Plaintiff's Opposing Statement of Facts"), and the Declaration of Meghan E. Greenfield, Esq. (Dkt. 278-2) ("Greenfield Declaration"), attaching exhibit A (Dkt. 278-3) ("Greenfield Declaration Exhibit").  Also filed on December 8, 2017, was Defendants' Memorandum in Opposition to the United States' Motion for Summary Judgment on Liability (Dkt. 279) ("Defendants' Response"), attaching Defendants' Response to Plaintiff's Statement of Undisputed Material Facts and Defendants' Counterstatement in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 279-1) ("Defendants' Opposing Statement of Facts"), and the Declaration of Matthew D. Miller, Esq. and Defendants' Appendix to Local Rule 56 Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 279-2) ("Miller Declaration"), to which are attached exhibits (Dkts. 279-3 to 279-4, 280-1 to 280-22, 281-1 to 281-15, and 282-1 to 282-2) ("Defendants' Response Exh(s). __").

On January 31, 2018, Plaintiff filed three motions to strike, including (1) the Motion to Partially Strike Affidavit of Stephen Apfelbaum (Dkt. 293) ("Apfelbaum Motion"), attaching United States' Memorandum in Support of Motion to Partially Strike Affidavit of Stephen Apfelbaum (Dkt. 293-1) ("Plaintiff's Memorandum - Apfelbaum"), and the Declaration of Assistant United States Attorney ("AUSA") Tsuki Hoshijima (Dkt. 293-2) ("Hoshijima Declaration - Apfelbaum"), attaching Exhibit A (Dkt. 293-3)

("Apfelbaum Motion Exh. A"); (2) the Motion to Partially Strike Declarations of Ray and Susan Kagel (Dkt. 294) ("Kagels Motion"), attaching United States' Memorandum in Support of Motion to Partially Strike Declarations of Ray and Susan Kagel (Dkt. 294-1) ("Plaintiff's Memorandum - Kagels"), and the Declaration of AUSA Tsuki Hoshijima (Dkt. 294-2) ("Hoshijima Declaration - Kagels"), attaching exhibits A through C (Dkts. 294-3 through 294-5) ("Kagels Motion Exh(s). __"); and (3) the Motion to Partially Strike Declaration of Alan Busacca (Dkt. 296) ("Busacca Motion"), attaching United States' Memorandum in Support of Motion to Partially Strike Declaration of Alan Busacca (Dkt. 296-1) ("Plaintiff's Memorandum - Busacca"), and the Declaration of AUSA Tsuki Hoshijima (Dkt. 296-2) ("Hoshijima Declaration - Busacca"), attaching exhibits A through G (Dkts. 296-3 through 296-9) ("Busacca Motion Exh(s). __").  Plaintiff also filed on January 31, 2018, United States' Reply in Support of Motion for Summary Judgment on Liability (Dkt. 297) ("Plaintiff's Reply"), attaching exhibits A and B (Dkts. 297-1 and 2) ("Plaintiff's Reply Exh(s). __").  On February 1, 2018, Plaintiff filed the Declaration of Assistant United States Attorney John E. Sullivan (Dkt. 298) ("Sullivan Declaration"), attaching exhibit C (Dkt. 298-1) ("Sullivan Declaration Exh. C").  On February 5, 2018, Defendants filed Defendants' Reply to Government's Response to Defendants' Motion for Summary Judgment (Dkt. 299) ("Defendants' Reply").

On May 15, 2018, Defendants filed in response to Plaintiff's motions to strike (1) the Memorandum in Opposition to the United States' Motion to Strike, in Part, the Expert Declaration of Mr. Steven Apfelbaum (Dkt. 307) ("Defendants' Response – Apfelbaum"), and the Declaration of Anne K. Bowling, Esq., in Opposition to Plaintiff's Motion to Strike, in Part, the Declaration of Mr. Steven Apfelbaum (Dkt. 307-1) ("Bowling

Declaration – Apfelbaum"); (2) the Memorandum in Opposition to the United States' Motion to Strike, in Part, the Expert Declaration of Dr. Alan Busacca (Dkt. 308) ("Defendants' Response – Busacca"), and the Declaration of Anne K. Bowling, Esq., in Opposition to Plaintiff's Motion to Strike, in Part, the Expert Declaration of Dr. Alan Busacca (Dkt. 307-1) ("Bowling Declaration – Busacca"), attaching exhibits 1 through 3 ("Busacca Motion Response Exh(s). __"); and (3) the Memorandum in Opposition to the United States' Motion to Strike, in Part, the Testimony of Ray Kagel and Susan Kagel (Dkt. 309) ("Defendants' Response – Kagels"), and the Declaration of Anne K. Bowling, Esq., in Opposition to Plaintiff's Motion to Strike, in Part, the Declarations of Mr. Ray and Dr. Susan Kagel (Dkt. 309-1) ("Bowling Declaration – Kagels"), attaching exhibits 1 through 5 (Dkts. 309-2 through 309-6) ("Kagels Motion Response Exh(s). __").

On May 17, 2018, Plaintiff moved for leave to file a supplemental brief opposing Defendants' motion for summary judgment (Dkt. 311) ("Plaintiff's Motion to File Supplemental Memorandum"), attaching as exhibit A the proposed sur-reply (Dkt. 311-1) ("Plaintiff's Supplemental Memorandum"). By Text Order entered May 30, 2018 (Dkt. 311) ("May 30, 2018 Text Order"), the undersigned granted Plaintiff's Motion to File Supplemental Memorandum, deeming Plaintiff's Supplemental Memorandum filed as of May 30, 2018, and setting June 6, 2018, as Defendants' deadline to file any further reply. On May 30, 2018, Defendants moved for reconsideration of the May 30, 2018 Text Order (Dkt. 316) ("Defendants' Reconsideration Motion"), which the undersigned, by Text Order entered May 31, 2018 (Dkt. 317) ("May 31, 2018 Text Order"), denied, granting Defendants' alternative request for an extension of time to file a further reply and setting June 15, 2018 as the new deadline.

On June 12, 2018, Defendants filed two motions to strike, including (1) the Motion to Strike, in Part, the Expert Declaration of Jonathan Jones (Dkt. 320) ("Jones Motion"), attaching the Memorandum in Support of Defendants' Motion to Strike Parts of the Expert Declaration of Jonathan Jones (Dkt. 320-1) ("Defendants' Memorandum – Jones"), and the Declaration of Anne K. Bowling, Esq., in Support of Defendants' Motion to Strike, in Part, the Declaration of Mr. Jonathan Jones (Dkt. 320-2) ("Bowling Declaration – Jones"), attaching exhibits 1 through 4 (Dkts. 320-3 through 320-6) ("Jones Motion Exh(s). __"), and (2) the Motion to Strike, in Part, the Expert Declarations of Noah Greenburg and [Dr.][3] Robert Brooks (Dkt. 321) ("Greenberg and Brooks Motion"), attaching the Memorandum in Support of Defendants' Motion to Strike Parts of the Expert Declarations of Mr. Noah Greenberg and Dr. Robert Brooks (Dkt. 321-1) ("Defendants' Memorandum – Greenberg and Brooks"), and the Declaration of Anne K. Bowling, Esq., in Support of Defendants' Motion to Strike, in Part, the Declarations of Noah Greenberg and [Dr.] Robert Brooks (Dkt. 321-2) ("Bowling Declaration – Greenberg and Brooks"), with exhibit 1 (Dkt. 321-3) ("Greenberg and Brooks Motion Exh. 1"). On June 14, 2018, Plaintiff filed United States' Reply in Support of Motion to Partially Strike Affidavit of Steven Apfelbaum (Dkt. 322) ("Plaintiff's Reply – Apfelbaum"), the United States' Reply in Support of Motion to Partially Strike Declarations of Ray and Susan Kagel (Dkt. 323) ("Plaintiff's Reply – Kagels"), and United States' Reply in Support of Motion to Partially Strike Declaration of [Dr.] Alan Busacca (Dkt. 324) ("Plaintiff's Reply – Busacca"), and Defendants filed Defendants' Response to the Government's "Supplemental Brief," (Dkt. 325) ("Defendants'

[3] Unless otherwise indicated, bracketed material and underlining has been added.

Supplemental Response"). On June 22, 2018, Plaintiff filed United States' Motion to Strike Defendants' Motions to Strike Expert Testimony (Dkt. 326) ("Plaintiffs' Motion to Strike the Motion to Strike"), attaching the Declaration of AUSA Tsuki Hoshijima (Dkt. 326-1) ("Hoshijima Declaration – Motion to Strike the Motion to Strike"). On June 28, 2018, Defendants filed the Memorandum in Opposition to Government's Motion to Strike Defendants' Motion to Strike, in Part, the Declaration of Jonathan Jones and Defendants' Motion to Strike, in Part, the Declarations of Noah Greenberg and [Dr.] Robert Brooks (Dkt. 328) ("Defendants' Response – Motion to Strike the Motion to Strike"), attaching the Declaration of Anne K. Bowling, Esq., in Opposition to the Government's Motion to Strike the Defendants' Motion to Strike, in Part, the Declaration of Jonathan Jones and the Defendants' Motion to Strike, in Part, the Declarations of Noah Greenberg and [Dr.] Robert Brooks (Dkt. 328-1) ("Bowling Declaration – Motion to Strike the Motion to Strike"). By Text Order entered June 28, 2018 (Dkt. 329), the undersigned granted United States' Consent Motion for Extension of Time to Respond to Defendants' Motions to Strike (Dkt. 327), extending Plaintiff's time to response to Defendants' motions to strike to thirty days following any denial of Plaintiff's Motion to Strike the Motion to Strike. On July 2, 2018, Plaintiff filed United States' Notice of No Reply (Dkt. 330), advising Plaintiff does not intend to file any reply in further support of Plaintiff's Motion to Strike the Motion to Strike.

On July 27, 2018, Defendants, with Plaintiff's consent, moved for leave to file supplemental authority, (Dkt. 331), which was granted on August 7, 2018 (Dkt. 332), with Plaintiff filing its response on August 9, 2018 (Dkt. 333).

Oral argument was deemed unnecessary.

Based on the following, Plaintiff's Motion to Strike - Busacca (Dkt. 293) is DENIED; Plaintiff's Motion to Strike - Kagels (Dkt. 294) is DENIED; Plaintiff's Motion to Strike - Apfelbaum (Dkt. 296) is DENIED; Defendants' Motion to Strike – Jones (Dkt. 320) is DISMISSED as moot; Defendants' Motion to Strike – Greenberg and Brooks (Dkt. 321) is DISMISSED as moot; Plaintiff's Motion to Strike the Motion to Strike (Dkt. 326) is GRANTED; Defendants Summary Judgment Motion (Dkt. 267) should be DENIED; Plaintiff's Summary Judgment Motion (Dkt. 269) should be DENIED in part, and GRANTED in part.

## **FACTS**[4]

At the center of this action is whether a certain 97-acre[5] tract of real property located in the Town of Amherst, Erie County, New York, also known as Tax Parcel 16.00-5-23 ("the Site" or "the Property"), constitutes wetlands under the Clean Water Act of 1972 ("CWA" or "the Act"), requiring the owner to obtain various permits prior to developing the Site.  The Property is essentially a rectangle bound on its eastern end by Transit Road, on the west by Millersport Highway, and to the north and south by other plots of land, measuring 4000' in length and approximately 1100' in width at the eastern end.  With its elevation decreasing by only four feet from the East to the West, the Property is relatively flat.  It is undisputed that the Property lies within three different 100-year floodplains as defined by the Federal Emergency Management Agency ("FEMA"), relative to nearby Black, Ransom, and Transit Creeks.  From at least the

---

[4] Taken from the pleadings and motion papers filed in this action.
[5] Although throughout the record, the Site is variously referred to as measuring 96.3 acres, 96.6 acres, and 97 acres, the court, in the interest of simplicity, refers to the Site as being 97 acres, unless specifically stated otherwise in a referenced document.

1920s through 1988, the Site was used almost exclusively for agricultural purposes.  As relevant, it is undisputed that in 1987, the United States Department of Agriculture ("USDA"), acting through the Soil Conservation Service ("SCS"), now known as the Natural Resource Conservation Service ("NRCS"),[6] designated the northern 67.7 acres of the Site as containing prior converted cropland ("PCC"), which, under the relevant regulations, is exempt from the CWA's permitting requirements for as long as the PCC remains agricultural in nature.  PCC Designation.[7]

One Craig Duff ("Duff"), farmed the property until 1978 when it was sold to Cimato Bros., Inc. ("Cimato Bros."), and Anthony Cimato ("Cimato"), and his family maintained a garden on a portion of the Transit Road side about 100 to 200 yards west of Transit Road.  Between 1982 and 1985, Cimato permitted Michael Badding ("Badding"), and Badding's brother to farm five acres of the Property adjacent to Transit Road, in an area in which is now situated Greenview Nursery ("Greenview" or "the nursery").  On November 28, 1988, Cimato Bros. sold the Site to a company owned by Joseph Jayson ("Jayson"), Realmark Properties ("Realmark"), which neither farmed or developed the property, nor permitted anyone one else to farm the property.  Nevertheless, Duff maintains that while owned by Realmark, he continued to clear the Site.  Duff Dep. Tr. at[8] at 90-92.  Realmark retained a New York State certified general real estate appraisal firm, Howard P. Schultz & Associates ("HPS"), to estimate the "As Is" market value of the Site.  On May 19, 2004, HPS issued its Self-Contained Appraisal

[6] The NRSC, formerly the SCS, is an agency within the USDA.
[7] Dkt. 273-3.
[8] References to "Duff Dep. Tr." are to pages of the transcript of Duff's deposition, portions of which are filed as Defendants' Response Exh. 13 (Dkt. 280-17).

Report ("HPS Appraisal Report"),[9] in which determined the Site had 13 acres of wetlands which was considered unusable.

Defendant William L. Huntress ("Bill Huntress" or "Huntress"), is the owner and manager of Defendants Acquest Development, LLC ("Acquest Development"), and Acquest Transit, LLC ("Acquest Transit") (together, "Defendants" or "Acquest"). In June 2005, Acquest and Realmark entered into a Purchase Agreement ("PA" or "Purchase Agreement"),[10] for Acquest to purchase the Site for $ 950,000. At that time, 13 of the Property's acres had already been identified as wetlands in the HPS Appraisal Report. PA ¶ 2(d) (Dkt. 270-1 at 34); Appraisal Report at 23 (Dkt. 270-1 at 79). The PA included a clause permitting Acquest substantial time to perform due diligence and examine the Property, as well as a clause providing for the purchase price to be reduced by $ 10,000 for each additional acre determined to be wetlands.

In July 2005, pursuant to the PA, Acquest hired Economy Tree Service ("ETS"), to hydro-axe (land-clearing method using one machine to cut, grind and clear vegetation) the Site to accommodate Acquest's property inspection. In October 2005, Acquest hired Earth Dimensions, Inc. ("EDI"), a wetlands consultant, to delineate any wetlands boundaries on the Site. One Scott Livingstone ("Livingstone"), of EDI performed the delineation by sampling and gathering data from 98 observation points on the Site over five days in October 2005. Analysis of the data ("EDI Report")[11] showed 77.02 acres, or 80% of the Site's total 96.3 acres consisted of wetlands that appeared to be connected with waters of the United States located off-site, *i.e.*, Ransom

---

[9] Filed as Dkt. 270-1 at 51-125.
[10] Filed as Dkt. 270-1 at 33-46.
[11] Filed as Dkt. 270-6 at 487-546.

Creek, Tonawanda Creek, and Niagara River, such that the wetlands were within federal jurisdiction under the CWA and at most, only 10 acres of the Site could be developed without obtaining permits as required under the CWA. Relying on the EDI Report, Acquest negotiated a $ 525,000 reduction in the purchase price, ultimately purchasing the Property for $ 425,000 on January 22, 2006.

Upon its purchase by Defendants, the Property contained three primary ditches referred to as the "South Ditch," the "South Central Ditch," and the "West Ditch" (together, the "three original ditches"). In these three original ditches, water was conveyed from the Property, naturally flowing from east, where the Property's elevation was, as noted, higher, to west in accordance with the Site's downward slope. The West Ditch discharges into the East Millersport Highway Ditch which flows - upstream through three culverts and downstream through four culverts -underneath Millersport Highway into the West Millersport Highway Ditch, and then downstream for 1 ½ miles into Ransom Creek. In addition to the three original ditches, at present there is a fourth ditch on the site, *e.g.*, the "North Ditch."

Without obtaining any permit under the CWA, Defendants, from early 2006 through 2008, paid $ 200,000 to Economy Tree Service to use mechanical equipment to clear vegetation from the Site and to clear, deepen and widen the three original ditches at the Site, including in areas delineated by EDI as wetlands. Also within areas delineated in the EDI Report as wetlands, the cleared materials were redeposited on the Site, and Defendants, in March and April 2007, hauled in and dumped broken blacktop and fabric onto the Site to construct a turnaround pad and gravel road accessible from Millersport Highway. Economy Tree Service also dug a 150' long drainage ditch, 8" to

10" deep, from the access road to the East Millersport Highway Ditch. An additional 300 dump truck loads of fill were deposited in the southwest portion of the Site.

In 2006 and 2007, Defendants applied for under § 402 of the CWA and received two permits for storm water discharges ("Discharge Permits"), allowing such discharges associated with the construction of the Greenview Nursery on the Property's eastern edge, as well as site work including cleaning existing ditches, site grading, and minor ditch improvement on four acres of the Site where the nursery is located. In July 2007, Defendants hired farmer Donald Spoth ("Spoth"), to plant corn on 88 acres of the Property. From July through the fall of 2007, Pat Huntress ("Pat Huntress"), brother of Bill Huntress, used an excavator to clear out the three original ditches at the Site. In the fall of 2007, John Kelkenberg ("Kelkenberg"), hired by Defendants, used a tractor to cut down the corn sown by Spoth and left it on the Property.

On February 21, 2008, the United States Environmental Protection Agency ("EPA"), issued a Cease and Desist Order ("First Cease and Desist Order"),[12] to Defendants, ordering the cessation of all earth moving work, filling, grading or excavation on the Site without first obtaining the requisite § 404 permit allowing such activity, pending a determination by the United States Army Corps of Engineers ("the Corps" or "the COE"), as to whether the Site was jurisdictional wetlands. On March 19, 2008, the COE designated Ransom Creek as a Traditional Navigable Waterway ("TNW"), within the jurisdiction of the CWA thereby requiring § 402 and § 404 permits. Dkt. 9-31. On July 28, 2008, the EPA obtained from this court, an Order for Entry on Open Land to Delineate Federal Wetlands and to Search for Suspected Violations of

---

[12] Dkt. 9-5.

the Clean Water Act ("Search Order"),[13] permitting EPA Environmental Scientist David G. Pohle ("Pohle"), accompanied by members of an EPA Wetlands Protection Team ("the EPA Inspection Team"), entry to the Site to investigate whether the Property contains federally regulated wetlands and, if so, whether any activity conducted by Defendants or others acting at Defendants' request or authorization on the Property was in violation of the CWA. The Search Order describes the Property as "mostly open fields, with some forested areas." Search Order at 2 (Dkt. 9-6 at 3). Upon inspecting the Site on July 29, 30, and 31, 2008, the EPA Inspection Team found no evidence of recent farming activity despite its farming history, but observed an excavator and ongoing excavation of a ditch along the Site's southern border (the South Ditch), in apparent violation of the Cease and Desist Order. Site Inspection Report[14] at 1, 8-9. The EPA Inspection Team used a backhoe or dug with shovels to sample 46 locations on the Site, almost all of which showed evidence of some disturbance, and finding hydric soils,[15] wetland vegetation, and wetland hydrology present throughout the Site, or were present prior to the fill and disturbance activities conducted by Defendants, *id.* at 22-23, concluding wetlands are present on the entire Site with 13.3 acres of fill deposited onto the Property constituting violations of the CWA. *Id.* at 24. The wetlands abut and maintain a continuous surface connection with the West Ditch from which water flows at least three seasons into the Millersport Highway East Side Ditch, underneath Millersport Highway, into the Millersport Highway West Site Ditch, and into

---

[13] Dkt. 9-6.

[14] Dkt. 8-3.

