UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    09CV55S

ACQUEST TRANSIT LLC, et al.,

                              Defendants.

## I.  INTRODUCTION

Before this Court are the parties' Motions for Summary Judgment (Docket Nos. 267 (defendants), 269 (plaintiff United States (hereinafter the "Government"))) and their respective Objections (Docket Nos. 337 (defendants' Objections), 338 (plaintiff's Objections), 339 (defendants' Objections to denial of their Motion for Summary Judgment), 340 (amended defense Objection to denial of Motion for Summary Judgment)) to the 103-page Report & Recommendation from Magistrate Judge Leslie Foschio, United States v. Acquest Transit LLC, No. 09CV55, 2018 WL 3861612 (W.D.N.Y. Aug. 14, 2018), on those motions (among others) (Docket No. 334, the "Report" or "R&R").    Familiarity with that comprehensive Report is presumed. Defendants' second set of Objections (Docket No. 339) is **terminated** in favor of the amendment (Docket No. 340).

Also, before this Court is an appeal from the denial of plaintiff's Motions (Docket Nos. 293 (Steven Apfelbaum), 294 (Ray Kagel and Dr. Susan Kagel, 296 (Dr. Alan Busacca) to strike portions of defense expert opinions considered in that Report.  This Order addresses plaintiff's appeal from the denial of these Motions and so much of defendants' Objections regarding the admissibility of certain hearsay testimony from a

deceased witness; the pending Summary Judgment Motions will be addressed in a separate Decision & Order.

The parties exchanged responses (Docket Nos. 342, 343; see also Docket No. 341 (Rule 72 certification)) but did not file any replies and the matter was deemed submitted without oral argument.

For future reference in this (and subsequent) Decision and Order some of the common shorthand, abbreviations, and acronyms for some key terms used in herein include:

Acquest, Acquest Transit, LLC;
Army Corps, U.S. Army Corps of Engineers;
CWA, Clean Water Act (or the "Act");
EDI, Earth Dimensions, Inc.;
EPA, Environmental Protection Agency;
PCC, prior converted cropland;
Realmark, Realmark Properties;
Report, Report and Recommendation, Docket No. 334, of Aug. 14, 2018, 2018 WL 3861612;
TNW, Traditional Navigable Waterway;
USDA, United States Department of Agriculture.

For the reasons stated below, plaintiff's appeal from the denial of Motions to Strike (Docket Nos. 293, 294, 296) is **granted in part (for a portion of Docket No. 294) and denied in part (for the other motions)**. Defendants' Objection (Docket No. 337) as to admission of the Grand Jury testimony of the late Patrick Huntress is **sustained** and that evidence is **not admissible** in this action.

## II. BACKGROUND

A. Objections

    1.  Defendants' First Set of Objections (Docket No. 337)

Defendants filed two sets of Objections (Docket No. 337; <u>see</u> Docket No. 340, Defs. Amended Objections at 1 n.1, noting defendants filing distinct Objections).  In their first Objections (addressing the Government's Motion for Summary Judgment, <u>see</u> Docket No. 337, Defs. Memo. at 1; Docket No. 340, Defs. Memo. at 1), they raise three issues; pertinent to this Decision and Order and addressed herein, defendants argue that the Magistrate Judge erred in admitting Grand Jury testimony of a deceased witness (Patrick Huntress) who was never cross-examined by defendants (Docket No. 337, Defs. Memo. at 1, 9-12; <u>cf.</u> Docket No. 334, R&R at 75-76, 2018 WL 3861612, at *26).  They contend that Patrick Huntress's Grand Jury testimony (on his excavation activities on defendants' Amherst, New York, parcel (hereinafter the "Site")) (Docket No. 270, Pl. Ex. 15, Patrick Huntress's Grand Jury Tr.) should not have been admitted as an agent's admission against interest, <u>cf.</u> Fed. R. Evid. 804(b)(1), because the statement was hearsay and defendants lacked the opportunity to cross examine this witness before his death (Docket No. 337, Defs. Memo. at 9; <u>see</u> Docket No. 334, R&R at 75, 2018 WL 3861612, at *26).  They contend that the Magistrate Judge erred in considering the Government's novel arguments in its reply (Docket No. 297, Pl. Reply Memo. at 9-10 & 10 n.7; <u>cf.</u> Docket No. 334, R&R at 76-77, 2018 WL 3861612, at *27) without affording defendants an opportunity to rebut (Docket No. 337, Defs. Memo. at 10, <u>see also</u> <u>id.</u> at iv, Local Rule 72(c) certification).  Although defendants filed their own reply (Docket No. 299) after the Government's (Docket No. 297), defendants did not seek leave to file

3

a sur-reply and defendants' reply did not discuss the use of decedent's Grand Jury testimony.

>    2.   The Government's Objections (Docket No. 338)—Appeal from Motions to Strike Defense Experts

As part of its Objections to the Report, the Government argues that the Magistrate Judge erred in denying plaintiff's motions to strike portions of defense expert opinions (Docket No. 338, Pl. Memo. at 17-25).  One expert, Ray Kagel (see Docket No. 294, Pl. Motion to Strike; Docket No. 338, Pl. Memo. at 17-21), conducted wetland hydrology study on the Site on 2012-13 using monitoring wells (Docket No. 338, Pl. Memo. at 17).  The Government contends that the Magistrate Judge abdicated his gatekeeper function under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993), by not addressing the unreliability of the well studies conducted by Kagel in 2012-13 to determine conditions of the Site in 2006 given the significant changes on the Site in the interim (id.; but cf. Docket No. 334, R&R at 37-46, 2018 WL 3861612, at *14-17).  The Government argues that Ray Kagel did not explain how he determined placement of the test wells relative to existing ditches and other disturbed places (Docket No. 338, Pl. Memo. at 18).  The Government next claims that Ray Kagel conducted his well testing without considering usual protocols for studying prior wetland hydrology (id.; Docket No. 294, Pl. Memo. at 7-8 (citing 1987 Army Corps Wetlands Delineation Manual), 7 n.3 (other authorities on protocol to be used for determining pre-disturbance wetland hydrology); Docket No. 323, Pl. Reply Memo. at 3).  The Government further complains that Ray Kagel also failed to collect data during the wetter start of the growing season rather than one month into that season (Docket No. 338, Pl. Memo. at 18).  The Government also argues that Ray Kagel's dye experiment, attempting to detect the dye downstream for the issue of significant

4

nexus of the Site's wetlands to a TNW, lacked a scientific basis (Docket No. 338, Pl. Memo. at 19-21; but cf. Docket No. 334, R&R at 46-52, 2018 WL 3861612, at *17-19).

