UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.                                              **DECISION AND ORDER**
                                                        09CV55S

ACQUEST TRANSIT LLC, et al.,

                              Defendants.

## I.  INTRODUCTION

Before this Court are the parties' Motions for Summary Judgment (Docket Nos. 267 (defendants), 269 (plaintiff United States, the "Government")) and their respective Objections (Docket Nos. 337 (defendants' Objections), 338 (Government's Objections), 339 (defendants' Objections to denial of their Motion for Summary Judgment), 340 (amended defense Objection to denial of Motion for Summary Judgment)) to the 103-page Report & Recommendation from Magistrate Judge Leslie Foschio, United States v. Acquest Transit LLC, No. 09CV55, 2018 WL 3861612 (W.D.N.Y. Aug. 14, 2018), on those motions (among others) (Docket No. 334, the "Report" or "R&R").  Familiarity with that comprehensive Report is presumed.

Also, before this Court is an appeal from the denial of the Government's Motions (Docket Nos. 293 (Steven Apfelbaum), 294 (Ray Kagel and Dr. Susan Kagel), 296 (Dr. Alan Busacca)) to strike portions of defense expert opinions considered in that Report.  In a separate Decision and Order (Docket No. 348, June 3, 2020) (familiarity with which also presumed), these Motions were granted in part (Docket Nos. 294 (Ray Kagel), 296 (Dr. Busacca)), denied in part (Docket Nos. 294 (Dr. Susan Kagel), 293 (Apfelbaum)).  That Decision and Order (Docket No. 348, at 1, 31) also terminated one set of defense

Objections (Docket No. 339) which were superseded by their amendment (Docket No. 340).

The parties exchanged responses to their Objections (Docket Nos. 342, 343; <u>see also</u> Docket No. 341 (Rule 72 certification)) but did not file any replies.  This Court then sought briefing on the significance of the Supreme Court's recent decision in <u>County of Maui v. Hawaii Wildlife Fund</u>, 590 U.S. ____, 140 S.Ct. 1462 (Apr. 23, 2020), to this case, with simultaneous responses due May 14, 2020 (Docket No. 344).  The Government (Docket No. 347) and defendants (Docket No. 346) filed their timely memoranda answering this query.  The matter then was deemed submitted without oral argument.

The issues in this case involve the application of the Clean Water Act to defendants' Amherst, New York, parcel (hereinafter the "Site"); namely, whether that Site contains "wetlands" connected to the "waters of the United States" for Clean Water Act jurisdiction.

For future reference in this Decision and Order some of the common shorthand, abbreviations, and acronyms used in herein include:

> Acquest, Acquest Transit, LLC;
> Army Corps, U.S. Army Corps of Engineers;
> CWA, Clean Water Act (or the "Act");
> DEC, New York State Department of Environmental Conservation (or "NYSDEC");
> EDI, Earth Dimensions, Inc.;
> EPA, Environmental Protection Agency;
> Joint Guidance, U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'rs, <u>Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States</u> (Dec. 2, 2008) (Docket No. 279, Pl. Ex. 29);
> NPDES, National Pollutant Discharge Elimination System;
> NOI, notice of intent;

NRCS, Natural Resources Conservation Service (successor to Soil
Conservation Service, or "SCS");

NWPR, U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'r, <u>The Navigable
Waters Protection Rule: Definition of "Waters of the United States"</u>, 85 Fed.
Reg. 22250 (Apr. 21, 2020) (effective June 22, 2020);

PCC, prior converted cropland;

Realmark, Realmark Properties;

Report or R&R, Report and Recommendation, Docket No. 334, of Aug. 14,
2018, 2018 WL 3861612;

Site, Town of Amherst Tax Parcel No. 16.00-5-23 (Docket No. 334, R&R,
at 10, 2018 WL 3861612, at *4);

TNW, Traditional Navigable Waterway;

USDA, United States Department of Agriculture.

For the reasons stated below, defendants Objections (Docket Nos. 337, 339) are

**granted in part, denied in part** and the Government's Objections (Docket No. 338) are

**denied**.  As a result, defendants' Motion for Summary Judgment (Docket No. 267) is

**denied** and the Government's Motion for Summary Judgment (Docket No. 269) is

**granted in part, denied in part**.

## II.  BACKGROUND

A.  Objections

1.  Defendants' First Set of Objections (Docket No. 337)

Defendants filed two sets of Objections (Docket No. 337; <u>see</u> Docket No. 340,

Defs. Amended Objections at 1 n.1, noting defendants filing distinct Objections).  In the

first Objections (addressing the Government's Motion for Summary Judgment, <u>see</u>

Docket No. 337, Defs. Memo. at 1; Docket No. 340, Defs. Memo. at 1), they raise three

issues:  the Government's failure to establish entitlement to judgment as a matter of law

on the validity of the permit held by defendant Acquest Transit LLC ("Acquest"); whether

the prior converted cropland (or "PCC") status for the Site can be abandoned under the

Clean Water Act; and whether the Magistrate Judge erred in admitting the Grand Jury testimony of a deceased witness (Patrick Huntress) who was never cross-examined by defendants (Docket No. 337, Defs. Memo. at 1, 9-12; cf. Docket No. 334, R&R at 75-76, 2018 WL 3861612, at *26). The third issue was addressed separately (Docket No. 348, Decision and Order of June 3, 2020).

First, under Count Two defendants contend that they had valid Section 402 permits and conclude that the Report (Docket No. 334, at 101, 2018 WL 3861612, at *36) erred in accepting the Government's contrary view (Docket No. 337, Defs. Memo. at 3-6). They contest the Government's assertion that defendants' notice of intent ("NOI") submitted with the permit applications misrepresented the dates and acreage of defendants' planned activity (id. at 3-6; see Docket No. 279, Defs. Statement ¶ 64; Docket No. 279, Defs. Memo. at 10-11). Defendants contend that their activities in 2006 were agricultural and did not require a Section 402 permit; thus, these activities cannot form the basis for any claim that the essentially unnecessary NOI contained false representations (Docket No. 337, Defs. Memo. at 5).

Defendants next argue that the prior converted cropland status (or "PCC") of the Site (and exclusion from the Act's definition for "waters of the United States") cannot be abandoned as a matter of law (Docket No. 337, Defs. Memo. at 7-9). They claim that the Report cites the abandonment provision in the Food Security Act, 16 U.S.C. § 3822(b)(1)(G) (Docket No. 334, R&R at 24, 93-94, 2018 WL 3861612, at *33), and not the CWA which has no abandonment provision (Docket No. 337, Defs. Memo. at 8-9).

Defendants also opposed admission of the Grand Jury testimony (Docket No. 270, Pl. Ex. 15) of Patrick Huntress, the late brother of defendant William Huntress (Docket

4

No. 337, Defs. Memo. at 9; <u>see</u> Docket No. 334, R&R at 75, 2018 WL 3861612, at *26). In the Decision and Order of June 3, 2020, this Court granted defendants' Motion and struck Patrick Huntress' Grand Jury testimony as inadmissible hearsay (Docket No. 348, at 26-29).

2. The Government's Objections (Docket No. 338)

Plaintiff the United States of America (the "Government") argues that the Report incorrectly found triable issues of fact as to whether defendants committed wetlands or stormwater violations (Docket No. 338, Pl. Memo. at 3-17).   First, the Government contends that the Report concluded in error that there is an issue of fact whether the Site had wetlands when acquired by defendants and whether these wetlands were "waters of the United States."  The Government asserts it need only show that some portion of the Site contained wetlands for CWA jurisdiction over the Site and an acknowledged portion of the Site was declared wetlands by the New York State Department of Environmental Conservation ("DEC").  This area also was not part of the PCC that defendants claim is outside of CWA jurisdiction.  (<u>Id.</u> at 3-5, 6 n.5.)  The Government argues that defendants' expert did not analyze the protected area to raise a fact issue whether that parcel was wetlands (<u>id.</u> at 5-6), assuming this expert was not stricken as the Government urged (<u>id.</u> at 5, 17-25).  The Government next states that wetland hydrology does not raise an issue of fact, that the relevant period to evaluate the Site was before defendants' earth moving in 2006 (<u>id.</u> at 8, 10).  The Government asserts that the Report was wrong in discounting the findings of Earth Dimensions, Inc. ("EDI"), defendants' contractor in determining the boundaries of the wetlands that ultimately led to the reduction of defendants' purchase price of the Site due to the extent of wetlands there (<u>id.</u> at 7).

Next, the Government contends that there is no issue of fact that the Site's wetlands are "waters of the United States" under the CWA as construed by the Supreme Court in Rapanos v. United States, 547 U.S. 715 (2006) (id. at 10-13).  The Government applies both the Rapanos plurality's standard of continuous surface connection (id. at 11-12) and Justice Anthony Kennedy's significant nexus standards (id. at 12-13) to establish that these wetlands as connected to "waters of the United States."  The Government claims that there is a continuous surface connection to a permanent waterway, here Ransom Creek, flowing from the wetlands on the Site through ditches on the property to the West Millersport Highway ditch into Ransom Creek (id. at 11-12).  The Government disputes the Report's conclusion that the significant nexus standard cannot be applied on summary judgment (id. at 12; but cf. Docket No. 334, R&R at 88, 2018 WL 3861612, at *31; Docket No. 342, Defs. Memo. at 14-15 (fact specific nature of significant nexus standard precludes summary judgment, citing Rapanos, supra, 547 U.S. at 782 (Kennedy, J.)); also Vander Salm v. Bailin & Assocs., Inc., No. 11-40180-TSH, 2014 WL 1117017, at *4 (D. Mass. Mar. 18, 2014) (plaintiffs declining to move for summary judgment on significant nexus standard because it was fact-intensive)).  The Government also argues that it is not required to establish amount of fill from the Site into waters to establish the significant nexus with TNW, found to be an issue of fact in the Report (No. 334, R&R at 98, 2018 WL 3861612, at *35).

As explained below, to be "waters of the United States" they must be connected to a traditional navigable waterway (or "TNW"); the Government argues that Ransom Creek, the connecting body of water between the Site's wetlands and more navigable-in-fact Tonawanda Creek and the Erie Canal, is itself a TNW (Docket No. 338, Pl. Memo. at 13-

14, 16).  The Government denies that culverts in Ransom Creek which may interrupt navigability create a factual issue whether that creek is a TNW; the Government contends that this is a question of law (id. at 13-14), see Economy Light & Power Co. v. U.S., 256 U.S. 113, 122 (1921) (navigation in fact, citing, at 121, The Daniel Ball, 10 Wall. 557, 563 (1870)).

Regarding Count Two discharge of stormwater without a permit, the Government argues the Report erred in finding an issue of fact as to defendants' intent to perform construction activity on the Site (id. at 15), determinant whether a permit is required.  The Government then faults the Report for requiring the Government to prove (at this initial liability stage) that more stormwater came from defendants' activities than not, contending that increases in stormwater volume goes to damages or sanctions (id. at 16).

3.  Defendants' Second Set of Objections (Docket Nos. 339, 340)

In their second set of Objections (addressing their Summary Judgment Motion, Docket No. 340, Defs. Memo. at 1), defendants argue that the Magistrate Judge erred considering their void for vagueness arguments surrounding the Clean Water Act (Docket No. 340, Defs. Am. Objections at 2-6).

According to the defense, the Magistrate Judge also erred in considering Count Two, Section 402 permit violations, because the regulations excluded construction activity, 40 C.F.R. § 122.26(b)(14)(x), and the EPA cannot expand its jurisdiction beyond what was authorized by Congress under the Clean Water Act (id. at 7-9).

B.  Facts

The following facts are drawn from the Amended Complaint (Docket No. 112) and the uncontested facts found by Magistrate Judge Foschio in the Report (Docket No. 334, 2018 WL 3861612).

On January 9, 2009, the Government commenced this action against Acquest for violations of the Clean Water Act, 33 U.S.C. §§ 1251, 1311, 1319(d), for engaging in ditch digging, earthmoving, and fill activities on the Site (Docket No. 334, Report at 3, 17, 2018 WL 3861612, at *1, 6).  The Government moved for preliminary injunction (Docket No, 6), which was granted (Docket No. 26), United States v. Acquest Transit LLC, No. 09CV55, 2009 WL 2157005 (W.D.N.Y. July 15, 2009) (Skretny, J.).   Pertinent to the pending motions, the Government then argued that both the plurality and concurring opinions of Rapanos v. United States, 547 U.S. 715 (2006), were applicable and that the Site's wetlands were "waters of the United States" as defined in those opinions, Acquest, supra, 2009 WL 2157005, at *6-7.  This Court found that the Government "had demonstrated sufficiently that the Property's wetlands are 'waters of the United States' within the CWA's jurisdiction" for the preliminary injunction, id. at *8.

The Amended Complaint (Docket No. 112; cf. Docket No. 111, Am. Compl. (unsigned)) added as defendants Acquest Development, LLC (allegedly the corporate developer and manager of the Site), and William L. Huntress (principal of Acquest and president and managing partner of Acquest Development, LLC) (Docket No. 112, Am. Compl. ¶¶ 8, 9).

Count One of the Amended Complaint alleged that defendants violated the Clean Water Act, 33 U.S.C. § 1311, by discharging dredge or fill materials into jurisdictional

wetlands at the Site without a permit (id. ¶¶ 45-53).  Count Two alleged that defendants violated 33 U.S.C. § 1362(12) by discharging stormwater associated with industrial activity from point sources into waters of the United States without a permit (id. ¶¶ 54-63).  Count Three claimed that defendants violated CWA, 33 U.S.C. § 1319, by continuing to discharge pollutants into jurisdictional wetlands in contravention of the Environmental Protection Agency's ("EPA") administrative Cease and Desist Order (id. ¶¶ 64-67; see Docket No. 338, Pl. Memo. at 1-2).

The facts as found by Magistrate Judge Foschio generally are not in dispute (save when indicated).  The Site is in three 100-year floodplains since three creeks are near it (Docket No. 334, R&R, at 10, 2018 WL 3861612, at *4).  From the 1920s to 1988, the Site was used exclusively for agricultural purposes, with an agency of the United States Department of Agriculture ("USDA") designating the northern ⅔ of the Site as containing "prior converted cropland" (or "PCC") (id. at 11, 2018 WL 3861612, at *4).

Magistrate Judge Foschio recounted the ownership for the Site from 1978 to defendants' acquisition in 2005 and the agricultural activities that occurred during that period (id. at 11-12, 2018 WL 3861612, at *4).  Farmer Craig Duff owned the Site up to 1978 when he sold it to Cimato Bros., Inc., and Anthony Cimato and family, who maintained a garden on a portion of the Site (id. at 11, 2018 WL 3861612, at *4).  Between 1982 and 1985 Cimato permitted Michael Badding and his brother to farm five acres of the Site, now the site of a nursery (id.).  In 1988, Cimato sold the Site to Realmark Properties ("Realmark"), which neither farmed nor developed the property (id.).  Duff stated that he continued to clear the Site while Realmark owned it (id.; see Docket No.