[15] "Hydric soils" are soils "that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part." Hydric Soils List Criteria, available at https://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/use/hydric/?cid=nrcs142p2_053959, *last visited* Aug. 14, 2018. "Anaerobic" refers to "a situation in which molecular oxygen is virtually absent from the environment." *Id.*

Ransom Creek, then to Tonawanda Creek and the Niagara River. *Id.* From the location of the nursery in the Site's eastern portion, water empties into the Transit Road West Side Ditch, flowing south to Black Creek, and into Ransom Creek before converging with Tonawanda Creek. *Id.* The EPA concluded that the presence of fish onsite establishes a continuous surface water connection between the wetlands and offsite waters, and the presence of amphibians helps maintain the biological integrity of the wetlands and connected waters. *Id.* The EPA also determined that the placement of fill on the Site to construct the gravel road, fill pad, parking area, south fill area, and Greenview Nursery, as well as the placement of material excavated from the South and West Ditches and subsequent distribution of excavated material across the Site all constituted discharges into wetlands. *Id.* at 25. The EPA furthermore concluded the measures onsite to control erosion from ongoing construction activity are inadequate thereby leading to increased discharges into the downstream waters. *Id.* After the EPA Team Inspection Team completed its investigation, Defendants resumed earth-moving activities at the Site, causing the EPA to issue on September 5, 2008 a second Cease and Desist Order ("Second Cease and Desist Order"),[16] reiterating that any further earth-moving activity on the Site was prohibited. On September 10 and 16, 2008, further earth-moving activity at the Site was observed by a Corps employee.

In the fall of 2008, Defendants allowed Kelkenberg to plant a crop of winter wheat on the Site. While planting the winter wheat, Kelkenberg dug new ditches in the wheat fields, connecting them to existing ditches, including the three original ditches.

---

[16] Dkt. 9-7.

On January 15, 2009, Plaintiff commenced this action seeking injunctive relief and civil penalties against Defendants for violations of the CWA by discharging pollutants, including storm water runoff and fill material, into waters of the United States without first obtaining the requisite § 402 and § 404 permits. On March 4, 2009, Plaintiff moved for a preliminary injunction enjoining Defendants from placing additional fill or performing any additional earthmoving work at the Property. The injunction was granted on July 15, 2009 (Dkt. 26).

Several scientists were retained by the parties as expert witnesses in this action. In particular, Robert P. Brooks, Ph.D. ("Dr. Brooks"), a practicing wetland scientist and wildlife biologist certified by the Society of Wetland Scientists and The Wildlife Society, Declaration of Robert P. Brooks, Ph.D. ("Dr. Brooks Declaration") ¶ 3, prepared United States v. Acquest Transit Expert Report: Ecological Functions and Significance of Wetlands and Waters at the Transit Site, Amherst, Erie County, New York ("Dr. Brooks Report"), and the Rebuttal Report for United States v. Acquest Transit Expert Report: Ecological Functions and Significance of Wetlands and Waters at Transit Site, Amherst, Erie County, New York ("Dr. Brooks Rebuttal Report").[17] Jonathan Earl Jones ("Jones"), a registered Professional Engineer and a Professional Hydrologist employed by Wright Water Engineers, Inc. ("WWE"), Declaration of Jonathan Earl Jones ("Jones Declaration") ¶ 1, prepared the Evaluation of Hydrology and related Topics at the Acquest Transit Site and Surrounding Area ("Jones Report"), and the Review of the Kagel Environmental, LLC, and Vinitas Consultants, LLC, December 2016 Expert Witness Reports in *United States v. Acquest Transit, LLC, et al.* ("Jones Rebuttal

---

[17] Respectively filed as Dkt. 271-2 at 1-4 (Dr. Brooks Declaration), 5-45 (Dr. Brooks Report), and 46-57 (Dr. Brooks Rebuttal Report).

Report").[18]  Noah Greenberg ("Greenberg"), a Senior Aquatic Research Scientist with WWE, Declaration of Noah Greenberg ("Greenberg Declaration"), prepared the Evaluation of Biological Considerations Related to the Connectivity of the Transit Site to Ransom Creek ("Greenberg Report"), and the Review of the Kagel Environmental, LLC, and Vinitas Consultants, LLC, December 2016 Expert Witness Reports in United States v. Acquest Transit, LLC, et al. ("Greenberg Rebuttal Report").[19]  Peter Stokely ("Stokely"), an Environmental Scientist with the EPA, Declaration of Peter Stokely ("Stokely Declaration"), prepared the Analysis of Overhead Imagery and Geographic Information System (GIS) Data Covering the Transit Site and Surrounding Area Located in Amherst, NY ("Stokely Report"), and the Rebuttal in Response to Vinitas Consultants, LLC, and Kagel Environmental, LLC Reports in the Matter of United States v. Acquest Transit 09-CV-55 (W.D.N.Y.) ("Stokely Rebuttal Report").[20]

Defendants retained as an expert Steven I. Apfelbaum ("Apfelbaum"), who opined based on his observations while inspecting the Site regarding a planted wheat crop, decomposing corn stems and corn cobs, intact root and stump systems of one to three-inch diameter saplings, shredded root fragments, a heavy-duty notched agricultural disk, undisturbed plant life in the Site's southern portion, agricultural ditches, and a farm road.  Apfelbaum relies on his specialized knowledge of agriculture and ecology in concluding what the shredded wood fragments and intact stumps demonstrate about activities on the Site, the nature of hydro-axing and disking, and their

---

[18] Respectively filed as Dkt. 270-7 at 2-4 (Jones Declaration), 5-195 (Jones Report), and 196-327 (Jones Rebuttal Report).
[19] Respectively filed as Dkt. 271-3 at 1-4 (Greenberg Declaration), 5-193 (Greenberg Report); and 194-241 (Greenberg Rebuttal Report).
[20] Respectively filed as Dkt. 271-4 at 1-5 (Stokely Declaration), 6-61 (Stokely Report), and 62-79 (Stokely Rebuttal Report).

impacts on the Site, as well as the relevance of the ditches and the road with regard to activity at the Site.

Also retained as experts by Defendants for the purpose of collecting, studying, and evaluating information relevant to the Site's regulatory status, particularly with regard to whether the Site is subject to regulation under the CWA, was Kagel Environment, LLC ("KE"), self-described wetlands, wildlife and permitting specialists, of Rigby, Idaho. KE's two principals, Susan Kagel, M.S., Ph.D. ("Dr. Kagel"), and Ray L. Kagel, Jr., M.S., PWS[21] ("Mr. Kagel"), conducted various studies that were incorporated into a single expert report, the Report of Kagel Environmental, LLC Regarding Transit Farm, Amherst, New York ("KE Report").[22] In particular, Dr. Kagel, a Wetland Scientist and KE's primary wetland delineation report writer, reviewed documents prepared by the Natural Resources Conservation Service ("NRCS"),[23] and historic aerial photographs in forming her conclusion that the Site qualifies as prior converted cropland ("PCC"), and thus is exempt from the CWA and its regulations, that since Acquest acquired the property in 2006, the length of ditching present at the Site has significantly decreased, resulting in a corresponding increase in hydrology at the Site, that any alleged wetlands adjacent to the major ditches present at the Site should not be considered "adjacent" to a tributary of a relatively permanent waterway, and that any alleged wetlands on the Site are isolated and not adjacent to any relatively permanent waterway such that the Site is not subject to regulation under the CWA. Mr. Kagel conducted groundwater monitoring well and dye tracing studies at the Site. Based on

---

[21] The acronym "PWS" is short for "Professional Wetland Scientist." Dkt. 280-5 at 16.
[22] The KE Report and its exhibits are filed as Dkts. 280-2 and 280-3, and refiled as Dkts. 280-5 through 280-8.
[23] The NRCS was formerly known as the Soil Conservation Service ("CSC").

the groundwater monitoring well study ("GMW study"),[24] Mr. Kagel concluded the Site lacks wetland hydrology, one of the three identifying characteristics for wetlands. Based on the dye tracing study ("dye tracing study"),[25] Mr. Kagel concluded there is no significant nexus between the Site and any TNW, a finding that would preclude federal regulatory jurisdiction under the CWA over the Site.

On March 21, 2017, Dr. Kagel prepared rebuttal reports to the reports of Dr. Brooks ("Rebuttal Report – Dr. Brooks"), Jones ("Rebuttal Report – Jones"), and Stokely ("Rebuttal Report – Stokely").[26]

Alan James Busacca, Ph.D. ("Dr. Busacca"), of Vinitas Consultants, LLC ("Vinitas"), was retained by Defendants to investigate the soils and hydrology at the Site and to issue an opinion regarding the existence of the hydric soils and wetland hydrology at the Site required for a wetland. In the Report of Evaluation of Hydrologic Condition and Wetland Status, Acquest Transit Road Farm, Amherst, New York ("Dr. Busacca Report"),[27] Dr. Busacca concluded that hydric soils present at the Site "are *relict* or fossil features frozen forever unchanging in the current, aerobic, farmed, hydrologic regime," Dr. Busacca Report at 22 (Dkt. 279-3 at 87) (italics in original), that the Site "lacks sufficient hydrology" and thus is incapable of supporting wetland ecological function and, as such, does not constitute wetlands. *Id.*

---

[24] The GMW study results are incorporated into the KE Report. Dkt. 280-2 at 13-19 and Exhs. 22-24, 24a, 25, 25a, 26, 26a, 27 and 27a, Dkt. 280-2 at 15-21, 69-100.

[25] The dye tracing study results are incorporated into the KE Report. Dkt. 280-2 at 7- 10 and Exhs. 16-18, Dkt. 280-2 at 57-62, and Exhs. 47-49, Dkt. 280-7 at 135-149.

[26] Respectively filed as Dkt. 280-3 at 2-21 (Dr. Brooks), 22-34 (Jones), and 35-58 (Stokely).

[27] Dkt. 279-3 at 65-88 with exhibits A through Q at 89-299 and sources at 300-304.

<u>**DISCUSSION**</u>

**1.      Clean Water Act Overview**[28]

The Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA" or "the Act"), was

enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity

of the Nation's waters."  33 U.S.C. § 1251(a).  The elimination of the discharge of

pollutants into navigable waters is the CWA's primary focus.  33 U.S.C. § 1251(a)(1)-

(7).  As such, the CWA renders unlawful "the discharge of any pollutant by any person,"

except under specific circumstances.  33 U.S.C. § 1311(a).

Under the CWA, "pollution" is defined as "the man-made or man-induced

alteration of the chemical, physical, biological, and radiological integrity of water."  33

U.S.C. § 1362(19).  A "discharge of a pollutant" is broadly defined to include, *inter alia*,

"any addition of any pollutant to navigable waters from any point source." 33 U.S.C. §

1362(12).  "Navigable waters" are defined as "the waters of the United States, including

the territorial seas."  33 U.S.C. § 1362(7). A "point source" includes "any discernible,

confined and discrete conveyance, including but not limited to any pipe, ditch, channel,

tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal

feeding operation, or vessel or other floating craft, from which pollutants are or may be

discharged."  33 U.S.C. § 1362(14).[29]  At present, whether specific wetlands constitute

"waters of the United States" within the meaning of and subject to jurisdiction under the

CWA is not settled, with two different standards pronounced by the Supreme Court

---

[28] This brief overview of the Clean Water Act and the regulations promulgated thereunder is provided to
assist the reader in understanding the importance of the various proffered expert opinions to the pending
summary judgment motions.
[29] "This term [point source] does not include agricultural stormwater discharges and return flows from
irrigated agriculture."  33 U.S.C § 1362(14).

including one requiring a continuing surface connection between the wetlands and a TNW, *Rapanos v. United States*, 547 U.S. 715, 742 (2006) ("*Rapanos*") (plurality opinion), and the other standard requiring the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of navigable waters. *Id.* at 780 (Kennedy, J., concurring).

As relevant here, the CWA provides for two permitted schemes authorizing certain entities to discharge pollutants into navigable waters, including some wetlands, specifically the National Pollutant Discharge Elimination System ("NPDES"), administered by the Environmental Protection Agency ("EPA"), under § 402 of the CWA ("§ 402"), 33 U.S.C. § 1342 ("§ 1342"), and a program administered by the Secretary of the Army, acting through the Chief of Engineers of the United States Army Corps of Engineers ("Corps"), under § 404 of the CWA ("§ 404"), 33 U.S.C. § 1344 ("§ 1344").[30] The permitted discharge of pollutants into navigable waters is subject to "effluent limitation" defined under the CWA as "any restriction established . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11). The Corps' 1987 Wetlands Delineation Manual (Dkt. 272-2) ("Corps Manual"), provides useful guidance in identifying wetlands within federal jurisdiction for processing §§ 402 and 404 permit applications.[31]

---

[30] Pursuant to 33 U.S.C. § 1344(g), states with qualifying programs may assume certain aspects of the Corps' permitting responsibilities. *Rapanos*, 547 U.S. at 760 (Kennedy, J., concurring).

[31] The Second Circuit recognizes that because agency manuals and enforcement guidelines are not adopted pursuant to rulemaking or other formal proceedings, their provisions are not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"). *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 490-91 (2d Cir. 2001) (holding EPA's position on policy statements made in opinion letters, reports, and litigation that

Under § 402, authority is granted to the EPA to issue permits allowing persons to discharge pollutants that can wash downstream upon condition that such discharge meets certain requirements including limitations on the discharged pollutants and the establishment of monitoring and reporting requirements.[32]  33 U.S.C. § 1342(a). Permits may be issued authorizing the discharge of any pollutant, except dredged or fill material, from a point source into a water of the United States.  33 U.S.C. § 1342. Generally, no permit is required for discharges entirely comprised of storm water unless, as relevant here, such discharge is "associated with industrial activity," 33 U.S.C. § 1342(p)(2)(B), which is defined under the relevant regulations to include "[c]onstruction activity including clearing, grading and excavation, except operations that result in the disturbance of less than five acres of total land area. . . ."  40 C.F.R. § 122.26(b)(14)(x). Congress also provides authority for issuing § 402 permits for discharges into waters of the United States by any state that "develops a permitting program and obtains approval for the program from the [ ] EPA."  *Peconic Baykeeper, Inc. v. Suffolk County*, 585 F.Supp.2d 377, 412 (E.D.N.Y. 2008) (citing 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter));

_____

dam releases were not "discharges" under the CWA and, thus, did not require permits, were not entitled to substantial deference under *Chevron*, because the EPA's position was never subjected to notice-and-comment rulemaking or formal adjudication under the Administrative Procedures Act, 5 U.S.C. §§ 553, 554) (citing *Christensen v. Harris County*, 529 U.S. 576, 587-88 (2000)).  Courts therefore are required to follow the Corps Manual position only insofar as it is persuasive.  *Id.*

[32] Pursuant to 33 U.S.C. § 1342(b), the EPA may designate a state as the permitting authority for § 402 permits.  In New York, the New York State Department of Environmental Conservation, is the authorized permitting authority.  N.Y. Envir. Conserv. Law § 17-0801 (McKinney 2006).

*aff'd in part, and vacated on other grounds*, 600 F.3d 180 (2d Cir. 2010).  Toward that end, New York created the "State Pollutant Discharge Elimination System" or "NYSPDES," N.Y. Envir. Conserv. Law § 17-0801 (McKinney 2006), a program administered by New York State Department of Environmental Conservation ("NYSDEC").

The permitting scheme administered by the Corps in accordance with § 404 authorizes the issuance of permits "for the discharge of dredged or fill material into the navigable waters at specific disposal sites."  33 U.S.C. § 1344(a); *see also* 33 C.F.R. § 323.1.  It is undisputed that Defendants never obtained any permit under § 404.[33]

Nevertheless, excluded from "wetlands" for purposes of the CWA and its permit requirements are prior converted croplands ("PCC"), which are defined as wetlands which, prior to December 23, 1985, were converted to farming by the production of an agricultural commodity, did not support woody vegetation, and any inundation was for fewer than 15 consecutive days.  33 C.F.R. § 328.3(b)(2); 7 C.F.R. §§ 12.2 and 12.8; 40 C.F.R. § 230.3(s).  The CWA, however, also provides for the loss of PCC status if "the wetlands characteristics returned after that date as a result of – (i) the lack of maintenance of drainage, . . . ; (2) a lack of management of the lands containing the wetland; or (iii) circumstances beyond the control of the person."  16 U.S.C. § 3822(b)(1)(G).

---

[33] The Corps bears primary responsibility for determining whether to issue § 404 permits, yet the EPA retains authority to veto the site specification for the discharge.  33 U.S.C. § 1344(c).

**2.     Motions to Strike**

Prior to addressing the summary judgment motions, the court considers motions filed by Plaintiff and Defendants to strike the reports of the opposing parties' expert witnesses, particularly opinions that the Site does or does not constitute wetlands.  In particular, Plaintiff seeks to strike the Affidavit of Steven I. Apfelbaum (Dkt. 280-9) ("Apfelbaum Affidavit"), and the accompanying exhibits because Defendants failed to timely produce Apfelbaum's expert report such that Plaintiff had no opportunity to take an expert deposition of Apfelbaum.  Plaintiff's Memorandum – Apfelbaum at 1.  Plaintiff moves to partially strike the Declaration of Susan Kagel, M.S., Ph.D. (Dkt. 280-1) ("Dr. Kagel Declaration"), and accompanying exhibits insofar as Dr. Kagel lacks expert qualifications to interpret historical aerial photography, and failed to consider certain relevant factors in forming her opinion that Defendants' ditching modifications likely increased hydrology on the Site.  Plaintiff's Memorandum – Kagels at 1-2.  Plaintiff moves to partially strike the Declaration of Ray L. Kagel, Jr., M.S., PWS (Dkt. 280-5) ("Mr. Kagel Declaration"), and accompanying exhibits insofar as Mr. Kagel's opinion that there is no wetland hydrology on the Site is based on a methodologically unreliable groundwater monitoring well study and his failure to apply accepted science regarding how to identify wetland hydrology, and that the dye tracer test on which Mr. Kagel predicates his opinion that no significant nexus exists between the Site and a traditionally navigable water is without any scientific basis.  *Id.* at 1.  Plaintiff also moves to partially strike the Declaration of Alan J. Busacca, Ph.D. (Dkt. 279-3) ("Dr. Busacca Declaration"), and accompanying exhibits on the basis that Dr. Busacca lacks the requisite expert qualifications to opine as to wetland hydrology, and Dr. Busacca's

wetland hydrology opinion lacks a reliable factual basis and, thus, is mere speculation and conjecture in violation of Fed.R.Evid. 702 ("Rule 702"). Plaintiff's Memorandum – Busacca at 1.

Defendants move to strike as unreliable portions of the declaration testimony of Jonathon Jones ("Jones"), regarding Jones's shallow groundwater study and resulting conclusions for lack of compliance with admissibility factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as well as the calculation of days in which stormwater discharges from the Site, because the predicate data is unreliable. Defendants' Memorandum – Jones at 1-2. Defendants also move to strike portions of the expert declaration of Noah Greenberg ("Greenberg"), concluding the Site has a significant nexus to Ransom Creek because such conclusion is speculative, conjectural, and without factual basis and, thus, does not comply with Fed.R.Evid. 702. Defendants' Memorandum – Greenberg and Brooks at 1-2. Defendants similarly move to strike the conclusion reached in the expert declaration of Robert P. Brooks, Ph.D. ("Dr. Brooks"), finding a significant nexus between the Site and Ransom Creek, as speculative, conjectural, and without factual basis in violation of Rule 702. *Id.*

As relevant, the Federal Rules of Evidence provide,

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702(a) – (d) ("Rule 702").

Under Fed.R.Evid. 104(a) ("Rule 104(a)"), "the proponent of the expert testimony carries the burden to establish that the proffered testimony satisfies the requirements for admissibility under Rule 702." *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F.Supp.2d 413, 424-25 (W.D.N.Y. 2005) (citing *Plourde v. Gladstone*, 190 F.Supp.2d 708, 718-19 (D.Vt. 2002), *aff'd*, 69 Fed.Appx. 485 (2d Cir. 2003) (additional citations omitted)). Admissibility of expert evidence must be established by a preponderance of the evidence. *Karavitis v. Makita U.S.A., Inc.*, 722 Fed.Appx. 53, 55 (2d Cir. Jan. 31, 2018) (citing *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) ("the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied")).