Defendants respond (Docket No. 342, Defs. Memo. at 2-9) that Magistrate Judge Foschio's denial of the Government's motions was not clearly erroneous.  Defendants counter that the Magistrate Judge applied the correct definition of wetland hydrology, that a water table within twelve inches of the surface is merely an indicator of hydrology and not dispositive of it (as the Government argues, but cf. Docket No. 338, Pl. Memo. at 19 (under Army Corps Manual, soil saturation is the "primary indicator," emphasis in original)) (Docket No. 342, Defs. Memo. at 2-3).  As for well locations, defendants conclude that plaintiff can raise this in cross-examination (id. at 4).  They defend the use of Kagel's well study because the Site is an appropriate method to determine its hydrology and the U.S. Army Corps of Engineering ("Army Corps") atypical situation method of wetland delineation either is not applicable here or Ray Kagel considered the factors for applying the atypical method (id.).  Defendants contend that Ray Kagel's collection of data into the growing season was due to not having data for April and May, but Kagel extrapolated what precipitation would have been during those earlier months; they conclude that any challenge to this method should be addressed in cross-examination rather than striking the opinion (id. at 4-5).  As for the dye testing, Magistrate Judge Foschio held that it complied with the four prongs of Daubert (Docket No. 334, R&R at 47-51, 2018 WL 3861612, at *17-19) and that the Government produced its rebuttal expert on this testing, leading to a "battle of the experts" to be resolved at trial (id. at 49, 2018 WL 3861612, at *18); defendants conclude that the

Government's arguments against the dye testing should be rejected (Docket No. 342, Defs. Memo. at 5).

The Government then faults Dr. Susan Kagel (Docket No. 294) for her opinion that ditching modifications at the Site by defendant Acquest Transit "likely increased hydrology" on the Site (Docket No. 338, Pl. Memo. at 21; Docket No. 334, R&R at 57-59, 2018 WL 3861612, at *21) claiming that opinion was unreliable because she did not consider the width and depth of the ditches but only their length (Docket No. 338, Pl. Memo. at 21-22).  The amount of drainage is determined by all three dimensions, not merely the length of a ditch (id. at 21).  Next, the Government argues that Magistrate Judge Foschio erred in not striking Dr. Kagel's opinion on continuous farming on the Site since she did not consider the testimony of other witnesses regarding the cessation of farming and based her opinion on her view of aerial photographs of the Site despite her concession the she could not draw a reliable opinion from aerial photography (id. at 22-23).

Defendants respond that Dr. Kagel's testimony satisfies Daubert (Docket No. 342, Defs. Memo. at 6-7).

The Government moves (Docket No. 296) to strike Dr. Alan Busacca's opinion on wetland hydrology because it did not account for the deficiencies in the factual bases for that opinion, such as deposition testimony Dr. Busacca failed to review (Docket No. 338, Pl Memo. at 23).  Dr. Busacca (and Mr. Kagel) based his opinion on personal observation of the saturation on the Site on May 2012 (Docket No. 334, R&R at 64, 2018 WL 3861612, at *23) but the Government argues that his opinion did not account for defendants' modifications there since 2006 (Docket No. 338, Pl. Memo. at 24).

6

Dr. Busacca also lacked experience in wetland delineation (Docket No. 296, Pl. Memo. at 5-6; Docket No. 334, R&R at 62-64, 2018 WL 3861612, at *22-23), therefore the Government argues that his opinion should have been stricken (Docket No. 338, Pl. Memo. at 24 n.12).

Defendants counter that the Government's objections to Dr. Busacca's opinion (supported by aerial imagery of the Site, the testimony of farmer Craig Duff and Donald Spoth, and Kagel's well test results) go to its weight and not to its admissibility (Docket No. 342, Defs. Memo. at 8).

Finally, the Government asserts that Steven Apfelbaum's opinion should be stricken (see Docket No. 293) because defendants failed to disclose Apfelbaum as their expert, with that failure shielding Apfelbaum from examination by the Government (Docket No. 338, Pl. Memo. at 24, 25 n.13).  The Government argues that Magistrate Judge Foschio erred in holding that this omission was harmless (id. at 24).  While the Government concedes Apfelbaum is a lay witness as to what he observed on the Site, the Government never conceded that his observations were accurate and could form a basis for his opinion (id.).

Defendants argue that their failure to disclose Apfelbaum was harmless and Magistrate Judge Foschio did not err in admitting the doctor's opinion (Docket No. 342, Defs. Memo. at 8-9).  The Government failed to meet their burden and show that it was prejudiced by the non-disclosure (id.).

B. Facts

The following facts are drawn from the Amended Complaint (Docket No. 112) and the uncontested facts found by Magistrate Judge Foschio in the Report (Docket No. 334, 2018 WL 3861612).

On January 9, 2009, the Government commenced this action against Acquest for violations of the Clean Water Act, 33 U.S.C. §§ 1251, 1311, 1319(d), by defendant engaging in ditch digging, earthmoving, and fill activities on a parcel (hereinafter the "Site") in the Town of Amherst, New York (Docket No. 334, Report at 3, 17, 2018 WL 3861612, at *1, 6). The Amended Complaint (Docket No. 112; cf. Docket No. 111, Am. Compl. (unsigned)) added Acquest Development, LLC (allegedly the corporate developer and manager of the Amherst parcel), and William L. Huntress (principal of Acquest and president and managing partner of Acquest Development) as defendants (Docket No. 112, Am. Compl. ¶¶ 8, 9).

Count One of the Amended Complaint alleged that defendants violated the Clean Water Act, 33 U.S.C. § 1311, by discharging dredge or fill materials into jurisdictional wetlands at the Site without a permit (id. ¶¶ 45-53). Count Two alleged that defendants violated 33 U.S.C. § 1362(12) by discharging stormwater associated with industrial activity from point sources into waters of the United States without a permit (id. ¶¶ 54-63). Count Three claimed that defendants violated Clean Water Act, 33 U.S.C. § 1319, by continuing to discharge pollutants into jurisdictional wetlands in contravention of the Environmental Protection Agency ("EPA") administrative Cease and Desist Order (id. ¶¶ 64-67; see Docket No. 338, Pl. Objection Memo. at 1-2). Defendants answered the Amended Complaint (Docket No. 121).