280, Defs. Ex. 13, Craig Duff Dep. Tr. at 90-92; see also Docket No. 296, Pl. Ex. B, Duff Tr. at 90-92).

Defendants purchased the Site from Realmark Properties in June 2005 with the price initially contingent upon the percentage of the property deemed to be wetlands (Docket No. 334, R&R at 12, 2018 WL 3861612, at *5).  On October 2005, defendants retained a wetlands consultant, Earth Dimensions, Inc. (or "EDI"), to delineate the wetlands boundaries.   EDI found 77.02 acres or 80% of the Site's 96.3 acres were wetlands that appear to be connected with waters of the United States, specifically Ransom Creek, Tonawanda Creek, and the Niagara River.   (Id. at 12-13, 2018 WL 3861612, at *5.)  EDI concluded that only 10 acres of the Site could be developed without wetlands permits (id. at 13, 2018 WL 3861612, at *5).  Defendants negotiated a reduction in the purchase price (reduced by $10,000 for each acre found to be unusable wetlands) by $525,000 and they purchased the Site for only $425,000 (id. at 13, 12, 2018 WL 3861612, at *5).  Defendants assert that the $10,000 reduction provision was eliminated from the final purchase agreement (Docket No. 279, Defs. Statement ¶ 13).

From 2006 to 2008, defendants contracted to clear the Site of vegetation, clear existing ditches, deepen and widen ditches, including ditches that ran in identified wetlands (Docket No. 334, R&R at 13, 2018 WL 3861612, at *5).  Cleared materials were redeposited in wetlands on the Site (id.).  In 2006 and 2007 defendants also applied for Clean Water Act permits for stormwater discharges (id. at 14, 2018 WL 3861612, at *5).  In July 2007, defendants hired farmer Donald Spoth to plant corn on 88 acres of the Site (id.).  From July through the fall of that year, Patrick Huntress, brother of defendant William Huntress, used an excavator to clear the three original ditches on the Site and

John Kelkenberg (hired by defendants) used a tractor to cut down the corn stalks planted by Spoth (id.).

In February 21, 2008, the EPA issued a Cease and Desist Order upon defendants to cease all earth moving work, filling, grading, or excavation on the Site without the requisite permits pending determination by the United States Army Corps of Engineers ("Army Corps") whether the Site was jurisdictional wetlands (id.).  On March 19, 2008, the Army Corps designated Ransom Creek a Traditional Navigable Waterway (or "TNW") (id.); hence making adjoining wetlands under federal jurisdiction of the Clean Water Act to require permits for discharge, 33 U.S.C. §§ 1342,1344.

Inspecting under a Search Order on July 28, 2008, the EPA found no evidence of recent farming activity on the Site but found violations of the first Cease and Desist Order due to ongoing excavations (id. at 15, 2018 WL 3861612, at *6).  This EPA inspection team also took 46 soil samples which led the agency to conclude that wetlands were present on the entire Site and 13.3 acres of fill were deposited in violation of the CWA (id.).  This inspection team also found that these wetlands

> "abut and maintain a continuous surface connection with the West Ditch [one of the three original ditches on the Site] from which water flows at least three seasons into the Millersport Highway East Side Ditch, underneath Millersport Highway, into the Millersport Highway West Side Ditch, and into Ransom Creek, then to Tonawanda Creek and the Niagara River,"

(id. at 15-16, 13, 2018 WL 3861612, at *6, 5).  The EPA, on September 5, 2008, issued a second Cease and Desist Order prohibiting further earth moving activities (id. at 16, 2018 WL 3861612, at *6).  On September 10 and 16, 2008, however, the Army Corps observed further earth-moving activities on the Site (id.).

C.  Procedural History

Defendants answered the Amended Complaint (Docket No. 121).  They later moved for summary judgment (Docket No. 267), contending that 404 and 402 permits under the Clean Water Act were not required for their activities on the Site (id., Defs. Memo. at 2-4, 11-15, 17-22), that the Clean Water Act, EPA, and Army Corps regulations regarding wetlands are of "indecipherable vagueness and mind-boggling complexities" (id. at 4, 6-7, 14-17).  They contended that two-thirds of their argument is reduced to "assuming arguendo that the Transit land [the Site] contains some 'wetland,'" posing the question "was the law clear and unambiguous during 2007-2008 that such acreage is 'jurisdictional wetlands' – clearly part of what the CWA calls 'the waters of the United States?'" (id. at 5 (emphasis in original)).

The Government (in effect) cross moved for summary judgment as to liability (Docket No. 269).  There, the Government argued that defendants violated the Act by discharging pollutants into the "waters of the United States" by polluting the wetlands on the Site (id. at 15-35).  The Government accused defendants of allowing unpermitted discharges of pollutants into stormwater (id. at 35-43) and defendants violated the EPA's administrative orders by continuing excavation work on the Site after being ordered to stop (id. at 43).

During briefing of the Motions for Summary Judgment, the Government moved to strike portions of the expert testimony of Ray Kagel (Docket No. 294), Dr. Susan Kagel (id.), Dr. Alan Busacca (Docket No. 296), and Steven Apfelbaum (Docket No. 293) that defendants introduced either in support of their motion or in opposition to the Government's motion.  Magistrate Judge Foschio (in a Decision and Order included with

the Report & Recommendation) denied these motions (Docket No. 334, R&R at 1 n.1, 25-66, 2018 WL 3861612, at *1 n.1, 9-23).  The Government appealed this denial and, on June 3, 2020, this Court granted the Government's motion in part to strike some of Ray Kagel's expert testimony; granted its motion (in part) to strike portions of the expert testimony of Dr. Busacca; but denied its motions to strike parts of  the expert testimonies of Dr. Kagel and Steven Apfelbaum (Docket No. 348, Decision & Order of June 3, 2020, at 20, 21, 22-24, 24-26).

Meanwhile, defendants commenced a parallel action challenging the legality of this case and the prosecution[1] against them under the CWA, e.g., Huntress, et al. v. Department of Justice, et al., No. 12CV1146.  The Huntress plaintiffs (the defendants in the present case) moved for a declaratory judgment that the Site was not subject to the CWA and an injunction against the Government's civil and criminal prosecution against them, Huntress, No. 12CV1146, Docket No. 2, to which the Government moved to dismiss the action, id., Docket Nos. 23, 30.

On May 24, 2013, this Court in Huntress granted the Government's motion to dismiss, denied the Huntress plaintiffs' motion for preliminary injunction, consolidating their motion for declaratory judgment with this case and converting it into a motion for summary judgment in Huntress and denying that dispositive motion, Huntress v. U.S. Dep't of Justice, No. 12CV1146, 2013 WL 2297076, at *1, (W.D.N.Y. May 24, 2013) (Skretny, C.J.), Docket No. 42, Order at 1-2.  This Decision and Order consolidated Huntress with this case and granted the former Huntress plaintiffs (and now defendants in this action) leave to move here for summary judgment on the grounds raised in

---

[1]United States v. Acquest Development, LLC, Acquest Transit, Huntress, 11CR347.

Huntress, id. at *14, Order at 28.  That Decision and Order discussed the continuing validity of the abandonment rule for prior converted croplands, id. at *10-14, Order at 19-27 (see also Docket No. 338, Pl. Objections at 8).

D.  Report & Recommendation (Docket No. 334, 2018 WL 3861612)

As for the dispositive motions, Magistrate Judge Foschio recommended denying defendants' motion for summary judgment (Docket No. 334, R&R at 72-74, 99-101, 102, 2018 WL 3861612, at *25-26, 35-36, 37) and granting in part, denying in part the Government's summary judgment motion (id. at 73, 73-77, 77-99, 99-101, 102, 2018 WL 3861612, at *26-27, 27-35, 35-36, 37), including rejecting arguments against the Government's motion (id. at 73-77, 2018 WL 3861612, at *26-27).   Specifically, Magistrate Judge Foschio recommended granting summary judgment to the Government on Count Two, defendants' land clearing operations (id. at 99-101, 2018 WL 3861612, at *35-36) but denying summary judgment due to issues of material fact as to Counts One and Three, illegally discharging dredge or fill materials into jurisdictional wetlands and continuing discharge of pollutants into jurisdictional wetlands contrary to administrative order (id. at 77-99, 2018 WL 3861612, at *27-36).

## III. DISCUSSION

A.    Applicable Standards

1.   Objection to Report and Recommendation

This Court reviews de novo any part of the Magistrate Judge's disposition in the Report and Recommendation that is properly objected to, see 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D.N.Y. Loc. Civ. R. 72.3(a), after consideration of the Objections, the Report, the record, applicable legal authorities, and the parties' submissions,

Bandham v. Lab. Corp. of Am., 234 F.2d 313, 316 (S.D.N.Y. 2002).  Under Rule 72(b)(3), this Court may "accept, reject, or modify the recommended disposition," as well as receive further evidence or return the matter to the Magistrate Judge for further proceedings, Fed. R. Civ. P. 72(b)(3).  This Court, however, is "not required to review the factual findings or legal conclusion of the magistrate judge as to which no proper objections are interposed," Alliance Indus. v. Longyear Holdings, Inc., 854 F. Supp. 2d 321, 326 (W.D.N.Y. 2012) (Skretny, C.J.), citing Ianiello v. Hartford Life & Acc. Ins. Co., No. 10-CV-370, 2012 WL 314872, at *1 (E.D.N.Y. Feb. 1, 2012) (citing in turn Thomas v. Arn, 474 U.S. 140, 150 (1985)).

2.  Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.  Ford, supra, 316 F.3d at 354.  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir.) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)), cert. denied, 522 U.S. 864 (1997).  While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323

15

(1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original removed); McCarthy v. American Intern. Group, Inc., 283 F.3d 121, 124 (2d Cir. 2002); Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).

A party asserting facts must support the assertion by citing to parts of the materials in the record, Fed. R. Civ. P. 56(c)(1)(A), or affidavits or declarations setting out facts that would be admissible in evidence, id. R. 56(c)(4).

      3.  Clean Water Act Primer

          a.  Clean Water Act and Regulations

As the Government asserts (Docket No. 338, Pl. Memo. at 3) without dispute, to state a claim under the Clean Water Act (such as Count One) the Government has the burden of showing that defendants discharged (without a permit) pollutants from a point source into wetlands that were then the "waters of the United States," 33 U.S.C. §§ 1311, 1342, 1344; see Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199, 215 (2d Cir. 2009), aff'g on other grounds, 472 F. Supp. 2d 219 (D. Conn. 2007). For Count Two, the Government needed to show that there was a discharge of pollutants, related to "industrial activities," from a point source, to "waters of the United States," and without a valid permit, 33 U.S.C. § 1342 (Docket No. 334, R&R at 99, 2018 WL 3861612, at *35; see Docket No. 338, Pl. Memo. at 15; see also Docket No. 337, Defs. Memo. at 3).

Questioned here are whether defendants' Site contains "wetlands" and whether they were deemed the "waters of the United States." The Report gave an extensive review of pertinent sections of the CWA and its applicable regulations to wetlands (see Docket No. 334, R&R at 21-24, 2018 WL 3861612, at *8-9).

The Clean Water Act applies to "navigable waters" which, in turn, are defined as the "waters of the United States," 33 U.S.C. § 1362(7). Currently[2] included with the "waters of the United States" are wetlands adjacent to waters susceptible to use in interstate or foreign commerce, interstate waters, tributaries of waters, territorial seas, 33 C.F.R. § 328.3(a)(7) (2019) (Army Corps). Wetlands, in turn, currently are defined as

> "[T]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar area,"

33 C.F.R. § 328.3(b) (Army Corps definition) (Docket No. 334, R&R at 89, 2018 WL 3861612, at *31). The Army Corps further defines "wetlands" as

> (1) prevalence of plant species typically adapted to saturated soil conditions, determined in accordance with the United States Fish and Wildlife Service's National List of Plant Species that Occur in Wetlands; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years.

Rapanos, supra, 547 U.S. at 761-62 (Kennedy, J., concurring) (citation to 1987 Army Corps Delineation Manual omitted) (id. at 90, 2018 WL 3861612, at *31). Thus, the three-

---

[2]The Navigable Waters Protection Rule refines this definition, effective June 22, 2020, 85 Fed. Reg. 22,250, 22,250, 22,251, 22,307-17, 22,339, 22,341. The EPA and Army Corps present an extensive history of the CWA rule making and interpretation of "waters of the United States" in the NWPR, id., 85 Fed. Reg. at 22,252-59.

part definitional test for wetlands is the existence of wetland vegetation, hydric soils, and wetland hydrology (id.).

Since August 25, 1993, EPA and Army Corps regulations defined the "waters of the United States" to exclude prior converted cropland, 40 C.F.R. § 232.2; 33 C.F.R. § 328.3(a)(8) (2019) (effective to June 21, 2020); 58 Fed. Reg. 45,008, 45,031 (Aug. 25, 1993); see also NWPR, 85 Fed. Reg. at 22,255.  Prior converted cropland (or "PCC") is defined as wetlands converted to farming prior to December 23, 1985, 33 C.F.R. § 328.3(a)(8) (2019) (effective to June 21, 2020); 7 C.F.R. §§ 12.2(a)(8) (definition), 12.5(b)(1)(i) (exemption for wetlands) (Docket No. 334, R&R at 89, 2018 WL 3861612, at *31).  This was similar to the USDA soil conservation regulations.  Under USDA regulations, PCC "is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity had been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support woody vegetation and did not meet the hydrologic criteria for farmed wetland," 7 C.F.R. § 12.2(a)(8).

### b.  Rapanos v. United States

The issue of what constitutes "the waters of the United States" was presented to the United States Supreme Court in Rapanos v. United States, 547 U.S. 715 (2006). This Court previously noted that

> "While all Justices agreed that the term 'waters of the United States' encompasses some waters that are not navigable in the traditional sense, id. at 730–31 (plurality opinion); 767–68 (Kennedy, J., concurring in the judgment); 792 (Stevens, J., dissenting), the Court split with respect to the proper standard for determining whether a wetland constitutes 'navigable waters' covered by the CWA,"

United States v. Acquest Transit, No. 09CV55, 2009 WL 2157005, at *6 (W.D.N.Y. July 15, 2009) (Skretny, J.) (Docket No. 26 Order).  Unfortunately, the Court rendered a plurality decision with a concurrence, resulting in a 4-1-4 split with no majority decision defining that phrase, see Rapanos, supra, 547 U.S. at 758 (Roberts, C.J., concurring) (Docket No. 334, R&R at 80-81, 85, 2018 WL 3861612, at *28, 30); see also United States v. Robertson, 875 F.3d 1281, 1287 (9th Cir. 2017) (Supreme Court's "fractured 4-1-4 decision" in Rapanos); Zdziebloski v. Town of E. Greenbush, No. 15-CV-0298(LEK/CFH), 2017 WL 1968672, at *4 (N.D.N.Y. May 11, 2017) (Justice Scalia's plurality opinion and Justice Kennedy's concurrence "offered dueling tests for determining whether a wetland adjacent to a tributary of a traditional navigable water is subject to regulation under the CWA").  The Government here terms this to be "two alternative standards for determining whether wetlands are within CWA jurisdiction" (Docket No. 338, Gov't Memo. at 10).