The admission of expert testimony ordinarily is committed to the sound discretion of the district court, but the exercise of such discretion is not unlimited. *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 710 (2d Cir. 1989) (citing cases). The framework for determining whether testimony is admissible as an expert opinion is set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1994) ("*Daubert*"), pursuant to which the district courts are to apply Rule 702 so as "to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (quoting *Daubert*, 509 U.S. at 589). Since *Daubert*, the Court has clarified that "whether a witness's area of expertise was technical, scientific, or more generally 'experience-based,' Rule 702 required the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert

in the relevant field.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (bracketed material in original)). The list of factors enumerated under *Daubert*, while not a "definitive checklist or test," includes "whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Id.* (citing *Daubert*, 509 U.S. at 593-94). "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Id.* Nevertheless, "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). As such, "'when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'" *Id.* at 396-97 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* Rather, evidence should be excluded only "'if the flaw is large

enough that the expert lacks 'good grounds' for his or her conclusions.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 746 (3d Cir. 1994)).

Testimony that does not involve scientific, technical, or specialized matters which the jury is capable of understanding without the benefit of such testimony, however, is not proper expert testimony.[34]  *Andrews*, 882 F.2d at 708.  Nor may an expert witness testify as to whether policies and guidelines were violated because such determinations are for the jury.  *Highland Capital Management, L.P. v. Schneider*, 551 F.Supp.2d 173, 186 (S.D.N.Y. 2008).  Furthermore, "[a]s a general rule an expert's testimony on issues of law is inadmissible," and "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citing cases).  Disputes as to an expert's credentials, faults in the expert's use of scientific methods and procedures, and lack of supporting textual authority for the expressed expert opinion go not to the opinion's admissibility, but to its weight.  *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (citing *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")).  Nevertheless, "[t]he decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly

---

[34] The court notes neither Plaintiff nor Defendants move to strike any of the proffered expert evidence as not necessary to explicate concepts beyond the common knowledge and experience of laypersons as required by Rule 702(a).  *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) ("In other words, '[e]xpert estimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson.'" (brackets in original) (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005)).

erroneous." *Id.*, 61 F.3d at 1042. Here, the court thus considers each of Defendants' disputed expert reports under these criteria.

## A. Apfelbaum

Among Defendants' filings in opposition to Plaintiff's Motion is the Affidavit of Steven I. Apfelbaum ("Apfelbaum Affidavit") and accompanying exhibits (Dkt. 280-9), which Plaintiff moves to preclude insofar as such materials contain Apfelbaum's expert opinions regarding the conditions of the Site because Defendants failed to timely disclose Apfelbaum as an expert as required by Fed.R.Civ.P. 26(a)(2) ("Rule 26(a)(2)"), thereby depriving Plaintiff of an opportunity to subject Apfelbaum to an expert deposition pursuant to Fed.R.Civ.P. 26(b)(4)(A) ("Rule 26(b)(4)(A)) (authorizing the deposition of a person designated by a party "as an expert whose opinions may be presented at trial."). Plaintiff's Memorandum – Apfelbaum at 1-4. Specifically, Plaintiff does not oppose Apfelbaum's various opinions based on his observations while inspecting the Site regarding a planted wheat crop, decomposing corn stems and corn cobs, intact root and stump systems of one to three-inch diameter saplings, shredded root fragments, a heavy-duty notched agricultural disk, undisturbed plant life in the Site's southern portion, agricultural ditches, and a farm road, but Plaintiff opposes Apfelbaum's opinion combining such observations with his specialized knowledge of agriculture and ecology, particularly conclusions as to what the shredded wood fragments and intact stumps demonstrate about activities on the Site, the nature of hydro-axing and disking, and their impacts on the Site, as well as the relevance of the ditches and the road with regard to activity at the Site. *Id.* at 3. Plaintiff further contends Defendants' reliance on the same Apfelbaum Affidavit and exhibits in opposing the earlier PI does not constitute the

required notice under Rule 26(a)(2), *id.* at 4-5, and absent substantial justification for the failure to timely disclose, the Apfelbaum Affidavit must be precluded. *Id.* at 5-6. In opposition, Defendants maintain Plaintiff's assertion of extreme prejudice if the Apfelbaum Affidavit is not stricken is without merit because Plaintiff have been in possession of the Apfelbaum Affidavit since 2009 when it was filed in opposition to Plaintiff's motion for a PI (Dkt. 17-4), and Plaintiff already provided a rebuttal to the Apfelbaum Affidavit in obtaining the PI, Defendants' Response – Apfelbaum at 3-4, such that Plaintiff's assertion of extreme prejudice based on Defendants failure to again disclose the Apfelbaum Affidavit in opposing summary judgment is without merit. *Id.* at 4-7. In further support of preclusion, Plaintiff argues despite being in receipt of the Apfelbaum Affidavit since 2009, Defendants' failure to designate Apfelbaum as an expert for trial was not harmless because absent such designation, Plaintiff was unaware of the need to review and test evidence underlying Apfelbaum's opinions, develop an expert rebuttal opinion, or depose Apfelbaum, which need is further demonstrated by Plaintiff's filing, in connection with the PI, supplemental declarations by two of Plaintiff's expert witnesses to rebut Apfelbaum's opinions. Plaintiff's Reply – Apfelbaum, at 2-4.

Expert disclosures are governed by Rule 26(a)(2) which, as relevant, requires an expert witness provide a written report "if the [expert] witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed.R.Civ.P. 26(a)(2)(B). An expert's written report must include, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data

considered by the witness in forming them; [and] any exhibits what will be used to summarize or support them." Fed.R.Civ.P. 26(a)(2)(B)(i)-(iii).[35] As relevant, disclosures are required to be made "at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(D).

In the instant case, the Seventh Amended Scheduling Order (Dkt. 228), directed that expert witnesses were to be identified and expert witness reports provided by December 20, 2016, with rebuttal expert reports served by February 7, 2017. Dkt. 228 ¶ 3. The deadline for serving rebuttal expert reports was later extended to March 21, 2017, Dkt. 243 ¶ 2, and all expert disclosures and depositions were ultimately to conclude by May 31, 2017. Dkt. 260 ¶ 2. Failure to timely serve such reports requires the reports be stricken and the related expert's trial testimony precluded from use as evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless. *See* Fed.R.Civ.P. 37(c)(1). "The harshest sanctions available [for discovery abuses] are preclusion of evidence and dismissal of the action." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). Preclusion thus should "be used only in extreme situations, and then only when a court finds 'willfulness, bad faith, or any fault' on the part of the prospective deponent." *Bobal v. Rensselaer Polytechnic Institute*, 916 F.2d 759, 764 (2d Cir. 1990) (citing *Theilmann v. Rutland Hospital, Inc.*, 455 F.2d 853, 855 (2d Cir. 1972), and quoting *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986)). Further, a district court "has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37, and its ruling will

---

[35] Plaintiff does not dispute that the exhibits accompanying the Apfelbaum Affidavit, including Apfelbaum's education, experience, and publications regarding wetland ecology, as well as a list of all cases for which Apfelbaum has been retained as a wetlands expert, satisfy the requirements of Rule 26(a)(2)(B), and are identical to those filed in connection with the PI. *See* Dkt. 17-5.

be reversed only if it constitutes an abuse of discretion." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006) (citing cases). Insofar as Rule 37(c)(1) does not require a showing of bad faith, no such requirement should be read into the rule. *Id*. at 296. The Second Circuit has identified four factors for consideration in determining whether to preclude evidence, including

> "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."

*Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (bracketed material in original) (quoting *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)).

Here, Defendants designated Apfelbaum as an expert in connection with their opposition to the PI. *See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 17) at 7 ("Defendant's expert Affidavit [of Apfelbaum] from Applied Ecological Services, Inc. establishes that the Property has been used as a farm since at least 1927 and continues as a farm."). Defendants attribute their failure to again disclose Apfelbaum as an expert witness to mere inadvertence given Apfelbaum, and the same Apfelbaum Affidavit, were already disclosed to Plaintiff in opposing Plaintiff's motion for a PI. Defendants' Response – Apfelbaum at 7. In further support of preclusion, Plaintiff argues Defendants have not established the failure to timely disclose Apfelbaum was substantially justified. Plaintiff's Reply – Apfelbaum at 2-3. Defendants, however, have never attempted to rely on the "substantially justified" prong of Rule 37(c)(1), instead maintaining their failure to re-disclose Apfelbaum as an expert was not intended to, and in fact did not, mislead or prejudice Plaintiff such that preclusion would not deter future noncompliance. Defendants' Response – Apfelbaum

at 3. Although not condoned by the court, Defendants' oversight under these circumstances is understandable. Accordingly, the first factor favors neither Plaintiff nor Defendants.

As for the second factor, Apfelbaum is an ecologist who opines, based on a site inspection of the Site, that there has been ongoing agricultural use of the site, supporting Defendants' position that the Site is PCC, for which no CWA permits were required. It thus cannot be disputed that Apfelbaum's testimony at trial will be crucial for Defendants in establishing the Site qualifies as PCC and is exempt from the CWA's discharge permit requirements. The second factor thus weighs in favor of Defendants.

With respect to the third factor, the court cannot conceive that any prejudice accruing to Plaintiff by denying Plaintiff's request to preclude the Apfelbaum Affidavit would be more than slight. In particular, Plaintiff, since 2009, has been in receipt of the Apfelbaum Affidavit, Dkt. 17-5, to which rebuttals were prepared by Dr. Thiesing and Pohle. Dkts. 20-3, 20-3, and 21-2. Further, because Plaintiff does not contest Apfelbaum's substantive opinion, a deposition is unnecessary, *see* Discussion, *supra*, at 29, despite the fact that Defendants' disclosure admittedly was untimely under Rule 26(a)(2)(D). Plaintiff's assertion that it "did not have the opportunity to review and test evidence underlying [Apfelbaum's] opinions, develop an expert rebuttal opinion, or depose [Apfelbaum]," Plaintiff's Reply – Apfelbaum at 3, thus is without merit and the third factor weighs in Defendants' favor.

Plaintiff's assertion, Plaintiff's Memorandum – Apfelbaum at 5-6, that if the court does not preclude the Apfelbaum Affidavit, discovery would have to be re-opened to permit Plaintiff to develop a rebuttal expert, requiring Plaintiff's motion for summary

judgment be resubmitted, thus further delaying this action, is without merit. As discussed above, Plaintiff has already submitted evidence rebutting the Apfelbaum Affidavit in further support of the PI, Dkts. 20-2, 20-3, and 21-2, which Plaintiff has referenced in support of summary judgment. Declaration of Dr. Mary Anne Thiesing (Dkt. 297-1) ¶ 6; Plaintiff's Reply – Apfelbaum at 2. Significantly, Plaintiff does not explain how the Apfelbaum Affidavit should be further rebutted. With regard to the Government's assertion that because Defendants never disclosed Apfelbaum as an expert who may testify at trial under Rule 26(a)(2), Plaintiff's Memorandum – Apfelbaum at 1, Defendants may not rely on Defendants' previous use of the Apfelbaum Affidavit in opposing the earlier motion for a PI, *id.* at 4-5, Plaintiff relies on caselaw that is inapposite. Specifically, in *Wreal LLC v. Amazon.Com, Inc.*, 2015 WL 1281042 (S.D.Fla. Mar. 20, 2015), the court's conclusion that "an expert's participation in preliminary injunction proceedings is separate and apart from whether that expert is a testifying expert for purposes of trial, as contemplated by Rule 26," was made in the context of a motion to quash a subpoena issued by the defendant to take the deposition of someone the plaintiff designated as a non-testifying expert in support of the plaintiff's motion for injunctive relief, but who had not been designated as an expert for trial. *Wreal LLC*, 2015 WL 1281042, at 1-3. The core issue was whether the non-testifying witness privilege applied, not whether such witness had been timely disclosed.

The weight of the four factors relevant to whether Apfelbaum's prospective testimony as reflected on the Apfelbaum Affidavit should be precluded thus favor Defendants. Accordingly, despite Defendants' failure to timely disclose Apfelbaum as an expert, Plaintiff has failed to demonstrate that substantive harm would result from the

court's consideration of the Apfelbaum Affidavit. Accordingly, Plaintiff's Apfelbaum Motion is DENIED.

### B. Mr. Kagel

Mr. Kagel, retained by Defendants as an expert in wetland delineation, conducted groundwater monitoring well and dye tracing studies at the Site. Based on the groundwater monitoring well study, Mr. Kagel concluded the Site lacks wetland hydrology, one of the three identifying characteristics for wetlands. Based on the dye tracing study, Mr. Kagel concluded there is no significant nexus between the Site and any TNW, a finding that would preclude federal regulatory jurisdiction under the CWA over the Site. In moving to partially strike Mr. Kagel's expert report, Plaintiff argues Mr. Kagel's opinion that there is no wetland hydrology on the Site is based on a methodologically unreliable groundwater monitoring well study and subsequent failure to apply accepted science in identifying wetland hydrology, Plaintiff's Memorandum – Kagels at 5-11, and his opinion that there is no significant nexus between the Site and a TNW is based on a version of a dye tracer test with no scientific basis. *Id.* at 11-15. In opposition, Defendants argue Plaintiff did not adequately represent to the court the Corps Manual's definition of wetland hydrology, Defendants' Response – Kagels at 6-9, Mr. Kagel's hydrologic well monitoring study was conducted according to established methodologies, *id.* at 9-13, and provides relevant and reliable information regarding wetland hydrology in 2012 and 2013, as well as prior to 2006, *id.* at 13-15, and the dye-tracer test followed methodologies developed upon consultation with a Dr. Thomas Aley ("Dr. Aley"), whom Defendants maintain is "the foremost expert on dye-tracer studies in the United States." *Id.* at 15-21. In further support of striking Mr. Kagel's report, Plaintiff

insists Mr. Kagel's groundwater monitoring well and dye-tracing studies are methodologically flawed rendering inadmissible his opinions on wetland hydrology and significant nexus, Plaintiff's Reply – Kagel at 1-8.

### 1.    Groundwater Monitoring Well Study

In conducting the groundwater monitoring well study ("GMW study")[36] on the Site, Mr. Kagel, on May 9, 2012, installed six groundwater monitoring wells ("Wells 1 through 6") ("the 2012 groundwater monitoring").  A year later on May 20, 2013, Mr. Kagel re-installed Wells 1 and 2 as "Wells D and E," and installed an additional four wells ("Wells A through C and F"), and all ten wells, including Wells 3 through 6 and Wells A through F recorded data in 2013 ("the 2013 groundwater monitoring").  All the wells were installed so as to record water levels for a range of 25 inches below the ground surface to 10 inches above the ground surface, and placed with the calibration at the ground surface.  A majority of the wells were placed on the Site's western site where the elevation was slightly lower than the eastern side, with a correspondingly greater probability for ponding, inundation, and saturation at the ground surface for at least two consecutive weeks during the growing season.  The well locations selected appeared to be undisturbed except for normal agricultural practices, and were chosen to avoid elevation bias, avoiding placement in artificially created soil depressions, and favoring areas close to standing or ponded water.  Based on the data collected from the ten wells, Mr. Kagel opined none of the well locations satisfied the criteria for positive wetland hydrology during the referenced period, *i.e.*, the spring/summer growing

---

[36] Mr. Kagel's GMW study results are incorporated into the Report of Kagel Environmental, LLC Regarding Transit Farm, Amherst, New York (Dkt. 280-2) ("KE Report"), at 15-21 and Exhs. 22-24, 24a, 25, 25a, 26, 26a, 27 and 27a (Dkt. 280-2 at 69-88).

season.  Plaintiff challenges the methodology Mr. Kagel employed in conducting the GMW study, particularly that the GMW study measured groundwater for 2012 and 2013, but fails to account for substantial disturbances to the Site after Acquest's 2006 acquisition of the Site, Defendants' Memorandum – Kagels at 5-9, and that Mr. Kagel failed to apply the accepted scientific understanding of wetland hydrology to the Site including Kagel's interpretation of the results of the 2012 and 2013 groundwater monitoring.  *Id.* at 9-11.

Plaintiff maintains that because this action alleges Acquest engaged in unauthorized discharges of pollutants and stormwater into protected wetlands, the GMW study should have accounted for the various earthmoving activities at the Site, including clearing vegetation with mechanized equipment, depositing fill material, deepening and widening existing ditches and excavating new ditches, as well as other such Site disturbances as filling, grading, discing and vegetation removal.  Plaintiff's Memorandum – Kagels at 6-7.  According to Plaintiff, Mr. Kagel placed each groundwater monitoring well in proximity to deepened or newly excavated ditches without attempting to determine whether such locations were influenced by the ditches' drawdown of the water table, *id.*, and the Site alterations removed wetland indicators, resulting in an "atypical" situation for which the Corps' Manual provides special procedures for determining whether wetland hydrology existed prior to the Site's alterations including, *inter alia*, evaluating adjoining properties with normal water tables unaffected by Defendants' disturbances as potential reference areas, and studying aerial photography and historical records.  *Id.* at 7-8.  Plaintiff further maintains Mr. Kagel failed to follow the Corps' 2005 guidance in *Technical Standard for Water-Table*

*Monitoring of Potential Wetland Sites*, ERDC TN-WRAP-05-02 (2005) (Dkt. 273-1)

("WRAP[37] Guidance"), instructing groundwater monitoring wells be placed in those

portions of a site most likely to meet wetland hydrology standards, *i.e.*, low-lying areas.

*Id.* at 8-9. In opposition, Defendants maintain the 2005 WRAP is not a binding legal

requirement for groundwater monitoring well studies, Defendants' Response – Kagels at

10, but even if it were binding, Mr. Kagel followed the methodology provided therein. *Id.*

Defendants argue Plaintiff's motion to strike Mr. Kagel's opinion overlooks the Site's

"capillarity," Defendants' Response – Kagels at 6-7, and inaccurately presents the

Corps Manual's definition of "wetland hydrology" as determined by a "continuous

saturation of the soil within twelve inches of the surface for at least five percent of the

mean year's normal growing season," *id.* at 7, but such factor is only an indicator of

wetland hydrology, and is not determinative because the soil's "capillary fringe"[38] at the

Site is insufficient to draw the water table up from 12" below the surface to cause soil

saturation for a sufficient duration to support hydrophytic vegetation for 14 days. *Id.* 7-9.

According to Defendants, the soil's capillarity is a question of fact that cannot be

resolved on summary judgment. *Id.* at 9. In further support of striking portions of Mr.

Kagel's report, Plaintiff maintains the Corps Manual does not include soil capillary action

as an indicator of soil saturation for purposes of establishing wetland hydrology, but that

soil saturation within 12" of the ground surface will impact vegetation within a major

portion of the root zone, indicating hydrology. Plaintiff's Reply – Kagels at 5-6. A plain

---

[37] "WRAP" is an acronym for "Wetlands Regulatory Assistance Program," which is not further identified by the parties but from the context, appears to be a program administered by the U.S. Army Corps of Engineers.

[38] "Capillary fringe" is defined as "[a] zone immediately above the water table (zero gauge pressure) in which water is drawn upward from the water table by capillary action." Corps Manual, Appx. A – Glossary (Dkt. 272-2 at 105-18), at A2.

reading of the relevant portion of the Corps Manual, *i.e.*, at 32 (Dkt. 272-2 at 44),

establishes that the soil's capillary fringe affects the depth from the ground surface to

the saturated soils. Accordingly, Defendants' presentation of the relevancy of the soil's

capillarity is correct and Mr. Kagel's report should not be stricken on this ground.

With regard to Plaintiff's argument that Mr. Kagel's study measured only

groundwater in 2012 and 2013, thus failing to adequately account for substantial Site

disturbances since Acquest's 2006 acquisition of the Site, including whether the

locations of the GMWs near newly deepened or excavated wells were influenced by the

drawdown effect of the ditches on the water table, Plaintiff's Memorandum – Kagels at

6-7, Defendants maintain that in determining where to place the wells, Mr. Kagel relied

on EDI's 2005 wetland delineation report, the EPA's 2008 Site visit, as well as KE's

2012 Site visit for empirical data regarding the water table depth. Defendants'

Response – Kagels at 9-10. Defendants further maintain this was in accordance with

the 2005 WRAP's sole requirement that groundwater monitoring wells be placed in

those "[p]ortions of a site that are most likely to meet wetland hydrology standards (e.g.,

low-lying areas such as depressions, floodplain backwaters, swales and washes,

fringes of lakes and ponds, toes of slopes, or other areas with shallow restrictive soil

layers," 2005 WRAP at 3, and avoided placement in any artificial or temporary

depressions or divots such as those created by tire tracks which would not accurately

indicate the presence of wetland hydrology on the Site. *Id.* at 10-12.