The facts as found by Magistrate Judge Foschio generally are not in dispute (save when indicated). The property at issue is Tax Parcel 16.00-5-23 in Town of Amherst (the "Site"), which is in three 100-year floodplains since three creeks are near the Site (Docket No. 334, R&R, at 10, 2018 WL 3861612, at *4). From the 1920s to 1988, the Site was used exclusively for agricultural purposes, with an agency of the United States Department of Agriculture ("USDA") designating the northern ⅔ of the Site as containing "prior converted cropland" (or "PCC"). (Id. at 11, 2018 WL 3861612, at *4.)

Magistrate Judge Foschio recounted the ownership for the Site from 1978 to defendants' acquisition in 2005 and the agricultural activities that occurred during this period (id. at 11-12, 2018 WL 3861612, at *4). Farmer Craig Duff owned the Site up to 1978 when he sold it to Cimato Bros., Inc., and Anthony Cimato and family, who maintained a garden on a portion of the Site (id. at 11, 2018 WL 3861612, at *4). Between 1982 and 1985 Cimato permitted Michael Badding and his brother to farm five acres of the Site, now the site of a nursery (id.). In 1988, Cimato sold the Site to Realmark Properties ("Realmark"), which neither farmed nor developed the property (id.). Duff stated that he continued to clear the Site while Realmark owned it (id.; see Docket No. 280, Defs. Ex. 13, Craig Duff Dep. Tr. at 90-92; see also Docket No. 296, Pl. Ex. B, Duff Tr. at 90-92).

Defendants purchased the Site from Realmark Properties in June 2005 with the price initially contingent upon the percentage of the property deemed to be wetlands (id. at 12, 2018 WL 3861612, at *5). On October 2005, defendants retained a wetlands consultant, Earth Dimensions, Inc. ("EDI"), to delineate the wetlands boundaries. EDI found 77.02 acres or 80% of the Site's 96.3 acres were wetlands that appear to be

connected with waters of the United States, specifically Ransom Creek, Tonawanda Creek, and the Niagara River (id. at 12-13, 2018 WL 3861612, at *5).  EDI concluded that only 10 acres of the Site could be developed without wetlands permits (id. at 13, 2018 WL 3861612, at *5).  Defendants negotiated a reduction in the purchase price (reduced by $10,000 for each acre found to be unusable wetlands) by $525,000 and they purchased the Site for only $425,000 (id. at 13, 12, 2018 WL 3861612, at *5).  Defendants assert that the $10,000 reduction provision was eliminated from the final purchase agreement (Docket No. 279, Defs. Statement ¶ 13).

From 2006 to 2008, defendants contracted to have the Site cleared of vegetation, clear existing ditches, deepen and widen ditches, including ditches that ran in identified wetlands (Docket No. 334, R&R at 13, 2018 WL 3861612, at *5).  Cleared materials were redeposited in wetlands on the Site (id.).  In 2006 and 2007 defendants applied for Clean Water Act permits for stormwater discharges (id. at 14, 2018 WL 3861612, at *5).  In July 2007, defendants hired farmer Donald Spoth to plant corn on 88 acres of the Site (id.).  From July through the fall of that year, Patrick Huntress, brother of defendant William Huntress, used an excavator to clear the three original ditches on the Site and John Kelkenberg (hired by defendants) used a tractor to cut down the corn stalks planted by Spoth (id.).

In February 21, 2008, the EPA issued a Cease and Desist Order upon defendants to cease all earth moving work, filling, grading, or excavation on the Site without the requisite permits pending determination by the Army Corps whether the Site was jurisdictional wetlands (id.).  On March 19, 2008, the Army Corps designated Ransom Creek a Traditional Navigable Waterway (or "TNW") (id.); hence making adjoining

wetlands under federal jurisdiction of the Clean Water Act to require permits for discharge, 33 U.S.C. §§ 1342,1344.  Inspecting under a Search Order on July 28, 2008, the EPA found no evidence of recent farming activity on the Site but found violations of the first Cease and Desist Order due to ongoing excavations (id. at 15, 2018 WL 3861612, at *6). This EPA inspection team also took 46 soil samples which led the agency to conclude that wetlands were present on the entire Site and 13.3 acres of fill deposited in violation of the CWA (id.).  This inspection team also found that these wetlands

> "abut and maintain a continuous surface connection with the West Ditch [one of the three original ditches on the Site] from which water flows at least three seasons into the Millersport Highway East Side Ditch, underneath Millersport Highway, into the Millersport Highway West Side Ditch, and into Ransom Creek, then to Tonawanda Creek and the Niagara River,"

(id. at 15-16, 13, 2018 WL 3861612, at *6, 5).  The EPA, on September 5, 2008, issued a second Cease and Desist Order prohibiting further earth moving activities (id. at 16, 2018 WL 3861612, at *6).  On September 10 and 16, 2008, however, the Army Corps observed further earth-moving activities on the Site (id.).

C.  Procedural History

On January 9, 2009, the Government commenced this action to enjoin defendants and seek penalties from defendants for violations of the Clean Water Act (Docket No. 1, Compl.; Docket No. 334, R&R at 17, 2018 WL 3861612, at *6).  The Government moved for a preliminary injunction (Docket No. 6), which this Court granted (Docket No. 26), United States v. Acquest Transit LLC, No. 09CV55, 2009 WL 2157005 (W.D.N.Y. July 15, 2009) (Skretny, J.).  This Court found that the Government "had demonstrated sufficiently that the Property's wetlands are 'waters of the United States' within the CWA's jurisdiction" for the preliminary injunction, Acquest, supra, 2009 WL 2157005, at *8.

Defendants answered (Docket No. 121) and later moved for summary judgment (Docket No. 267). The Government (in effect) cross moved for summary judgment as to liability (Docket No. 269). Both sides presented their respective expert opinions to support their positions or to oppose their opponent; the Report and Recommendation outlined all these submissions (Docket No. 334, R&R at 17-20, 2018 WL 3861612, at *6-7). As raised in the Government's appeal, four experts are at issue. Defendants retained ecologist Steven Apfelbaum (Docket No. 280, Ex. 5, Aff. of Steven Apfelbaum ¶ 1) for his opinion as to the activities on the Site based upon his observation of plants, the nature of hydro-axing (use of a Royer or hydro axe brush cutter, id. ¶ 11) and disking (use of a "heavy duty notched blade agricultural disc," id. ¶ 13) that occurred there, their impact on the Site, and the relevance of the ditches and road relative to activity at the Site (Docket No. 334, R&R at 18-19, 2018 WL 3861612, at *6-7). From his observations on the grounds and review of aerial photographs of the Site, Apfelbaum concluded that the Site had on-going agricultural use (Docket No. 280 Ex. 5, Apfelbaum Aff. ¶¶ 10-21, 5-9).