Justice Antonin Scalia for the plurality defined "'waters of the United States" encompassing "relatively permanent bodies of water that are connected to traditional navigable waters (TNWs) and wetlands with a continuous surface connection to such relatively permanent bodies of water," Rapanos, supra, 547 U.S. at 742 (plurality opinion) (id. at 10-11; see Docket No. 334, R&R at 80-81, 2018 WL 3861612, at *28).

Justice Kennedy concurred in the judgment (remanding the cases) and would have the definition focus on the significant nexus the wetlands have to waters that are or were navigable in fact or that could reasonably be made so, id. at 759, 782 (Kennedy, J., concurring) (Docket No. 338, Gov't Memo. at 11).  He posed the issue as "whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain

and are not adjacent to waters that are navigable in fact," id. at 759.  Justice Kennedy sought to be consistent with the standard set forth in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159, 167 (2001), and its application of "significant nexus" to waters that are or were navigable, Rapanos, supra, 547 U.S. at 759 (Kennedy, J., concurring).  Under the significant nexus approach,

> "wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"

Id. at 780 (Kennedy, J., concurring).  Under this standard, the Army Corps is to establish "a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries," id. at 782 (Kennedy, J., concurring).

In dissent, Justice John Paul Stevens recognized that "wetlands adjacent to tributaries generally have a significant nexus to the watershed's water quality," id. at 797 (Stevens, J., dissenting) (Docket No. 334, R&R at 81, 2018 WL 3861612, at *28).  The dissenters recognized the Army Corps' determination "that wetlands adjacent to tributaries of traditionally navigable waters preserve the quality of our Nation's waters" and the Corps' decision to treat wetlands "as encompassed within the term 'waters of the United States' is a quintessential example of the Executive's reasonable interpretation of a statutory provision," id. at 788 (Stevens, J., dissenting).  The dissent would adopt the definition accepted in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 135 (1985), Rapanos, supra, 547 U.S. at 772-73 (Stevens, J., dissenting).  Justice Stevens concluded his dissent that on remand "the judgment should be reinstated if either of those tests [the plurality's or Justice Kennedy's] is met," id. at 810; see also id. at 810 n.14 ("in future cases the United States may elect to prove jurisdiction under either test").

The Justices noted that, after Rapanos, either the Army Corps or courts would have to take an ad hoc, case-by-case determination of whether a given wetland is connected to "waters of the United States" for CWA jurisdiction, see id. at 758 (Roberts, C.J., concurring), 812 (Breyer, J., dissenting); see also Sackett v. Environmental Protection Agency, 566 U.S. 120, 123-24 (2012) (citing Roberts, C.J., concurrence, noting parties lacked guidance after Rapanos); County of Maui, supra, 140 S.Ct. at 1484 n.4 (Alito, J., dissenting) (noting that the term "waters of the United States" is not defined by the CWA and "has presented a difficult issue for this Court," citing Rapanos, supra, 547 U.S. 517).

Justice Samuel Alito placed the source for "real relief" on Congress "to do what it should have done in the first place:  provide a reasonably clear rule regarding the reach of the Clean Water Act" by defining the phrase "waters of the United States" in the CWA instead of leaving the phrase undefined.  "The phrase not a term of art with a known meaning; and the words themselves are hopelessly indeterminate."  Sackett, supra, 566 U.S. at 132 (Alito, J., concurring) (see also Docket No. 346, Defs. Memo. at 2).  Left to agency interpretation, the Army Corps and the EPA interpreted the phrase "as an essentially limitless grant of authority," a view rejected in Rapanos, Sackett, supra, 566 U.S. at 132 (Alito, J., concurring).  Justice Alito then noted that "the precise reach of the Act remains unclear.  For 40 years Congress has done nothing to resolve this critical ambiguity, and the EPA has not seen fit to promulgate a rule [as of 2012] providing a clear and sufficiently limited definition of the phrase.  Instead the agency has relied upon informal guidance," id.  That EPA informal guidance "advises property owners that many

jurisdictional determinations concerning wetlands can only be made on a case-by-case basis by EPA field staff," id.

Magistrate Judge Foschio here rendered alternative recommendations under the plurality's standard and under Justice Anthony Kennedy's significant nexus standard (Docket No. 334, R&R at 80-89, 89-98 (wetlands, traditional navigable waterway, and continuous surface connection), 98-99 (significant nexus), 2018 WL 3861612, at *28-31, 31-35).

Although the Government argues that two standards (the plurality's and Justice Kennedy's) apply (Docket No. 338, Pl. Memo. at 10; see also Docket No. 334, R&R at 83-85, 80-81, 2018 WL 3861612, at *29-30, 28-29), but one court used all three opinions for standards to test the sufficiency of evidence and jury instructions in defining the waters of the United States, United States v. Lucas, 516 F.3d 316, 325 n.8, 326-27 (5th Cir.), reh'g en banc denied, 2008 U.S. App. LEXIS 11529 (5th Cir.), cert. denied, 535 U.S. 822 (2008).  The new Navigable Waters Protection Rule, however, will meld the two standards defining "adjacent wetlands" as part of the jurisdictional waters of the United States, see 85 Fed. Reg. at 22,308, 22,338 (to be codified as 33 C.F.R. § 328.3(a)(4), (c)(1)), 22,340 (to be codified as 40 C.F.R. § 120.2(1)(iv), (3)(i)) (effective June 22, 2020)).

The Court in Marks v. United States, 430 U.S. 188 (1977), stated that "when a fragmented Court decided a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by the those Members who concurred in the judgments on the narrowest grounds,'" 430 U.S. at 193 (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).  See also Rapanos, supra, 547 U.S. at

810 n.14 (Stevens, J., dissent) (conceding that Justice Kennedy's concurrence is narrower and hence controlling).

After describing the three Rapanos opinions, Robertson, supra, 875 F.3d at 1287-89, the Ninth Circuit concluded "all this paints a rather complex picture, and one where without more it might not be fair to expect a layman of normal intelligence to discern what was the proper standard to determine what are waters of the United States," but use of circuit precedent "clarified" that picture, id. at 1289 (citing Northern Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 995 (9th Cir. 2007), holding that Justice Kennedy's concurrence was controlling opinion in Rapanos).  The Robertson court cited other decisions that chose Justice Kennedy's opinion as controlling, id.[3], noting that the First, Third, and Eighth Circuits[4] had selected both the plurality and Justice Kennedy's opinions as defining the standard, id. at 1289-90.  The Report also noted the case law and the application of at least one, sometimes two or more,

_____

[3]Northern Cal. River Watch, supra, 496 F.3d at 995; Robertson, supra, 875 F.3d at 1289, citing United States v. Moses, 496 F.3d 984, 990 (9th Cir. 2007) (recognizing Justice Kennedy's "opinion as the controlling rule of law"); San Francisco Baykeeper v. Cargill Salt Div., 481 F.3d 700, 707 (9th Cir. 2007) ("Justice Kennedy's controlling concurrence explained that only wetlands with a significant nexus to a navigable-in-fact waterway are covered by the Act" (emphasis added)); Northern Cal. River Watch, 496 F.3d at 999-1000.

[4]United States v. Johnson, 467 F.3d 56, 64-66 (1st Cir. 2006); United States v. Donovan, 661 F.3d 174, 176, 182 (3d Cir. 2011); United States v. Bailey, 571 F.3d 791, 799 (8th Cir. 2009). The Robertson court noted other Circuits apply the standards in varying ways, 875 F.3d at 1289.

"The Fourth Circuit has used Justice Kennedy's test, without deciding whether the plurality's test could provide an alternate ground for establishing CWA jurisdiction. See Precon Dev. Corp. v. United States Army Corps of Eng'rs, 633 F.3d 278 (4th Cir. 2011). The Sixth Circuit has expressly not yet decided which test is controlling.  See United States v. Cundiff, 555 F.3d 200, 210 (6th Cir. 2009). It appears that the Fifth Circuit has also not yet decided which test controls, see United States v. Lucas, 516 F.3d 316, 324-28 (5th Cir. 2008), …"

Robertson, supra, 875 F.3d at 1289.  The Fifth Circuit in Lucas applied standards from the plurality, Justice Kennedy, and the dissent, 516 F.3d at 325-27, 325 n.8.

standards from the plurality opinion and Justice Kennedy's concurrence (Docket No. 334, R&R at 86-87, 2018 WL 3861612, at *30, citing U.S. v. Gerke Excavating, Inc., 464 F.3d 723, 724 (7th Cir. 2006); Northern Cal. River Watch, supra, 457 F.3d at 1029-30; Simsbury-Avon Pres. Soc'y v. Metacon Gun Club, 472 F. Supp. 2d 219, 227-30 (D. Conn. 2007), aff'd on other grounds, 575 F.3d 199 (2d Cir. 2009); United States v. Donovan, 661 F.3d 174, 184 (3d Cir. 2011)).

The Second Circuit has not squarely addressed this issue; see Zdziebloski, supra, 2017 WL 1968672, at *5, holding that the plaintiffs there had failed to come forward with admissible evidence sufficient to allow a reasonable jury to conclude that either Justice Scalia's or Justice Kennedy's test were satisfied, id.  In Simsbury-Avon Preservation Club, supra, 575 F.3d at 215-16 (2d Cir. 2009), the court discussed, but did not decide, the question of jurisdictional wetlands pursuant to Rapanos in deciding a "point source" question, but cf. Simsbury-Avon Pres. Club, supra, 472 F Supp. 2d at 227-30 (D. Conn. 2007) (applying both the plurality and Justice Kennedy's concurrence standards), aff'd on other grounds, 575 F.3d 199, 222 (2d Cir. 2009).  Finally, in Catskill Mountain Chapter Trout Unlimited v. Environmental Protection Agency, 846 F.3d 492, 512-13 (2d Cir. 2017), cert. denied sub nom. New York v. Environmental Prot. Agency, 138 S.Ct. 1164 (2018), the Second Circuit noted that the phrase "waters of the United States" was ambiguous, see Rapanos, supra, 547 U.S. at 752 (plurality), 804 (Stevens, J., dissenting), in determining whether that phrase helped in defining the scope of banning pollutants "to navigable waters" or "addition of any pollutant to the waters of the United States."

      c.     <u>County of Maui v. Hawaii Wildlife Fund</u>, 590 U.S. \_\_\_\_,
140 S.Ct. 1462 (2020)

Recently, the Supreme Court decided the question "whether the [Clean Water]

Act 'requires a permit when pollutants originate from a point source but are conveyed to

navigable waters by a nonpoint source,' here 'groundwater,'" <u>County of Maui</u>, <u>supra</u>,

140 S.Ct. at 1468 (Apr. 23, 2020).  The Court (in a 6-3 decision) held "that the statutory

provisions at issue require a permit if the addition of the pollutants through groundwater

is the functional equivalent of a direct discharge from the point source into navigable

waters," <u>id.</u>; <u>see also</u> <u>id.</u> at 1476.  The CWA forbids "the 'addition' of any pollutant from a

'point source' to 'navigable waters' without the appropriate permit from the

Environmental Protection Agency," <u>id.</u> at 1468, citing 33 U.S.C. §§ 1311(a),

1362(12)(A).  This case considered "whether, or how," the permit requirement "applies

to a pollutant that reaches navigable waters only after it leaves a 'point source' and the

travels through <u>groundwater</u> before reaching navigable waters," 140 S.Ct. at 1469

(emphasis added).  This case involved the role the CWA plays with groundwater given

that the Act intended to leave regulation of groundwater to the States, <u>id.</u> at 1471 (<u>see</u>

<u>also</u> Docket No. 346, Defs. Memo.).

Although Justice Breyer cites the plurality opinion in <u>Rapanos</u>, <u>County of Maui</u>,

<u>supra</u>, 140 S.Ct at 1475, <u>see also</u> <u>id.</u> at 1478 (Kavanaugh, J., concurring), 1482

(Thomas, J., dissenting), there is no discussion of the definition of "waters of the United

States" at issue in this case, <u>cf.</u> <u>id.</u> at 1484 & n.4 (Alito, J., dissenting) ("The Act defines

'navigable waters' as 'waters of the United States, including the territorial seas.'

§ 1362(7).  The term 'navigable waters' has a well-known meaning, but the broader

term 'waters of the United States' is not defined by the Clean Water Act and has

presented a difficult issue for this Court," citing <u>Rapanos</u>), 1482 (Thomas, J., dissenting) (noting plurality was dictum that did not bind the Court).

B.     Objections to Report and Recommendation, Motions for Summary Judgment

Central to judgment for either side is whether the Site had wetlands subject to the jurisdiction of the federal Government under the Clean Water Act; that is, whether that Site possesses wetlands (as defined in Army Corps regulations) abutting bodies of water that flowed into waters of the United States.  Wetlands thus need to be inundated; meet the Army Corps' three-part test of possessing wetland vegetation, hydric or wetland soil, and wetland hydrology; and must be connected to traditional navigable waters for federal jurisdiction to apply.  As noted in the comprehensive Report (Docket No. 334, 2018 WL 3861612) and as just posed, this major issue has several subsidiary issues, some requiring interpretation of the Clean Water Act and its regulations and ultimately determining whether there exist material issues of fact to preclude summary judgment to either party.

* * * *

The Report also raises a preliminary issue whether one issue is a question of fact or of law.  Initially, the Report declares that the required determination "that the Site contains wetlands that are 'waters of the United States,' as well as Ransom Creek is a TNW under the CWA" as "questions <u>of fact</u> for the jury" (Docket No. 334, R&R at 77, 2018 WL 3861612, at *27 (emphasis added)).  Later, the Report concludes that "whether the record establishes, as a matter of law, that the Site constitutes wetlands within the jurisdiction of the CWA, particularly with regard to § 404" was a "<u>question of law</u> for the court to resolve and need not be submitted as a question of fact, or mixed question of law

and fact, to the jury" (id. at 81 & n.55, 2018 WL 3861612, at *28 & n.55 (emphasis added)). That footnote referred to discussion at page 46 of the Report concluding that questions regarding Ray Kagel's interpretation of data in his expert opinion was a question that went "to the weight of the evidence to be afforded by the jury" (id. at 46 & n.41 (discussing defendants' right to trial by jury for liability phase but not for the penalty phase), 2018 WL 3861612, at *17 & n.41). The Report does not cite authority for viewing the question of whether wetlands are "waters of the United States" as a question of law.