In responding to questions at his May 17, 2017 deposition, Mr. Kagel explained

in greater detail how he chose the location for the groundwater monitoring wells, Mr.

Kagel Dep. Tr.[39] at 189-97, including performing a general characterization of the Site to determine which areas were most likely to provide unbiased information about the Site's hydrologic character. Mr. Kagel specifically focused on whether any areas were disturbed or contained hydric soil, and the presence of breaks in soil that were significantly higher or lower. *Id.* at 190-93. Insofar as Mr. Kagel stated that in placing the wells, "we deliberately attempted to avoid the highest and the lowest places," Mr. Kagel Dep.Tr. at 208, Mr. Kagel further stated such decision was in accordance with the 2005 WRAP's direction that wells be placed where they were most likely to provide "a fair characterization" of an entire site's wetland hydrology, explaining that a groundwater monitoring well that returned a result consistent with wetland hydrology in a specific, low-lying location would not necessarily indicate the presence of wetland hydrology in other portions of the site. *Id.* at 207-08. Significantly, that the 2005 WRAP equivocally states that those portions of a site that are most likely to meet wetland hydrology standards "*should* be identified during the site characterization and considered for well placement," 2005 WRAP at 3 (italics added), does not, as Plaintiff argues, Plaintiff's Memorandum - Kagels at 8-9, require placement of wells in a site's lowest-lying areas. Further, Mr. Kagel explained that not only did he avoid placing wells in artificially low-lying divots such as those created by a tractor tire, but he also avoided placing wells in any areas that were "significantly higher" such as a "mound of dirt" or an area that appeared to have been raised by deposited fill which could interfere with the attempt to obtain "a fair understanding of what was going on hydrologically below the surface. . . ." Mr. Kagel Dep. Tr. at 191-94. Moreover, according to the KE Report, because the

---

[39] Referenced to "Mr. Kagel Dep. Tr." are to the pages of the transcript of Mr. Kagel's May 17, 2017 deposition, filed in its entirety as Dkt. 274-3, and portions of which are filed as Dkt. 309-4.

elevation is slightly lower in the western portion of the Site, the majority of the wells were placed there, and "[r]ather than install a well in an artificially created soil depression, the wells were placed as close as practical to areas of standing water . . . ." KE Report at 13-14. Well #1 was placed "immediately adjacent to ponded water standing in a slight depression." *Id.* at 14. Well # 3 was "located within a relatively undisturbed forested area identified by the EPA as a jurisdictional wetland . . . . exhibiting absolutely no recent evidence of land surface disturbance, and therefore assumed to be the lowest in elevation . . . . [and] is the closest to a seasonal high water table." *Id.* Well # 5's monitoring data showed "many brief periods of soil saturation and/or water ponding, [but] none of those periods lasted more than twelve consecutive days during this wetter than normal year." *Id.* at 16. The placement of Well A "was specifically chosen where the ground surface appeared level and where there was no discernable slope that would prevent water from ponding during a storm event." *Id.* at 17. Well B was located "in a completely undisturbed reference area of adjacent forested land," *id.* at 18, and Well C was "placed in a shallow furrow of what appeared to be an area that had been previously disked for planting," but without "evidence of any fill material. . . ." *Id.* Well D was located "in an area that was obviously farmed and where there was no evidence of any discharged fill material. . . . [and] located in a perceptively low/depressional area." *Id.* Well F was located "within a completely undisturbed forested section of the site . . . ." *Id.* at 19. A fair reading of the KE Report thus demonstrates that Mr. Kagel's placement of the various wells avoided only artificially high or low points, and was not intended to skew the groundwater monitoring results.

With regard to Plaintiff's argument that the May 2012 and 2013 installation of the wells was not in accordance with the 2005 WRAP's requirement that water-level measurements be taken at least once a day commencing 5 to 7 days before the first day of the growing season, *i.e.*, April 12, and continuing through November 6, the end of the growing season, Plaintiff's Memorandum – Kagels at 8-9, Defendants maintain that because locally, precipitation is relatively constant in April and May, taking readings from May through mid-October 2012, and May through August 2013, encompassed and thus is indicative of the majority of the growing season. Defendants' Response – Kagels at 12-13. In further support of striking, Plaintiff reiterated its complaint that delaying the commencement of the well study for one month after the start of the growing season skewed the study's results because the beginning of the growing season tends to be the wettest. Plaintiff's Reply – Kagels at 4.

According to the KE Report, the GMW study was completed in two phases, with the 2012 groundwater monitoring commencing May 9, 2012 through late October 2012, and the 2013 groundwater monitoring commencing May 19, 2013 through various dates in August 2013. KE Report at 13-19.[40] A plain reading of the relevant portion of the 2005 WRAP provides that although generally water-level monitoring measurements are to be taken at least daily "beginning 5-7 days before the first day of the growing season and continuing until the end of the growing season . . . ," 2005 WRAP at 11, the WRAP also recognizes that "because long-term monitoring is often impractical in a regulatory context, short-term studies may provide sufficient information if the normality of

---

[40] Although not specified, the charted results for the GWM study indicate the final 2012 groundwater readings were taken October 23, 2012, and the final 2013 groundwater monitoring readings were taken at various times in August 2013. *See* Defendants' Response Exhs. 22-39 (Dkt. 280-2 at 69-100; Dkt. 280-3 at 1-13).

precipitation during the monitoring period is considered." *Id.* at 11-12. Significantly, attached as Exh. 44 to the KE Report is a chart comparing daily precipitation for 2012 and 2013 to the 30-year average annual precipitation, Dkt. 280-7 at 127-28, and Mr. Kagel clarified at his deposition that in undertaking the GMW study, he considered that locally, the monthly precipitation throughout the year is "fairly uniform" such that there is little difference between April and May precipitation, rendering the commencement of the GMW study in May, rather than April, of little concern. Kagel Dep. Tr. at 67-69. Moreover, Plaintiff does not deny Defendants' assertion, Defendants' Response – Kagels at 10, that the 2005 WRAP is not legally binding; rather, Plaintiff, in further support of striking Mr. Kagel's evidence, refer to the 2005 WRAP as "well-established and widely accepted procedures" and "guidance," for hydrologic testing, Plaintiff's Reply – Kagels at 3, implying Plaintiff concurs with Defendants' characterization of the 2005 WRAP as not legally binding. Accordingly, Mr. Kagel's failure to commence the GMW study before the April 12 start of the growing season does not necessarily render the GMW study's results unreliable, but merely provides fodder for cross-examination and, thus, is not ground for striking his testimony and opinion. *See Amorgianos*, 303 F.3d at 267 (an expert's evidence should be excluded only where the flaw in the analysis "'is large enough that the expert lacks 'good grounds' for his or her conclusions.'" (quoting *In re Paoli*, 35 F.3d at 746)). *See also McCullock*, 61 F.3d at 1044 (provided expert's testimony is adequately based in scientific knowledge, questions as to methods and procedures used in arriving at opinion were matters of weight, not admissibility).

With regard to Plaintiff's assertion that Mr. Kagel failed to apply accepted scientific understanding of wetland hydrology to the data, Plaintiff's Memorandum –

Kagels at 9-11, Defendant insists Mr. Kagel's hydrological monitoring study provided
reliable and relevant information regarding the existence of wetland hydrology at the
Site in 2012 and 2013, as well as prior to 2006.  Defendants' Response – Kagels at 13-
15.  In reply, Plaintiff maintains Mr. Kagel interpreted the GMW study data in
accordance with the premise that wetland hydrology exists only where there is soil
surface saturation, which is inconsistent with the accepted scientific understanding of
wetland hydrology, Plaintiff's Reply – Kagels at 5, and that even the GMW study results
establish continuous saturation of the soil within 12 inches of the surface for at least 14
days of the growing season as required for a finding of wetland hydrology per the Corps
Manual.  *Id.* at 5-6 (citing Corps Manual at 32).

A plain reading of the portion of the Corps Manual referenced by Plaintiff fails to
support Plaintiff's argument regarding Mr. Kagel's application of the GMW study data.
In particular, the Corps Manual provides that "it is essential to establish that a wetland
area is periodically inundated or *has saturated soils during the growing season.*"  Corps
Manual at 29 (italics added).  The characteristics for sufficiently saturated soil includes
"soils that are saturated to the surface for sufficient duration to develop hydric soils and
support vegetation typically adapted for life in periodically anaerobic soil conditions."  *Id.*
"Saturated soil conditions are defined as conditions "in which all easily drained void
(pores) between soil particles in the root zone are temporarily or permanently filled with
water to the soil surfaces at pressures greater than atmospheric."  *Id.* at A11.  The "root
zone" is "[t]he portion of a soil profile in which plant roots occur."  *Id.*  Further, "[f]or soil
saturation to impact vegetation, it must occur within a *major portion of the root zone*
(usually within 12 inches of the surface) of the prevalent vegetation."  Corps Manual at

32 (italics in original). The Corps Manual, however, provides that the occurrence of soil saturation within a major portion of the root zone impacting vegetation is only an indicator, and is not necessarily determinative, of wetland hydrology. *Id.* at 28-31. Significantly, the Corps Manual also provides that of the three requisite prongs for a determination that a particular site constitutes "wetlands," the third prong, hydrology, "is often the least exact of the parameters, and indicators of wetland hydrology are sometimes difficult to find in the field." Corps Manual at 29. Accordingly, questions regarding whether Mr. Kagel properly interpreted the data produced by the GMW study so as to determine whether the Site contains saturated soils as defined by the Corps Manual as indicative of wetlands do not require striking that portion of the KE Report but, rather, go to the weight of the evidence to be afforded by the jury.[41] *Amorgianos*, 303 F.3d at 267; *McCullock*, 61 F.3d at 1044.

## 2. Dye-Tracer Study

In attempting to establish the absence of the requisite "significant nexus" between the Site's groundwater and Ransom Creek, the alleged TNW, Mr. Kagel performed a "dye-tracer" test in which two different biologically inert dyes, eosine and rhodamine, were introduced, on May 2, 2012, into several alleged wetlands areas of the Site, with carbon sample packets designed to act as filters and capture the dye placed at various intervals both upstream and downstream from the Site. KE Report at 5-6 and

---

[41] It is settled that a defendant is entitled to a jury trial on the issue of liability under the CWA, but not as to the penalty to be imposed should the jury find the defendant violated the CWA. *Tull v. United States*, 481 U.S. 412, 420-21 (1987) (Seventh Amendment guarantees right to jury trial in action by Government seeking to hold defendant liable for CWA violations, but not as to penalty phase). Pursuant to Fed.R.Civ.P. 38(b), Defendants, in both the Answer (Dkt. 14) and the Answer to the First Amended Complaint (Dkt. 121), demanded a jury trial, and Plaintiff has not moved to strike the request as untimely or otherwise.

Exh. 18.[42]  Mr. Kagel was advised by Dr. Aley of Ozark Underground Laboratory ("OUL"), in conducting the dye-tracer study.  Mr. Kagel Dep. Tr. at 278-80.  Samples collected from the carbon packets weekly for more than five months after the dye introduction until October 22, 2012, were analyzed for dye content at an independent laboratory, KE Report at 6 and Exh. 18, with no dye detected in the Millersport Road ditches, indicating any dye or dye components detected in Ransom Creek or downstream could not have come from the Site.  KE Report at 7 and Exh. 18.

Plaintiff moves to preclude Mr. Kagel's opinion that the dye-tracer test establishes the absence of a significant nexus between the Site and Ransom Creek as methodologically unreliable.  Plaintiff's Memorandum – Kagels at 11-15.  In opposition, Defendants maintain Mr. Kagel's dye-tracer test followed all established methodologies and relied on experts with extensive knowledge of surface and groundwater testing in deciding which dyes to use, where and how to place the dyes, and where and how to collect the samples.  Defendants' Response – Kagels at 15-21.  In further support of preclusion, Plaintiff asserts the dye-tracer study was methodologically flawed because the study has never been subject to peer review, but was a mere experiment without any scientific support other than Mr. Kagel's his reliance for some of the parameters on Dr. Aley, whom Defendants failed to disclose as an expert.  Plaintiff's Reply – Kagels at 7-8.

Plaintiff, relying on the Rebuttal Report of its expert Malcom S. Field, Ph.D. ("Dr. Field") ("Dr. Field Rebuttal Report"),[43] maintains Mr. Kagel's dye-tracer study was designed without any scientific basis such that no dyes would be detected downstream.

---

[42] KE Report Exh. 18 is filed as Dkt. 280-2 at 61-62.
[43] Kagels Motion Exh. C (Dkt. 294-5).

Plaintiff's Memorandum – Kagels at 12-14. According to Plaintiff, Mr. Kagel's dye-tracer study failed to rely on peer-reviewed academic research in selecting the dyes, failed to consider the potential for dye degradation effects of sunlight, turbidity interference (cloudiness of water caused by algae, clay, silt and other organic or inorganic matter, and microscopic organisms), and the potential for vegetation uptake of the dye, failed to test the dye introduction locations for migration potential, failed to conduct a standard percolation test to determine the soil absorption rate, failed to flush the dye introduction sites with water, and did not rely on a scientific basis for the study's length of time, and to determine the amount of dye to be released. *Id.* In opposition, Defendants maintain Mr. Kagel's original plan for the dye-tracer study, including the methodology, was reviewed by OUL which provided advice including use of the dyes eoisine and rhodamine which are anionic compounds less likely to be absorbed in the clay-like soils at the Site, the appropriate amount of dye, the location for the borings into which the dye was placed, and the location of the carbon filter traps for collecting water samples to determine whether any of the dye had migrated. Defendants' Response at 17-18. Defendants specifically refute Dr. Field's criticism of the dye-tracer study as hinging "upon unsupported and uncited 'probablies' [*sic*]" that Dr. Field contends would have yielded different results. *Id.* at 18-19. In particular, Defendants deny failing to use sufficient quantities of dye, *id.* at 18, maintain flushing the bore holes would not yield results consistent with natural ecological conditions, *id.* at 19, a percolation test is not relevant to a rain water runoff study, *id.*, nor was the dye-tracer study required to establish to where the dye migrated as long as it established no migration between the Site and Ransom Creek, *id.*, assert Dr. Field fails to explain why a hydrogeological

study of the dye degradation of sunlight and turbidity interference, and column-leaching

tests were essential, *id.* at 19-20, and does not indicate the desired length of time for

the test, *id.* at 20, and maintain Plaintiff's assertion the dye-tracer study was designed to

fail is without any scientific support. *Id.* at 20-21. In further support of preclusion,

Plaintiff reiterates that Defendants' dye-tracer study is without a scientific basis.

Plaintiff's Reply – Kagels at 6-7.

Plaintiff's reliance on Dr. Field's Rebuttal Report in support of its motion to strike

the dye-tracer study portions of Defendants' KE Report does not bear on the

admissibility of the KE Report but, rather, amounts to little more than a 'battle of the

experts; which must be resolved by the jury. *Universal Instruments Corporation v. Micro*

*System Engineering, Inc.*, 2017 WL 745594, at * 10 (W.D.N.Y. Feb. 24, 2017) ("These

differing opinions present a battle of the experts, which must be resolved by a jury."

(citing *Victory v. Hewlett-Packard Co.*, 34 F.Supp.2d 809, 824 (E.D.N.Y. 1999)

("Resolution of the battle of experts is a matter best suited for the trier of fact."))).

Accordingly, Plaintiff's Motion to Strike – Kagels, may be denied on this ground alone.

Plaintiff's further assertion, Plaintiff's Reply – Kagels at 6-7, that Mr. Kagel

admitted at his deposition that the dye-tracer study is nothing more than an "*ipse dixit*

experiment" is belied by a plain reading of the relevant deposition testimony.

Specifically, although Mr. Kagel did testify that "I came up with that idea on my own,"

Mr. Kagel Dep. Tr. at 275, Mr. Kagel explains that he first envisioned creating a dye-

tracer study more than ten years earlier, and "ran it by some Corps of Engineers people

that I worked with when I was still with the Corps in the Walla Walla district and with

some regulators in Utah." *Id.* at 275-76. According to Mr. Kagel, the Corps engineers

with whom he shared his idea for the dye-tracer study agreed it was better than the method then used to establish a continuous surface water connection, *i.e.*, observing floating corks or ping-pong balls to determine movement, because use of dye was more scientific and provided for more control.  *Id.* at 276.  After Mr. Kagel developed the initial dye-tracer study on his own, but before conducting the dye-tracer study at the Site in 2012, Mr. Kagel learned that Dr. Aley had experience conducting similar studies.  *Id.* at 278.  Significantly, Mr. Kagel testified that Dr. Aley was involved in developing the dye-tracer study conducted in 2012 at the Site, including advising on the type and minimum quantity of dye.  *Id.*  Mr. Kagel also added that to account for any possible dilution in the dye, he used "several times more than what the minimum would be required."  *Id.*  On this record, Plaintiff's characterization of the dye-tracer study as Mr. Kragel's "*ipse dixit* experiment" is without foundation.  Furthermore, the idea that the failure to detect any dye can indicate only that the dye-tracer test failed, as Plaintiff's rebuttal expert, Dr. Field, suggests (Dkt. 294-5 at 8), is simply non-sensical.  It may indicate that the test failed, or that the hypothesized significant nexus between the Site and a TNW is flawed because the dye never left the Site, or left the Site in a direction opposite from where the filters were placed such that no dye was ever trapped by any of the filters evidencing potential flow into Ransom Creek.  The undersigned, as the expert evidence gatekeeper, is not required to choose which outcome is, on this record, more plausible; rather, that choice is for the jury. *Universal Instruments Corporation, Inc.*, 2017 WL 745594, at * 10.  In short, the dye-tracer study's shortfalls, as posited by Plaintiff's rebuttal expert Dr. Field, go merely to what weight, if any, the jury will afford Mr. Kagel's dye-tracer study, but does not impair its admissibility.

Finally, also completely without merit is Plaintiffs' argument, Plaintiff's Reply – Kagels at 7, in support of precluding that portion of the KE Report regarding the dye-tracer study because Dr. Aley was never revealed as an expert witness, Plaintiff had no opportunity to depose Dr. Aley. Significantly, Plaintiff references no legal authority supporting the novel concept that an individual on whose expertise a party's expert witness relies must be designated as an expert witness despite the fact the party has not proffered such individual as an expert, and such information is not listed among the items required to be included in an expert's report. *See* Rule 26(a)(2)(B)(i) – (vi). Further, Dr. Aley's work, Groundwater Tracing Handbook, published by OUL in 2002, and referenced in the KE Report at 7 n. 9, is identified as a source relied upon by Kagel Environment in preparing the KE Report, Dkt. 280-7 at 150-52, and OUL is identified as the laboratory to which the water samples collected from the carbon filter traps were sent for analysis. *See* KE Report Exhs. 48-49.[44] Because Defendants have not proffered Dr. Aley as an expert, nor have Defendants submitted any report prepared by Dr. Aley in support of summary judgment, Defendants were not required to include Dr. Aley in Defendants' Rule 26 expert disclosures.

Moreover, under Fed.R.Evid. 703, an expert may testify based on facts and data which may not be admissible if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject . . . ." Here, Plaintiff does not contend experts in the field of wetland hydrology would not reasonably rely on the facts or data resulting from Mr. Kagel's dye-tracer study utilizing Dr. Aley's protocols. Thus, that Defendants failed to designate Dr. Aley as a testifying expert is

---

[44] Dkt. 280-7 at 138-45.

irrelevant to the admissibility of Dr. Kagel's testimony on this issue. See United States
v. Turner, 709 F.3d 1187, 1190-91 (7th Cir. 2013) (affirming expert testimony during
criminal drug trafficking prosecution, by state crime laboratory supervisor describing
laboratory employees' procedures and safeguards observed in handling substances
submitted for analysis despite government's failure to introduce testimony of the analyst
who actually tested the substance submitted for analysis in connection with the criminal
drug trafficking charges), *cert. denied*, __ U.S. __, 134 S.Ct. 2660; *reh'g denied*, __ U.S.
__; 135 S.Ct. 22 (2014).