Defendants also retained Kagel Environment, LLC, a self-described wetland, wildlife, and permitting specialist, to opine on the regulatory status of the Site, with Dr. Susan Kagel, Ph.D., and Ray Kagel, Jr., rendering opinions (Docket No. 334, R&R at 19-20, 2018 WL 3861612, at *7; Docket No. 280, Exs. 3 (Susan Kagel Decl. (in 4 volumes)), 4 (Ray Kagel Decl. (in 4 volumes)). Dr. Kagel reviewed documents prepared by the USDA's Natural Resources Conservation Service and historic aerial photographs of the Site in forming her conclusion that the Site qualified as PCC and therefore exempt from the CWA (Docket No. 334, R&R at 19, 2018 WL 3861612, at *7). Ray Kagel conducted well tests and groundwater dye testing and separately concluded that the Site

lacked the requisite wetland hydrology, one of the three identifying characteristics of wetlands under the CWA.

Defendants also retained Dr. Alan Busacca, Ph.D., to investigate soils and hydrology at the Site (see Docket No. 279, Ex. 1, Alan Busacca Decl. (in 2 volumes, with exhibits)). Dr. Busacca concluded that hydric soils present at the Site "are *relict* or fossil features frozen forever unchanging in the current, aerobic, farmed, hydrologic regime," that the Site "lacks sufficient hydrology" and thus is incapable of supporting wetland ecological function, and thus were not wetlands (id. at 20, 2018 WL 3861612, at *7 (emphasis in original)).

Plaintiff later moved to strike in part the expert testimonies from Ray and Susan Kagel (Docket No. 294), Alan Busacca (Docket No. 296), and Steven Apfelbaum (Docket No. 293).

D. Report & Recommendation (Docket No. 334, 2018 WL 3861612)

Magistrate Judge Foschio considered with the motions for summary judgment plaintiff's motions to strike these defense expert opinions (Docket Nos. 293, 294, 296) and issued a Decision and Order within the Report & Recommendation (Docket No. 334, R&R at 1 n.1, 2018 WL 3861612, at *1 n.1). There, he denied plaintiff's motions to strike the opinions of Dr. Busacca, the Kagels, and Apfelbaum (id. at 25-66, 102, 2018 WL 3861612, at *9-23, 27), while also striking other motions plaintiff filed to strike other defense experts (id. at 66-68, 102, 2018 WL 3861612, at *23-24, 37; cf. Docket Nos. 320, 321). He also admitted the Grand Jury testimony of Patrick Huntress over defendants' objections (Docket No. 334, R&R at 75-76, 2018 WL 3861612, at *26).

## III. DISCUSSION

A.    Applicable Standards

    1.  Appeal Magistrate Judge's Order—Standard

Under Federal Rule Civil Procedure 72(a), this Court considers timely objections to a Magistrate Judge's Order on any non-dispositive matter and may modify or set aside any part of the Order that is clearly erroneous or contrary to law, Fed. R. Civ. P. 72(a).

    2.  Motion to Strike Evidence

Federal Rule of Evidence 702 provides that

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

"(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

"(b) the testimony is based on sufficient facts or data;

"(c) the testimony is the product of reliable principles and methods; and

"(d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Civ. P. 702.  Pursuant to its gatekeeper role, see Daubert, supra, 509 U.S. 579, this Court determines if a purported expert's testimony is admissible.  At summary judgment, this Court can "'decide questions regarding the admissibility of evidence, including expert opinion evidence,'" Foley v. United States, 294 F. Supp. 3d 83, 91 (W.D.N.Y. 2018) (Larimer, J.) (quoting Bah v. Nordson Corp., No. 00-cv-9060, 2005 U.S. Dist. LEXIS 15683 (S.D.N.Y. Aug. 1, 2005)).  For "[o]n a summary judgment motion, a district court properly considers only evidence that would be admissible at trial," Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998); Foley, supra, 294 F. Supp. 3d at 91, even if that exclusion is outcome-determinative, Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005); Foley, supra, 294 F. Supp. 3d at 91.  "The court performs the same role at the summary judgment

14

phase as at trial; an expert's report is not a talisman against summary judgment," <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997); <u>Berk</u>, <u>supra</u>, 380 F. Supp. 2d at 351.

     3.   Clean Water Act Primer

         a.   Clean Water Act and Regulations

As the Government asserts (Docket No. 338, Pl. Memo. at 3) (without dispute), to state a claim under the Clean Water Act (such as Count One) the Government has the burden of showing that defendants discharged (without a permit) pollutants from a point source into wetlands that were then the "waters of the United States," 33 U.S.C. §§ 1311, 1342, 1344; <u>see</u> <u>Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 215 (2d Cir. 2009).  For Count Two, the Government needed to show that there was a discharge of pollutants, related to "industrial activities," from a point source, to "waters of the United States," and without a valid permit, 33 U.S.C. § 1342 (Docket No. 334, R&R at 99, 2018 WL 3861612, at *35; <u>see</u> Docket No. 338, Pl. Memo. at 15; <u>see also</u> Docket No. 337, Defs. Memo. at 3).

The Clean Water Act applies to "navigable waters" which are defined as the "waters of the United States," 33 U.S.C. § 1362(7).  Included with the "waters of the United States" are wetlands adjacent to waters (such as waters susceptible to use in interstate or foreign commerce, interstate waters, tributaries of waters, territorial seas), 33 C.F.R. § 328.3(a)(7) (Army Corps), 40 C.F.R. § 232.2(g)(7) (EPA).  Wetlands, in turn, are defined as

      "[T]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar area,"

33 C.F.R. § 328.3(b) (Army Corps definition); 40 C.F.R. § 232.2(r) (EPA) (Docket No. 334,

R&R at 89).  The Army Corps further defines "wetlands" as

> (1) prevalence of plant species typically adapted to saturated soil conditions, determined in accordance with the United States Fish and Wildlife Service's National List of Plant Species that Occur in Wetlands; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years.

Rapanos v. United States, 547 U.S. 715, 761-62 (2006) (Kennedy, J., concurring)

(citation omitted, citing the 1987 Army Corps Wetlands Delineation Manual) (id. at 90).