As _de novo_ review of this matter, this Court determines that the question of the status of the Site's wetlands involves **factual** issues whether it meets the three-part Army Corps definition, is sufficiently inundated, and whether it is in a water system that eventually connects with a navigable waterway to be considered "waters of the United States" (under whatever standard for meeting that definition). The legal issues (as discussed below) involve the appropriate standard to apply those facts but those facts need to be proven to show whether the Site is wetlands.

This Court turns next to the stated issues of fact.

1. Identified Issues of Material Fact

The Report identifies several issues of material fact (Docket No. 334, R&R at 77, 91-93, 93-94, 95-97, 100-01, 2018 WL 3861612, at *27, 32-33, 33-34, 36) and the parties' Objections disagree. The first declared issue of fact is whether the Site contains "wetlands" that are part of the "waters of the United States" for Clean Water Act jurisdiction (id. at 77, 2018 WL 3861612, at *27). Next, the Report found an issue of fact whether Ransom Creek is a TNW (id. at 77, 101, 2018 WL 3861612, at *27, 36). The Report

posed as an issue of fact whether the Site contains wetland hydrology (id. at 91-93, 2018 WL 3861612, at *32-33), key to satisfying the definition of "wetlands."

Next, the Report contends another material issue of fact was whether PCC status could be abandoned by subsequent use (id. at 94-95, 2018 WL 3861612, at *32-33), leading to questioning the reasons for defendants' earth work on the Site and whether that manifested the intention to cease agricultural pursuits (id. at 94, 2018 WL 3861612, at *33-34).

To connect the wetlands on the Site (assuming wetlands are found there) to the "waters of the United States" there either needs to be a "continuous surface connection" between the two entities, Rapanos, supra, 547 U.S. at 742 (plurality opinion), leading to the material issue of fact whether in fact the Site's wetlands are so connected to Ransom Creek, the identified supposed TNW (id. at 97, 2018 WL 3861612, at *35).  For the alternative significant nexus standard under Rapanos, supra, 547 U.S. at 780 (Kennedy, J., concurring), the Report identifies a fact issue whether defendants' activities significantly affected the integrity of the waters or were these activities speculative or insubstantial (id. at 98, 2018 WL 3861612, at *35).

Finally for Count Two, the Report raises as an issue whether defendants engage in agriculture or construction or industrial activities to run afoul of their 402 permits (id. at 99-101, 2018 WL 3861612, at *35-36).

   2.  Defendants' Summary Judgment Motions (Docket No. 267)

      a.  "Wetlands" and the Site's Wetland Hydrology

The Government first argues that part of the Site was declared wetlands by the State of New York and that declaration thus resolves any fact issue about the nature of

the Site (Docket No. 338, Pl. Memo. at 3-5, 6 n.5).   Defendants counter that the Government did not assert this declaration in its motion for summary judgment and that the State's definition of wetlands has only one factor, wetland vegetation, in common with the federal standard and not the three factors required by the Army Corps (Docket No. 342, Defs. Memo. at 21-22).   Defendants conclude that the Government had the burden of proving that the Site's property also had hydric soil and wetlands hydrology to qualify as CWA wetlands (id.).   Defendants dispute the Government's reliance on the EDI wetlands declination of 2008 and the Government's expert findings and opinions (id. at 22).   And, as discussed below, defendants argue that the Government fails to prove that the area of the Site was "waters of the United States" (id. at 22-23).   Finally, defendants assert that the Government has not proved that fill was placed in the state-designated wetlands area (id. at 23).

Even on the Government's argument that wetlands found anywhere on the Site give it CWA jurisdiction (cf. Docket No. 338, Pl. Memo. at 3-4), the wetlands need to meet all the Army Corps' criteria, not just wetland vegetation.   Therefore, New York State declaration that a portion of the Site is wetlands (based solely on its vegetation) does not make that area CWA wetlands absent proof of hydric soil and water hydrology.   Hydric soil is not in dispute (see id. at 4; Docket No. 334, R&R at 90, 2018 WL 3861612, at *31; but cf. Docket No. 342, Defs. Memo. at 22 n.22 (noting the Government failed to provide evidence in its Objections supporting its contention that this portion of the Site exhibits hydric soils)).   For the state wetlands, defendants assert the parties' experts dispute whether that parcel meets the Army Corps criteria, rejecting the opinion of Government's expert Dr. Mary Anne Thiesing and the Government's reliance on the EDI study (Docket

No. 342, Defs. Memo. at 22; Docket No. 279, Defs. Memo. at 20-24; but cf. Docket No. 297, Pl. Reply Memo. at 6-8).

Putting to one side the section of the Site conceded to be state wetlands but possibly not <u>federal</u> wetlands, the one overarching disputed matter is the whether the Site contains wetland hydrology to be deemed wetlands. After this Court's Decision and Order on the expert admissibility issues (Docket No. 348, at 20-26), Ray Kagel and Dr. Busacca's opinions remain. Both defense experts conclude that there is insufficient wetland hydrology to qualify the Site as wetlands. The parties dispute the methodology and whether inundation is required to satisfy wetland hydrology. The Government, however, cites to the EDI study (originally procured by defendants for the purchase of the Site) and its expert's assessment that it showed wetland hydrology (Docket No. 338, Pl. Memo. at 7) with its expert, Jonathan Jones, demonstrating the hydrology on the site (<u>id.</u> at 10). Putting aside both Ray Kagel's dye test (deemed inadmissible in the prior Decision and Order, Docket No. 348, at 20-21) and the qualifiers of "likely" in Mr. Jones' report whether wetland hydrology was present (<u>cf.</u> Docket No. 334, R&R at 91, 2018 WL 3861612, at *32; <u>see</u> Docket No. 338, Pl. Memo. at 10), **issues of material fact still exist** whether the Site contains wetland hydrology to be federal wetlands due to the parties' dispute on what satisfies wetland hydrology. That dispute ultimately may turn into a battle of experts that cannot be resolved on a summary judgment motion. Therefore, for slightly different reasons, the Report **is adopted as modified** and the Government's objection on this matter (Docket No. 338) is **rejected**.

b.  "Waters of the United States"

1)  Vagueness

Defendants argue that the determination of jurisdictional wetlands under the Clean Water Act and relevant regulations is void for vagueness, given the three major opinions in Rapanos v. United States, 547 U.S. 715 (2006), interpreting the term "waters of the United States" (Docket No. 340, Def. Memo. at 1-6; see Docket No. 334, R&R at 85, 2018 WL 3861612, at *29-30).   They argue that they should be granted summary judgment because of the unconstitutional vagueness of the CWA's application to the Site (Docket No. 340, Def. Memo. at 6).   The chief objection is the lack of a single standard construing "waters of the United States."

The Rapanos Court presents three standards construing the definition for "waters of the United States."   Defendants are not arguing to select an opinion for the standard (but cf. Docket No. 340, Defs. Memo. at 4-5 (stating plurality's approach is the "'better'" standard than Justice Kennedy's)).   Rather, they contend that the existence of multiple opinions without a definitive holding make the phrase "waters of the United States" unconstitutionally vague and, as applied to defendants and other landowners, burdensome (id. at 2-6).

The problem starts with the CWA itself, cf. Sackett, supra, 566 U.S. at 133 (Alito, J., concurring) (calling for Congress to clarify definition of "waters of the United States" in the Act).   As the Court noted in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985), "Congress chose to define the waters covered by the Act broadly."   This left a definitional issue for "between open water and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are

not wholly aquatic but nevertheless fall far short of being dry land.  Where on this continuum to find the limit of 'waters' is far from obvious," id. at 132.

The Rapanos Court complicates matters by rendering multiple opinions without a dispositive holding from the Court construing the phrase "waters of the United States." Courts have applied one or all three decisions in determining what constitutes "waters of the United States" (see cases cited at III.A.5.b. pages 23 & notes 3, 4 supra).

Under the Fifth Amendment Due Process Clause, "a provision is void for vagueness if it is so vague that it gives no warning to the challenger that his conduct is prohibited," United States v. Harriss, 347 U.S. 612, 617 (1954); United States v. Sun and Sand Imports, Ltd., 725 F.2d 184, 187 (2d Cir. 1984).  This differs from the standard in criminal prosecutions, where the Fifth Amendment Due Process Clause protects against taking someone's life, liberty, or property upon "a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement," Johnson v. United States, 576 U.S. ___, 135 S.Ct. 2551, 2556 (2015); Robertson, supra, 875 F.3d at 1292-93; see also United States v. Lanier, 520 U.S. 259, 265 (1997) (based on principle "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed").  Having three opinions with different standards poses problems for defendants and other landowners.  They contend that they cannot guess what would be the narrowest or applicable standard (see Docket No. 340, Defs. Memo. at 4-5, cf. Marks, supra, 430 U.S. 188; Docket No. 334, R&R at 86, 2018 WL 3861612, at *30).

The post-Rapanos lower courts applying the Marks doctrine to identify the appropriate rule of decision uniformly choose an opinion (or opinions) for the standard

defining "waters of the United States" and rejected arguments that the law was unconstitutionally vague given the multiple opinions in Rapanos and no definitive holding of the Court, United States v. Rodriguez, No. CR-09-279, 2011 WL 1458231, at *6 (D. Idaho Apr. 15 2011); United States v. Lippold, No. 06-30002, 2007 WL 3232483, at *6 (C.D. Ill. Oct. 31, 2007); see also Robertson, supra, 875 F.3d at 1292-93 (see also cases cited at III.A.5.b., at pages 23, notes 3 and 4, supra). No court has held that the CWA is unconstitutionally vague (and defendants here have not shown this unconstitutionality) due to the plethora of constructions of the phrase found in Rapanos. Courts have applied one standard or another to define "waters of the United States" in the situations before them. While these courts have a variety of standards, all are derived from Rapanos (be it the plurality's continuous surface connection or Justice Kennedy's significant nexus). Therefore, challengers to the definition of "waters of the United States" have warning that their conduct may be prohibited, see also Rodriguez, supra, 2011 WL 1458231, at *6 (applying criminal standard for unconstitutional vagueness). The Supreme Court's decision in Marks provides guidance when the Court renders a splintered ruling: when the Court is fragmented, look to the position of the Justices who concur on the narrowest grounds, 430 U.S. at 193. This procedure eliminates the vagueness arising from multiple standards by focusing courts and litigants on the narrowest grounds. Until the Supreme Court revisits this issue (or absent congressional action), the only way to determine the appropriate standard is to rely upon the procedure in Marks, defendants' objections notwithstanding (but cf. Docket No. 340, Defs. Memo. at 5). This Court joins the other courts, Lucas, supra, 516 F.3d at 327-28 (applying criminal vagueness standard, holding defendants were on

notice "to the possibility that the wetlands were waters of the United States under the CWA" as well as notices of potential violation); Rodriguez, supra, 2011 WL 1458231, at *6; Lippold, supra, 2007 WL 3232483, at *6; see also Robertson, supra, 875 F.3d at 1292-93, and holds that the "waters of the United States" definition (as construed by Rapanos and subsequent cases) is **not void for vagueness**.

Defendants' Motion for Summary Judgment on the vagueness of the CWA provision (Docket No. 267) (and their Objection to the Report on this issue, Docket No. 340) is **denied**.

### 2)  Applicable Rapanos Standard

This Court still must determine which standard is applicable to decide whether the Site contains "wetlands" under the CWA, see Marks, supra, 430 U.S. at 193.  The County of Maui Court only discussed the Rapanos plurality opinion for reasons other than defining "waters of the United States," 2020 WL 1941966, at *8 (Breyer, J., for majority), 11 (Kavanaugh, J., concurring), 15 (Thomas, J., dissenting), 17 & n.4, 19 & n.5 (Alito, J., dissenting).  Each opinion in County of Maui noted here did not discuss Justice Kennedy's concurrence.  This appears consistent with post-Rapanos decisions by the Supreme Court; in these cases, the Court cites the plurality opinion, e.g., National Ass'n of Manufacturers v. Department of Defense, 583 U.S. ___, 138 S.Ct. 617, 625 (2018); cf. Sackett, supra, 566 U.S. at 123-24 (citing Roberts, C.J., concurring, noting parties will lack guidance after Rapanos), but generally without citing Justice Kennedy's concurrence.  One case cited the plurality and Justice Kennedy's concurrence when these opinions agreed upon the interstate commerce standard for defining navigable waters, PPL Montana, LLC v. Montana, 565 U.S. 576, 592 (2012)

34

(citing the navigable in fact formulation from The Daniel Ball, 10 Wall. 557 (1871)).

County of Maui, 140 S.Ct. 1462, supra, does not discuss the holding of Rapanos and

the applicable rationale.  The closest discussion is Justice Alito recognizing the difficulty

the Court has had with the "waters of the United States" definition, id. at 1484 n.4.

In supplemental briefing on County of Maui, defendants argue that this decision

reinforced congressional intention to restrict the CWA "to protect the nation's traditional

navigable waters ('TNWs') without infringing on States' rights to regulate land use and

isolated waters" (Docket No. 346, Defs. Memo. at 2) and County of Maui was in a long

line of decisions (including Rapanos) "in which the Supreme Court has attempted to

define the jurisdictional limits of the CWA" (id. at 3; see also id. at 2, 3-6).  Defendants

then recounted EPA and Army Corps regulations after the start of this case construing

Rapanos in the "broadest permissible reading" until the agencies retrenched this April

that the agencies recognized the primacy of states in regulating land and water

resources (id. at 6-7, citing U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'r, The

Navigable Waters Protection Rule:  Definition of "Waters of the United States", 85 Fed.

Reg. 22,250 (Apr. 21, 2020) ("NWPR")).  They also note that under the new Navigable

Waters Protection Rule artificial, man-made ditches (as here connecting the Site to

Ransom Creek) are excluded from the definition of waters of the United States (id. at 7

n.4).  But these regulations post-date defendants' activities of 2006-08.

The Government argues that County of Maui was not applicable here because

the direct discharge into waters of the United States was not in dispute in the case at

bar, while County of Maui involved an indirect discharge (Docket No. 347, Pl. Memo. at

1, 3).  The Government reasserts that defendants "directly discharged pollutants (dirt,

fill, and redeposited vegetation) from point sources (mechanized equipment) into navigable waters (wetlands on the Site that are waters of the United States)" (id. at 3-4) and defendants discharged "sediment-laden storm water that was directly conveyed through ditches (a series of point sources) into Ransom Creek (a water of the United States), and then on to Tonawanda Creek and the Erie Canal (also waters of the United States)" (id. at 4).