     Plaintiff's motion to preclude portions of the KE Report prepared by Mr. Kagel is
DENIED.

### C.    Dr. Kagel

     Dr. Kagel was retained by Defendants to conduct testing and render opinions
regarding wetland hydrology at the Site, whether there exists a continuous surface
connection or significant nexus to TNW, and whether the Site's previous status as PCC
was abandoned. Dr. Kagel relied on aerial photography in forming her opinion that the
Site consists of PCC, KE Report at 1-2, the alleged wetlands are separated from the
Site by an earthern berm and a 600' underground culvert system, *id.* at 8-9, and ditching
modifications by Defendants likely increased the Site's hydrology, *id.* at 10, and the
former Discharge Permits covered most of the Site. *Id.* at 19-20.

     Plaintiff seeks to strike the Dr. Kagel's opinion that Acquest's ditching
modifications have likely increased hydrology on the site insofar as the opinion is based
on interpreting aerial photography for which Dr. Kagel is unqualified, Plaintiff's
Memorandum – Kagels at 15-16, and is based on unreliable methodology that fails to

consider necessary variables, *id.* at 16-19, and also seeks to strike as unreliable Dr. Kagel's opinion, based on aerial photography interpretation, that the Site was continuously used for farming since at least 1927.  *Id.* at 19-20.  In opposition, Defendants argue Dr. Kagel's conclusion that hydrology increased on the Site is based on reliable methodologies and firm grounds, Defendants' Response – Kagels at 21-24, and Dr. Kegal is qualified to examine aerial photography such that her opinion that the Site's status is PCC is admissible.  *Id.* at 24-25.  In further support of striking Dr. Kagel's report, Plaintiff maintains Dr. Kagel's aerial photography interpretation is based on unreliable methodology, rendering unreliable the opinions on increased hydrology, Plaintiff's Reply – Kagels at 8-9, and on the Site's continuous use for farming, *id.* at 9, and reiterates that Dr. Kagel is unqualified to offer expert opinions based on aerial photography.  *Id.* at 10.

### 1. Aerial Photography Qualifications

With respect to Plaintiff's attack on Dr. Kagel's qualifications to offer an expert opinion on aerial photography, Plaintiff's Memorandum at 15-16, Plaintiff relies on Dr. Kagel's failure to include on her curriculum vitae any professional positions, education, certification or publications qualifying her to interpret historical aerial photography, and Dr. Kagel's deposition testimony in which Dr. Kagel limits her qualifications in aerial photography to "on-the-ground and self-training."  According to Plaintiff, Dr. Kagel's aerial photography opinion is thus based on "'meager qualifications.'"  *Id.* (quoting *Zaremba v. General Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004)).  In opposition, Defendants argue that Dr. Kagel's background, education and training in farming practices and agriculture, including being raised on a farm, active involvement in Future

Farmers of America, a Bachelor's degree in agriculture, a Master's degree in animal science, and a Ph.D. in veterinary molecular biology render Dr. Kagel sufficiently qualified to render opinions regarding farming and agriculture. Defendants' Response – Kagels at 4-6. Defendants submit a list of projects in which Dr. Kagel relied on aerial photography, asserting as evidence that her conclusions drawn from aerial photography have been accepted as qualified by regulatory agencies the fact that the EPA and Army Corps have relied on such delineations in drafting settlement agreements, issuing permits, and issuing approved jurisdictional determinations. *Id.* at 6 (citing Dr. Kagel's Declaration Exh. 2). In further support of preclusion, Plaintiff maintains such projects are "too meager" for her opinion to be considered. Plaintiff's Reply at 9-10.

The Supreme Court recognizes that expert testimony may be based on "personal knowledge or experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("there are many different kinds of experts, and many different kinds of expertise"). It is not necessary that Dr. Kagel be certified in aerial photography interpretation so long as her opinion is based on "scientific knowledge." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (rejecting suggestion that physician proffered as expert witness had to be a specialist in the precise subject area to provide expert testimony as "an unwarranted expansion of the gatekeeper role announced in *Daubert*"). In particular, "[u]nder *Daubert*, ' 'scientific' implies a grounding in the methods and procedures of science,' while 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* (quoting *Daubert*, 509 U.S. at 590). In the instant case, Dr. Kagel, in rebutting Stokely, asserts that in assessing the presence of wetland hydrology at the Site, she "applied methods and standards generally used by

wetland scientists and professionals, including, but not limited to, soils evaluation for hydric characteristics, aerial photography review, . . . direct observation, and scientific measurement of nexus between an alleged wetland and downstream waters." Dkt. 280-4 at 7. Dr Kagel further explains she "compiled aerial photographs using Google Earth Pro and USGS EarthExplorer," and also "obtained weather records from the AgACIS website, and reviewed a 2005 wetland delineation report by Earth Dimensions Institute ("EDI"), that Dr. Brooks relied upon." *Id.* Significantly, Plaintiff does not challenge the validity of Dr. Kagel's assertions.

Furthermore, Dr. Kagel's education includes an undergraduate degree in agriculture, and a Master's degree in animal science with specialization in pastures and cattle nutrition. Dr. Kagel Dep. Tr. at 5.[45] In obtaining her Master's degree, Dr. Kagel "did a lot of work with pastures, grasslands, things like that." *Id.* Dr. Kagel received additional training in plant identification through working with a botanist and taking online courses on sedges, grasses, and wetland trees. *Id.* at 7. Dr. Kagel describes her training in aerial photography as "a lot of on-ground and self-training where I have utilized online photography for the last ten years in almost every wetland delineation we've done. . . . typical[ly] looking at all historical photos that are available." *Id.* at 7-8. Dr. Kagel explains most of her knowledge is based on field testing, checking that the ground data is consistent with what Dr. Kagel observes in aerial photography which she has interpreted for more than ten years. *Id.* at 8. Dr. Kagel also has past experience mapping whether lands have been farmed particularly with regard to "violation work." *Id.* at 8-9. Although Dr. Kagel was never qualified by any court as an expert in storm

---

[45] References to "Dr. Kagel Dep. Tr." are to pages of the transcript of Dr. Kagel's deposition, filed as Dkt. 274-2.

water permitting, she prepared storm water permitting plans for clients in connection with another business, Alpenglow Environmental Services ("Alpenglow"), and was formally trained by the EPA in storm water permitting. *Id.* at 9-10. According to Dr. Kagel, although she has not previously been qualified as an expert in any court action, neither has she ever been disqualified and the vast majority of the legal cases for which Dr. Kagel's services were retained settled. *Id.* at 120. Moreover, Dr. Kagel lists 17 wetland delineation projects KE completed for which the conclusion was supported by Dr. Kagel's interpretation of aerial photography. Kagels Motion Response Exh. 2 (Dkt. 309-3) at 12-13. Of the 17 projects, 16 were violations, permit applications, or jurisdictional determinations, each of which was reviewed by the EPA and/or Army Corps of Engineers, and incorporated into a settlement or jurisdictional determination, while the 17th project was a lawsuit that was settled in the clients' favor. *Id.* With respect to Plaintiff's assertion that such qualifications on historical aerial photography interpretation are "too meager" to support consideration as an expert, Plaintiff's Reply Memorandum – Kagels at 10, the case on which Plaintiff relies on this point, *i.e.*, *Zaremba v. General Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004), dealt not with the putative expert's training in a particular area but, rather, the fact that an allegedly safer alternative design on which the expert's opinion was based had not been tested nor subjected to peer review such that the alternative design's rate of error was unknown. A comparison of questions of feasible alternative designs as in *Zaremba*, to the observations of natural, physical occurrences as in the instant matter are simply to attenuated to be controlling. *Zaremba* is, thus, inapposite. Moreover, Plaintiff essentially concedes that evidence of Dr. Kagel's competence in interpreting aerial

photography would support her opinion, *see* Fed.R.Evid. 703; *Kumho Tire Co., Ltd.*, 526 U.S. at 150, Plaintiff's Reply – Kagels at 10, such that the acceptance by the EPA and the Army Corps of Engineers of Dr. Kagel's aerial photography interpretation in 17 projects, despite Dr. Kagel being essentially self-taught in historical aerial photography interpretation, also permitted by Fed.R.Evid. 702 (expert may be qualified by . . . experience. . ."), is sufficient evidence to treat Dr. Kagel as an expert in that field.  Any quarrel Plaintiff has with the asserted shortcomings in Dr. Kagel's formal academic training in aerial photography, rather than going to the admissibility, is instead relevant to its weight and may be explored on cross-examination.

## 2. Increased Hydrology Opinion

Plaintiff argues Dr. Kagel's opinion based on aerial photography interpretation that the Site's hydrology likely increased, rather than decreased, as a result of changes to the ditches must be stricken as unreliable.  Plaintiff's Memorandum – Kagels at 16-19.  According to Plaintiff, although Dr. Kagel found, after Acquest's acquisition, the length of ditching at the Site significantly decreased which would have decreased water drainage and subsequently increased hydrology, Dr. Kagel failed to consider the depth and width of the ditches, as well as whether the ditches had "silted in" over time.  *Id.* at 17-19.  In opposition, Defendants argue Dr. Kagel's opinion that hydrology at the Site likely increased was based not only on the shortening of the ditches from 1927 through 1985, as revealed in aerial photography, but also on the fact that since Acquest acquired the Site in 2006, the ditching is more widely spaced, covering only a portion, rather than the whole, Site such that pre-2006, the ditching system more effectively removed water.  Defendants' Response - Kagels at 21-22.  Defendants further maintain

that Dr. Kagel's opinion of increased hydrology is based not only on comparisons of historical aerial photography showing the ditches, but also on the testimony of Duff who lived almost his entire life at the Site where he helped his grandparents maintain an active farm. *Id.* at 22-23 (citing Dr. Kagel Rebuttal Report to Plaintiff's Expert Jonathan Jones, Ph.D. ("Rebuttal Report to Dr. Jones"),[46] at 6 (citing Duff Dep. Tr. at 160 (testifying in 2011 Acquest was responsible for filling in the ditches by disking over them))). Dr. Kagel relies on her experience growing up on a farm, involvement with Future Farmers of America, her formal college education in farming and agricultural practice, and consulting work as a wetland scientist, particularly developing and monitoring storm water pollution prevention plans ("SWPP"), and completing wetland delineations, *id.* ¶¶ 2-13, in opining the pre-2006 ditches were more effective at draining water from the Site than the current ditches such that she did not need to calculate the ditches' width and depth. *Id.* ¶ 23. In reaching this conclusion, Dr. Kagel specifically rejects Dr. Jones's assertion that the drainage ditches existing at the Site prior to 2006 had "silted in due to a lack of maintenance," *id.* ¶ 22 (quoting Dr. Jones's Report at 4), as unsupported by any evidence and contradicted by Duff's deposition testimony that Acquest was responsible for filling in the ditches by disking over them. *Id.* (citing Duff Dep. Tr. at 160).

Accordingly, Plaintiff's argument that Dr. Kagel's opinion regarding wetland hydrology at the Site is unsupported by any evidence is belied by the evidence in the record. That Plaintiff's expert evidence is contradicted by Defendants' expert evidence

---

[46] Dkt. 280-4 at 22-28.

establishes a fact issue for resolution by the jury, but does not affect the admissibility of Dr. Kagel's opinion.

### 3. Continuous Farming Opinion

Plaintiff characterizes as unreliable Dr. Kagel's opinion that since at least 1927, the Site was continually farmed because such opinion is based on Dr. Kagel's interpretation of historical aerial photographs for which Plaintiff maintains Dr. Kagel is unqualified to assert an opinion.  Plaintiff's Memorandum - Kagels at 19-20.  In opposition, Defendants maintain Dr. Kagel is qualified to express an opinion that aerial photographs of the Site taken in 1927, 1951, 1963, 1972, 1985, 1995, and 2002, all show evidence of farming and cropping of most of the Site with no evidence that farming was ever abandoned for five consecutive years so as to lose its PCC designation, and the aerial photographs do not reveal either the specific types of vegetation or crops growing on the Site or whether there was any farming on the Site during the years for which no aerial photographs are available such that Plaintiff's arguments are relevant only to the weight, but not the admissibility, of Dr. Kagel's testimony.  Defendants' Response – Kagels at 24-25.  In further support of striking Dr. Kagel's opinion that the Site was continuously farmed, Plaintiff points to Dr. Kagel's admission during her deposition that she could not reliably opine, based on aerial photography, that the Site was continuously farmed since 1927, rendering Dr. Kagel's opinion on the matter unreliable and thus inadmissible.  Plaintiff's Reply – Kagels at 9.

Although Dr. Kagel did admit during her deposition that it is not possible to tell based solely on aerial photography whether there was any interruption in farming at the Site, Dr. Kagel Tr. at 48, 56, Dr. Kagel did not solely rely on aerial photography in

making such determination, but also on Duff's deposition testimony in which Duff indicated that hay farming and agricultural grazing had occurred at the Site "off and on for years." *Id.* at 49. *See also* Rebuttal Report – Stokely ¶ 21 (DKt. 280-4 at 41-42). Despite agreeing with Stokely's conclusion that aerial photography confirms the Site essentially was actively cultivated through 1963, Dr. Kagel does not concur with Stokely's opinion that by 1978 the southern portion of the Site was becoming overgrown with natural vegetation and by 1981 was of "overgrown nature," *id.* (citing Stokely Report at 7), because Stokely fails to define "overgrown" and "natural," which failure Dr. Kagel attributes to the fact it is impossible to determine the species or genus of the vegetation observed in the aerial photographs. *Id.* Dr. Kagel continues that the vegetation characterized by Stokely as of "overgrown nature" is "essentially of the same tones and textures as some of the cultivated fields in the northern part" of the Site, *id.*, that trees and shrubbery are commonly found along ditches and the edges of cultivated fields, *id.*, which is consistent with Duff's deposition testimony that numerous shrubs and trees naturally grew along the ditches and fences at the Site. *Id.* (citing Duff Dep. Tr. at 62-63). Dr. Kagel also references the USDA's 1987 Wetland Determination classifying the Site as PCC as supporting her opinion that farming activity was not abandoned at the Site in 1985 as Stokely suggests. *Id.* ¶ 24 (Dkt. 280-4 at 43); *see* PCC Designation (Dkt. 273-3). Dr. Kagel's interpretation of a March 28, 1995 CIR (color infrared) photograph in which Stokely asserts shrubby growth is present may indicate only that some parts of the Site were allowed to lie fallow for a year or two without actually having been abandoned from agricultural use. *Id.* ¶ 25. Simply put, under the circumstances of this case, the ability of Plaintiff or Defendants to establish

whether the Site was continuously farmed is a determination for the jury, which may very well turn on the credibility and persuasiveness of the parties' dueling experts, requiring Plaintiff's motion to strike Dr. Kagel's testimony be DENIED on this ground.

### D.    Dr. Busacca

Dr. Busacca of Vinitas was retained by Defendants to investigate the soils and hydrology at the Site and to issue an opinion regarding the existence of the hydric soils and wetland hydrology at the Site required for a wetland.  Dr. Busacca concluded that significant amounts of hydric soils were present at the Site, but that such soils were "relict," *i.e.*, were present from the natural conditions of the Site prior to its use for farming for approximately the past 100 years, but that the wetland hydrology that resulted in the hydric soils was abruptly halted with the excavation of ditches seen in aerial photographs from the 1920s that significantly lowered the water table at the Site, such that wetland hydrology is no longer present at the Site which is now incapable of supporting wetland ecological function.  *Id.* at 18-22 (Dkt. 279-3 at 83-87).  Dr. Busacca further concluded that the Site consists of viable farm land, as evidenced by the USDA certification of the Site as PCC in 1987, and the personal observations by Spoth, Apfelbaum, and Duff of corn and wheat crops growing at the Site between 2007 and 2011, which agricultural use would not have been possible had the Site reverted to wetland hydrology, and that measurements by KE in connection with the GMW study showed the water tables mostly deeper than 25 inches and failing to rise to the 12-inch depth of regulatory concern during the growing season.  *Id.*

Plaintiff moves to strike as inadmissible the Busacca Report insofar as Dr. Busacca opines as to wetland hydrology at the Site because Dr. Busacca lacks the

expert qualifications in hydrology such that his opinion lacks a reliable factual basis, and Dr. Busacca "oversteps his qualifications" by making "unjustified analytical jumps" from the facts in opining wetland hydrology has been absent from the Site since the 1920s. Plaintiff's Memorandum – Busacca at 5.  In opposition, Defendants maintain Plaintiff restates disputed facts in "an impermissible end run around the summary judgment process," when the record establishes Dr. Busacca is eminently qualified to offer his opinions which are reliably based on sufficient facts and data.  Defendants' Reply – Busacca at 1-2.  In further support of striking Dr. Busacca's opinion, Plaintiff maintains the "flaws" in Dr. Busacca's opinion "are sufficiently glaring to justify exclusion rather than being considered by the factfinder for weight of the evidence."  Plaintiff's Reply – Busacca at 1.  A thorough review of the record demonstrates no basis for striking Dr. Busacca's opinion on wetland hydrology at the Site.

In particular, although Dr. Busacca testified, as Plaintiff asserts, that he never took a course "called hydrology or hydrogeology," Busacca Dep. Tr.[47] at 23, Dr. Busacca explained that hydrology "was an important component of my studies in soil science."  *Id.*  Dr. Busacca continued that the fields of soil physics and pedology "are concerned with the top six, eight, ten feet of the land, the soil profile and the soil and water movement there, whereas hydrogeology, as taught in the geology program, often considers things, . . . a little deeper down.  But my training of soil physics, which is the movement of water and gases in soils, as well as the studies in pedology, include the fundamental concepts that are part of hydrology."  *Id.* at 23-24.  Dr. Busacca further explains that his education included course in geomorphology which included "very

[47] References to "Busacca Dep. Tr." are to the pages of the transcript of Busacca's deposition, filed in its entirety at Dkt. 296-3.

specific teaching models about rivers and streams, about overland flow and subsurface flow . . . ." *Id.* at 24-25.  In particular, Dr. Busacca's studies included the "vadose zone," or the zone "between the aerated part of the soil and – and a groundwater system or a water system that is continuously saturated under the surface." *Id.* at 24.  Although Dr. Busacca concedes he does not consider himself to be a hydrologist, *id.* at 25, when asked at his deposition whether, "when the topic of hydrology would come up in your soil classes, did you ever study issues of hydrology related to rivers and streams and above-surface precipitation," Dr. Busacca unequivocally responded, "Yes.  My studies did include those things," and then proceeded to list several specific instances in which Dr. Busacca studied hydrology. *Id.* at 24-25.  Dr. Busacca further explained he has experience studying wetlands, including in Eastern Washington States and Northern Idaho. *Id.* at 35-37.  Dr. Busacca maintains that through Vinita, he has 20 years of "consulting-based practical experience . . . with hydrophytic vegetation," *id.* at 38-39, including studies of hydric soils and "wetland hydrology" in the states of Washington, Idaho, Iowa, Wisconsin, Maryland and New York. *Id.* at 38-40.  For more than 25 years, Dr. Busacca was a Professor of Soil and Science Geology in the Departments of Crop and Soil Sciences and Geology at Washington State University, teaching numerous courses and leading field studies on pedology (soil science), through which Dr. Busacca "taught students how to see and learn to accurately describe and correctly interpret the myriad of morphological features in diverse soils, their hydrologic regimes, their geomorphological settings, and in many cases how these influences effect [sic] the formation of distinct soil features that confirm the hydrologic conditions during soil

formation." Declaration of Alan James Busacca, Ph.D. ("Dr. Busacca Declaration")[48] ¶ 9. Dr. Busacca has published in international journals research results in which he and coauthors interpreted the hydrology and hydrologic conditions of soils and reconstructed the movement of water in soils as well as how such movement affects soil formation. *Id.* ¶ 10. Dr. Busacca, who received his Ph.D. from University of California, Davis, *id.* ¶ 4; Consulting Resumé at 1 (Dkt. 308-2 at 7), further describes himself as having "significant research experience in wetland hydrology, including studies where hydrology and hydrologic conditions were used to critically interpret and even model hydrology and soil formation." Dr. Busacca Declaration ¶ 11 and Exh. C.[49] Among Dr. Busacca's published works are 50 referred journal articles, six book chapters, seven serial publications, and 13 field-trip guides, and he edited one book and led eight symposia. *Id.* (Dkt. 308-2 at 22-42). Defendants thus have established Dr. Busacca is sufficiently educated and experienced in hydrology components to provide an opinion on wetland hydrology, and Plaintiff may cross-examine Dr. Busacca at trial with regard to any deficiency in Dr. Busacca's training perceived by Plaintiff.[50]

With regard to Plaintiff's challenges to Dr. Busacca's methodologies, the methodologies as described by Dr. Busacca sufficiently suggest a scientific basis, such that it is for the jury to determine what weight to accord Dr. Busacca's opinions. In particular, Dr. Busacca relied on the Site's history and a personal visit to the Site in May 2012, when Dr. Busacca was "personally surprised" that, given marks of strong

---

[48] Dkt. 308-2 at 1-5.
[49] Dkt. 308-2 at 69-71. "Private Consulting Research and Fieldwork Related to Wetlands," listing 14 private consulting projects regarding wetland delineations.
[50] Although Defendants also address Dr. Busacca's training in aerial photography analysis, Defendants' Response – Busacca at 8-10, Plaintiff has not moved to disqualify Busacca's opinions based on aerial photography analysis and, accordingly, the court does not address Dr. Busacca's qualifications in that area.

redoximorphic (changes from reduced oxygen caused by soil saturation) processes, and the average precipitation in the months preceding his visit the average water table in the soil pits he dug was 30 inches below the surface. Dr. Busacca Report at 12-13 (Dkt. 279-3 at 78-70). Dr. Busacca then investigated the history of the Site to ascertain the reason for the discrepancy between the actual and expected level of the water tables given the soil's hydric nature. *Id.* at 13-17 (Dkt. 279-3 at 79-83). The investigation included comparing two oblique aerial photographs taken 11 days apart in June 2010, the first taken June 7, 2010, showing only "minor ponding" of water despite 4.9" of rainfall in the previous 6 days, including 2.2" on June 7, 2010, and the second photograph showing no inundation, standing water, or ponding on the entire Site. *Id.* at 12-14 (Dkt. 279-3 at 79). Dr. Busacca considered the sworn testimony of Spoth, a corn and other commodity crop farmer who, despite living near the Site his entire life, had never seen standing water at the Site, and who explained that if there were standing water at the Site, it would not have supported any planted crop. *Id.* at 14-15 (Dkt. 279-3 at 79-80 (citing Dr. Busacca Report Exh. H[51] at 80 (Dkt. 279-3 at 151) ("Soil that doesn't drain won't grow a crop of corn. . . .")). Dr. Busacca also considered the professional expertise of conservationists with the USDA's Soil Conservation Service ("SCS"), now the Natural Resources Conservation Service ("NRCS"), who, in 1987, certified the Site as PCC and, thus, exempt from the CWA. *Id.* at 15 (Dkt. 279-3 at 80). The results of the GMW study performed by Mr. Kagel in 2012 and 2013, were considered and compared to the results of the EDI study in concluding hydrological conditions at the Site are within normal ranges. *Id.* at 15-16 (Dkt. 279-3 at 80-81.