Thus, the three-part definitional test for wetlands is the existence of wetland vegetation,

hydric soils, and wetland hydrology (id.).

Excluded from the definition of wetlands is  prior converted cropland (or "PCC"),

defined as wetlands converted to farming prior to December 23, 1985, 33 C.F.R.

§ 328.3(a)(8); 7 C.F.R. §§ 12.2(a)(8) (definition), 12.5(b)(1)(i) (exemption for wetlands)

(Docket No. 334, R&R at 89, 2018 WL 3861612, at *31).  Under USDA regulations, PCC

"is a converted wetland where the conversion occurred prior to December 23, 1985, an

agricultural commodity had been produced at least once before December 23, 1985, and

as of December 23, 1985, the converted wetland did not support woody vegetation and

did not meet the hydrologic criteria for farmed wetland," 7 C.F.R. § 12.2(a)(8).  Under EPA

and Army Corps regulations, the "waters of the United States do not include prior

converted cropland," 40 C.F.R. § 232.2; 33 C.F.R. § 328.3(a)(8).

> b.  Rapanos v. United States

The issue of what constitutes "the waters of the United States" was presented to

the United States Supreme Court in Rapanos v. United States, 547 U.S. 715 (2006).

> "While all Justices agreed that the term "waters of the United States"
> encompasses some waters that are not navigable in the traditional sense,
> id. at 730–31 (plurality opinion); 767–68 (Kennedy, J., concurring in the
> judgment); 792 (Stevens, J., dissenting), the Court split with respect to the
> proper standard for determining whether a wetland constitutes "navigable
> waters" covered by the CWA,"

United States v. Acquest Transit, No. 09CV55, 2009 WL 2157005, at *6 (W.D.N.Y.

July 15, 2009) (Skretny, J.) (Docket No. 26 Order).  Unfortunately, the Court rendered a

plurality decision with a concurrence, resulting in a 4-1-4 split with no majority decision

defining that phrase, see Rapanos, supra, 547 U.S. at 758 (Roberts, C.J., concurring)

(Docket No. 334, R&R at 80-81, 85, 2018 WL 3861612, at *28, 30); see also United

States v. Robertson, 875 F.3d 1281, 1287 (9th Cir. 2017) (Supreme Court's "fractured 4-

1-4 decision" in Rapanos).

Justice Antonin Scalia for the plurality defined "'waters of the United States"

encompassing relatively permanent bodies of water that are connected to traditional

navigable waters (TNWs) and wetlands with a continuous surface connection to such

relatively permanent bodies of water" (id. at 10-11; see Docket No. 334, R&R at 80-81,

2018 WL 3861612, at *28), Rapanos, supra, 547 U.S. at 742.

Justice Kennedy, concurring in the judgment (remanding the case), would have

the definition focus on the significant nexus the wetlands have to waters that are or were

navigable in fact or that could reasonably be made so, id. at 759, 782 (Kennedy, J.,

concurring) (Docket No. 338, Gov't Objection Memo. at 11).  He posed the issue as

"whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do

not contain and are not adjacent to waters that are navigable in fact," id. at 759.  Justice

Kennedy sought to be consistent with the standard set forth in Solid Waste Agency of

Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159,167 (2001), and

17

its application of "significant nexus" to waters that are or were navigable, Rapanos, supra, 547 U.S. at 759 (Kennedy, J., concurring).  Under the significant nexus approach,

> "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"

Id. at 780 (Kennedy, J., concurring).  Under this standard, the Army Corps is to establish "a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries," id. at 782 (Kennedy, J., concurring).

The Government here terms Justice Scalia's plurality opinion and Justice Kennedy's concurrence to be "two alternative standards for determining whether wetlands are within CWA jurisdiction" (Docket No. 338, Gov't Memo. at 10).

B.    Appeals of Motions to Strike

First, this Court addresses the Government's appeal from the denial of its motions to strike portions from four experts' opinions, applying the clear error or contrary to law standards, Fed. R. Civ. P. 72(a).  The motions for summary judgment are dependent upon admissible evidence under Rule 56, including proffered expert opinions, see Foley, supra, 294 F. Supp. 3d at 91, specifically on wetland hydrology and significant nexus issues.

1.    Ray Kagel

The Report relied upon Ray Kagel's opinion regarding the Site's wetland hydrology (Docket No. 334, R&R at 92, 2018 WL 3861612, at *32), leading to the conclusion that there was an issue of fact on that point (id.).  Ray Kagel drilled test wells and placed dye into the water of the Site to determine if it flows eventually into Ransom Creek.

a.  Test Wells

The Government disputes whether the siting of those wells would accurately test the hydrology of the Site as it was in 2006.

Daubert requires this Court to determine the reliability of well testing methodology. The Government has not raised technical objections to the methods used by Kagel; rather, it opposes obtaining information in 2012 about the condition of the Site in 2006. Kagel sited the wells based upon 2005 wetland delineation report from EDI, the EPA's 2008 Site visit, as well as Kagel's own site visit in 2012 (see Docket No. 334, R&R at 40, 2018 WL 3861612, at *15), so part of the siting decision was based upon the conditions of the Site around 2006.    Defendants point to Magistrate Judge Foschio acknowledgement of Kagel's consideration of changes to the Site since 2006 when siting the wells (Docket No. 342, Defs. Memo. at 4; Docket No. 334, R&R, at 40-43, 2018 WL 3861612, at *15).  Kagel's report described the well siting process and he intentionally avoided placing wells where there had been indentation due to farm operations (e.g., Docket No. 280, Defs. Ex. 3, Kagel Environmental Report at 12).  These 2012 wells were dug to determine the depth of the water table "to show whether or not the ground was inundated or saturated for the requisite number of days during the growing season" (Docket No. 309, Defs. Memo. at 9; see Docket No. 334, R&R at 40, 2018 WL 3861612, at *15).  Thus, the point for 2012 wells was to establish the water table and the potential for inundation at earlier times.

The Government also objected to well monitoring starting about a month into the growing season, after the wettest period of the year (Docket No. 338, Pl. Memo. at 18). Kagel testified that he checked precipitation by month and found it was relatively constant

in April and May, hence a May start for well tests was appropriate (see Docket No. 334, R&R at 43, 2018 WL 3861612, at *16).  Third, the Government contends that Kagel did not follow hydrology protocol, as set forth in the 1987 Army Corps Wetlands Delineation Manual, determining sufficiently saturated soil (id., R&R at 44-46, 2018 WL 3861612, at *16-17), that soil saturation is a primary indicator of wetland hydrology (Docket No. 338, Pl. Memo. at 19).