What remains in dispute after County of Maui (and contrary to the Government's argument) is whether these pollutants and stormwaters are going into "waters of the United States."  The Court in County of Maui, while resting on the plurality opinion of Justice Scalia in Rapanos for other reasons, did not adopt its standard for defining "waters of the United States"—the issue in Rapanos.  The County of Maui Court did not use that case as an opportunity to clarify that definition; the issue there was the scope of the Clean Water Act for groundwater pollution that eventually reached the Pacific Ocean, 140 S.Ct. at 1469; see also id. at 1478 (Kavanaugh, J., concurring).  The Pacific Ocean was clearly a water of the United States, id. at 1469; Clean Water Act § 502(12), 86 Stat. 816, 886; see 33 C.F.R. § 328.3(a)(1), (2), (6) (Army Corps definition), 40 C.F.R. § 232.3 (EPA definition of "waters of United States" include waters susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of tides; all interstate waters; territorial sea), so the definitional issue here did not arise.  Almost exclusive citation to Rapanos' plurality opinion (although termed by one justice to be "dictum," 140 S.Ct. at 1482 (Thomas, J., dissenting)) does not mean that the County of Maui Court adopted its definition or definitional standard as the proper construction of "waters of the United States."  Again,

until the Supreme Court or Congress[5] revisit this definition, the applicable law is the fractured opinions from Rapanos.

Applying the narrowest result agreed to by the Justices in Rapanos, see Marks, supra, 430 U.S. at 193, the applicable standard is Justice Kennedy's **significant nexus standard**, Rapanos, supra, 547 U.S. at 759, 782; see also Robertson, supra, 875 F.3d at 1290-92; United States v. Robison, 505 F.3d 1208, 1221 (11th Cir. 2007), reh'g denied, 521 F.3d 1319 (11th Cir.), cert. denied, 555 U.S. 1045 (2008); Gerke Excavating, supra, 464 F.3d at 724; Northern Cal. River Watch, supra, 457 F.3d at 1029-30.  As found in Robison, supra, 505 F.3d at 1221, Justice Kennedy's concurrence is "less far-reaching (i.e., less-restrictive of CWA jurisdiction)" than the plurality's opinion.  Justice Kennedy's test "at least in wetlands cases such as Rapanos, will classify a water as 'navigable' more frequently than Justice Scalia's test," id., because Justice Kennedy's rejection of two limitations in the plurality's view, that the navigable waters need to be "relatively permanent, standing or flowing bodies of water" and the requirement of a "continuous surface connection," id. (quoting Rapanos, supra, 547 U.S. at 768-73 (Kennedy, J., concurring), 732, 742 (plurality opinion).  This Court thus disagrees with the Government (Docket No. 338, Pl. Memo. at 10) and the Report (Docket No. 334, at 88-98, 98-99, 2018 WL 3861612, at *30-35, 35-36) that applied both the plurality's standard of continuous surface connection and the significant nexus standards.

---

[5]A third avenue is the regulatory route.  As noted below, the Army Corps and the EPA recently enacted the Navigable Waters Protection Rule, 85 Fed. Reg. 22,250 (Apr. 21, 2020, effective June 22, 2020), which revises the agencies' construction of "waters of the United States" wherein the agencies meld the plurality and Kennedy's concurrence in their definition.

In many cases, the significant nexus standard would include areas that would be deemed "waters of the United States" under the continuous surface connection standard, cf. U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States (Dec. 2, 2008) at 6-7, 8 n.31 (Docket No. 273, Pl. Ex. 29, at 6-7, 8 n.31) ("Joint Guidance").  In 2007, in response to the Rapanos decisions, the EPA and Army Corps jointly issued internal guidance for implementing Rapanos; that guidance was updated effective December 2, 2008, Joint Guidance (Docket No. 273, Pl. Ex. 29).  In discussing Rapanos, the agency concluded that

> "where there is no majority in a Supreme Court case, controlling legal principles may be derived from those principles espoused by five or more justices.[15]  Thus, regulatory jurisdiction under the CWA exists over a water body if either the plurality's or Justice Kennedy's  standard is satisfied,[16]"

(Docket No. 273, Pl. Ex. 29, at 3, citing, at note 15, Marks, supra, 430 U.S. at 193-94, other citation omitted; at note 16 citing Rapanos, supra, 547 U.S. at 810 (Stevens, J., dissent), remaining text omitted).  This guidance is reflected in the Government's present position interpreting Rapanos in this manner (Docket No. 273, Ex. 29, at 3; see Docket No. 338, Pl. Memo. at 10).  This guidance provides that wetlands adjacent to TNW are determined without the waters being in continuous surface connection (Docket No. 273, Ex. 29, at 5; see id. at 8 n.31 ("agencies will assert jurisdiction, without the need for a significant nexus finding, over all wetlands that are both adjacent and have a continuous surface connection to relatively permanent tributaries," citing id. at 6-7).  Where certain adjacent wetlands are not adjacent to navigable tributaries to TNW, the agencies assert jurisdiction when these waters "have a significant nexus with a traditional waterway:  (1) non-navigable tributaries that are not relatively permanent,

(2) wetlands adjacent to non-navigable tributaries that are not relatively permanent, and

(3) wetlands adjacent to, but not directly abutting, a relatively permanent tributary (e.g., separated from it by uplands, a berm, dike or similar feature)" (id. at 8, footnote omitted).

### 3)  Fact Issue for Wetlands

Applying the substantial nexus standard from Justice Kennedy's concurrence, the Government contends that the Site meets that standard from the change of volume in water from the Site after defendants' activities (Docket No. 269, Pl. Memo. at 30-31) despite arguing that it did not have to prove the amount of pollutant that reached a TNW (Docket No. 338, Pl. Memo. at 12-13).   The Government rests on the opinion of its expert, Jonathan Jones, that "the destruction of the wetlands through ditching increased the risk of downstream flooding, with 2.75 times more water leaving the Site as runoff in post-disturbance conditions" (id. at 13; Docket No. 269, Pl. Statement ¶ 54 (Site's wetlands "had a significant physical impact on Ransom Creek," citing factors)).

Defendants counter and agree with the Report (Docket No. 334, R&R at 88-89, 2018 WL 3861612, at *31) that the substantial nexus test "is highly fact-specific and cannot be resolved on a summary judgment motion (Docket No. 342, Defs. Memo. at 14-15).  The Government differs, citing examples of cases resolving waters of the United States questions under the significant nexus standard on summary judgment (Docket No. 338, Pl. Memo. at 1 n.1 (citing cases),12).

This Court agrees with the Government that whether significant nexus has been met for a body of water to be deemed "waters of the United States" can be resolved on summary judgment.  First, defendants cite the District of Massachusetts' decision in

Vander Salm v. Bailin & Associates, supra, 2014 WL 1117017, at *4, that the significant nexus "test is highly fact-specific and cannot be resolved on summary judgment" (Docket No. 342, Defs. Memo. at 14-15).   In Vander Salm, plaintiffs declined the alternative argument (allowed in the First Circuit United States v. Johnson, supra, 467 F.3d at 64; Vander Salm, supra, 2014 WL 1117017, at *4) on summary judgment that the significant nexus test established that CWA jurisdiction applied in their case, 2014 WL 1117017, at *4.  "While Plaintiffs [there] contend that CWA jurisdiction applies under either test [significant nexus or continuous surface connection], they, acknowledging that the test set forth by Justice Kennedy is highly factual and thus less conducive to summary judgment, only argue here that the CWA applies based on the plurality's test," id. (emphasis added).  The court did not hold that summary judgment was not appropriate for applying the significant nexus standard.

Defendants cite to a portion of Justice Kennedy's concurrence, Rapanos, supra, 547 U.S. at 782 (concurrence), apparently referring to "establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries."   Justice Kennedy did not say that the significant nexus standard could not be determined on a motion for summary judgment.  In one of the two cases heard in Rapanos, in Carabell, the Army Corps had moved (successfully) for summary judgment, id. at 765 (Kennedy, J., concurring).  Justice Kennedy then noted that the record in Carabell (as well as in Rapanos) "contains evidence suggesting the possible existence of a significant nexus," id. at 783; see id. at 785-86 (Kennedy, J., concurring) (Carabell record), but the cases were remanded because the courts did not properly consider the issue under the controlling legal standards, id. at 783.  Justice

Kennedy cautioned in Carabell's case that conditional language in assessments by the Army Corps "could suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps' claims," id. at 786, including missing factors like the "quantity and regularity of flow in the adjacent tributaries," id. Justice Kennedy "would vacate the judgments of the Court of Appeals and remand for consideration whether the specific wetlands at issue possess a significant nexus with navigable waters," id. at 787 (Kennedy, J., concurrence).

Magistrate Judge Foschio, in rejecting the significant nexus standard, found in the Report that the standard was too "nebulous for resolving on summary judgment whether the Site contains wetlands, requiring a determination as to whether particular wetlands 'significantly affect the chemical, physical, and biological integrity of other covered waters'" (Docket No. 334, R&R at 88, 2018 WL 3861612, at *31). On a record addressing the chemical, physical, and biological integrity of wetlands and the adjacent waterways, summary judgment can be determined; if a litigant raises material issues of fact as to the nature of a wetland, then summary judgment should be denied. Thus, determination of whether the Army Corps (or the EPA) meets the threshold of substantial evidence to support the claim that significant nexus exists between wetlands and a TNW can be done in a motion for summary judgment. As required by Justice Kennedy, if the EPA or Army Corps present "substantial evidence supporting" their claim that the wetlands have a significant nexus with a waterway, id. at 786 (Kennedy, J., concurring), then summary judgment should be granted to the Government.

The Government here introduced evidence purporting to connect the Site's wetlands with Ransom Creek (Docket No. 269, Pl. Statement ¶¶ 54-56) applying (in the

alternative) the significant nexus standard (id.).  As for the physical impact of the Site on Ransom Creek, the Government's experts reported on the effect of the flow of flood waters from the Site to Ransom Creek (id. ¶ 54).  Jonathan Jones predicted that the runoff from the Site was more than 2.75 times more water after 2008 and defendants' activities than before (id. ¶ 54f.).  Other Government experts opined about the significant biological impact of the Site on Ransom Creek from organisms found in Ransom, Black, and Tonawanda Creeks that were in the Site (id. ¶ 55).  As for significant chemical impact on Ransom Creek from the Site, the Government produced experts attesting to the water quality in the ditches leaving the Site, with water quality degraded following defendants' activities (id. ¶ 56e.).  The Government also produced witnesses for stormwater discharges from the Site into ditches (id. ¶ 57).  One Government expert observed "turbid (sediment laden) runoff from" the Site into ditches then to the East Millersport Highway ditch (id. ¶ 57b.) then to Ransom Creek with water samples containing nitrate, total phosphorous, and total suspended solids (id. ¶ 58).

Defendants respond that the Site did not contain wetlands first because the land was not inundated or saturated for fourteen consecutive days in most years (Docket No. 279, Defs. Statement ¶¶ 54-56, 83-88).  This was considered above in discussing wetlands hydrology.  Defendants also deny the Government's allegations of significant physical impact to Ransom Creek, criticized the Government's experts for not quantifying the impact or potential impact (id. ¶ 54a.).  Specifically, defendants fault the premises of Government expert Jonathan Jones on the source of runoff into the Millersport Highway ditch, since some runoff may have come from the Highway itself (id. ¶ 54f.).  They conclude that these experts considered outflow from these ditches with

the Site in error (id. ¶ 55c., d.).  As for stormwater discharge, defendants argue that the Government has no witnesses to observing pollutants from the Site flowing into ditches as rain runoff (id. ¶ 57).  They counter that the tests conducted by the Government's expert did not control for Highway runoff (id. ¶ 58).

As stated above regarding wetlands hydration, the extent of inundation in the Site is a **material issue of fact** precluding summary judgment.  The other evidence the Government points to for significant nexus between the Site and Ransom Creek also raise material issues of fact.  For example, for the biological impact, there is a question whether the Site was the source for invertebrate life found in ditches leading to Ransom Creek or whether that life exists only within the ditches themselves (see Docket No. 279, Defs. Statement ¶ 55b.).  The Government points to wildlife in the culvert as showing biological impact of the Site's wetlands on Ransom Creek (Docket No. 269, Pl. Statement ¶ 55d., f., g.) but the Government does not show that these creatures came from the Site.  The direction of water flow also is at issue (see Docket No. 279, Defs. Statement ¶ 57a.).  Many of the Government's proffered facts and expert opinions make general statements about the impact of wetlands on adjoining waterways and not what this Site itself produced.  The Government also states the purported impact of defendants' activities on the Site on the waters (cf. id. ¶¶ 54, 55 h., 56 e.-f.).  Contrast the Army Corps' evaluation in Carabell (as reported in Justice Kennedy's concurrence in Rapanos, supra, 547 U.S. at 785), which focused on the pollutants that might enter from that wetlands and the destruction that might occur if those plaintiffs' work proceeded.

To preclude questions of fact the Government needs to produce evidence that establishes these factors and show the significant nexus between the Site and Ransom Creek despite the mile and a half distance between the two areas (see Docket No. 334, R&R at 14, 2018 WL 3861612, at *5) or what defendants term four miles between the Site and the nearest navigable-in-fact TNW (as deemed by defendants, Tonawanda Creek) (Docket No. 346, Defs. Memo. at 11; see Docket No. 279, Defs. Statement ¶¶ 51, 53 (denying that Ransom Creek is a TNW)).  As with other parts of this case, these impact factors are reduced to a dispute between the Government's experts and defense experts.

Again, the significant nexus standard can be determined on a summary judgment motion; here there are **issues of material fact that preclude granting judgment in this case**.  This Court, however, finds these issues of fact that differ with the findings in the Report (cf. Docket No. 334, R&R at 98, 2018 WL 3861612 at *35).  That Report relied upon the dye testing of Ray Kagel to establish the material issue of fact (id.) which this Court separately has deemed that testing inadmissible (Docket No. 348, Decision and Order at 21).  Even without that testing, issues of material fact remain for adjudication.

c.  Ransom Creek as Traditional Navigable Waterway

Under the plurality's continuous surface connection or Justice Kennedy's significant nexus standard, the waters involved ultimately need to be navigable in order to be "waters of the United States" for CWA purposes (see Docket No. 334, R&R at 95-97, 2018 WL 3861612, at *34).  Defendants contend that navigability is defined by

navigation in fact (Docket No. 342, Defs. Memo. at 15), minimally raising an issue of fact here whether Ransom Creek is navigable-in-fact (id.).