---

[51] Dkt. 279-3 at 148-157.

On this record, the court finds Dr. Busacca's expert conclusions have a sufficient scientific basis, and are not *ipse dixit* findings and, thus, are admissible as expert evidence, and Plaintiff's Motion to Strike – Busacca is DENIED.  Plaintiff may, however, challenge Dr. Busacca's conclusions upon cross-examination at trial.

### E.     Jones, Greenberg and Dr. Brooks

Defendants, on June 12, 2018, more than four months after the deadline for filing papers relative to Plaintiff's Summary Judgment Motion, filed the Jones Motion and the Greenberg and Brooks's Motion, seeking to strike the evidence submitted by Plaintiff's experts Jones, Greenberg and Dr. Brooks because the proffered experts are unqualified to give the expert opinions, and failed to follow establish scientific methodologies and and relied on erroneous data in arriving at their respective conclusions.  In opposition to the Jones and Greenberg and Brooks's Motions, Plaintiff did not file a memorandum of law but, rather, filed the Motion to Strike the Motion to Strike, arguing Defendants' motions to strike portions of Plaintiff's expert evidence are untimely filed, unaccompanied by any reasonable justification for the delay, and are prejudicial to Plaintiff given opposing such motions requires Plaintiff's consultation with its experts, resulting in further delay.  Plaintiff's Memorandum – Motion to Strike the Motion to Strike at 4-5.  In opposing the Motion to Strike the Motion to Strike, Defendants argue Plaintiff's motion is not authorized under the Federal Rules and Civil Procedure and, thus, is procedurally improper and disserves the interest of justice, Defendants' Response – Motion to Strike the Motion to Strike at 4-5, and Defendants' Motions seeking to strike the expert evidence of Jones, Greenberg and Dr. Brooks are not untimely because they were filed prior to completion of briefing on the Government's

motions to strike such that permitting the motion results in no prejudice to Plaintiff. *Id.* at 5-7.

It is basic that "district courts 'enjoy an inherent authority to manage their dockets.'" *Benzemann v. Citibank N.A.*, 622 Fed.Appx. 16, 18 (2d Cir. Nov. 16, 2015) (quoting *Katz v. Cellco Partnership*, 794 F.3d 341, 345 (2d Cir. 2015)). *See Deitz v. Bouldin*, __ U.S. __; 136 S.Ct. 1885, 1892 (2016) (observing court's inherent authority to manage its docket with a "view toward the efficient and expedient resolution of cases . . . ."). The district court's inherent authority has also been recognized with regard to the court's need to prevent abuse in its proceedings. *See McMillian v. Walters*, 2018 WL 555510, at * 3 (N.D.N.Y. Jan. 18, 2018) (ordering that, pursuant to the court's inherent authority to control and manage its docket to prevent abuse in its proceedings, the *pro se* plaintiff was prohibited from filing without prior leave of the court any further motions for preliminary injunctive relief where 22 of such motions had already been previously filed by the plaintiff, albeit each one unsuccessful).

Here, although the court has entertained Plaintiff's motions to strike portions of Defendants' experts' evidence, in the papers filed in support of each such motions, Plaintiff specifically states each motion seeks to strike portions of Defendants' experts' evidence filed in response to Plaintiff's Summary Judgment Motion. *See*, *e.g.*, Plaintiff's Motion – Apfelbaum at 1 (providing notice Plaintiff moves to strike the affidavit and accompanying exhibits of Apfelbaum that Defendants "submitted in opposition to the United States' motion for summary judgment to the extent that they contain Mr. Apfelbaum's expert opinions"); Plaintiff's Memorandum – Kagels at 1 (explaining Plaintiff moves to strike portions of the expert evidence of the Kagels "submitted in

opposition to the United States' motion for summary judgment"); and Plaintiff's Memorandum – Busacca at 1 (same). Each of the such motions thus were filed as part of Plaintiff's opposition to Defendants' summary judgment motions. Similarly, Defendants assert they seek to strike portions of Plaintiff's experts' evidence submitted in support of Plaintiff's Summary Judgment Motion. *See* Jones Motion at 1 (explaining Defendants move to strike portions of Jones's expert evidence filed in support of the Plaintiff's summary judgment motion); and Greenberg and Brooks's Motion at 1 (explaining Defendants move to strike portions of the expert evidence of Greenberg and Dr. Brooks filed in support of Plaintiff's summary judgment motion). Accordingly, Defendants' motions to strike are part of Defendants' response to Plaintiff's Summary Judgment Motion and, as such, were required to be filed with the rest of Defendants' response papers, *i.e.*, by December 8, 2017. Significantly, Defendants proffer no reason or justification for the late filing which, at this late date, will only result in further delay.[52] *See also* Fed.R.Civ.P. 1 (requiring Federal Rules of Civil Procedure be administered to achieve, *inter alia*, "the speedy . . . determination of every action and proceeding.").

Accordingly, exercising its inherent authority to manage its docket, the court GRANTS Plaintiff's Motion to Strike the Motion to Strike, and DISMISSES as moot Defendants' Motion to Strike – Jones, and Motion to Strike – Greenberg and Brooks.

---

[52] Insofar as the court granted Plaintiff's motion seeking leave to file a supplemental brief in further opposition to Defendants' Summary Judgment Motion, a fact to which Defendants point in opposing Plaintiff's Motion to Strike the Motion to Strike, Defendants' Response to Motion to Strike the Motion to Strike, at 3, the court's consideration of Plaintiff's supplemental filing is limited to caselaw, requiring no further development of the facts and, insofar as Plaintiff attempts to present new arguments in the supplemental filing, the court does not consider such belatedly-raised arguments. *See Bayview Refining Co. v. Oxygenated Marketing & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000) (reviewing for abuse of discretion district court's decision to rely on evidence submitted with moving party's reply papers).

### 2. Summary Judgment

Plaintiff moves for summary judgment on the issue of Defendants' liability for violating the CWA by failing to obtain a § 404 permit for discharging pollutants from point sources into waters of the United States, including the Site which Plaintiff maintains are wetlands under federal regulatory jurisdiction pursuant to the CWA, and Ransom Creek which Plaintiff also maintains is a TNW, Plaintiff's Memorandum at 15-35, failing to obtain a § 402 permit for discharging storm waters associated with industrial activity into navigable waters of the United States, *i.e.*, Ransom Creek, *id.* at 35-43, and continuing work at the Site after the EPA issued on February 21, 2008, its First Cease and Desist Order for failing to obtain a § 404 permit. *Id.* at 43-44. Defendants argue in support of summary judgment that the First and Third Claims, both of which pertain to alleged § 404 violations, should be dismissed because the underlying laws relevant to determining whether the Site is wetlands within the federal regulatory jurisdiction of the CWA are ambiguous and unconstitutionally vague and, thus, void, Defendants' Memorandum at 5-17, and the Second Claim, alleging discharges of storm water in violation of § 402, relies on an impermissibly strained definition of "industrial activities" to include certain "construction activities" as "clearing, grading and excavating," *id.* at 17-22.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  Any "disputed questions of

material fact [however] should be resolved by a jury at trial, not by a court at summary judgment." *Dufort v. City of New York*, 874 F.3d 338, 349-50 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . [when] he is ruling on a motion for summary judgment. . . .") (bracketed material in original)). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

In support of summary judgment, Defendants maintain that even assuming, *arguendo*, the Site contains jurisdictional wetlands, a factual determination strongly disputed by Defendants in opposing Plaintiff's Summary Judgment Motion, *see* Defendants' Response at 13-25, because the current state of the law regarding how to determine whether wetlands are "waters of the United States" is not clear and ambiguous but, rather "notoriously unclear" as the Supreme Court's 4-1-4 decision, split on this very issue, implicitly acknowledged in *Rapanos*, there can be "no certainty that the EPA or ACOE had *any jurisdiction* over [the Site]." *Id.* at 11-17 (italics in original). According to Defendants, absent a clear and unambiguous standard regarding how to determine whether a piece of real property containing wetlands also qualifies as "waters of the United States," there essentially is no relevant law on this point such that owners of such property are left to guess and act at their own peril, risking the imposition of crippling fines should the property owners undertake any development of their property without first obtaining permits the relevant government agency later determines are required. *Id.* In opposing summary judgment on this point, Plaintiff argues Defendants

have not demonstrated that the CWA's prohibition against discharges from point sources into the waters of the United States is unconstitutionally vague as applied to Defendants' conduct. Plaintiff's Response at 6-15. In further support of summary judgment on this point, Defendants maintain Plaintiff's arguments in opposition are undercut by the realities of the situation. Defendants' Reply at 5-18.

Plaintiff, in support of summary judgment, argues there are no disputed issues of material fact in the record that the Site constitutes wetlands, Plaintiff's Memorandum at 18-23, that are waters of the United States under both the "continuous surface connection" standard advanced in the plurality opinion of *Rapanos*, *id.* at 23-30, as well as under Justice Kennedy's "significant nexus" standard, *id.* at 30-33, that Defendants discharged pollutants, particularly dredged and fill material, from point sources at the Site, *id.* at 16-18, and that the Site's PCC status was abandoned long before Acquest acquired the Site in 2006. *Id.* at 33-35. In opposition, Defendants argue the NYSDEC issued two § 402 permits including one in 2006 for construction of the nursery and storing fill on the Property, and the second to disturb four acres from October to December 2007, Defendants' Response at 10-11, the Site is not wetlands because wetland hydrology has not been present on the Site for more than a century, *id.* at 13-25, and even if wetlands are present at the Site, they do not constitute waters of the United States because Ransom Creek is not a TNW, *id.* at 25-27, the Government has failed to establish a continuous surface connection or a significant nexus between the Site and a TNW, *id.* at 27-34, and the Millersport Highway ditches are not waters of the United States. *Id.* at 34-35. Defendants further maintain the Site remains PCC which is excluded from regulation under the CWA. *Id.* at 35-40. In further support of summary

judgment, Plaintiff reiterates that the Site had wetland hydrology when acquired by Acquest in 2006, Plaintiff's Reply at 2-10, the Site's wetlands are waters of the United States, *id.* at 10-15, and the Site's PCC status was abandoned, *id.* at 15-18.

### A. Preliminary Arguments

Preliminarily, the court addresses some of Defendants' initial contentions raised in opposition to Plaintiff's Summary Judgment Motion. Defendants' Response at 6-8. In particular, Defendants argue none of the activities on which the alleged CWA violations are based are actionable, Defendants' Response at 6, the Government has failed to meet its burden to establish each "person" is individually liable for the alleged violations, *id.*, and some of Plaintiff's evidence is inadmissible. *Id.* at 6-8.

First, Plaintiff does not respond to and, as such, has conceded that Defendants' assertion that the Government is not entitled to summary judgment for any alleged discharges or actions occurring prior to 2007, based on the Amended Complaint's allegations that all activities and discharges began "in or around January 1, 2007," Defendants' Response at 6 (quoting Amended Complaint, Dkt. 112), is correct.

With regard to Defendants' argument that Plaintiff's failure to meet its burden of proving the individual liability of each individual Defendant warrants summary judgment in Defendants' favor, Defendants' Response at 6, as Plaintiff replies, Plaintiff's Reply at 23-24, courts, including the Second Circuit, have held that the CWA, a strict liability statute, imposes liability for CWA violations on officers, employees and agents for action on behalf of a company engaged in the proscribed activity. *See*, *e.g.*, *United States v. Pollution Abatement Services of Oswego, Inc.*, 763 F.2d 133, 135 (2d Cir. 1985) (holding with regard to an alleged violation of the Rivers and Harbors Act of 1899, a

precursor to the CWA, that "[i]n light of the clear congressional intent to hold 'person[s]' liable for violations, we see no reason to shield from civil liability those corporate officers who are personally involved in or directly responsible for statutorily prescribed activity."). *See also City of Newburgh v. Sarna*, 690 F.Supp.2d 136, 161-62 (S.D.N.Y. 2010) (holding corporate officer could be personally liable for CWA violation in a civil action where the alleged violations were undertaken at the behest of such corporate officer yet dismissing claims for failing to provide adequate notice), *aff'd*, 406 Fed.Appx. 557 (2d Cir. Jan. 21, 2011).  Because each of the named Defendants in the instant action was responsible for or had control over work on the Site resulting in the alleged violations, with Acquest Development negotiating the purchase of the Site, Acquest Transit owning the Site, and Huntress acknowledging he is the sole member and manager of both Acquest Development and Acquest Transit, with checks for Economy Tree Services for land clearing written from accounts for both companies, Burden Dep. Tr. [53] Exh. 3, Dkt. 270-6 at 252 (Huntress), 259, 408, 410 (Acquest Transit), and 307, 402, 407 (Acquest Development), all Defendants are sufficiently involved to be held personally liable for the alleged CWA violations.

Defendants further maintain some of the Government's evidence is inadmissible and may not be considered by the court in considering Plaintiff's Summary Judgment Motion.  Defendants' Response at 6-8.  Specifically, Defendants maintain Mary Anne Thiesing's Site Visit Report and the conclusions drawn therefrom by Pohle, Jones, Dr. Brooks, and Greenberg are all inadmissible because Thiesing failed to follow the Corps

---

[53] References to "Burden Dep. Tr." are to the pages of the transcript of the deposition of Timothy Burden, who is president of ETS, and the exhibits attached thereto.  The Burden Dep. Tr. and its attached exhibits are filed as Dkt. 270-6 at 1 - 441.

Manual.  Defendants' Response at 6-7.  Defendants challenge the testimony of Dr.

Brooks on aerial photography as inadmissible because Dr. Brooks is not an expert in

aerial photography.  *Id.* at 7.  According to Defendants, Jones's shallow groundwater

drawdown spreadsheet conclusions are inherently unreliable because Jones did not test

such model and when tested by Defendants, the model proved unreliable, was never

peer-reviewed, has no known rate of error, and is generally not accepted by other

experts in the field of wetland hydrology, such that it fails to meet the *Daubert* factors for

admissibility as expert evidence.  *Id.*  According to Defendants, the statements found in

the expert reports of Thiesing, Dr. Brooks, Jones, and Greenberg regarding the

"significant effects" discharges from the Site have on Ransom Creek are speculative

and conclusory and must be excluded.  *Id.*  Defendants similarly maintain Jones's

calculation of the number of days of alleged runoff from the Site is based on a model for

which the main input was the Site's water level in the East Millersport Highway Ditch

labeled 3ES, without accounting for water entering 3ES from the neighboring highway,

properties upstream of the culverts under Millersport Highway, and non-point source

discharges from the Site, rendering conclusory and speculative Jones's opinion that

there must have been a discharge from the Site whenever at least one inch of water is

measured at 3ES.  *Id.* at 7-8.  Defendants further characterize as "inadmissible hearsay"

the Grand Jury testimony of Patrick Huntress, who is now deceased and, as such,

unavailable for cross-examination, *id.* at 8, the reading by ETS president Burden of

large parts of his Grand Jury testimony into his deposition transcript without first

verifying the testimony was intended to refresh Burden's recollection as required by

Fed.R.Evid. 803(5), *id.*, unidentified "statements by David Pohle to establish that 'earth

moving' work occurred," *id.*, and unidentified and unauthenticated "numerous photographs" in Plaintiff's papers. *Id.*

Not only did Defendants fail to specifically move to strike or suppress this evidence, but Defendants fail to adequately present facts and law in support of striking or suppressing this evidence. Significantly, Defendants' failure to formally move to strike this evidence, accompanied by legal arguments and facts, essentially requires the court to "scour the record" in search of evidence and possible legal arguments in support, something the court, as adjudicator rather than an advocate, is not required to do. *See ABC v. NYU Hospitals Center*, 629 Fed.Appx. 46, 49 (2d Cir. Oct. 22, 2015) ("the District Court [is] 'not required to scour the record on its own in a search for evidence'" the parties failed to present on summary judgment (quoting *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013))); *Taylor v. Harbour Pointe Homeowners Association*, 690 F.3d 44, 48 (2d Cir. 2012) (the court is not permitted to "scour the record" to research a legal theory and serve as an advocate for one party over the other). Accordingly, these arguments do not merit further consideration.

Further, as Plaintiff asserts, because Patrick Huntress was an agent for Acquest, his Grand Jury testimony about his work at the Site for Acquest constitutes "statements of a party opponent 'on a matter within the scope of that relationship while it existed.'" Plaintiff's Reply at 10 n. 7 (quoting Fed.R.Evid. 801(d)(2)(D)). Moreover, with regard to the asserted unauthenticated photographs, Plaintiff argues, and Defendants do not dispute, many such photographs were produced by Acquest and, thus, were authenticated upon their production, *see*, *e.g.*, *Orr v. Bank of America, NT & SA*,285

F.3d 764, 776 (9th Cir. 2002) (citing 31 Wright & Gold, *Federal Practice & Procedure* § 7104 at 30-31 (2000) ("Once evidence offered against one party is deemed authentic, its authenticity is established as against all other parties as well."), and the remaining photographs were authenticated either in the preliminary injunction proceedings, or by expert declarations. *Id.* at 8 n. 6. Authentication requirements are flexible, requiring, by "sufficient evidence" based, *inter alia*, on testimony of a witness with knowledge that "an item is what it is claimed to be." Fed.R.Evid. 901(b)(1). As such, these arguments provide no basis for denying Plaintiff's Summary Judgment motion.