The Government's objections to the well testing here (as found by Magistrate Judge Foschio, Docket No. 334, R&R at 46, 2018 WL 3861612, at *17) goes to the weight of Mr. Kagel's opinion testimony and not to its admissibility.  This Court finds Mr. Kagel's well testing methodology is based upon reliable principles and methods.  The details of how and when he proceeded and what he relied upon in siting wells and ultimately reaching his opinion are subject to cross-examination.  The Government's motion to strike the well testing opinion properly was **denied**.

b.  Dye Testing

Mr. Kagel also used dye to determine if ground water from the Site eventually flowed into Ransom Creek.   The Government objects to Kagel's dye testing of groundwater, that it was not scientifically reliable in that it was not tested or peer reviewed, it lacked standards, and there was no evidence of acceptance of this method within the scientific community (Docket No. 338, Pl. Memo. at 19-20).  Magistrate Judge Foschio concluded that this dispute is a battle of experts, between defendants' Kagel and Dr. Thomas Aley and the Government's rebuttal expert Dr. Malcom Field on the validity of this method (Docket No. 334, R&R at 49, 2018 WL 3861612, at *18).

20

While this appears to be a contest of experts, one <u>Daubert</u> requirement for acceptance of a scientific opinion is whether the experiment was subjected to peer review and publication, <u>Daubert</u>, <u>supra</u>, 509 U.S. at 593.  Kagel supports acceptance of his technique by relying upon his consultation with Dr. Aley (Docket No. 309, Defs. Memo. at 16-17).  Defendants do not cite to the literature supporting Kagel or Dr. Aley in using this technique.  It is also unclear if this experiment has gained general acceptance in the scientific community to answer the question Kagel used it for:  whether one can tell if a parcel's wetlands has a significant nexus to a traditional navigable waterway.  While testing of groundwater for pollutants by dye testing is widely accepted (<u>cf.</u> Docket No. 309, Defs. Memo. at 16), it is not clear if it has been used to test for the nexus of waterways beyond this case.  Kagel's dye test is simple enough:  he dropped dye into the groundwater, monitored Ransom Creek in some way, and if some dye appears in Ransom Creek one can conclude that the wetlands is connected (at least chemically or physically) to that waterway.  The particulars of the method, such as how much dye is to be used, how long is the groundwater and body of water were to be monitored for the leached dye, whether factors other than disconnection with a TNW caused the absence of the dye in the body of water, should have been considered by more than the purported leading expert in the field.  Thus, the validity of dye testing goes beyond a mere clash of experts; dye testing results are **inadmissible absent proof of scientific acceptance as a method as applied in this case**.  The Government's Motion (Docket No. 294) to strike the dye test opinion is **granted**.

2.  Dr. Susan Kagel

The Government's objection here is to the methodology used by Dr. Susan Kagel in measuring ditching methodology but only considering one dimension of ditch (its length) but not the ditch's depth and width.  This opinion addresses the PCC status of the Site and significant nexus for the alleged wetlands to Ransom Creek.  Magistrate Judge Foschio's denial (Docket No. 334, R&R at 57 (Dr. Kagel's expertise in interpreting aerial photographs), 58-59 2018 WL 3861612, at *20, 21) of the Motion to Strike (Docket No. 294) Dr. Kagel's testimony is **not clearly erroneous or contrary to law** and is **affirmed**.  Questions about Dr. Kagel's methodology can be raised at trial whether a finder of fact should rely upon her expert testimony as a question of the weight to be given to that opinion testimony.

3.  Dr. Alan Busacca

The Government objects to portions of Dr. Busacca's opinion based on factual deficiencies leading to the opinion (Docket No. 338, Pl. Memo. at 23).  Dr. Busacca opined about the hydric soils and wetland hydrology at the Site (see Docket No. 334, R&R at 20, 61, 2018 WL 3861612, at *7, 22).  It was **not clear error** in not striking Dr. Busacca's opinion testimony.  The points the Government raises for striking this testimony, especially Dr. Busacca's study of hydrology and his methodologies and the sources he relied upon to reach his opinions, goes to its weight and not to its admissibility.  The Government's appeal from the denial of its Motion (Docket No. 296) to strike Dr. Busacca's opinion is **denied**.

The Report also found as a material issue of fact abandonment of PCC status due to cessation of agricultural activity for five consecutive years (Docket No. 334, R&R

22

at 93, 94-95, 2018 WL 3861612, at *33-34).  Defendants (arguing that Magistrate

Judge Foschio did not err in finding this material issue of fact, Docket No. 342, Defs.

Memo. at 13) cite the testimony of their expert, Dr. Busacca, to support the fact of

farming on the Site (Docket No. 279, Defs. Statement ¶ 112 & n.225).  Referring to

farmer Craig Duff's testimony, Dr. Busacca explained that the Site was farmed in 2005

because Duff testified of his love for the farm and that Duff "went out as much as he

could afford to and brush hogged parts of the farm to keep it active." When asked

"active" for what purpose, Dr. Busacca said active as a farm.  (Docket No. 296, Pl.

Motion to Strike, Ex. A, Dr. Busacca Dep. Tr. at 126-27.)  Reviewing Duff's testimony

about his brush hog operation (Docket No. 296, Ex. B, Duff Tr. at 90-91, 116-17) during

his deposition, Dr. Busacca stated that he recalled seeing that testimony and explained

that Duff "having grown up on the farm, he was doing things to maintain – maintain the

farm" and that the enjoyment Duff testified to was the enjoyment of the farm (Docket

No. 296, Ex. A, Dr. Busacca Tr. at 172-75).  Dr. Busacca concluded that operating a

brush hog was an act of farming, that Duff was "keeping the farm alive" by clearing

woody vegetation (id. at 176).  Dr. Busacca said that Duff kept farming after selling off

other equipment and farm animals in 1980 by running a brush hog and continued to do

so until the "late 1990s or something like that, or 2002" (id. at 177).

Dr. Busacca based this opinion from his reading of Duff's testimony, which is

essentially hearsay, see Fed. R. Evid. 801(c)(2), 802.  Duff, however, did not testify he

operated the brush hog for farming purposes; he testified to operating the brush hog either

for enjoyment of operating that vehicle or clearing part of the Site for other recreational

uses (Docket No. 296, Ex. B, Duff Tr. at 116-17, 91).  Dr. Busacca conceded that there

was nothing in Duff's testimony that Duff was farming (Docket No. 296, Ex. A, Dr. Busacca Tr. at 175). Dr. Busacca extrapolated from Duff's enjoyment of operating the brush hog to a love of this farm and hence to its continued agricultural operation.