Using the significant nexus standard, Justice Kennedy (as well as Justice Scalia for the plurality, Rapanos, supra, 547 U.S. at 730-31), contends that Congress intended to regulate "at least some waters that were not navigable in the traditional sense," id. at 767 (Kennedy, J., concurring).  The "Act contemplates regulation of certain 'navigable waters' that are not in fact navigable," id. at 779, see id. at 768 (Kennedy, J., concurring).  Relying upon the holding in Riverside Bayview, supra, 474 U.S. at 133, Justice Kennedy gave "navigable" "limited import," upholding the Army Corps' judgment that certain "'wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water,'" Rapanos, supra, 547 U.S. at 779 (Kennedy, J., concurring) (quoting Riverside Bayview, supra, 474 U.S. at 135).  Justice Kennedy's conclusion was that the integral parts of the aquatic environment found in Riverside Bayview was the "significant nexus with navigable waters" that is his touchstone for defining what are waters of the United States, id.  Significant nexus thus defines the navigable nature of the waters in question; "with the need to give the term 'navigable' some meaning, the Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense," id.  The concurrence focused on the wetlands end of the equation, see id. at 779-80, but then left for the Army Corps to determine whether a particular tributary had the sufficient volume of flow (either annually or on average),

proximity to navigable waters, or other relevant considerations to deem that tributary to be part of a system leading to navigable waters, id. at 780-81.

The Report focused on obstructions in Ransom Creek that raised a fact question whether it was passible or the duration of the interruptions to its flow (Docket No. 334 R&R at 96-97, 2018 WL 3861612, at *34).  This focuses on the navigability of the stream and just one factor Justice Kennedy identified in determining whether a tributary was part of navigable in fact waterway's system.  Justice Kennedy, however, deferred to the Army Corps in its finding whether a tributary meets this standard, id. at 780-81.  In 2008, the Army Corps declared Ransom Creek to be a navigable waterway (see id. at 96, 2018 WL 3861612, at *34).  This Court also defers to the agency's finding, thus there is **no issue of fact as to the status of Ransom Creek as a TNW**.  The Government's objection (Docket No. 338) on this point is **granted**.

### d.  Prior Converted Cropland

#### 1)  Abandonment of PCC Status and Huntress

In Huntress, this Court discussed prior converted cropland status for the Site and held that this status could be abandoned under the rules for the EPA and Army Corps, Huntress, supra, 2013 WL 2297076, at *10-14, Docket No. 42, Order at 19-27.  The regulations were based upon EPA (and not USDA) rules that acknowledged that land use changes could lead to abandonment of PCC status, id. at *11-13, Order at 22-24, that the abandonment rule was of long standing despite publication only in the Federal Register and not subsequent codification in the Code of Federal Regulations, id. at *13, Order at 25.  This Court held that "thus, contrary to Plaintiffs' argument, a complete and enforceable rule is created when the Code of Federal Regulations, which excludes prior-

converted croplands from the definition of 'waters of the United States,' is read in conjunction with the Federal Register, which defines 'prior-converted croplands' and subjects them to abandonment," id. at *14, Order at 26-27, citing Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 158 (1982); Chico v. Schweiker, 710 F.2d 947, 954 (2d Cir. 1983); Louisiana Envtl. Action Network v. United States, 172 F.3d 65, 69 (D.C. Cir. 1999).  This Court concluded that "the Transit property's status as a 'prior-converted cropland' is subject to the EPA's and the Corps' provisions on abandonment," thus denying this case's defendants' motion in Huntress for summary judgment, Huntress, supra, 2013 WL 2297076, at *14, Order at 27.

In the present motions, defendants argue that as a matter of law PCC status cannot be abandoned (Docket No. 337, Defs. Memo. at 1-2, 7-9; Docket No. 342, Defs. Memo. at 13).  Factually, defendants contend that there are issues of fact (as found in the Report, Docket No. 334, at 93-95, 2018 WL 3861612, at *33-34) whether farming in fact ceased for five or more consecutive years to trigger abandonment of PCC status (Docket No. 342, Defs. Memo. at 13).

The Government argues that the EPA defined PCC "to exclude abandoned farmland—that is cropland that has not been used at least once every five years for agricultural purposes—that exhibits wetlands characteristics" (Docket No. 343, Pl. Memo. at 13 (citing 58 Fed. Reg. 45,034) & n.4 (despite changed interpretation by the USDA, interpreting PCC for Clean Water Act purposes "[n]otwithstanding the determination of an area's status as prior converted cropland by another Federal agency," 33 C.F.R. § 328.3(a)(8) (1994)).  The Government concedes that "abandonment" does not appear in 33 C.F.R. § 328.3(a)(8), but abandonment of PCC status can be subject to

interpretation (id.). The Government reaffirms that PCC status can be abandoned if agricultural use ceases for five consecutive years, as held by this Court in Huntress, supra, 2013 WL 2297076, Docket No. 42 Order (Docket No. 338, Pl. Memo. at 8 (citing Huntress); Docket No. 343, Pl. Memo. at 12-13 (allusion to Huntress Order, at 13).

The EPA and the Army Corps initially align their abandonment rule with the then-USDA's NRCS (formerly SCS) rule, 16 U.S.C. §§ 3801-3862, 3822(b)(1)(G), Huntress, supra, 2013 WL 2297076, at *10-11, Order at 19-20; 1993 Clean Water Rule, 58 Fed. Reg. at 45,033-34 (Aug. 25, 1993) (Docket No. 334, R&R at 93-94, 2018 WL 3861612, at *33).   Prior converted cropland is considered abandoned unless once in five years some agricultural commodity is produced on that property, 58 Fed. Reg. at 45,034; Huntress, supra, 2013 WL at *10, Order at 20.  As previously held in Huntress, supra, 2013 WL 2297076, at *10, Order at 19, PCC status

> "can be lost if the land is not used for farming purposes for five consecutive
> years.  As explained in the relevant Federal Register preamble, the EPA
> and the [Army] Corps excluded prior-converted croplands 'to ensure
> consistency in the way various federal agencies are regulating wetlands.'
> 58 Fed. Reg. 45008, 45034 (August 25, 1993).  In this vein, the agencies
> used the abandonment provisions set out by the Soil Conservation
> Service—an arm of the United States Department of Agriculture . . . that is
> now called the National [sic] Resources Conservation Service—and applied
> them to the CWA."

Id. at *10, Order at 19.  While interagency consistency caused the EPA and the Army Corps to adopt USDA abandonment principles, when the USDA changed that abandonment policy with its repeal by the 1996 amendments to the Food Security Act, 61 Fed. Reg. 52,664, 52,669 (Oct. 7, 1996); 61 Fed. Reg. 47,019, 47,021 (Sept. 6, 1996); see Huntress, supra, 2013 WL 2297076, at *11, Order at 20, the EPA and the Army Corps did not; see also NWPR, supra, 85 Fed. Reg. at 22,255 (Army Corps and EPA did not update PCC regulations following 1996 amendments to Farm Security Act).  This Court

held that the EPA under its power to issue rules implementing the CWA enacted an abandonment rule that mirrored the USDA's rule and it was "inconsequential that the USDA's rule was subsequently amended by statute.  In other words, simply because the rule on which the EPA based its own rule was changed, does not, ipso facto, render the EPA's rule changed," id. at *11, Order at 22.  While Congress amended the Food Security Act (requiring revision of the USDA's abandonment policy) the CWA was not amended, see id. at *12, Order at 22-23; see also United States v. Cam, No. 3:05cr141, Opinion and Order at 27 (D. Or. Dec. 21, 2007) (unpublished).  The EPA could (and has) retain the abandonment rule despite the apparent inconsistency with another federal agency for the agencies operate under different congressional mandates.   The EPA retained "'ultimate statutory responsibility for determining the scope of CWA jurisdiction,' 58 Fed. Reg. 45008-01, 45033; 33 C.F.R. § 328.3(a)(8)," Huntress, supra, 2013 WL 2297076, at *12, Order at 22.

Defendants renewed their argument in the defense summary judgment motion that this Court erred in holding in Huntress that abandonment was possible (Docket No. 279, Defs. Memo. at 37), contending that abandonment was repealed in 1996 in the Farm Bill (id., citing 16 U.S.C. § 3822) and that the EPA and the Army Corps did not promulgate their own rule (id.).  Defendants reaffirm this position in their Objections (Docket No. 337, Defs. Memo. at 7-9).

The Government countered that the Huntress Order was law of the case (Docket No. 297, Pl. Memo. at 15), and its reasoning has been adopted by other courts (id., citing Orchard Hill Bldg. Co. v. U.S. Army Corps, No. 15-cv-06344, 2017 WL 415072, at *11 (N.D. Ill. Sept. 19, 2017), vacated on other grounds, 893 F.3d 1017 (7th Cir. 2018)).

49

The Seventh Circuit in <u>Orchard Hill</u>, in vacating the judgment for the Army Corps that held that the wetlands there were "waters of the United States," declined to reach the Army Corps' interpretation of "prior converted cropland" to exclude lands abandoned for five or more years as a legislative rule that violated the Administrative Procedure Act notice and comment requirement, 893 F.3d at 1020 n.2.

This Court notes, however, that another district court held that the change of use policy related to PCC was never promulgated as a rule and hence was unlawful, <u>New Hope Power Co. v. U.S. Army Corps of Eng'rs</u>, 746 F. Supp. 2d 1272, 1282 (S.D. Fla. 2010); <u>see</u> NWPR, <u>supra</u>, 85 Fed. Reg. at 22,255 (<u>cf.</u> Docket No. 343, Pl. Reply Memo. at 13).  The change of use without full rulemaking in <u>New Hope Power</u> was not abandonment of PCC status, rather it was the Stockton Rules that regulated shifts to non-agricultural use of PCC rendered the property subject to CWA regulation, 746 F. Supp. 2d at 1276, 1281-82.  The court in <u>New Hope Power</u> recognized abandonment as the sole basis for changing PCC's status, <u>id.</u> at 1282 (the Stockton Rules created "a second exception, in addition to abandonment, whereby prior converted croplands can lose their exempt status").

The Government also states that the Report misidentifies the agricultural statute as authority for the abandonment under the PCC for CWA (Docket No. 338, Pl. Memo. at 10 n.6; <u>cf.</u> 16 U.S.C. § 3822(b)(1)(G)).  As just discussed above, however, the origin of the abandonment of prior converted cropland came from that agriculture statute as regulations were promulgated by the SCS and its successor NRCS.  The EPA (and the Army Corps) adopted the then-existing SCS/NRCS abandonment regulations for defining wetlands and PCC under the CWA.  The Report is correct in the origin of the

EPA and Army Corps regulations, but their continuation is independent of 16 U.S.C. § 3822.

Thus, defendants' motion to (in effect) reject this Court's decision in <u>Huntress</u> and now hold that abandonment of PCC status was not possible is **rejected**. The EPA and Army Corps could (as they did until 1996) seek consistent policies regarding wetlands with other relevant agencies (such as the SCS and its successor), but where (as occurred after the Food Security Act amendment in 1996) Congress dictated different policies to these agencies, the EPA and Army Corps can regulate the CWA to reflect its priorities (also as set by Congress) that differ from the USDA.

2)  Enactment of EPA and Army Corps Abandonment Regulations

One issue is the effect of a preamble to the Federal Register as a binding regulation. The Report accepted this preamble and held that PCC can be abandoned if agricultural use ceased (Docket No. 334, R&R at 93-94, 2018 WL 3861612, at *33). Defendants argued that "general policy statements not included in the Code of Federal Regulations do not have the force of law and are not binding on the public, or the agency" (Docket No. 279, Defs. Memo. at 37, citing <u>Brock v. Cathedral Bluffs Shale Oil Co.</u>, 796 F.2d 533, 539 (D.C. Cir. 1986); <u>see also</u> <u>Natural Resources Defense Council v. EPA</u>, 559 F.3d 561, 565 (D.C. Cir. 2009)) (<u>see also</u> Docket No. 334, R&R at 94, 2018 WL 3861612, at *33). This Court declined to extend <u>Brock</u> to this case, <u>Huntress</u>, <u>supra</u>, 2013 WL 2297076, at *13, Order at 24-25. In <u>Huntress</u>, this Court compared the regulation considered in <u>Brock</u> with the PCC abandonment rule presented here. In <u>Brock</u>, then-Judge Antonin Scalia said "our conclusion is not at all cast in doubt by the fact that the Secretary's guidelines were published in the Federal Register. <u>Failure</u> to

publish in the Federal Register is indication that the statement in question was <u>not</u> meant to be a regulation," 796 F.2d at 539 (emphasis in original), but "the converse, …, is not true:  <u>Publication</u> in the Federal Register does <u>not</u> suggest that the matter published <u>was</u> meant to be a regulation, since the [Administrative Procedure Act] requires general statements of policy to be published as well," <u>id.</u> (again, emphasis in original) (citations omitted).  The sentence defendants emphasize from <u>Brock</u> (<u>see</u> Docket No. 279, Defs. Memo. at 37) is "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability <u>and legal effect</u>,' 44 U.S.C. § 1510 (1982) (emphasis added)," <u>Brock</u>, 796 F.2d at 539.  The Secretary of Labor in <u>Brock</u> "took pain to exclude the enforcement guidelines from the final rule, and directed that they not be published with the rule in the Code of Federal Regulations," <u>id.</u>

This Court in <u>Huntress</u> distinguished the Secretary of Labor's handling of the policy statement in <u>Brock</u> from the EPA (and Army Corps) with PCC abandonment; the latter agencies "long understood its rule on prior-converted croplands to contain an abandonment provision," <u>Huntress</u>, <u>supra</u>, 2013 WL 2297076, at *13, Order at 25.  Also, unlike that statement in <u>Brock</u>, the PCC abandonment statement was "not precatory or tentative; it does not leave room for discretion in its application, and it does not offer simply suggested protocol," <u>id.</u> at *13, Order at 26.

In <u>Natural Resources Defense Council v. EPA</u>, 559 F.3d at 564-65, the D.C. Circuit discussed preamble statements, noting that they may "in some unique cases constitute binding, final agency action susceptible to judicial review, <u>Kennecott Utah</u>

Copper Corp. v. Dep't of Interior, 88 F.3d 1191, 1222-23 (D.C. Cir. 1996), this is not the norm," cautioning that "Agency statements 'having general applicability and legal effect' are to be published in the Code of Federal Regulations.  Federal Register Act, 44 U.S.C. § 1510(a)-(b); 1 C.F.R. § 8.1; see Brock [supra, 796 F.2d at 539]." The CWA abandonment policy for PCC status is a unique case.  As seen in this case, the abandonment policy has been susceptible to judicial review, unlike the changes in particulate requirements buried in a policy statement in Natural Resources Defense Council v. E.P.A., 706 F.3d 428, 432 (D.C. Cir. 2013), in which the D.C. Circuit reaffirmed its position on the preamble statements not published in the Code of Federal Regulations.  The D.C. Circuit in the earlier Natural Resource Defense Council case also held that "Agencies must publish substantive rules in the Federal Register to give them effect," 559 F.3d at 565; see Natural Resource Defense Council v. National Highway Traffic Safety Admin., 894 F.3d 95, 106 (2d Cir. 2018) ("a regulation is not 'prescribed' until it has legal effect, and it does not have legal effect until it is published in the Federal Register").  The preamble in dispute here was published in the Federal Register.  The preamble here has "independent legal effect" turning on the agencies' "intention to bind itself or regulated parties," Kennecott, supra, 88 F.3d at 1223.  The abandonment preamble is sufficiently clear that the EPA and Army Corps intended it to be binding; these agencies adopted the then-SCS regulation to have consistency in land use among agencies dealing with farmed wetlands and (for the EPA and Army Corps) to define what is and is not wetlands under the CWA, 58 Fed. Reg. at 45,034, 45,008, 45,031-32.  These agencies received public comment on these changes, id., at 45,008-09, 45,031-32, specifically about the abandonment provision, id. at 45,033-34.