### B. First and Third Claims

The First Claim alleges Defendants violated the CWA by discharging pollutants, *i.e.*, dredged and fill materials, from point sources onto the Site, which constitutes waters of the United States, without first obtaining the requisite § 404 permit. Amended Complaint, First Claim. The Third Claim alleges that after the EPA issued the First Cease and Desist Order on February 21, 2008, prohibiting Defendants from the unauthorized discharge of pollutants into waters of the United States, Defendants nevertheless continued making such discharges in violation of the administrative order. Amended Complaint, Third Claim. Thus, both the First and Third Claims require a determination that the Site contains wetlands that are "waters of the United States," as well as that Ransom Creek is a TNW under the CWA. These are questions of fact for the jury. *See Simsbury-Avon Preservation Club, Inc.*, *v. Metacon Gun Club, Inc.*, 575 F.3d 199, 216-23 (2d Cir. 2009) (affirming district court's grant of summary judgment where there was insufficient evidence to raise a triable issue of fact as to whether the

property in question was jurisdictional wetlands, a berm was a point source, or that surface water runoff from the berm was a discharge).

The discharge of "dredged material," pertains to "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). "[T]he term fill material means material placed in waters of the United States where the material has the effect of: (i) [r]eplacing any portion of a water of the United States with dry land; or (ii) [c]hanging the bottom elevation of any portion of a water of the United States." *See Rapanos*, 547 U.S. at 723 ("dredged or fill material – [ ] unlike traditional water pollutants, are solids that do not readily wash downstream . . . ."). "[T]he term discharge of dredged material means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.2(d)(1). As particularly relevant here, activities excluded from the "discharge of dredged material" include those "that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated solid material." 33 C.F.R. § 323.2(d)(2)(ii).

### 1. The Waters of the United States

In furtherance of their respective arguments on summary judgment, the parties dispute how to determine whether there are wetlands at the Site constituting "waters of the United States," the proper definition for which has been at the core of many CWA cases, including the instant case. Prior to passage of the CWA, the phrase "navigable waters of the United States" was interpreted as referring "to interstate waters that are

'navigable in fact' or readily susceptible of being rendered so." *Rapanos*, 547 U.S. at

723 (citations omitted).[54]  The Corps initially adopted this definition after passage of the

CWA, *id.* (citing 33 C.F.R. § 209.120(d)(1) (1974)), but later adopted a broader

definition designed "to extend the definition of 'the waters of the United States' to the

outer limits of Congress's commerce power." *Id.*

In 1985, the Supreme Court observed that Congress recognized that "[p]rotection

of aquatic ecosystems . . . demanded broad federal authority to control pollution, for

'[w]ater moves in hydrologic cycles and it is essential that the discharge of pollutants be

controlled at the source.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S.

121, 132-33 (1985) (quoting S.Rep. No. 92-414, p. 77 (1992), U.S.Code Cong. &

Admin.News 1972, pp. 3668-3742).  The Court thus further observed that Congress

intended to regulate some waters "that would not be deemed 'navigable' under the

classical understanding of the term," *id.* at 133, and upheld the Corps' assertion of CWA

jurisdiction over wetlands adjacent to other waters covered by the CWA.  *Id.* at 135

(concluding "a definition of 'waters of the United States' encompassing all wetlands

adjacent to other bodies of water over which the Corps has jurisdiction is a permissible

interpretation of the Act.").  In 2001, the Court declined to extend the definition of

"waters of the United States" to isolated ponds used as breeding sites for migratory

birds in the absence of any "significant nexus" between the ponds and adjacent

navigable rivers as defined under *Riverside Bayview*.  *Solid Waste Agency of Northern*

---

[54] "[T]here is no question that 'the Federal Government under the Commerce Clause of the Constitution (Art. I, § 8, cl.3) has dominion, to the exclusion of the States, over navigable waters of the United States.'" *Islander East Pipeline Co., LLC v. Connecticut Dept. of Environmental Protection*, 482 F.3d 79, 92 (2d Cir. 2006) (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 334 (1958)).  "By enacting the CWA, Congress provided states with an offer of shared regulatory authority." *Id.* (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 1010 (1992) (stating the CWA "anticipates a partnership between the States and the Federal Government, animated by a shared objective.").

*Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 167-68, 174

(2001) ("*SWANCC*") (finding "nothing approaching a clear statement from Congress that

it intended § 404(a) to reach an abandoned sand and gravel pit . . . .").  The Supreme

Court's next pronouncement in 2006 on the issue was the 4-1-4 decision rendered in

*Rapanos* where the wetlands at issue were neither adjacent to navigable waters as in

*Riverside Bayview*, nor isolated like the abandoned pits in *SWANNC*; rather, the

wetlands in that case were "adjacent to tributaries of traditionally navigable waters."

*Rapanos*, 547 U.S. at 787.  In its four-justice plurality decision, the Court concluded that

to be subject to § 404's permit program, there must exist a "significant nexus" between

the non-navigable wetland and a traditionally navigable waterway ("TNW"), *id.* at 741,

with the plurality continuing that "*only* those wetlands with a <u>continuous</u> <u>surface</u>

<u>connection</u> to bodies that are 'waters of the United States' in their own right, so that

there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such

waters and covered by the Act."  *Id.* at 742 (italics in original).  The plurality further

observed that "[w]etlands with only an intermittent, physically remote hydrologic

connection to 'waters of the United States' do not implicate the boundary-drawing

problem of *Riverside Bayview*, and thus lack the necessary connection to covered

waters that we described as a 'significant nexus' in *SWANCC*."  *Id.*  Accordingly, the

plurality held that establishing that any specific wetlands are covered by the CWA

"requires two findings: first, that the adjacent channel contains a 'water of the United

States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate

navigable waters); and second, that the wetland has a continuous surface connection

with that water, making it difficult to determine where the 'water' ends and the 'wetland'

begins." *Id.* Justice Kennedy, concurring in the judgment, would have extended jurisdiction under the CWA to wetlands that "possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, <u>significantly</u> <u>affect</u> <u>the</u> <u>chemical</u>, <u>physical</u>, <u>and</u> <u>biological</u> <u>integrity</u> <u>of</u> <u>other</u> <u>covered</u> <u>waters</u> more readily understood as navigable." *Id.* at 753. Nevertheless, when "wetlands' effect on water quality [of a navigable water] are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* In contrast, the four-justice dissent, recognizing that "wetlands adjacent to tributaries generally have a significant nexus to the watershed's water quality," and may be significantly intertwined with the ecosystem of such adjacent waterways, *id.* at 797, construed "navigable waters" so broadly as to permit federal regulation of any wetlands lying alongside a ditch or drain, regardless of how remote or insubstantial, from which waters eventually may flow into a TNW. *Id.* at 808-09. It is against this backdrop of statutory ambiguity and conflicting judicial constructions that the court considers whether the record establishes, as a matter of law, that the Site constitutes wetlands within the jurisdiction of the CWA, particularly with regard to § 404.[55]

The court understands Defendants' frustration regarding how to properly construe certain parts of the CWA to facilitate self-compliance. The CWA, including the regulations promulgated thereunder, however, is not the only example of challenging drafting by Congress and federal agencies. Other complex federal enactments frequently recognized as less than ideal models of legislative clarity include

---

[55] As noted, Discussion, *supra*, at 46 n. 41, this issue is a question of law for the court to resolve and need not be submitted as a question of fact, or mixed question of law and fact, to the jury.

Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.

§§ 9601 *et seq.* ("CERCLA"), *see*, *e.g.*, *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986)

(observing CERCLA provisions of, are "not . . . model[s] of legislative draftsmanship,"

and its statutory language is "at best inartful and at worst redundant."); *Pennsylvania*

*Dept. of Environmental Protection v. Beazer East, Inc.*, 553 Fed. Appx. 153, 157 n. 14

(3rd Cir. Jan. 2, 2014) ("CERCLA is not a paradigm of clarity or precision . . . ." (quoting

*Artesian Water Co. v. Gov't of New Castle County*, 851 F.2d 643, 648 (3d Cir. 1988)));

*Bernstein v. Bankert*, 733 F.3d 190, 200 (7th Cir, 2013) ("CERCLA is not known for its

clarity or for its brevity."), and the Employee Retirement Income Security Act of 1974, 29

U.S.C. §§ 1021 *et seq.* ("ERISA"). *See*, *e.g.*, *New York State Conference of Blue Cross*

*& Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (remarking on the

"unhelpful nature" of ERISA's text and the "frustrating difficulty of defining its key term");

*Board of Trustees of IBT Local 863 Pension Fund v. C & S Wholesale Grocers, Inc.*,

802 F.3d 534, 545 (3rd Cir. 2015) ("We appreciate that ERISA is not a model of clarity.

It is, in fact, a bewilderingly complex statute."). Nevertheless, less than ideal clarity

generally does not require throwing the proverbial baby out with the bath water (polluted

or otherwise), nor create a bar to enforcement; instead, the court is required to interpret

the CWA according to the applicable maxims of statutory construction, *see Tcherepnin*

*v. Knight*, 389 U.S. 332, 335 (1967) (taking note of the "familiar canon of statutory

construction that remedial legislation should be construed broadly to effectuate its

purposes"), particularly in light of the CWA's "broad remedial purpose, *i.e.*, to 'restore

and maintain the chemical, physical and biological integrity of the Nation's waters. . . ,'"

*Simsbury-Avon Preservation Club, Inc.*, 575 F.3d at 224 (quoting 33 U.S.C. § 1251(a)),

yet that same remedial purpose "cannot override the plain text and structure of the statute." *Id.* (citing *United States v. Plaza Health Laboratories, Inc.*, 3 F.3d 543, 647 (2d Cir. 1998)). Although "maxims of statutory construction provide helpful guideposts, the reach of [a] statute ultimately becomes a matter of judgment made upon review of the legislative goal." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 259 (2d Cir. 2014) (internal quotation marks and citation omitted). With regard to the definition of "the waters of the United States" as used in the CWA, the *Rapanos* decision, which is the Supreme Court's most recent pronouncement on the issue, controls.

That the Supreme Court Justices were able to cull from the CWA three separate, yet viable definitions demonstrates the task is not insurmountable. This is consistent with caselaw decided subsequent to *Rapanos* in which the CWA survived ambiguity challenges in the criminal context in which the ambiguity test is more lax than in the civil context. *See*, *e.g.*, *United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008) (fact that areas of property were wet, proximity of property to "an area network of creeks and their tributaries leading to the Gulf, some of which connected to wetlands on the property," that one of the defendant's employees advised "the property might contain wetlands," and that the deed to the property noticed it may include wetlands, undercut any vagueness in applying the CWA to the defendant's conduct; Accordingly, Defendants' motion for summary judgment should be DENIED as to this argument, and the court turns to which of the two *Rapanos* standards should be applied.

As discussed, Discussion, *supra*, at 80-81, in *Rapanos*, a majority of the Supreme Court Justices, albeit four in the plurality opinion and Justice Kennedy in a concurring opinion, rejected as too expansive the Corps' then current regulations

broadly defining "'the waters of the United States' to include, in addition to traditional interstate navigable waters, 33 C.F.R. § 328.3(a)(1) (2004), '[a]ll interstate waters including interstate wetlands,' § 328.3(a)(2); '[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes,[56] or natural ponds, the use, degradation of destruction of which could affect interstate or foreign commerce,' § 328.3(a)(3); '[t]ributatries of [such] waters [and tributaries] (other than waters that are themselves wetlands,' § 328.3(a)(7)." *Rapanos*, 547 U.S. at 724 (bracketed material in original). Under this rejected definition, the Site, assuming for the sake of this discussion, it is wetlands, would undoubtedly qualify as part of "the waters of the United States."  As noted, to support the plurality opinion of four Supreme Court Justices, however, calls for a "continuous surface connection" standard, defining the phrase "the waters of the United States" to include "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" *Rapanos*, 547 U.S. at 739 (plurality opinion) (quoting Webster's New International Dictionary 2882 (2d ed.) ("Webster's Second")).  The Court continued that "[t]he phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."  *Id.*  Accordingly, the plurality concluded the Corps' interpretation was too expansive and "is thus not 'based on a permissible

---

[56] "Playa lakes" are naturally created round hollows in the Southern High Plains of the United States which are primarily filled with rain water in the spring or from salt-water aquifers, and support local agriculture and a variety of wildlife including migratory birds and various plant life, and can be adversely affected by agricultural activity.  *See* Playa Lakes/Wetland Protection and Restoration/US EPA, available at https://www.epa.gov/wetlands/playa-lakes, *last visited* Aug. 14, 2018.

construction of the statute.'" *Id.* (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

In his concurring opinion, Justice Kennedy also rejected the Corps' interpretation of "the waters of the United States" as beyond the CWA's intent, but would construe the term as applying to those wetlands that "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). In the absence of more specific regulations, this "significant nexus" would be established by the Corps "on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries." *Id.* at 782.

Although a majority of the Supreme Court Justice failed to reach a consensus on the correct interpretation of the term "the waters of the United States," the five Justices joining in the result agreed that rejecting as too expansive the Corps' then operative regulatory interpretation was necessary to avoid defining the term to apply to lands and waters the CWA was never intended to reach. *Compare Rapanos*, 547 U.S. at 734 ("The plain language of the statute simply does not authorize this 'Land is Waters' approach to federal jurisdiction.") (plurality opinion), with p. 782 (asserting demonstrating a "significant nexus" between wetlands and navigable waters "is necessary to avoid unreasonable applications of the statute") (Kennedy, J., concurring). Under such circumstances, the Supreme Court has directed that "[w]hen a fragmented

Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). At least one court, however, has pointed out that strict application of *Marks* is not possible. *United States v. Johnson*, 467 F.3d 56, 62 (1st Cir. 2006). In particular, in *Marks*, the court observed that in applying Justice Kennedy's "significant nexus" test, both the Seventh and Ninth Circuits, without explanation, "equat[ed] the 'narrowest opinion' with the one least restrictive of federal authority to regulate." *Johnson*, 467 F.3d at 61-62 (citing *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006), and *No. Cal. River Watch v. City of Healdsburg*, 457 F.3d 1023, 1029 (9th Cir. 2006)). As the First Circuit observed, however, even assuming, *arguendo*, the narrowest opinion is correctly construed as the one least imposing on federal regulatory authority, circumstances may exist where federal jurisdiction does not exist under the "significant nexus" test, but a "slight surface hydrological connection" would support jurisdiction under the "continuous surface connection test." *Id.* (quoting *Gerke*, 464 F.3d at 724-25).[57] Nor has the Second Circuit indicated which test is preferred. *See Simsbury-Avon Pre. Soc'y, LLC v. Metacon Gun Club*, 472 F.Supp.2d 219, 227-30 (D.Conn. 2007) (analyzing alleged CWA violations under both continuous surface connection and significant nexus tests, but not choosing between either), *aff'd on other grounds*, 575 F.3d 199, 222 (2d Cir. 2009) (not reaching question of which *Rapanos* standard applies to determine whether site constituted jurisdictional wetlands under CWA). Of those federal courts that have reached the

---

[57] The Seventh Circuit recognized this possibility, but dismissed it as a "rare case." *Gerke*, 464 F.3d at 724-25.

issue, some courts hold there is jurisdiction if either standard applies, *see*, *e.g.*, *United States v. Donovan*, 661 F.3d 174, 184 (3d Cir. 2011) ("We hold that federal jurisdiction to regulate wetlands under the CWA exists if the wetlands meet either the plurality's test or Justice Kennedy's test from *Rapanos*," but the failure to meet either standard means the wetlands are not subject to the CWA); *Johnson*, 467 F.3d at 60  (holding United States may assert jurisdiction over wetlands in question provided either "continuous surface connection" or "significant nexus" standard is met); and at least one district court within the Second Circuit has applied the continuous surface connection test. *Haniszewski v. Cadby*, 2013 WL 6816622, at * 8 (W.D.N.Y. Dec. 20, 2013) (applying continuous surface connection test without explanation).  Finally, although the EPA and the Corps jointly issued new guidance adopting the "significant nexus" standard, such guidance was never formally promulgated as administrative regulations but only with regard to agency decision issuing or denying applications for pollution discharges under the NPDES.  *See National Ass'n of Mfrs. V. Department of Defense*, __ U.S. __; 138 S.Ct. 617, 625-26 (2018) (observing that in 2015, the EPA and the Corps attempted to craft a new statutory definition "waters of the United States" for use in administering the NPDES permitting scheme connection, dubbed the Waters of the United States Rule ("WOTUS Rule"), which "separates waters into three jurisdictional groups – waters that are categorically jurisdictional (*e.g.*, interstate waters); those that require a case-specific showing of their significant nexus to traditionally covered waters (*e.g.*, waters lying in the flood plain of interstate waters); and those that are categorically excluded form jurisdiction (*e.g.*, swimming pools and puddles," but which "'does not establish any regulatory requirements' and is instead 'a definitional rule that clarifies the scope of' the

statutory term 'waters of the United States.'" (quoting 80 Fed.Reg. at 37054 (2015)))."

This new definition of waters of the United States as adopted by the Corps, however, does not apply in the instant case which concerns the Corps' definition of waters of the United States as it existed before 2015. *See Orchard Hill Building Co. v. United States Army Corps of Engineers*, 893 F.3d 1017, 1020 (7th Cir. 2018) (applying definition of "waters of the United States" as it existed prior to 2015 when agency Corps issued, at the plaintiff developer's request, a jurisdictional determination that subject property contained wetlands).

In this vein, the plurality's "continuous surface connection" standard provides the more objective approach to determining whether wetlands fall within federal jurisdiction under the CWA as part of "the waters of the United States." Simply put, the "significant nexus" standard as enunciated by Justice Kennedy, *Rapanos*, 547 U.S. at 780, is too nebulous for resolving on summary judgment whether the Site contains wetlands, requiring a determination as to whether particular wetlands "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable,'" *Rapanos*, 547 U.S. at 780, and the ensuing analysis of each concept, *e.g.*, finding a "significant biological" impact on a TNW, renders this standard more subjective and, thus, prone to, at best, simple error, and at worse, bias and deliberate 'weaponization' by the EPA of the type to which Defendants maintain they have been subjected. *See* Defendants' Reply at 15 (drawing analogy between being a defendant in the instant action to "the medieval process of running the gauntlet, the ancient form of corporal punishment in which the condemned party was forced to run between two rows of soldiers who would strike out, attacking him with their weapons.").

Accordingly, the "continuous surface connection" standard is the proper standard for analyzing the claims against Defendants on the pending summary judgment motions. Nevertheless, because the dispositive motions are before the undersigned for a report and recommendation, the motions are alternatively analyzed according to the "significant nexus" standard in the interest of completeness should the District Judge disagree.

Regardless of which standard is ultimately determined applicable, both require determining that the Site constitutes wetlands and that Ransom Creek is a TNW. Accordingly, the court considers each in turn.

### a.    Wetlands

As particularly relevant to the instant action, under the relevant regulations, "waters of the United States" include "wetlands," 33 C.F.R. § 328.3(a)(2), which are defined as

> those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

33 C.F.R. § 328.3(c)(4).

Wetlands are considered adjacent to tributaries and, thus, covered by the CWA, even if they are "separated by constructed dikes or barriers, natural river berms, beach dunes, and the like." 33 C.F.R. § 328.3(c)(1). Nevertheless, excluded from "wetlands" for purposes of the CWA are prior converted croplands ("PCC"), which are defined as wetlands converted to farming prior to December 23, 1985. 33 C.F.R. § 328.3(b)(2); 7 C.F.R. § 12.2.

In the Corps Manual, "wetlands" is further

defined to require (1) prevalence of plant species typically adapted to saturated soil conditions, determined in accordance with the United States Fish and Wildlife Service's National List of Plant Species that Occur in Wetlands; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years.

*Rapanos*, 547 U.S. at 761-62 (citing Wetlands Research Program Technical Report Y-87-1 (on-line edition), pp. 12-34 (Jan. 1987), http://www.saj.usace.army.mil/permit/ Documents/87manual.pdf).