Dr. Busacca is proffered as an expert in soil and geology (Docket No. 279, Defs. Memo. at 2; Docket No. 279, Ex. 1, Ex. C, Dr. Busacca Initial Report at 1, 6; see Docket No. 296, Pl. Memo. at 2) and not regarding agriculture, use of farm equipment, or farm operations. Dr. Busacca based his opinion, in relevant part, on review of the affidavit and deposition testimony of Duff (Docket No. 280; Ex. 10, Duff Aff.; Docket No. 279, Ex. 1, Ex. C, Dr. Busacca Initial Report at 9-11). Duff's statements do not say all that Dr. Busacca opined and deny a factual basis for the doctor's opinions about use. Thus, Dr. Busacca's testimony as his opinion regarding Duff's motivation and whether there was farming on the Site from 1980 to 2005 **is not admissible evidence**. This differs from Magistrate Judge Payson's decision in Lee Valley Tools, Ltd. v. Industrial Blade Co., 288 F.R.D. 254, 267 (W.D.N.Y. 2013) (cf. Docket No. 342, Defs. Memo. at 8), where (at the discovery stage of that action) the party allegedly gave incomplete information to their expert. Here, Dr. Busacca was given complete information and formed his own interpretation of that information and formed his opinion from that interpretation rather than the underlying evidence itself.

An expert's opinion is not required to learn Duff's motivation, cf. Fed. R. Evid. 702(a); he testified to it in deposition and the fact finder can assess that testimony without assistance. Although the Government has not moved to strike this portion of Dr. Busacca's opinion, this opinion underpins defendants' contention about agricultural use of the Site prior to their acquisition without a factual basis. Under Rule 702 and this

24

Court's gatekeeper duty under Daubert, see Miller v. Baker Implement Co., 439 F.3d 407, 413 (8th Cir. 2006) ("sua sponte consideration of admissibility of expert testimony is permissible so long as the court has an adequate record on which to base its ruling"); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1094 (7th Cir.) (district court considered admissibility of purported expert sua sponte in summary judgment motion), cert. denied, 512 U.S. 1222 (1994); see also David Herr, Annotated Manual for Complex Litigation § 23.351, at 577 (4th ed. 2020), that opinion lacks a basis in fact and is not helpful for any fact finder here.  In O'Conner, the court interpreted Daubert as requiring undertaking a two-step inquiry, first whether the expert's testimony pertains to scientific knowledge and whether the evidence assists the trier of fact in understanding the evidence or in determining a fact in issue, 13 F.3d at 1106; Daubert, supra, 509 U.S. at 590-91.

As discussed above, this Court has an adequate record to consider the admissibility of Dr. Busacca's testimony.  Dr. Busacca's statements about Duff's conduct and intentions are not scientific and do not rely upon the doctor's scientific knowledge (or his expertise in soils and geology) to be admissible.  Also, these statements do not assist this Court or ultimately the trier of fact in either understanding the evidence or in determining any fact issue.  Therefore, so much of Dr. Busacca's opinion regarding the question of abandonment of PCC status **is not admitted**.

4.  Steven Apfelbaum

The Government also objects to portions of Steven Apfelbaum's opinion because defendants failed to disclose him as an expert under Federal Rule of Civil Procedure 26(a)(2) (Docket No. 338, Pl. Memo. at 24).  As noted by Magistrate

Judge Foschio (Docket No. 334, R&R at 30, 2018 WL 3861612, at *11), the Government selectively opposes Apfelbaum's opinions, specifically his conclusions about what shredded wood fragments and intact stumps indicate about uses of the Site (id.) while not objecting to other opinions although the issue is the timing of the disclosure of Apfelbaum as an expert.

In exercising this Court's wide discretion in imposing sanctions for failing to comply with Rule 26, Design Strategy, Inc. v. Davis, 469 F.3d 284, 294 (2d Cir. 2006) (id. at 32-33, 2018 WL 3861612, at *12), Magistrate Judge Foschio correctly considered the four Second Circuit factors before precluding evidence as a sanction, Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (id. at 33-36, 2018 WL 3861612, at *12-13), concluding that those factors weighed against preclusion (id. at 35-36, 2018 WL 3861612, at *13). One additional argument on the prejudice factor is that the Government has picked from Mr. Apfelbaum's opinion despite the tardiness of its submission.  That same tardy opinion had parts that the Government failed to object to while only objecting to opinions that opposed its position.  The decision denying this Motion (Docket No. 293) was **not clearly erroneous**; the Government's appeal (Docket No. 338) is **rejected**.

C.     Defendants' Objection to Admission of Deceased Witness's Testimony

Patrick Huntress testified before the Grand Jury (Docket No. 270, Pl. Ex. 15, Patrick Huntress's Grand Jury Tr.) but later died.   Defendants object to use of his unchallenged testimony as hearsay (Docket No. 337, Defs. Memo. at 9-12).  Magistrate Judge Foschio noted, however, that defendants never moved to strike this testimony (Docket No. 334, R&R at 76, 2018 WL 3861612, at *26-27).  The late Patrick Huntress

testified to excavation activities on the Site and the reasons for digging out the ditches (Docket No. 270, Pl. Ex. 15, Patrick Huntress's Grand Jury Tr. at 12, 21-23, 46-47).

On the defense's procedural objection to the Government raising a new argument on reply, the Government cited Patrick Huntress's testimony in its initial moving papers asserting generally that it was admissible as a statement by a deceased declarant (Docket No. 269, Pl. Statement ¶¶ 27-33, ¶ 27 n.44; Docket No. 270, Ex. 15).  Defendants objected arguing the hearsay rule for such declarations, Fed. R. Evid. 804(b)(1) (Docket No. 267, Defs. Memo. at 8).  The Government then replied to refute defense hearsay arguments citing a different Rule of Evidence (Docket No. 297, Pl. Reply at 9-10 & 10 n.7 (citing Fed. R. Evid. 801(d)(2)(D)).   (See Docket No. 343, Pl. Reply Memo. at 16.) Defendants did not seek leave to sur-reply or otherwise object to Magistrate Judge Foschio before he rendered his Report based on the Government's reply (cf. Docket No. 299, Defs. Reply Memo.).   Defendants provide in this Opposition to the Report substantive arguments against admission of this testimony on the alternative hearsay exception raised by the Government (Docket No. 337, Defs. Memo. at 10-11), alternatively arguing that this Court examine the evidentiary ruling (id. at 11-12).  This Court will consider both hearsay exceptions offered for admission of that testimony.