Even though the USDA no longer determines abandonment of PCC, the EPA and Army Corps retained their abandonment standards. The fact that these agencies manifested their decision through a preamble published in the Federal Register is of no moment. This Court **adheres to the earlier ruling** in <u>Huntress</u>, <u>supra</u>, 2013 WL 2297076, at *13-14, Order at 24-27, as well as the Report's recommendation (Docket No. 334, at 94, 2018 WL 3861612, at *33), and again holds that PCC status can be abandoned under unaltered EPA and Army Corps regulations and despite USDA's congressionally-mandated alteration of its abandonment regulation. Defendants' motion on this ground (<u>see</u> Docket No. 279, Defs. Memo. at 37; Docket No. 337, Defs. Memo. at 1-2, 7-9; Docket No. 342, Defs. Memo. at 13) is **denied**.

This Court notes that the Navigable Waters Protection Rule (effective June 22, 2020) expressly includes in the definition of "prior converted cropland" an abandonment provision, that if land is not used for agricultural purposes (including leaving it fallow for conservation or agricultural purposes) for five consecutive years and the land reverts to wetlands, PCC status is deemed abandoned, NWPR, 85 Fed. Reg. at 22,320-21, 22,339 (to be codified at 33 C.F.R. § 328.3(c)(9)).

3) Factual Issue--Abandonment

Next is the issue whether the Site in fact lost PCC status by the time defendants' acquisition in 2005 due to non-agricultural use. The Report found abandonment was a material issue of fact due to the duration of the cessation of agricultural activity (Docket No. 334, R&R at 93, 94-95, 2018 WL 3861612, at *33-34).

Disputing the evidence of cessation of farming for at least five consecutive years, defendants contend that "as long as farm maintenance activities continued, which they

54

did, PCC was not abandoned" (Docket No. 342, Defs. Memo. at 13).  They point to the testimony of former owner Craig Duff that he farmed the Site until 1980 (Docket No. 280, Duff Dep. Tr. at 90-92; see Docket No. 334, R&R at 11, 2018 WL 3861612, at *4) and witnessed Badding Brothers farm the property until the late 1980s and early 1990s (Docket No. 279, Defs. Memo. at 39; Docket No. 279, Defs. Statement in Opposition ¶¶ 99-100, 106-13).  Duff also testified that for every two years he cleared the Site with a brush hog which defendants claim was to maintain it for crop production (Docket No. 279, Defs. Memo. at 39; Docket No. 279, Defs. Statement in Opposition ¶ 112; Docket No. 280, Ex. 10, Duff Aff. of Apr. 17, 2009, ¶¶ 13-14 (farming in the early 1990s); Docket No. 296, Pl. Ex. B, Duff Dep. Tr. at 92 (observed Badding Brothers farm Site), 101, 114 (witnessed farming in 1990s)), maintaining it by "brush-hogging the Property (a normal farming practice)" (Docket No. 279, Defs. Statement in Opposition ¶ 112), which the Report acknowledges (Docket No. 334, R&R at 11 (that Duff "continued to clear the Site"), 2018 WL 3861612, at *4).  Duff described a brush hog as "a big lawn mower on the back of your tractor" (No. 296, Ex. B, Duff Tr. at 90).

The Government relies upon the testimony of Duff discussing his sale of the property and the end of farming there in 1980 (Docket No. 338, Pl. Memo. at 9; Docket No. 296, Ex. B, Duff Dep. Tr.); the testimony of Joseph Jayson, the owner through his company Realmark of the Site from 1988 to defendants' acquisition in 2006 (Docket No. 334, R&R at 11-12, 95, 2018 WL 3861612, at *4, 33; Docket No. 269, Pl. Statement ¶ 12); and expert evidence (aerial photography analysis of the Site) to conclude that the Site was not farmed since 1988 (Docket No. 338, Pl. Memo. at 9; Docket No. 334, R&R at 11, 2018 WL 3861612, at *4).  The Government points to Duff's testimony about

maintenance of the Site but doing so to run "field cars," snowmobiles, three- and four-wheelers for amusement and Duff's pleasure in operating a brush hog (Docket No. 297, Pl. Reply Memo. at 17; Docket No. 296, Pl. Ex. B, Duff Dep. Tr. at 91, 117).  The Government argues that Spoth's and Kelkenberg's testimony about their farming activities (see Docket No. 334, R&R at 95, 2018 WL 3861612, at *33) should be discounted since it occurred after defendants acquired the Site (Docket No. 338, Pl. Memo. at 10, 7).

Jayson testified that the Site was vacant land while Realmark owned it and third parties did not conduct any activities on the Site during that time (Docket No. 270, Pl. Ex. 1, Joseph Jayson EBT Tr. at 36).  This testimony (cf. Docket No. 279, Defs. Opposition Statement ¶ 12 (admitting that Jayson so testified but disputing its truth)) would establish the absence of farming by him (or others) for five consecutive years that would be deemed abandonment of PCC status.  Duff's testimony about clearing the Site during this same period, however, and the purpose of that operation, raise issues of fact.  Magistrate Judge Foschio found that the Site was not farmed by Realmark from 1988 (Docket No. 334, R&R at 11, 95, 2018 WL 3861612, at *4, 33).  The Report found that Duff continued to clear the land on the Site after he sold it (Docket No. 334, R&R at 11, 2018 WL 3861612, at *4), which his testimony and affidavit supports.  Duff's purpose for this clearing, however, is not discussed in the Report.  Duff swore an affidavit on April 17, 2009, that he periodically obtained a brush hog to cut grass and vegetation on the Site (Docket No. 280, Ex. 10, Duff Aff. of Apr. 17, 2009, ¶ 12).  Once Badding Brothers left the Site and Realmark acquired it in 1988, Duff returned periodically to brush hog the Site (id. ¶ 15).

56

Duff claimed that the Site was always a farm and not used for commercial purposes (id. ¶ 16).  "Since 1959," he said, "every inch of the Property has at one point or another been turned over for plowing and planting, except for the small wooded area on the west end near the Millersport Highway" (id. ¶ 18).  He concluded, however, that "since the time I have known Acquest to be the owner of the Property, which is about four years ago, I have seen the Property returned to use as a working farm with corn planted on the Property and presently what appears to be winter wheat planted sometime during the Fall 2008" (id. ¶ 19 (emphasis supplied)).  Duff later explained this answer that "it was nice to see it farmed again with crops planted, crops growing" (Docket No. 296, Ex. B, Duff Dep. Tr. at 104).

Duff then testified that he cleared a portion of the Site he called the lane was for operating amusement vehicles (Docket No. 297, Pl. Reply Memo. at 17, Duff Dep. Tr. at 91, 106-07, 117).

As just stated, there are inconsistencies between Duff's affidavit stating that the Site was always in agricultural use and his later testimony restricting the time since his ownership when it was in agricultural use or declaring that it was nice to see it "farmed again," implying a break in farming.

Duff also never testified that he brush hogged the Site for agricultural use.  Duff ran the brush hog every couple of years over the property (id. at 108).  He testified that he ran the brush hog over a lane as part of the Site to create a clear field for amusements (driving three- and four-wheelers and snowmobiles) (id. at 91) or to create transit lanes (id. at 105-07).  He also testified that he ran the brush hog out of enjoyment of operating that vehicle (id. at 117).

Defendants argue that operating a brush hog is agricultural in and of itself and was operated for crop production (Docket No. 279, Defs. Memo. at 39; see Docket No. 279, Defs. Statement ¶ 112) but cite as the only basis for that contention the so-called expert testimony of Dr. Busacca, which was stricken in a separate Decision and Order (Docket No. 348, at 22-26).  The only evidence as to brush hog operation left is Duff's testimony; he never said that operation of that equipment was agricultural.  There is no other evidence that operation of the brush hog is agricultural.

This Court concludes that there is a material issue of fact whether Duff's maintenance on the brush hog constituted "farming" on the Site to preserve PCC status. Other issues of fact arise from the dueling experts (Dr. Kagel and Apfelbaum for defense and the Government aerial photography analysis) on the duration of farming on the Site from 1988 to 2005 to retain PCC status.  Defendants' Objection (Docket No. 337) on this issue is **granted**.  Thus, for the element of abandonment of PCC status based upon no farming for five consecutive years, **there is a material issue of fact** as to this point.  Insofar as the Report found these issues of fact, the Report is **adopted**. The Government's Motion for Summary Judgment (Docket No. 269) is **denied**.[6]

For completeness, this Court next discusses wetland hydrology and abandonment of PCC status.

---

[6]The Navigable Waters Protection Rule also provides another potential fact issue not raised before.  During the 1990s and 2000s before defendants' purchase, the Site could have been left fallow for agricultural or conservation purposes.  Under the NWPR leaving land fallow would not be deemed an abandonment of PCC status, 85 Fed. Reg. at 22,320.  The record here does not indicate the reason for non-agricultural use of the Site at that time and no one mentioned leaving any of it fallow.

4)  Factual Issue—Wetland Hydrology

Note, abandonment due to the end of agricultural activities is but one element for losing PCC status; the land also needs to revert to wetlands and meet the three identifying wetlands characteristics from Army Corps regulations (wetlands plants, hydric soils, and wetlands hydrology) (see Docket No. 279, Defs. Memo. at 38 & n.23, citing 7 C.F.R. § 12.33 (1987); U.S. Dep't of Agriculture, Highly Erodible Land and Wetland Conservation, Final Rule, 52 Fed. Reg. 35,194, 35,208 (Sept. 17, 1987); 43 C.F.R. § 12.31 (wetlands criteria); cf. NWPR, 85 Fed. Reg. at 22,339, 22,341 (amending 33 C.F.R. § 328.3(c)(9), (16), 40 C.F.R. § 120.2(3)(ix), (xvi), effective June 22, 2020). Defendants identify this as an issue of material fact (Docket No. 279, Defs. Memo. at 39; Docket No. 342, Defs. Memo. at 13), as did the Report (Docket No. 334, R&R, at 92-93, 2018 WL 3861612, at *32).  The Report also accepted the testimony of Spoth and Kelkenberg that crops could not grow if the Site had reverted to wetlands (Docket No. 334, R&R at 95, 2018 WL 3861612, at *33).  On this issue, the Government  disagrees and faults the Report for discounting the testimony of its expert, Jonathan Jones, about the hydrology of the Site generally (Docket No. 338, Pl. Memo. at 10).

Since resolution of the water hydrology issue generally also resolves the same question for the application of the abandonment of PCC status, this Court addressed that matter above and concluded that **fact issues remain regarding wetlands hydrology**. These issues apply to the parcel deemed PCC as well as other areas of the Site.  For abandonment, if water hydrology is unresolved, the Government cannot prevail in claiming that PCC status was abandoned.  Therefore, defendants' Objections (Docket No. 337) are **accepted in part, denied in part**, rejecting the legal contention that

abandonment is not possible but finding issues of fact whether it in fact has occurred for this Site.

\* \* \* \*

With the issues of fact identified above, defendants' Motion for Summary Judgment (Docket No. 267) is **denied**.  Also as noted above, the Government's Motion for Summary Judgment is **denied in part** on the grounds considered above.  Next, this Court addresses Count Two and the recommended grant of summary judgment to the Government finding defendants' 2007 DEC permit was invalid (cf. Docket No. 334, R&R at 99-101, 2018 WL 3861612, at *35-36).

### 3.  Summary Judgment to the Government (Docket No. 269)

Count Two also alleges unauthorized discharges of stormwater since January 2007 (Docket No. 112, Am. Compl. ¶¶ 55-63).  The Government terms defendants' activities to be industrial, thus requiring a permit to discharge stormwater from a point source (the Site) into the waters of the United States (see id. ¶¶ 55-58, 60).  Aside from the discussion whether these are "waters of the United States," also at issue here is whether defendants' activities were industrial (id. ¶ 55) to require a stormwater permit.  Defendants deny that their excavation and crop clearing activities were industrial; they term these activities either agricultural or construction (Docket No. 340, Defs. Memo. at 7-9).  They also argue that they denied that the NOI for the DEC permit was false, as asserted by the Government (Docket No. 337, Defs. Memo. at 3-4).

### a.  "Industrial Activity" and "Construction Activity"

Section 402 of the CWA established the National Pollutant Discharge Elimination System (or "NPDES"), requiring permits (issued either by the EPA or by states) for

discharge of pollutants, 33 U.S.C. § 1342(a)(1) (codifying Pub. L. No. 92-500, § 402).

Although § 402's provision on municipal and industrial discharges is written in a series

of negatives (permits are not required except when they are), the easier way to consider

33 U.S.C. § 1342(p)(2)(B) is to note that permits are required for municipal and

industrial stormwater discharge "associated with industrial activity."  Section 402 does

not require a discharge permit "for discharges composed entirely of return flows from

irrigated agriculture," 33 U.S.C. § 1342(l)(1), or from silvicultural activities (such as

logging, nursery operations), id. § 1342(l)(3).

The Act, however, does not define "industrial activity"; thus, definition is left to the

EPA, 40 C.F.R. § 122.26(b).  The agency, in turn, see 33 U.S.C. § 1342(p)(4)(A),

defines "storm water discharge associated with industrial activity" initially referring to

"the discharge from any conveyance that is used for collecting and conveying storm

water and that is directly related to manufacturing, processing or raw materials storage

areas at an industrial plant," 40 C.F.R. § 122.26(b)(14).  After noting exclusion of

discharges from otherwise exempt facilities, the regulation then gives categories of

some, "but . . . not limited to," industrial facilities (such as industrial plant yard, access

roads, and refuse sites), id.  The regulation then concludes with eleven "categories of

facilities [that] are considered to be engaging in 'industrial activity' for purposes" of this

paragraph, id.  Considered there are "landfills, land application sites, and open dumps,"

and "facilities involved in the recycling of materials," id. § 122.26(b)(14)(v), (vi).  Section

122.26(b)(14)(x) (controverted here) includes "construction activities including clearing,

grading, and excavation, except operations that result in the disturbance of less than

five acres of total land area.  Construction activity also includes the disturbance of less

than five acres of total land area that is a part of a larger common plan of development or sale if the larger common plan will ultimately disturb five acres or more."  40 C.F.R. § 122.26(b)(14)(x).