For the sake of simplicity, these three separate prongs are referred to as (1) wetland

vegetation; (2) wetland soils; and (3) wetland hydrology, and all three must be present

for a wetlands determination. *Simsbury-Avon Preservation Club, Inc.* 575 F.3d at 216

(citing cases). In the instant case, it is not disputed that the Site meets the first two

prongs, with both wetland vegetation and the criteria for wetland soils present at the

Site, but Defendants maintain the presence of wetland vegetation does not necessarily

indicate the Site is wetlands, particularly because such vegetation "'may persist for

decades following alteration of hydrology that will render an area nonwetland,'"

Defendants' Response at 16 (quoting Corps Manual at 6), and the hydric soils present

on the Site are "relict of a time past when wetland hydrology was present" at the Site, *id.*

at 15-16, and also dispute that wetland hydrology is also present at the Site, *id.* at 16-

25, and maintain that even if the evidence establishes the presence of wetland

hydrology, any wetlands at the Site are exempt from the CWA's reach as PCC.

According to the Corps Manual,

"wetland hydrology" encompasses all hydrologic characteristics of areas that are periodically inundated or have soils saturated to the surface at some time during the growing season. Areas with evident characteristics of wetland hydrology are

those where the presence of water has an overriding influence on characteristics of vegetation and soils due to anaerobic and reducing conditions, respectively. Such characteristics are usually present in areas that are inundated or have soils that are saturated to the surface for sufficient duration to develop hydric soils and support vegetation typically adapted for life in periodically anaerobic soil conditions.

Corps Manual at 28-29.

The Corps' Manual states that it "only provides a basis for determining whether a given area is wetland for purposes of Section 404" of the CWA, Corps Manual at 3, under which the Corps issues permits for the discharge of dredged or fill material. *See* 33 U.S.C. § 1344. Because the EPA regulations use the same definition of wetlands, the Corps' Manual is helpful in identifying wetlands subject to the NPDES permit requirement. *Simsbury-Avon Preservation Club, Inc.*, 575 F.3d at 216 n. 4. In the instant case, the plethora of expert evidence submitted by both sides establishes material issues of genuine fact as to whether there is currently wetland hydrology at the Site, precluding summary judgment.

For example, to establish wetland hydrology was present at the Site when acquired by Acquest in 2006, Plaintiff relies on determinations by Jones's "drawdown calculations" based on analysis of daily precipitation, evapotranspiration,[58] and soil moisture storage data from 1995 to 2016 to conclude that the Site's "water table would likely be present within 12 inches of the ground surface for at least 14 consecutive days during the growing season in an average year." Plaintiff's Statement of Facts ¶ 40.h. The court notes the equivocal nature of this determination based on the modifier "likely." Dr. Brooks's conclusion that EDI's determination in 2005 that 80% of the Site met the

---

[58] The process by which water is transferred to the atmosphere by evaporation from the surface of the land and plants.

conditions for jurisdictional wetlands under the CWA was conducted pursuant to the standard protocols, was reasonably accurate and thorough in delineating and mapping wetlands throughout the site, *id.* ¶ 40.f, is contradicted by the fact that although Defendants relied on the EDI's determination to negotiate a lower purchase price for the property, the final purchase price was significantly higher than would have been expected had Defendants insisted on the $ 10,000 reduction in price per acre of wetlands as determined by EDI.[59]  The GMW Study conducted by Mr. Kagel yielded results consistent with a determination that the Site does not have wetland hydrology. KE Report at 13-19 and Exhs. 22-24, 24a, 25, 25a, 26, 26a, 27 and 27a (Dkt. 280-2 at 15-21, 69-100).  The statements by Spoth and Kelkenberg that the successful crops of corn and winter wheat would not have been possible had conditions of wetland hydrology been present at the Site, Dr. Busacca Report at 8-9, 22 (Dkt. 279-3 at 73-74, 87); Spoth Dep. Tr.[60] at 80-81, Kelkenberg Dep. Tr.[61] at 62-64, raise further issues of fact as to the wetland character of the Site.  The foregoing are but a scant few of numerous disputed issues of fact regarding whether the Site contained wetlands hydrology.  Accordingly, a determination of whether the Site contains wetland hydrology so as to qualify as wetlands requires a weighing of facts by the jury not permitted on

---

[59] According to the original purchase price of $ 950,000 for the 97-acre site, the price per acre was just under $ 10,000.  Given the EDI's determination that 80% of the site, or 77 acres, was comprised of jurisdictional wetlands, Defendants could have insisted on a decrease in the purchase price of $ 770,000 for a final purchase price of $ 180,000.  That the final purchase price was $ 425,000 raises an issue of fact as to either the accuracy of the EDI report, or the disbelief of the purchaser and seller regarding the findings, neither of which is explained by Jayson's deposition testimony that the $ 425,000 purchase price indicated that it ultimately would be determined some portion of the property would not be usable.  Jayson Dep. Tr. at 83 (Dkt. 270-1 at 14).

[60] References to "Spoth Dep. Tr." are to the pages of the transcript of Spoth's deposition, portions of which are filed as Dr. Busacca Report Exh. H (Dkt. 279-3 at 148-57).

[61] References to "Kelkenberg Dep. Tr." are to the pages of the transcript of Kelkenberg's deposition, portions of which are filed as Dkt. 281-5.

summary judgment, *Dufort*, 874 F.3d at 349-50, and both Plaintiff's and Defendants' Summary Judgment Motions should be DENIED on this ground.

Defendants further argue that, even assuming, *arguendo*, the evidence in the record establishes the Site is wetlands, such wetlands are Prior Converted Cropland ("PCC"), and thus exempt from regulation under the CWA. Defendants' Response at 35-49. Plaintiff concedes the northern portion of the Site was formally designated as PCC in 1988, but maintains such designation was abandoned when farming on the Site ceased in 1988. Plaintiff's Memorandum at 33-35; Plaintiff's Reply at 15-18. As relevant, it is undisputed that in 1987, the Soil Conservation Service ("SCS"), now known as the Natural Resource Conservation Service ("NRCS"), designated the northern 67.7 acres of the Site containing hydrolic soils as PCC.

Wetlands that are "prior converted cropland" are not "waters of the United States" for purposes of the CWA. 40 C.F.R. § 230.3(s); 33 C.F.R. § 328.3(b)(2). "Prior converted cropland" or "PCC" is defined under the relevant regulation as a converted wetland where the conversion occurred prior to December 23, 1985, and agricultural commodity had been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support "woody vegetation," and any inundation was for fewer than 15 consecutive days. 7 C.F.R. § 12.2(8).

Plaintiff maintains that the Site's PCC status was abandoned when farming ceased in 1988. Plaintiff's Memorandum at 33-35; Plaintiff's Reply at 15-18. In support of this argument, Plaintiff relies on a general policy statement contained in the preamble to the Federal Register, *i.e.*, 1993 Clean Water Rule, 58 Fed.Reg. at 45033-34 (Aug.

25, 1993), providing for the Corps and EPA to use the SCS provisions on abandonment to ensure that PCC that is no longer farmed and again exhibits wetlands criteria will be considered to have abandoned its PCC designation unless "once in every five years the area has been used for the production of an agricultural commodity or the area has been used and will continue to be used for the production of an agricultural commodity in a commonly used rotation with aquaculture, grasses, legumes, or pasture production." Defendants object to reliance on this provision because it has not been promulgated as a regulation but, rather, is merely a general policy statement that does not have force of law and, thus, is not binding on either the public or the agency. Defendants' Response at 37. Although preamble statements not published in the Code of Federal Regulations generally do not constitute binding, final agency action susceptible to judicial review, *Natural Resources Defense Council v. EPA*, 559 F.3d 561, 565-66 (D.C.Cir. 2009), the CWA provides for the loss of PCC status if "the wetlands characteristics returned after that date [December 23, 1985] as a result of – (i) the lack of maintenance of drainage, . . . ; (2) a lack of management of the lands containing the wetland; or (iii) circumstances beyond the control of the person." 16 U.S.C. § 3822(b)(1)(G). Accordingly, Defendants' argument that PCC status cannot be abandoned or lost is without merit.

Nevertheless, there exist questions of fact as to whether such designation of a portion of the Site was, in fact, abandoned. For example, although Defendants cannot definitively state or point to undisputed evidence establishing farming continued at the Site after 1988 until within five years of Acquest's acquiring the Site, Plaintiff likewise fails to point to conclusive evidence such farming did not occur within the temporally

relevant period. Significantly, Defendants' insistence that all earth-moving activity at the Site was undertaken in connection with the intention of maintaining the Site as farmland is consistent with the statements by Defendants' witnesses Spoth and Kelkenberg, both farmers, that had the Site reverted to wetland hydrology, the corn and winter wheat crops successfully grown on the Site after being purchased by Acquest would not have been supported. Spoth Dep. Tr. at 80-81, Kelkenberg Dep. Tr. at 62-64. Plaintiff points to no opinion evidence to the contrary, but relies, as evidence that farming activity at the Site was abandoned, on Jayson's deposition testimony that no farming occurred on the Site while owned by Realmark between 1988 and 2006, Plaintiff's Memorandum at 34, and the observation of heavy brush and saplings at the Site, Plaintiff's Memorandum at 34-35, as well as Duff's deposition statements that after 1988, Duff cleared only that portion of the Site on which he rode various recreational vehicles. Plaintiff's Reply at 9.

There thus are unresolved issues of fact as to whether the Site's PCC designation was abandoned, and summary judgment on this same issue should be DENIED.

### b.    Ransom Creek as TNW

Even if all three prongs supporting a determination that the Site is wetlands are present, Defendants further dispute that waters from the Site flow into Ransom Creek, or that Ransom Creek qualifies as a TNW, a fact the parties dispute. Defendants' Response at 26-27; Plaintiff's Reply at 14-15. TNWs include "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," and their "[t]ributaries." 33 C.F.R. § 328.3(a)(1), (5). The Corps is authorized to determine whether a water is a TNW, and although such determination is

"accorded substantial weight by the courts," 33 C.F.R. § 329.14(a), "conclusive determinations of navigability can be made only by federal Courts." *Id.* Here, the determination requires reconciling a crucial issue of fact by a jury.

In particular, although Ransom Creek's 2008 TNW Designation[62] is based on the observation of waterborne recreation activity, particularly canoes and kayaks, the TNW Designation also refers to several impediments to travel including several physical barriers, as well as "greatly" varying depth throughout the year. Dkt. 9-31 at 2. Nor is there any indication as to what percentage of Ransom Creek is impassable. *See id.* (referring to "the occasional need to clear downed vegetation" in addition to "one major impedance to travel" where navigation is "culverted" requiring boaters to physically remove their watercraft from the creek, as well as another point that is "too narrow with an increase in bank and downed vegetation impeding navigation"). The TNW Designation also states that "[u]sage of the designation by motorized boats is limited to the first 0.5 miles from Tonawanda Creek/Erie Canal," *Id.*

Even accepting Plaintiff's argument that "short interruptions in flow do not defeat navigability," Plaintiff's Reply at 14 (citing cases), in the absence of any evidence establishing that such admitted "interruptions in flow" are "short," there exist issues of fact as to whether Ransom Creek is a TNW in spite of the "greatly" varying depth throughout the year, a fact Plaintiff does not address. Summary judgment thus should be DENIED with regard to whether Ransom Creek is a TNW.

Moreover, should the jury determine Ransom Creek is a TNW under the CWA, the court is intrigued by the fact that the Corps did not designate Ransom Creek as a

---

[62] Dkt. 9-31.

TNW until March of 2008, after Defendants acquired the Site and had commenced the subject earth-moving activities. Despite the glut of legal arguments submitted on the pending motions, neither Plaintiff nor Defendants point to any caselaw explaining the legal significan ce, if any, to such an apparently belated TNW designation and the court's research has revealed none. Nevertheless, notions of due process point toward affording the timing of this designation some potential weight in assessing any fines or penalties against Defendants should Defendants ultimately be found liable under any or all claims.

### c.     Continuous Surface Connection

Assuming for the sake of discussion, the Site constitutes wetlands and Ransom Creek is a TNW, then whether the Site is within "the waters of the United States" also depends on whether there exists a "continuous surface connection" between the Site and Ransom Creek.[63] Toward this end, Dr. Kagel maintains that the only discharges from the Site into the West Millersport Highway Ditch are storm waters, and questions how much of the storm water run-off in the West Millersport Highway Ditch is from the Site or from the nearby road and other parcels of property that undisputedly are wetlands. Dr. Kagel Dep. Tr. at 83-86; 126-28. Furthermore, the dye-tracer study performed by Mr. Kagel also raises genuine issues of material fact as to whether any dredged or fill material from the Site, or storm water discharged from the Site, ended up in Ransom Creek.[64] The record thus is without conclusive evidence establishing a

---

[63] The court notes the plurality in *Rapanos* cast doubt on whether the continuous surface connection could be established where such connection depended on culverts and ditches such as exist in this case, Facts, *supra*, at 13, which do not have a permanent flow. *Rapanos*, 547 U.S. at 733.

[64] No permit was required for storm water run-off under § 404, which pertains only to dredged and fill material, or under § 402, which specifically exempts discharges of storm water unless associated with industrial activity.

continuous surface connection between the Site and Ransom Creek (assuming Ransom Creek is a TNW). These questions preclude summary judgment under the continuous surface connection standard.

### d. Significant Nexus

Should the District Judge determine the "significant nexus" standard applies, the dye-tracer study is even more relevant given that Justice Kennedy specifies that the subject wetlands, either alone or in combination with similarly situated neighboring wetlands, "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as navigable. When, in contrast, wetlands' effect on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). Pointedly absent from the evidence in the record is any attempt to calculate the amount of dredged or fill material that allegedly left the Site through groundwater and eventually migrated into Ransom Creek, assuming, for the sake of this discussion, Ransom Creek is a TNW. Nor is there any evidence from either Plaintiff or Defendants conclusively establishing that the total ditching at the Site increased or decreased as a result of Defendants' activities, having anything more than "speculative or insubstantial" effects on the water quality of Ransom Creek. *See Orchard Hill Building Company*, 893 F.3d at 1025-26 (holding Corps' reliance on "rough estimates" of the effect of anticipated rise in floodwaters that supported only a "trivial" increase in the amount of pollutants in downstream waters was insufficient to establish a "significant nexus" between the wetlands and downstream waters). Accordingly, summary judgment also is not available under the significant nexus standard.

Both Plaintiff's and Defendants' Summary Judgment Motions should thus be DENIED as to the First and Third Claims.

### C. Second Claim

The Second Claim alleges Defendants engaged in conduct, including excavating ditches and clearing from the Site brush and trees, resulting in an increase in storm water entering the ditches bordering the Site and flowing into Ransom Creek, and in violation of § 402 of the CWA which requires a permit for such discharges of storm waters into waters of the United States. As relevant here, § 402 requires permits for the discharge of pollutants, including storm waters, from a point source when the discharge is related to "industrial activities." 33 U.S.C. § 1342. The parties dispute whether Defendants' excavation and dredging of ditches, depositing of fill material, and clearing of brush, saplings and other vegetation at the Site constituted "industrial activities," which are defined under the relevant regulations to include "[c]onstruction activity including clearing, grading and excavation . . . " 40 C.F.R. § 122.26(b)(14)(x) ("§ 122.26(b)(14)(x)"), and whether § 122.26(b)(14)(x) applies to Defendants' actions.[65]

In particular, Defendants maintain that all land-clearing activity undertaken at the Site was in furtherance of agricultural ends as evidenced by Spoth's planting corn in 2007, and Kelkenberg's subsequently planted crops of winter wheat, none of which is activity subject to any permit requirements under § 122.26(b)(14)(x) which applies only to "industrial activity through construction facilities." Defendants' Response at 9-10. Plaintiff not only disputes that such activity at the Site was only in support of farming the

---

[65] Plaintiff's has conceded that Defendants' "as-applied" challenge to § 122.26(b)(14)(x) is not governed by 33 U.S.C. § 1369(b)(1)'s limitations requirement that challenges to an agency's actions in issuing or denying a storm water discharge permit be filed within 120 days of the relevant agency action. Plaintiff's Supplemental Memorandum at 3.

Site, Plaintiff's Reply at 18-19, but also maintains that the EPA's interpretation of the CWA and its storm water regulations, including § 122.26(b)(14)(x), is entitled to deference so long as it is supported by an explanation that is a reasonable policy choice for the agency to make. Plaintiff's Supplemental Memorandum at 4 (citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017)).

In the instant case, the court observes that § 122.26(b)(14)(x) refers not to "construction facilities" as Defendants maintain, Defendants' Response 9, but rather to "construction activity," undermining Defendants' argument that § 122.26(b)(14)(x) cannot apply in the absence of a physical facility or plant. *Id.* With regard to Defendants' argument that reading "industrial activity" to include "clearing, grading and excavation" creates an unlawful extension of EPA powers beyond those conferred by Congress, Defendants' Supplemental Response at 5 n. 1, § 122.26(b)(14)(x) cannot be said to be an unreasonable policy choice given the remedial purpose of the CWA. *See Catskill Mountains Chapter of Trout Unlimited, Inc.*, 846 F.3d at 507. Nor do Defendants deny that § 122.26(b)(14)(x) was properly promulgated in accordance with due process requirements and in accordance with EPA's rule-making requirements, including the provision for public comments.

Further, there is a question of fact, as discussed above, as to whether Defendants were engaged only in farming activity, or also in clearing the Site with the intention of further developing the Property in accordance with the construction business in which Defendants regularly engage. This is an issue of fact for the jury and, thus requires denying summary judgment. Should the jury ultimately determine Defendants' activity at the site constituted construction activity as contemplated under §

122.26(b)(14)(x), the same issue of fact discussed above, Discussion, *supra*, at 95-97, regarding whether Ransom Creek is a TNW will need to decided, as well as whether any activity at the Site resulted in the discharge of storm water in excess of that which would have been discharged in the absence of Defendants' alleged industrial activity, another fact disputed by the evidence. *See*, *e.g.*, Dr. Kagel Dep. Tr. at 74-82; 124-27 (Dr. Kagel asserting it was impossible to determine whether Defendants' activity at the Site increased, or decreased the overall amount of ditching).

Finally, with regard to Defendants' argument that the NYSDEC did grant to Acquest Transit two § 402 permits, including one to construct the nursery in 2006, which also included the right to store fill on the property for the nursery, and the second to disturb four acres of the Site between October and December 2007, Defendants' Response at 10-11, Plaintiff does not dispute that the permits were issued nor does Plaintiff assert it is now declaring the permits invalid. Plaintiff's Reply at 19. Rather, Plaintiff requests the court find the 2007 permit was invalid because it was issued under false pretenses because the Notice of Intent submitted by Acquest in applying for the 2007 permit misrepresented both the dates and the acreage of the planned activities to be conducted under the permit. *Id.* at 19-21. Defendants have not argued in further opposition on this point, nor do Defendants deny their earth-moving activities at the Site continued beyond December 2007, and occurred on more than four acres of the Site. Accordingly, as to this aspect, Plaintiff's Summary Judgment Motion should be GRANTED.[66]

---

[66] Because the parties have not discussed whether there is any legally significant difference between the submission of a materially inaccurate NOI in applying for a § 402 permit, as opposed to violating the terms of a § 402 permit, the court does not reach the issue.

**CONCLUSION**

Based on the foregoing, Plaintiff's Motion to Strike - Busacca (Dkt. 293) is

DENIED; Plaintiff's Motion to Strike - Kagels (Dkt. 294) is DENIED; Plaintiff's Motion to

Strike - Apfelbaum (Dkt. 296) is DENIED; Defendants' Motion to Strike – Jones (Dkt.

320) is DISMISSED as moot; Defendants' Motion to Strike – Greenberg and Brooks

(Dkt. 321) is DISMISSED as moot; Plaintiff's Motion to Strike the Motion to Strike (Dkt.

326) is GRANTED; Defendants' Summary Judgment Motion (Dkt. 267) should be

DENIED; Plaintiff's Summary Judgment Motion (Dkt. 269) should be DENIED in part,

and GRANTED in part; the case should be scheduled for trial.


SO ORDERED as to Plaintiff's Motions to Strike –
Busacca (Dkt. 293), Kagels (Dkt. 294), and
Apfelbaum (Dkt. 296), Defendants' Motions
to Strike – Jones (Dkt. 320), and Greenberg
and Brooks (Dkt. 321), and Plaintiff's Motion to
Strike the Motion to Strike (Dkt. 326).

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


Respectfully submitted as to Defendants' Summary
Judgment Motion (Dkt. 267), and Plaintiff's Summary
Judgment Motion (Dkt. 269),

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:     August 14, 2018
           Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     August 14, 2018
           Buffalo, New York