Hearsay generally is not admissible unless allowed by the Federal Rules of Evidence, Fed. R. of Evid. 802 (among other sources for exceptions).  One exception is if the declarant is unavailable, the testimony is given in a trial, hearing, or lawful deposition, and it is offered against a party "who had—or in a civil case, whose predecessor had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination," Fed. R. Evid. 804(b)(1).  Another pertinent exception comes from

the definition of what constitutes "hearsay"; when the statement is made by a party's agent on a matter within the scope of that relationship and while it existed, Fed. R. Evid. 801(d)(2)(D) (see Docket No. 297, Pl. Reply Memo. at 10 n.7).  The proponent of the hearsay under the latter ground must lay sufficient foundation and establish that the speaker was the party's agent or employee, was speaking on a matter within the scope of agency, and was made while the agency relationship existed, Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 128-29 (2d Cir. 2005) (Docket No. 337, Defs. Memo. at 10); see Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir. 1992).  Statements against a party's interest in this situation is "received into evidence without many of the technical prerequisites of other evidentiary rules—such as, for example, trustworthiness and personal knowledge—admissibility under this rule should be granted freely," Pappas, supra, 963 F.2d at 537, based upon the premise that current employees of a party are "unlikely to make damaging statements about his employer, unless those statements are true," id. (citing McCormick on Evidence § 267 (2d ed. 1972); 2 Wigmore, Evidence § 280(2) (Chadbourn rev. 1979)).

Thus, two possible exceptions are offered for the admissibility of late Patrick Huntress's testimony.  Rule 804(b)(1) fails because defendants lacked the opportunity to develop this testimony by direct, cross-, or redirect examination since it came from Grand Jury testimony and defendants (either as suspects or criminal defendants) lack the opportunity to cross-examine or examine Grand Jury witnesses.  With Patrick Huntress's death, defendants were unable to depose him themselves.  Therefore, it was erroneous for the Magistrate Judge to rule that late Mr. Huntress's testimony was admissible under Rule 804(b)(1).

Under Rule 801(d)(2)(D), the Government has not established that Patrick Huntress was employed by Acquest or Acquest Development or by his brother, William Huntress or was employed in 2010 when he testified before the Grand Jury (Docket No. 270, Pl. Ex. 15, Patrick Huntress Grand Jury Tr. at 1 (commenced May 18, 2010)). The Government generally states that Patrick Huntress was an agent of Acquest for supervision of the ditch work on the Site, testifying about matters within the scope of his authority (Docket No. 343, Pl. Memo. at 15; Docket No. 270, Pl. Ex. 15, Patrick Huntress Grand Jury Tr.).  Defendant William Huntress testified that Patrick cleaned ditches and supervised cleaning fallen trees from the October 2006 storm.  This does not show definitively any connection between Patrick Huntress and defendants, save the familial relationship between William and Patrick which might have led Patrick to help his brother in his corporate operations.  The record here does not show that Patrick was employed by any defendant.  Next, Patrick worked at the Site in 2007 and 2008 but testified in 2010; the Government has not shown that Patrick had a continuing agency relationship with defendants when Patrick was before the Grand Jury.  It is the continuing relationship (assuming one existed) that gives credence to Patrick's testimony that any damaging statements made against defendants here are true because of the continuing relationship between Patrick and the defense.  That relationship has not been shown in the produced excerpts of the Grand Jury transcript.  Therefore, on the alternative ground of Rule 801(d)(2), Patrick Huntress's testimony **is stricken as inadmissible hearsay**.

## IV.    CONCLUSION

This Court herein resolves some preliminary evidentiary issues in anticipation of consideration of the Objections (Docket Nos. 337, 338, 340) to the Report (Docket

No. 334) and the parties' Motions for Summary Judgment (Docket Nos. 267, 269).  The Government's Motion to Strike the expert testimony of Steven Apfelbaum (Docket No. 293) is **denied**; the Motion to Strike the expert testimony of Dr. Susan Kagel (Docket No. 294) is **denied**; the Decision and Order contained in the Report (Docket No. 334) on these motions is **affirmed**.  The Motion to Strike the expert testimony of Ray Kagel (Docket No. 294), however, is **granted in part, denied in part** (and the portion of the Report that is the Decision and Order on this motion is **reversed in part**) on the grounds stated above, to wit the testimony on the wells is allowed but testimony on the dye testing is not.  Similarly, the Motion to Strike the expert testimony of Dr. Alan Busacca (Docket No. 296) is **denied in part** on the grounds stated in the Report (allowing his opinion as to hydrology) but is **granted on other grounds, striking his testimony on agricultural activities in support of prior converted cropland status** as that opinion was not based upon the factual record.

Defendants' motion within its Objections (Docket No. 337) to reverse Magistrate Judge Foschio's ruling that the late Patrick Huntress's Grand Jury testimony is admissible is **granted**.

## V.   ORDER

For the reasons stated herein, the Government's appeal (Docket No. 338) of the denial of its motions to strike (Docket Nos. 293, 294, 296) portions of defense experts' opinions is **granted in part, denied in part**; its Motion to Strike Ray Kagel's opinion (Docket No. 294) is **granted** regarding the dye testing and the remainder of that Motion (and the Motion to Strike Dr. Kagel's opinion) is **denied**.  The Government's Motion (Docket No. 296) to Strike portions of the opinion testimony of Dr. Busacca is **granted in**

**part** (on grounds different than those asserted by the Government)**, denied in part**, and its Motion to Strike portions of the opinion of Mr. Apfelbaum (Docket No. 293) is **denied**.

As such, Defendants' Objections to the Report (Docket No. 337) seeking reversal of the admission of the Grand Jury testimony of the late Patrick Huntress is **granted**. Their Objections (Docket Nos. 337, 340) to the recommended denial of their motion for summary judgment (Docket No. 267) and Plaintiff's Objection (Docket No. 338) to the recommended partial denial of its motion for summary judgment (Docket No. 269) **remain pending** and are addressed in a separate Decision and Order.  Defendants' second set of Objections (Docket No. 339) is **terminated** in favor of its amendment (Docket No. 340).


SO ORDERED.

Dated:       June 3, 2020
             Buffalo, New York


                                              s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                            United States District Judge