Defendants take issue with the EPA purportedly exceeding the statutory mandate from § 402 in forming regulations that extend the definition of "industrial activity" to include "construction activity including clearing, grading and excavation," 40 C.F.R. § 122.26(b)(14)(x).  Defendants argue that the EPA exceeded its statutory mandate in adding construction activity when express congressional intent was only for industrial activity, violating the separation of powers.  (See Docket No. 340, Defs. Memo. at 7).

The Government argues that 33 U.S.C. § 1342(p) requiring permits for certain stormwater discharges "associated with industrial activity" is ambiguous because the CWA does not define "industrial activity."  As a result, the EPA filled the gap by defining "industrial activity" in § 122.26 to include construction activity.  (Docket No. 343, Pl. Memo. at 5-6.)  The Report agrees that this was not "an unreasonable policy choice given the remedial purpose of the CWA" (Docket No. 334, R&R at 100, 2018 WL 3861612, at *36), see Catskill Mt. Chapter, supra, 846 F.3d at 507.

Supporting their position, defendants quote Decker v. Northwest Environmental Defense Center, 568 U.S. 597, 601 (2013), in which the Supreme Court upheld the EPA's interpretation of 40 C.F.R. § 122.26(b)(14) which defined "associated with industrial activity" as covering conveyance of stormwater that is "directly related to manufacturing, processing or raw materials storage areas at an industrial plant" in a case deciding whether a logging road met that definition.  While emphasizing the first part of § 122.26(b)(14), defendants disregard the deference the Court gave to the EPA

62

in the construction of its own regulation, Decker, supra, 568 U.S. at 601.  Citing the permit exception for silviculture, 40 C.F.R. § 122.27(b)(1); see 33 U.S.C. § 1342(l)(3), the Decker Court accepted the EPA's conclusion that logging roads were not required to have stormwater permits, Decker, supra, 568 U.S. at 603-05.  The Court then stated that petitioners there had "to secure NPDES permits for the discharges of channeled stormwater runoff only if the discharges were 'associated with industrial activity,' 33 U.S.C. § 1342(p)(2)(B), as that statutory term is defined in the preamendment version of the Industrial Stormwater Rule, 40 C.F.R. § 122.26(b)(14) (2006)," Decker, supra, 568 U.S. at 611 (emphasis added); otherwise, the stormwater discharges there would fall under the CWA's general exemption from NPDES permits, id.  While reasoning that language of the regulation "may be limited by the requirement that the discharges be 'directly related to manufacturing, processing or raw materials storage areas at an industrial plant,'" id. at 613, the Court rested upon the EPA's interpretation of its regulations (even if that interpretation is not the only one or the best one), id. Courts defer to an agency's own interpretation "'unless that interpretation is "plainly erroneous or inconsistent with the regulations,"'" id. (quoting Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 208 (2011) (quoting in turn Auer v. Robbins, 519 U.S. 452, 461 (1997)).  The Court concluded that the EPA's interpretation, that permits were not required for logging as opposed to more fixed facility operations, was rational and that references to "facilities," "manufacturing," and the like in the regulation "leave open the rational interpretation that the regulation extends only to traditional industrial buildings such as factories and associated sites, as well as other relatively fixed facilities," id. at 614.  The Decker Court cited to § 122.26(b)(14)(x), as Northwest Environmental

Defense Center noted that the regulation required permits for "other types of outdoor activity," and citing the "large construction sites" provision, distinguishing them from logging operations due to their fixed nature, Decker, supra, 568 U.S. at 613.  The Court did not reject the construction activity provision (nor did the EPA in arguing Decker).

Absent a statutory definition of "industrial activity" and delegation of regulatory authority to the EPA in this area, as Magistrate Judge Foschio found here (Docket No. 334, R&R, at 100, 2018 WL 3861612, at *36), this Court **is bound by the EPA's interpretation of its own regulation**.  It is not plainly erroneous or inconsistent within the regulation to include construction activities with industrial activities.  The other categories industrial activities in the regulation need to be built.  Thus, the EPA could rationally regulate the construction site as well as the completed industrial facilities. Section 122.26(b)(14) includes categories of activities that are not purely manufacturing or storage of raw or finished products.  As the regulation defines "industrial" to include (for example) landfills, 40 C.F.R. § 122.26(b)(14)(v), but exclude office buildings and parking lots, id. § 122.26(b)(14), the regulation can include construction sites as industrial use.  Defendants' objections on this ground (Docket No. 340) are **rejected**.

### b.  Defendants' Activity as an Issue of Fact

The Report identified as an issue of fact whether defendants engaged only in agricultural activity (which would not require a permit, see 33 U.S.C. § 1342(p)(1)), as opposed to construction or industrial activity which would (Docket No. 334, R&R, at 100-01, 2018 WL 3861612, at *36).  The Report correctly found (Docket No. 334, R&R, at 100, 2018 WL 3861612, at *36) the existence of an issue of fact as to what defendants were doing at that site, whether it was construction or agricultural activity.  This Court

focuses on this question rather than the volume of stormwater discharge as the issue (but cf. id. at 101, 2018 WL 3861612, at *36); for liability purposes, the question is whether a permit was required not the extent of discharge without a permit.  The extent of discharge would go to the penalty phase of this action (if the case proceeds that far).

Defendants deny not only performing industrial activity but also any construction activity at all (Docket No. 342, Defs. Memo. at 24).  The question, then, is the characterization of defendants' excavation work on the Site.  The same issues discussed above surrounding possible abandonment of PCC status (Duff's operation of the brush hog, whether planting corn and wheat are possible if land has wetland hydrology) are apropos here as well as defendants planting then cutting down unharvested crops of corn and wheat planted on the Site and remain **issues of fact precluding summary judgment**.

### c.  Notice of Intent ("NOI")

Defendants argue that they did oppose the Government's motion and its contentions that their NOI contained misrepresentations, thus the Report's contrary finding here (Docket No. 334, R&R at 101, 2018 WL 3861612, at *37) was erroneous (Docket No. 337, Defs. Memo. at 4; Docket No. 279, Defs. Statement ¶¶ 63[7], 73).  The Government counters that defendants failed to supply evidence to support their conclusory statements in opposition (Docket No. 343, Pl. Memo. at 8).

In paragraph 63 of defendants' response Statement, they admit to the Government's statement at the same paragraph—that the DEC received defendants'

---

[7]Incorrectly cited as ¶ 64.

NOI and granted Acquest conditional authorization to discharge stormwater with the condition being that the information in the NOI was "accurate and complete" (Docket No. 269, Pl. Statement ¶ 63).  Defendants' response only added that the statements in the NOI were true and accurate (Docket No. 279, Defs. Statement ¶ 63) without citation to the record to support that conclusory statement.  Defendants did not include sworn statements from William Huntress or Ashok Kapoor, Acquest officials at the time of issuance of the permit (with Kapoor signing the permit application for Acquest, Docket No. 270, Pl. Ex. 4, at Bates CWM00015), asserting the truth of the statements in the permit application to counter the Government's allegation.  Paragraph 73 was from defendants' counterstatement, it states "in 2007, Acquest Transit obtained a second CWA Section 402 permit from the NYSDEC to disturb four additional acres of the site. The government has presented no evidence that Acquest Transit (or any of the defendants) violated this permit" (id. ¶ 73, citations omitted).

Defendants argue that the Government did not deserve summary judgment when the Government failed to offer undisputed evidence that statements in the NOI were false. Defendants fault the Government for not citing Kapoor or William Huntress who could substantiate the truthfulness of the NOI statements (Docket No. 337, Defs. Memo. at 4). Defendants, including Huntress, would be in a better position to produce his statement about his belief in the truthfulness of the application.  The Government contended that the NOI misrepresented (1) when defendant began stormwater work, (2) the area they intended to disturb, and (3) the planned start and stop dates for the work (Docket No. 269, Pl. Statement ¶¶ 64, 61 (Government's expert finding 286 occasions of stormwater runoff between 2006-16 from the Site)).

The NOI (Docket No. 270, Pl. Ex. 4, at Bates CWM00007-15) does state that defendants intended to disturb 4 acres of 93.3 acres of the Site (id. at Bates CWM00009), that defendants would start in October 2007 and finish in December 2007 (id. at Bates CWM00010).  The Government alleges prior excavation work based on the conclusions of its expert, Jonathan Jones (Docket No. 269, Pl. Statement ¶ 61; Docket No. 270, Pl. Ex. 7, Jones Report at 83-86).

Based upon the documents and Jonathan Jones' expert report, the Government established that there was no material issue of fact that defendants conducted work beyond the temporal and geographic scope of the DEC permit and as a result that there were misrepresentations in the NOI.  Presenting Kapoor or William Huntress's testimony might illuminate the purported misrepresentations (or raise material issues of fact whether there were misrepresentations), but the Government was not obliged to produce that material.  The Government did include excerpts from depositions of both men (Docket No. 270, Pl. Exs. 2 (William Huntress Dep. Tr. excerpts), 5 (Kapoor Dep. Tr. excerpts); see Docket No. 270, Pl. Ex. 5, Kapoor Tr. at 193-96, 197-99 (discussing NOI)), without inclusion of any testimony (if it exists) regarding the truth of the application.  If such testimony existed and defendants failed to identify it or produce it, they then did not meet their burden of coming forward with specific facts establishing a genuine issue of fact, see Matsushita Elec., supra, 475 U.S. at 586-87.  Defendants, while arguing the Government's case was incomplete without reference to that testimony, fails to produce Huntress or Kapoor's testimony that refutes the claim of misrepresentations in the NOI or posit this as a factual dispute.  Defendants did produce William Huntress's excerpted testimony (cf. Docket No. 280, Defs. Ex. 8 (William Huntress Dep Tr. excerpts) but did

not produce his statements affirming the truth of the application. Although the Government as movant has the initial burden of showing that there was no genuine issue of fact and this Court has to view the evidence in the light most favoring defendants as nonmovants, defendants need to "come forward with specific facts showing that there is a genuine issue for trial," id., and they have not done so here.

Therefore, the Government's Motion for Summary Judgment (Docket No. 269) on this ground is **granted** and defendants' objections to the recommendation from Magistrate Judge Foschio (Docket No. 337) is **rejected**.

\* \* \* \*

The NOI further presents an interesting fact yet to be considered by the parties. Defendants in that document represented that the Site in 2007 was "vacant brushland" and their intended future use **was not** as agricultural property (Docket No. 270, Pl. Ex. 4, at Bates No. CWM00009). This contradicts defendants' contention that the property was always farmed or was in 2007, thus not abandoning PCC status due to lack of agricultural activity. Since this Court holds that abandonment is an issue of fact, defendants' contemporaneous statements may have impact on the ultimate truth of that matter.

## IV.   CONCLUSION

Therefore on Counts One and Three of the Complaint, applying Justice Kennedy's significant nexus standard to define the "waters of the United States" here and to the Defendants' Site, this Court concludes that there are **material issues of fact** whether the Site contains wetlands for purposes of Clean Water Act jurisdiction. Under the same standards, Ransom Creek is a traditional navigable waterway.

This Court **reaffirms** that prior converted cropland ("PCC") status legally can be abandoned if agricultural activities cease for five consecutive years and the property reverts to wetlands as indicated by the three characteristics for federal wetlands.  Issues of material fact exist, however, whether PCC status was abandoned here because of continued farming activities on the Site and its hydrology.

The Government, however, is granted summary judgment on so much of its Count Two alleging misrepresentations in the DEC permitting process.  Under EPA regulations, defendants were required to obtain § 402 permits before discharging stormwater from construction activities.   There remains, however, an issue of fact as to whether defendants were engaged in construction activities or agricultural activities to require CWA permits.

* * * *

This Court submitted an Alternative Dispute Resolution notice to the parties at the outset of this case (Docket No. 15).  The initial Scheduling Order in this case set forth deadlines for mediation (Docket No. 77) and the deadline for the end of that referral was extended in the subsequent amendments to that Scheduling Order (see Docket Nos. 104, 109, 126, 138, 203, 208, 228, 243, 260, 263, amended Scheduling Orders).  No one moved to opt-out of the Court's Alternative Dispute Resolution program; the parties, in fact, stipulated to a mediator (Docket No. 88, selecting Gregory Photiadis) but review of the docket shows no filed certificates from mediation sessions.

Given the state of this case following resolution of the pending motions and objections and the EPA's and Army Corps' evolving position regarding navigable waters (see Docket No. 346, Defs. Memo. at 7 & n.4 (NWPR, effective June 22, 2020)), this is

an opportune moment for the parties to consider using alternative dispute resolution before this case approaches trial preparation, potential trial, or possible appeal. The last (Tenth Amended) Scheduling Order had mediation end by November 7, 2017 (Docket No. 263); referral to mediation is **now revived and extended to January 29, 2021**. The parties are urged to contact mediator Gregory Photiadis and schedule a mediation session before him. This Court also may refer this case to Magistrate Judge Foschio to conduct a settlement conference, given his familiarity with the issues herein. Finally, this Court will set a Status Conference and require Status Reports from the parties to learn the direction and progress of this action to resolution or trial.

To see what next needs to occur in this case, an interim Status Conference shall be held on **Wednesday, July 15, 2020, at 2 pm**, by Zoom teleconference. Chambers will give directions for how to contact this Court for that conference.

## V.   ORDER

For the reasons stated herein, Defendants' Objections (Docket Nos. 337, 340) to the recommended denial of their motion for summary judgment (Docket No. 267) are **granted in part, denied in part**. The Government's Objections (Docket No. 338) to the Report and its recommendation of partial denial of its motion for summary judgment (Docket No. 269) are **denied in part, granted in part**, as stated in detail above. Also as discussed above, this Court **concurs** in the findings and recommendations contained in the Report and Recommendations as modified in this Decision and Order.

It is hereby ORDERED that (Docket No. 334) Report and Recommendations is ACCEPTED IN PART **AS SO MODIFIED**.

Furthermore, defendants' Motion for Summary Judgment (Docket No. 267) is **denied** and the Government's Motion for Summary Judgment as to liability (Docket No. 269) is **granted in part** (as recommended in the Report) **and denied in part**.

Referral of this case to mediation before Gregory Photiadis shall continue until **January 29, 2021**.

An interim Status Conference shall be held on **Wednesday, July 15, 2020, at 2 pm**, by Zoom teleconference.   Chambers will provide directions for attending this conference.

Parties shall report the status of the action (that is, whether a mediation conference or settlement conference was scheduled or held, readiness of parties for trial, resolution of the case) by **November 3, 2020**.  This Court reserves the right to refer this case back to Magistrate Judge Foschio to conduct a settlement conference.  Upon review of the status report, this Court may schedule additional Status or Pretrial Conference.


SO ORDERED.

Dated:          June 4, 2020
                Buffalo, New York


                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge