UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                            Plaintiff,

         v.                                              **DECISION AND ORDER**

                                                         09-CV-55S

ACQUEST TRANSIT LLC, et al.,

                            Defendants.

## I.  INTRODUCTION

This is a 2009 Clean Water Act case arising from 2007 disposal of fill from Defendants' property (containing purported wetlands) allegedly into "waters of the United States."  The underlying issue is whether that property contained wetlands that are part of "waters of the United States" to be governed by the Clean Water Act's edicts.  That phrase "waters of the United States" is a regulatory term of art under Clean Water Act regulations that has changed since the commencement of this action.  This case is scheduled for trial in September 2021 (Docket Nos. 354, 369).  Prior to trial, the parties raise issues arising from the retroactivity of the recent change in the definition of that phrase and bifurcation of liability and penalty phases in this action.

Presently before this Court are (1) the Government's argument that the Navigable Waters Protection Rule (enacted in 2020) only applies prospectively and does not affect this case (Docket No. 363); (2) Defendants' Motion to Dismiss on jurisdictional grounds (Docket No. 365), resting (in part) on the retroactive application of the Navigable Waters Protection Rule; and (3) the Government's contention that trial of this case has to be split,

with the liability portion tried before a jury separately from the penalty phase (if warranted) before this Court because Defendants seek a jury trial (Docket No. 364).

For future reference in this Decision and Order (and as applied in the Decision and Order of June 4, 2020, Docket No. 349, 2020 WL 3042673) some of the common shorthand, abbreviations, and acronyms used in herein include:

Acquest, Acquest Transit, LLC;
Army Corps, U.S. Army Corps of Engineers;
CWA, Clean Water Act (or the "Act");
EDI, Earth Dimension, Inc.
EPA, Environmental Protection Agency;
NWPR, U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'r, The Navigable Waters Protection Rule:  Definition of "Waters of the United States", 85 Fed. Reg. 22250 (Apr. 21, 2020) (effective June 22, 2020), codified at 33 C.F.R. § 328.3 (2020) (or the "Rule");
Site, Town of Amherst Tax Parcel No. 16.00-5-23 (R&R, 2018 WL 3861612, at *4);
TNW, Traditional Navigable Waterway.

Prior Decisions and Orders cited herein include:

Docket No. 26, Decision and Order of July 15, 2009, 2009 WL 2157005;
R&R, Docket No. 334, Report and Recommendation, 2018 WL 3861612 (Foschio, Mag. J.)
Docket No. 349, Decision and Order of June 4, 2020, 2020 WL 3042673.

Familiarity with these Decisions is presumed.  These Decisions will be referenced by their Westlaw citations.

For the reasons stated below, Defendants' Motion to Dismiss (Docket No. 365) Counts One and Three is denied.  The NWPR does not apply to this action and the alleged activities of 2007 because of its June 2020 effective date.  The trial of this case is bifurcated, with liability conducted before a jury trial and any penalty phase handled by this Court if any Defendant is held liable by the jury.

## II.  BACKGROUND

A.  Facts

The following facts are drawn from the Amended Complaint (Docket No. 112) and the uncontested facts found by Magistrate Judge Foschio in the Report (R&R, 2018 WL 3861612), as later noted and accepted by this Court in the Decision and Order of June 4, 2020 (Docket No. 349, 2020 WL 3042673).

On January 9, 2009, the Government commenced this action against Acquest for violations of the Clean Water Act, 33 U.S.C. §§ 1251, 1311, 1319(d), for engaging in ditch digging, earthmoving, and fill activities on the Site (R&R, 2018 WL 3861612, at *1, 6). The Government moved for preliminary injunction (Docket No. 6), which was granted (Docket No. 26, 2009 WL 2157005).  There, this Court found that the Government "had demonstrated sufficiently that the Property's wetlands are 'waters of the United States' within the CWA's jurisdiction" for the preliminary injunction (2009 WL 2157005, at *8).

1.  The Amended Complaint (Docket No. 112)

The Amended Complaint, filed on April 6, 2011 (Docket No. 112), added as Defendants Acquest Development, LLC (allegedly the corporate developer and manager of the Site), and William L. Huntress (principal of Acquest and president and managing partner of Acquest Development, LLC) (id. ¶¶ 8, 9).

Count One of the Amended Complaint alleged that Defendants violated the Clean Water Act, 33 U.S.C. § 1311, by discharging dredge or fill materials into jurisdictional wetlands at the Site without a permit (id. ¶¶ 45-53).  Count Two alleged that Defendants violated 33 U.S.C. § 1362(12) by discharging stormwater associated with industrial activity from point sources into waters of the United States without a permit (id. ¶¶ 54-63).

3

Count Three claimed that Defendants violated CWA, 33 U.S.C. § 1319, by continuing to discharge pollutants into jurisdictional wetlands in contravention of the Environmental Protection Agency's administrative Cease and Desist Order (id. ¶¶ 64-67).

### 2. The Site and Clean Water Act

The Site is in three 100-year floodplains since three creeks are nearby (R&R, 2018 WL 3861612, at *4). Magistrate Judge Foschio recounted the ownership for the Site from 1978 to defendants' acquisition in 2005 (id., 2018 WL 3861612, at *4; see Docket No. 349, Order, 2020 WL 3042673, at *5).

Defendants purchased the Site from Realmark Properties in June 2005 with the price initially contingent upon the percentage of the property deemed wetlands (R&R, 2018 WL 3861612, at *5; Docket No. 349, Order, 2020 WL 3042673, at *5). On October 2005, defendants retained a wetlands consultant, Earth Dimensions, Inc., to delineate the wetlands boundaries. EDI found 77.02 acres or 80% of the Site's 96.3 acres were wetlands that appear to be connected with waters of the United States, specifically Ransom Creek, Tonawanda Creek, and the Niagara River. (R&R, 2018 WL 3861612, at *5.)

From 2006 to 2008, Defendants contracted to clear the Site of vegetation, clear existing ditches, deepen and widen ditches, including ditches that ran in identified wetlands. Defendants redeposited this cleared material in the wetlands on the Site (id., 2018 WL 3861612, at *5). In 2006 and 2007 defendants also applied for Clean Water Act § 402 permits for stormwater discharges (id., 2018 WL 3861612, at *5) for work the Government contends required §§ 402 and 404 permits (id. at *6).

In February 21, 2008, the EPA issued a Cease and Desist Order upon defendants to cease all earth moving work, filling, grading, or excavation on the Site without the requisite § 404 permits pending determination by the United States Army Corps of Engineers whether the Site was jurisdictional wetlands (id.; see Docket No. 375, Defs. Reply Memo. at 10-11, 11 n.4, Ex. A (Feb. 21, 2008, cease and desist order); see also Docket No. 9, Gov't Ex. 4, David Pohle Decl. Ex., copy of Feb. 21, 2008, cease and desist order)).   On March 19, 2008, the Army Corps designated Ransom Creek a Traditional Navigable Waterway (R&R, 2018 WL 3861612, at *6); hence this made adjoining wetlands fall under federal jurisdiction of the Clean Water Act to require permits for discharge therein, 33 U.S.C. §§ 1342,1344.

Inspections under a Search Order on July 28, 2008, revealed violations of the first Cease and Desist Order due to ongoing excavations (id., 2018 WL 3861612, at *6).   This EPA inspection team also took soil samples which led the agency to conclude that wetlands were present on the entire Site.   The EPA also found 13.3 acres of fill were deposited in violation of the CWA.   (Id.).   This inspection team also found that these wetlands

> "abut and maintain a continuous surface connection with the West Ditch [one of the three original ditches on the Site] from which water flows at least three seasons into the Millersport Highway East Side Ditch, underneath Millersport Highway, into the Millersport Highway West Side Ditch, and into Ransom Creek, then to Tonawanda Creek and the Niagara River,"

(id., 2018 WL 3861612, at *6, 5).   The EPA, on September 5, 2008, issued a second Cease and Desist Order prohibiting further earth moving activities (id., 2018 WL 3861612, at *6), but on September 10 and 16, 2008, the Army Corps observed further earth-moving activities on the Site (id.).

B.  Procedural History

The Government amended its Complaint (Docket No. 112).  Defendants answered the Amended Complaint (Docket No. 121) and later moved for summary judgment (Docket No. 267), contending that permits under the Clean Water Act were not required for their activities on the Site (id., Defs. Memo. at 2-4, 11-15, 17-22).  Defendants argued that the Clean Water Act, EPA, and Army Corps regulations regarding wetlands are of "indecipherable vagueness and mind-boggling complexities" (id. at 4, 6-7, 14-17).  They posed the question whether the CWA regulations were clear and unambiguous in establishing that the Site contained jurisdictional wetlands, whether they were part of the "waters of the United States" (id. at 5).

The Government also moved for summary judgment as to liability (Docket No. 269), arguing that Defendants violated the Act by discharging pollutants into the "waters of the United States" by polluting the wetlands on the Site (id. at 15-35).

In a comprehensive Report and Recommendation, Magistrate Judge Foschio recommended denial of Defendants' motion (R&R, 2018 WL 3861612, at *25-26, 35-36, 37), and the grant of a portion of the Government's Motion for Summary Judgment (id. at *26-27, 27-35, 37).  On the objections to the Report & Recommendations (Docket Nos. 337, 338, 339, 340), this Court found issues of fact establishing whether the Site contains "waters of the United States."  This Court applied Justice Kennedy's concurrence in Rapanos v. United States, 547 U.S. 715, 780, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (Kennedy, J., concurring), and his significant nexus standard in construing the definition "waters of the United States" in this case (Docket No. 349, Order, 2020 WL 3042673, at *31).

6

During a subsequent status conference, Defendants asked for a trial date and this Court set it for September 15, 2021, with a Final Pretrial Conference on July 21, 2021 (Docket No. 354).  This Court later issued the Final Pretrial Order (Docket No. 369, Order of Feb. 2, 2021).

Meanwhile, the parties indicated that further discovery was not necessary (see Docket No. 354).  In discussing the retroactivity of NWPR, however, the Government suggested supplemental discovery may be necessary for determining jurisdictional status of the Site at any penalty phase (Docket No. 363, U.S. Memo. re retroactivity at 9 n.3, 12 n.5, 6, 9-11).  The Government reiterated in its bifurcation memorandum that additional penalty discovery may be required (Docket No. 364, U.S. Memo. re bifurcation at 5 n.4).  The Government, however, did not state when it intends to seek that discovery.  Defendants have not commented on their need for further discovery or penalty phase discovery.

Meanwhile, this Court ordered renewed efforts at mediation and possible settlement conference before Magistrate Judge Leslie Foschio (Docket Nos. 358, 359).

 C.  Pending Motions and Matters (Docket Nos. 363-65)

At the December 2, 2020, status conference, the Government raised the question whether the NWPR applied retroactively to this case, while Defendants argued that the Rule merely clarified existing law (Docket No. 356).  The Government then stated the case would have to be bifurcated, with a jury trial on liability and a bench proceeding setting the penalty if Defendants are found liable (id.).  This Court ordered parties to brief the two issues of retroactivity of NWPR and bifurcation (Docket No. 357).  Defendants

7

later reported their opposition to bifurcation (see Docket No. 360, Parties' Jt. Status Report at 3).

The Government submitted two memoranda on the retroactivity of the NWPR (Docket No. 363[1]) and bifurcation of the trial of this case (Docket No. 364[2]).  In response to these memoranda, Defendants moved to dismiss (Docket No. 365[3]) arguing that NWPR has retroactive effect and shows the lack of CWA jurisdiction.

Pursuant to the parties' stipulated schedule (Docket No. 360), responses on these two open points was due by February 5, 2021 (Docket Nos. 361, 368).  This Court also scheduled briefing for Defendants' Motion to Dismiss (Docket No. 365), with response due on February 5, 2021 (Docket No. 368).  Defendants noted that the Government in opposition to their Motion to Dismiss raised novel issues requiring a Reply Brief (Docket No. 371, Defs. Memo. at 4).  Defendants moved for leave to reply (Docket No. 372), which was granted (Docket Nos. 373, 374) and Defendants timely submitted their Reply (Docket No. 375).  A further status conference was scheduled for March 24, 2021 (Docket No. 368).

---

[1] The Government submits its arguments on the retroactivity of the NWPR, Docket No. 363. Defendants responded with their Motion to Dismiss, Docket No. 365, and a memorandum filed on February 5, 2021, Docket No. 371.

[2] The Government submits its arguments on bifurcation of the trial, Docket No. 364.  Defendants responded with their Memorandum, Docket No. 371.

[3] Defendants submit their Memorandum of Law, Docket No. 365, their Memorandum, Docket No. 371, and their Reply Memorandum, Docket No. 375, in support of their Motion to Dismiss.  The Government respond with its opposing Memorandum, Docket No. 370.

### III. DISCUSSION

A.   Applicable Standards

1.  Motion to Dismiss

Defendants have moved to dismiss the Complaint on the grounds that it states a claim for which relief cannot be granted.  Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court cannot dismiss a Complaint unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a Complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face," id. at 570 (rejecting longstanding precedent of Conley, supra, 355 U.S. at 45-46); Hicks v. Association of Am. Med. Colleges, No. 07-00123, 2007 U.S. Dist. LEXIS 39163, at *4 (D.D.C. May 31, 2007).  To survive a motion to dismiss, the factual allegations in the Complaint "must be enough to raise a right to relief above the speculative level," Twombly, supra, 550 U.S. at 555; Hicks, supra, 2007 U.S. Dist. LEXIS 39163, at *5.  As reaffirmed by the Court in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009),

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' [Twombly, supra, 550 U.S.] at 570 . . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556 . . . .  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Ibid.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of "entitlement to relief."' <u>Id.</u>, at 557 . . . (brackets omitted)."

<u>Iqbal</u>, <u>supra</u>, 556 U.S. at 678 (citations omitted).

A Rule 12(b)(6) motion is addressed to the face of the pleading.  The pleading is deemed to include any document attached to it as an exhibit, Fed. R. Civ. P. 10(c), or any document incorporated in it by reference.  <u>Goldman v. Belden</u>, 754 F.2d 1059 (2d Cir. 1985).  In considering such a motion, the Court must accept as true all of the well pleaded facts alleged in the Complaint.  <u>Bloor v. Carro, Spanbock, Londin, Rodman & Fass</u>, 754 F.2d 57 (2d Cir. 1985).  However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true.  <u>New York State Teamsters Council Health and Hosp. Fund v. Centrus Pharmacy Solutions</u>, 235 F. Supp. 2d 123 (N.D.N.Y. 2002).

### 2.  Clean Water Act Primer

#### a.  Clean Water Act and Regulations

As noted in the June 2020 Decision and Order, 2020 WL 3042673, at *8-9, and as the Government asserted (Docket No. 338, Pl. Memo. at 3) without dispute, to state a claim under the Clean Water Act (such as Count One) the Government has the burden of showing that defendants discharged (without a permit) pollutants from a point source into wetlands that were then the "waters of the United States," 33 U.S.C. §§ 1311, 1342, 1344; <u>see</u> <u>Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 215 (2d Cir. 2009), <u>aff'g on other grounds</u>, 472 F. Supp.2d 219 (D. Conn. 2007).  For Count Two, the Government needed to show that there was a discharge of pollutants, related to "industrial activities," from a point source, to "waters of the United States," and without a

valid permit, 33 U.S.C. § 1342 (R&R, 2018 WL 3861612, at *35; <u>see</u> Docket No. 338, Pl. Memo. at 15; <u>see also</u> Docket No. 337, Defs. Memo. at 3).

Questioned here are whether defendants' Site "wetlands" were deemed the "waters of the United States."  The Clean Water Act applies to "navigable waters" which, in turn, are defined as the "waters of the United States," 33 U.S.C. § 1362(7).

As discussed at length in the June 4, 2020, Decision (Docket No. 349, 2020 WL 304673), the Clean Water Act does not define the phrase "waters of the United States" (<u>see</u> Docket No. 363, U.S. Memo. re retroactivity at 2), <u>County of Maui v. Hawaii Wildlife Fund</u>, 590 U.S. ___, ___ n.4, 140 S.Ct. 1462, 1484 n.4, 206 L.Ed.2d 640 (2020) (Alito, J., dissenting) (noting that the term "waters of the United States" is not defined by the CWA and "has presented a difficult issue for this Court," citing <u>Rapanos</u>, <u>supra</u>, 547 U.S. 715), EPA and Army Corps of Engineers regulations defined "waters of the United States" ambiguously, and multiple opinions, but no majority decision, from the United States Supreme Court in <u>Rapanos</u>, <u>id.</u>, attempt to interpret this regulatory landscape.

Under the pre-NWPR regulations, included with the "waters of the United States" were wetlands adjacent to waters susceptible to use in interstate or foreign commerce, interstate waters, tributaries of waters, territorial seas, 33 C.F.R. § 328.3(a)(7) (2014) (Army Corps); 40 C.F.R. § 232.2(q) (2014) (EPA).

Earlier in this case, the issue raised was whether the Site contains "wetlands" as defined in these regulations, <u>see</u> 33 C.F.R. § 328.3(b) (defining "wetlands"), (a)(8) (excluding "prior converted cropland" from wetlands considered waters of the United States) (2014).  The June 2020 Decision concluded that these are fact issues (Docket

No. 349, Order, 2020 WL 3042673, at *14, 18-20).   Present now, however, is the

applicable definition of "waters of the United States."

### b.  Penalties of CWA

For the civil penalties for violations of the CWA, 33 U.S.C. § 1319(d) provides that

> "Any person who violates section 1311, 1312, 1316, 1317, 1318, 1322(p), [1328,] or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator, or by a State, or in a permit issued under section 1344 of this title by a State, or any requirement imposed in a pretreatment program approved under section 1342(a)(3) or 1342(b)(8) of this title, and any person who violates any order issued by the Administrator under subsection (a) of this section, shall be subject to a civil penalty not to exceed $25,000 per day for each violation.  In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.  For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation."

33 U.S.C. § 1319(d).

### c.  Rapanos v. United States

The issue of what constitutes "the waters of the United States" in the CWA

regulations was presented to the United States Supreme Court in Rapanos v. United

States, supra, 547 U.S. 715.  This Court previously noted that

> "While all Justices agreed that the term 'waters of the United States' encompasses some waters that are not navigable in the traditional sense, id. at 730–31 (plurality opinion); 767–68 (Kennedy, J., concurring in the judgment); 792 (Stevens, J., dissenting), the Court split with respect to the proper standard for determining whether a wetland constitutes 'navigable waters' covered by the CWA,"

(Docket No. 26, Order, 2009 WL 2157005, at *6).  Unfortunately, the Court rendered a

plurality decision with a concurrence, resulting in a 4-1-4 split with no majority decision

defining that phrase, see Rapanos, supra, 547 U.S. at 758 (Roberts, C.J., concurring)
(R&R, 2018 WL 3861612, at *28, 30); see also United States v. Robertson, 875 F.3d
1281, 1287 (9th Cir. 2017) (Supreme Court's "fractured 4-1-4 decision" in Rapanos);
Zdziebloski v. Town of E. Greenbush, No. 15-CV-0298(LEK/CFH), 2017 WL 1968672,
at *4 (N.D.N.Y. May 11, 2017) (Justice Scalia's plurality opinion and Justice Kennedy's
concurrence "offered dueling tests for determining whether a wetland adjacent to a
tributary of a traditional navigable water is subject to regulation under the CWA").

Justice Antonin Scalia for the plurality defined "'waters of the United States"
encompassing "relatively permanent bodies of water that are connected to traditional
navigable waters (TNWs) and wetlands with a continuous surface connection to such
relatively permanent bodies of water," Rapanos, supra, 547 U.S. at 742 (plurality
opinion) (see R&R, 2018 WL 3861612, at *28).

Justice Kennedy concurred in the judgment (remanding the cases) and would have
the definition focus on the significant nexus the wetlands have to waters that are or were
navigable in fact or that could reasonably be made so, id. at 759, 782 (Kennedy, J.,
concurring).  He posed the issue as "whether the term 'navigable waters' in the Clean
Water Act extends to wetlands that do not contain and are not adjacent to waters that are
navigable in fact," id. at 759.  Justice Kennedy sought consistency with the standard set
forth in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,
531 U.S. 159, 167, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (or "SWANCC"), and its
application of "significant nexus" to waters that are or were navigable, Rapanos, supra,
547 U.S. at 759 (Kennedy, J., concurring).  Under the significant nexus approach,

> "wetlands possess the requisite nexus, and thus come within the statutory
> phrase 'navigable waters,' if the wetlands, either alone or in combination

with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"

Id. at 780 (Kennedy, J., concurring).  Under this standard, the Army Corps is to establish "a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries," id. at 782 (Kennedy, J., concurring).[4]

After Rapanos, the Justices noted that either the Army Corps or courts would have to take an ad hoc, case-by-case determination of whether a given wetland is connected to "waters of the United States" for CWA jurisdiction, see id. at 758 (Roberts, C.J., concurring), 812 (Breyer, J., dissenting); see also Sackett v. Environmental Protection Agency, 566 U.S. 120, 123-24, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012) (citing Roberts, C.J., concurrence, noting parties lacked guidance after Rapanos); County of Maui, supra, 140 S.Ct. at 1484 n.4 (Alito, J., dissenting).

Magistrate Judge Foschio rendered alternative recommendations under the plurality's standard and under Justice Anthony Kennedy's significant nexus standard (R&R, 2018 WL 3861612, at *28-31 (wetlands, traditional navigable waterway, and continuous surface connection), 31-35 (significant nexus)).  Faced with the lack of decisive precedent (and absent Second Circuit guidance on the question), this Court applied Justice Kennedy's significant nexus standard with its case-by-case application to

---

[4]In dissent, Justice John Paul Stevens recognized that "wetlands adjacent to tributaries generally have a significant nexus to the watershed's water quality," Rapanos, supra, 547 U.S. at 797 (Stevens, J., dissenting) (R&R, 2018 WL 3861612, at *28).  The dissenters recognized the Army Corps' determination "that wetlands adjacent to tributaries of traditionally navigable waters preserve the quality of our Nation's waters" and the Corps' decision to treat wetlands "as encompassed within the term 'waters of the United States' is a quintessential example of the Executive's reasonable interpretation of a statutory provision," id. at 788 (Stevens, J., dissenting).  The dissent would adopt the definition accepted in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 135, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), Rapanos, supra, 547 U.S. at 772-73 (Stevens, J., dissenting).

determine if the Site was part of the "waters of the United States" (Docket No. 349, Order, 2020 WL 3042673, at *17).

               d.  NWPR

               (1)     CWA Regulations Prior to NWPR

The Government provides the regulatory history for definition of the phrase "waters of the United States" from 1986 (Docket No. 363, Gov't Memo. at 3-4), while the NWPR gives the regulatory history and case law after enactment of the CWA in 1973, <u>see</u> 85 Fed. Reg. at 22,254-59.

In 1973 and 1974, the EPA and the Army Corps separately issued regulations defining "waters of the United States," but these definitions did not include wetlands, <u>id.</u> at 22,254; 38 Fed. Reg. 13,528, 13,529 (May 22, 1973) (codified at 40 C.F.R. § 125.1 (1973)) (EPA); 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974) (codified at 33 C.F.R. § 209.120 (1974)) (Army Corps).  The Army Corps' definition was challenged in the United States District Court for the District of Columbia for not including in the definition of navigable waters to include (among bodies of water) wetlands above the ordinary high-water mark, 85 Fed. Reg. at 22,254; <u>see</u> <u>Natural Resources Defense Council, Inc. v. Callaway</u>, 392 F. Supp. 685 (D.D.C. 1975).  The Army Corps issued interim regulations in 1975 adding periodically inundated freshwater wetlands to the definition of navigable waters, 85 Fed. Reg. at 22,254; <u>see</u> 42 Fed. Reg. 37,122, 37,144 (July 19, 1977).

By 1986, the agencies' definition of "waters of the United States" became virtually identical, 85 Fed. Reg. at 22,254-55 & 22,254 n.6 (agencies refer to Army Corps' regulations).  The regulatory text applicable in 2007 was the Army Corps regulations from 1986, 51 Fed. Reg. 41,206, 41,250 (Nov. 13, 1986), <u>codified at</u> 33 C.F.R. § 328.3(a) (until

August 28, 2015), and the EPA's similar regulations in 1988, 53 Fed. Reg. 20,764, 20,774

(June 6, 1988), codified at 40 C.F.R. § 232.2(q) (until August 28, 2015).

From the Army Corps' version, waters of the United States included

"(3) All other waters such as intrastate . . . wetlands, . .  the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

"(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

"(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

"(iii) Which are used or could be used for industrial purpose by industries in interstate commerce; . . ."

and

"(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section."

33 C.F.R. § 328.3(a)(3), (7) (2014) (Army Corps); see also 40 C.F.R. § 232.2, definition

of "waters of the United States" (2004) (EPA).  Neither agency's regulations referred to

man-made ditches that connect natural bodies of water.

These agencies jointly amended these regulations in 2015 which the

Government contends amended the definition of "waters of the United States" (Docket

No. 363, Gov't Memo. re retroactivity at 4), 80 Fed. Reg. 37,054 (June 29, 2015),

codified at 40 C.F.R. § 232.2 (2015).  This regulation had an effective date of August

28, 2015, 80 Fed. Reg. at 37,054.  The agencies published the changes in 2015, 80

Fed. Reg. 37,054 (June 29, 2015).

"In this rule, the agencies interpret the scope of the 'waters of the United States' for the CWA using the goals, objectives, and policies of the statute, the Supreme Court case law, the relevant and available science, and the agencies' technical expertise and experience as support.  In particular, the agencies looked to the objective of the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and the scientific consensus on the strength of the effects of upstream tributaries

16

and adjacent waters, including wetlands, on downstream traditional navigable waters, interstate waters, and the territorial seas.  An important element of the agencies' interpretation of the CWA is the significant nexus standard.  This significant nexus standard was first informed by the ecological and hydrological connections the Supreme Court noted in Riverside Bayview, developed and established by the Supreme Court in SWANCC, and further refined in Justice Kennedy's opinion in Rapanos. The agencies also utilized the plurality standard in Rapanos by establishing boundaries on the scope of "waters of the United States" and in support of the exclusions from the definition of "waters of the United States."  The analysis used by the agencies has been supported by all nine of the United States Courts of Appeals that have considered the issue," 80 Fed. Reg. at 37,056.

They noted that

"In response to the Supreme Court opinions, the agencies issued guidance in 2003 (post-SWANCC) and 2008 (post-Rapanos).  However, these two guidance documents did not provide the public or agency staff with the kind of information needed to ensure timely, consistent, and predictable jurisdictional determinations.  Many waters are currently subject to case-specific jurisdictional analysis to determine whether a "significant nexus" exists, and this time and resource intensive process can result in inconsistent interpretation of CWA jurisdiction and perpetuate ambiguity over where the CWA applies.  As a result of the ambiguity that exists under current regulations and practice following these recent decisions, almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination."

80 Fed. Reg. at 37,056.

As codified at 40 C.F.R. § 232.2, the 2015 amended regulation defines "waters of

the United States" to include

"(vi) All waters adjacent to a water identified in paragraphs (1)(i) through (v) of this definition, including wetlands, ponds, lakes, oxbows, impoundments, and similar waters;

"(vii) All waters in paragraphs (1)(vii)(A) through (E) of this definition where they are determined, on a case-specific basis, to have a significant nexus to a water identified in paragraphs (1)(i) through (iii) of this definition.  The waters identified in each of paragraphs (1)(vii)(A) through (E) of this definition are similarly situated and shall be combined, for purposes of a significant nexus analysis, in the watershed that drains to the nearest water identified in paragraphs (1)(i) through (iii) of this definition.  Waters identified in this paragraph shall not be combined with waters identified in paragraph (1)(vi) of this definition when performing a significant nexus

analysis.  If waters identified in this paragraph are also an adjacent water under paragraph (1)(vi), they are an adjacent water and no case-specific significant nexus analysis is required."

40 C.F.R. § 232.2 (2015) (defining "waters of the United States").  The waters listed in

subparagraphs (A)-(E) did not include wetlands and also excluded man-made ditches, id.

In 2019, these agencies rescinded the 2015 changes, reverting the prior version

of the rules, anticipating the coming replacement rule, which became the NWPR, 84 Fed.

Reg. 56,626 (Oct. 22, 2019).

(2)     NWPR, 2020

In April 2020, the EPA and Army Corps promulgated the NWPR which refines the

"waters of the United States" definition, effective June 22, 2020, 85 Fed. Reg. 22,250,

22,250, 22,251, 22,307-17, 22,339, 22,341.   The NWPR melds the plurality and

significant nexus standards from Rapanos to define "adjacent wetlands" as part of the

jurisdictional waters of the United States, see 85 Fed. Reg. at 22,308, 22,338 (to be

codified  as  33  C.F.R.  §  328.3(a)(4),  (c)(1)),  22,340  (to  be  codified  as  40  C.F.R.

§ 120.2(1)(iv), (3)(i)) (effective June 22, 2020)).

The NWPR formally adopts one of the plurality opinions in Rapanos in defining

"waters of the United States."  Defendants argue that Justice Scalia's opinion, requiring

wetlands  to  be  adjacent  to  navigable  waters  to  be  under  the  Clean  Water  Act,  was

incorporated in the NWPR (Docket No. 365, Defs. Memo. at 3).

The NWPR excludes from "waters of the United States" ditches which are deemed

"not  traditional  navigable  waters,  tributaries,  or  that  are  not  constructed  in  adjacent

wetlands, subject to certain limitations," id. at 22,251-52.

As codified in the current version of 33 C.F.R. § 328.3, jurisdictional waters of

United States include territorial seas, waters susceptible to use in interstate or foreign

18

commerce; tributaries; lakes and ponds; and adjacent wetlands, 33 C.F.R. § 328.3(a)(1)-(4).  Non-jurisdictional waters include those waters not identified above in § 328.3(a)(1)-(3), 33 C.F.R. § 328.3(b)(1).

The EPA and Army Corps present an extensive history of the CWA rule making and interpretation of "waters of the United States" in the NWPR, id., 85 Fed. Reg. at 22,252-59.   The NWPR clarifies the definition of "waters of the United States" and specifically includes wetlands in that definition.   The agencies noted in the NWPR that "not all waters are waters of the United States," id. at 22,251.

### 3.  Retroactivity

"Retroactivity is not favored in the law.  Thus, . . . administrative rules will not be construed to have retroactive effect unless their language requires this result," Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Docket No. 363, Gov't Memo. at 7).  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress," id. (see id.).  Specification of an effective date indicates a lack of retroactivity, Sierra Club v. Tennessee Valley Auth., 430 F.3d 1337, 1351 (11th Cir. 2005 (id. at 7-8).  "There is no point in specifying an effective date if a provision is to be applied retroactively," id.

Where an ostensibly new rule clarifies relevant law rather than effect a substantive change in the law, the new rule can be applied retroactively, James T. O'Reilly, Administrative Rulemaking § 16.23 (2020); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 506 (3d Cir. 2008).  A new rule "should not be deemed to be 'retroactive' in its operation—and thus does not implicate the Supreme Court's concerns in Bowen—

19

if it 'd[oes] not alter existing rights or obligations [but] merely clarifie[s] what those existing rights and obligations ha[ve] always been.'  Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 113 (3d Cir. 1996)," Levy, supra, 544 F.3d at 506.  Where the new rule is a clarification and not a substantive change "of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does not have an impermissible retroactive effect, regardless of whether Congress has delegated retroactive rulemaking power to the agency," id. (emphasis in original).

The Third Circuit in Levy applied four factors in determining whether the new rule merely clarifies the existing law, first, whether the text of the old regulation was ambiguous; second, whether the new regulation resolves, or at least attempts to resolve, that ambiguity; third, whether the new regulation's resolution of the ambiguity is consistent with the text of the old regulation; and, fourth, whether that resolution also is consistent with the agency's prior treatment of the issue, id. at 507.

### 4.  Bifurcation

Federal Rule 42(b) provides that "for convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.  When ordering a separate trial, the court must preserve any federal right to a jury trial."  The decision to bifurcate is in this Court's discretion, Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 15 (2d Cir. 1988) (Docket No. 364, Gov't Memo. re Bifurcation at 2).  Bifurcation is an exception, e.g., Moody v. CSX Transp., Inc., 271 F. Supp.3d 410, 433 (W.D.N.Y. 2017) (Payson, Mag. J.).

For civil liability under the CWA, a defendant has the right to have a jury determine liability, but this Court imposes civil penalties and injunctive relief if the fact finder concludes liability, see Leslie Salt Co. v. United States, 55 F.3d 1388, 1396-97 (9th Cir. 1995) (Pregerson, J., with Lay, J., concurring); 33 U.S.C. § 1319(d), (b) (Docket No. 364, Gov't Memo. at 3).

B.     Retroactivity of NWPR

This Court first considers the retroactivity of the NWPR (Docket No. 363), whether that rule, by its terms set to be effective on June 22, 2020, 85 Fed. Reg. at 22,250, applies to Defendants' property in 2007 when they were cited by the Government.  This issue permeates Defendants' jurisdictional Motion to Dismiss (Docket No. 365).  This Court then considers Defendants' Motion to Dismiss two counts in this case (Docket No. 365) and concludes with discussion of bifurcation (see Docket No. 364) of whatever remaining issues for trial in this case.

1.   Parties' Arguments

The Government contends that the NWPR became effective on June 22, 2020, and had no retroactive effect (Docket No. 363, Gov't Memo. at 4, 7).  The Government analogized NWPR with its predecessor, the 2015 Clean Water Rule, which held that its revised definition of "waters of the United States" did not apply retroactively (id. at 8), United States v. HVI Cat Canyon, Inc., 314 F. Supp.3d 1049, 1059 n.12 (C.D. Cal. 2018); Jones Creek Investors, LLC v. Columbia County, No. CV 111-174, 2016 WL 593631, at *4-6 (S.D. Ga. Feb. 12, 2016).  The Government argues that the NWPR does not apply to any liability phase of this case but might apply at a penalty phase on the jurisdictional status of the Site (id. at 9 n.3).

21

Defendants respond that the NWPR clarified the existing rules and hence applied retroactively (see Docket No. 371, Defs. Memo. at 1; see Docket No. 365, Defs. Memo. at 8).  The NWPR reinforced Defendants' position that the EPA and Army Corps lacked jurisdiction over their Site because, applying NWPR, the Site was never adjacent to waters of the United States (Docket No. 371, Defs. Memo. at 2).  They did characterize the discussion of retroactivity as "nonsensical" (Docket No. 365, Defs. Memo. at 7).

### 2.  Retroactivity of NWPR

Review of the changes in the regulatory definition of the phrase "waters of the United States" noted above shows that the NWPR is not a mere clarification of the definitional rule.  The NWPR effects substantive changes.  The NWPR replaced the 2015 rule which attempted to meld the adjacent wetlands (from Justice Scalia's plurality) and the significant nexus analysis from Justice Kennedy where that former rule excluded wetlands from the significant nexus analysis.  The NWPR drops the significant nexus analysis entirely, acknowledging that this was a departure from the Government's prior position, 85 Fed. Reg. at 22,291, and extends the definition of "waters of the United States" only to wetlands adjacent to another waterway.  It eliminates the case-by-case analysis of any premise to determine if it was wetlands in the waters of the United States.

NWPR is the culmination of regulatory changes, each with effective dates.  For example, the regulations in effect in 2007 each had effective dates, 51 Fed. Reg. at 41,206 (Army Corps), 53 Fed. Reg. at 20,764 (EPA).  The 2015 regulation had an effective date of August 28, 2015, 80 Fed. Reg. at 37,054.  The 2019 regulation rescinding the 2015 regulation and reinstating the preexisting rule had an effective date of December 23, 2019, 84 Fed. Reg. at 56,626.  Enacting an effective date indicates that the agencies

intended prospective implementation of the NWPR, see Sierra Club, supra, 430 F.3d at 1351.

Applying the factors recognized by the Third Circuit in Levy, supra, 544 F.3d at 507, to distinguish clarification of existing law from a new rule and as the Supreme Court considered in Rapanos, supra, 547 U.S. 715, the meaning of the phrase "waters of the United States" was ambiguous; this Court noted the ambiguity (Docket No. 349, Order, 2020 WL 3042673, at *9; see also Docket No. 23, Order, 2009 WL 2157005, at *6).  The NWPR does resolve (or at least attempts to resolve) that ambiguity by defining only adjacent wetlands to waters of the United States are governed by CWA and its regulations.  Unlike the regulation in Levy, supra, 544 F.3d at 508, the NWPR is not consistent with the text of the old regulation.  For example, the agencies varied whether man-made dikes are within the definition of "waters of the United States" and the NWPR adopts the position that most man-made dikes are not within the definition.  The earlier versions of these regulations either had dikes not expressly mentioned or were authorized before the rejection in the 2015 amendment.

The final Levy factor fails to show a clarification here because the Army Corps and EPA changed their position from (pertinent for this case) 2007 to 2020, therefore not consistent with the prior regulations, but cf. id.  The agencies expressly stated that the NWPR was a departure from prior positions of the Government, 85 Fed. Reg. at 22,291.  Changes in 2015 were repealed in 2019 in anticipation of enactment of the NWPR, presumably a wholesale revision of the regulations, id. The NWPR also avoids case-by-case application, while prior versions of the regulations called for case-by-case analysis.

Since this Rule is creating new regulation and not construing what already existing by clarifying existing law, it cannot be applied retroactively.

The Government alternatively argues that NWPR might apply at the penalty phase to establish regulatory jurisdiction (see Docket No. 363, Gov't Memo. re retroactivity at 9 n.3, 11-12, 12 n.5; Docket No. 364, Gov't Memo. re bifurcation at 4).   The Government, however, fails to explain how the Rule is not applicable to determine liability but might become applicable for establishing the penalty.   The power of the EPA to regulate activity on the Site and then to sanction Defendants for violation of those regulations is pursuant to the same regulatory standards.   If Defendants violated CWA regulations in 2007, the penalty should not be determined by the standard of 2021 (absent the regulations so providing), especially if that 2021 standard would not hold any violation occurred.   It would be a wasteful exercise of overtaxed judicial resources to conduct liability jury trial under the 2007 version of regulations then conclude no penalty arose therefrom under 2021 standards.   In tentatively raising this assertion, the Government has not shown that NWPR applies at the penalty phase for liability arising in the distant past   Penalties are set forth in the CWA, 33 U.S.C. § 1319(d), and not in the regulations.   Regulatory jurisdiction applies for liability and penalty.

   C.  Motion to Dismiss

1.  Parties' Contentions

In their Motion to Dismiss (Docket No. 365), Defendants argue that the Site did not contain "waters of the United States" for Clean Water Act jurisdiction and the NWPR reflects this lack of jurisdiction.   They contend "that wetlands which are not adjacent to navigable-in-fact waters are not part of the 'waters of the United States,'" (id. at 3

(emphasis in original), citing <u>Sackett v. E.P.A.</u>, 566 U.S. 120, 124, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012)).

The Government opposes dismissal, arguing that the NWPR still does not apply to Defendants' property, that Defendants misconstrue the Clean Water Act and the nature of this case (Docket No. 370, Gov't Response Memo. at 1, 2). The Government argues that the NWPR is a change in the law that cannot be applied retroactively (<u>id.</u> at 6-11), with the 1986 regulations in effect for the activities alleged in this case (<u>id.</u> at 9). The Government repeats the Defendants' property contains waters of the United States (<u>id.</u> at 1, 11-14). The Government states that establishing liability does not require determination of the jurisdictional status of the Site, but the penalty phase of a trial might (Docket No. 363, Gov't Memo. re Retroactivity of NWPR at 9 n.3; <u>see</u> Docket No. 364, Gov't Memo. re Bifurcation at 4, 5 n.3).

Defendants respond that the NWPR clarifies Clean Water Act's jurisdiction and thus applies retroactively to their property (Docket No. 371, Defs. Memo. at 1-2). They deny that their property abuts a jurisdictional water, as listed in 33 C.F.R. § 328.3(a)(1), (2), (3) (<u>id.</u> at 2). Jurisdiction was alleged from violation of the Clean Water Act, 33 U.S.C. § 1319(b) (<u>id.</u> at 3 n.2; Docket No. 112, Am. Compl. ¶ 3) but Defendants contend there were no violations for jurisdiction (Docket No. 371, Defs. Memo. at 3 n.2).

Upon the Government's jurisdictional argument, Defendants replied that the burden of establishing subject matter jurisdiction in this case was upon the Government and that the Government failed to meet this burden (Docket No. 375, Defs. Reply Memo. at 1-2). They contend that the Government fails to assert facts to support the various grounds in the definition for "waters of the United States" (<u>id.</u> at 2-3). Defendants reaffirm

application of the NWPR retroactively to this case (id. at 1, 2, 3-4), as a clarification of the interpretation of "old law," the Clean Water Act (id. at 11-12).

Defendants take the Government's own description of the Site and its topography as "waters," with the asserted chain link of surface water connections and man-made ditches as a concession that the Site is not adjoining to "waters of the United States," is an admission of party opponent (id. at 3-4; see Docket No. 365, Defs. Memo. at 4-5).

Defendants next deny any inundation of the Site from territorial seas or tributaries to have 33 C.F.R. § 328.3(c)(ii), (iii), or (iv) apply (Docket No. 375, Defs. Reply Memo. at 3-4). They conclude the Government cites to these various regulations but does not show how anyone applies to the Site (id. at 4).

Defendants argue that this Court has an independent obligation to determine the existence of subject matter jurisdiction (id. at 6), see Arbaugh v. Y&H Corp., 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006).

As for Count III, Defendants reply that it was based upon not obtaining a § 404 permit, 33 U.S.C. § 1344, not § 402 permit the Government now argues (id. at 10-11, 11 n.4, Ex. A (Feb. 21, 2008, cease and desist order); see also Docket No. 9, Gov't Ex. 4, David Pohle Decl. Ex., copy of Feb. 21, 2008, cease and desist order). Defendants argue that these are two different orders (Docket No. 375, Defs. Reply Memo. at 11 n.4) but these documents are identical.

2. Consideration of Motion to Dismiss

a. Subject Matter Jurisdiction

First, the issue of this Court's subject matter jurisdiction may be considered at any time and by this Court sua sponte, see Fed. R. Civ. P. 12(h)(3) (see id. at 6). The

Government is correct that it alleged federal jurisdiction by invoking the CWA in the Complaint (Docket No. 1, Compl. ¶¶ 1-3) and Amended Complaint (see Docket No. 112, Am. Compl. ¶¶ 1-3), thus this Court has jurisdiction to consider the case.  The issue then becomes whether that invocation of regulatory jurisdiction and of the CWA is correct for this case to continue.

b.  Effect of Retroactivity of NWPR on Motion to Dismiss

Based up the holding above that the NWPR is a new regulation and not clarification of the existing definition, this Court needs to apply the regulatory definition as of the alleged violation in 2007, which applied to wetlands adjacent to other defined waters, e.g., 33 C.F.R. § 328.3(a)(3), (7) (2014).  The Government has not alleged the interstate jurisdictional uses of the waters to include the Site as "waters of the United States," such as interstate recreation, fishing, or industrial uses in interstate or foreign commerce, cf. id. § 328.3(a)(3)(i)-(iii).

The remaining basis to define it "waters of the United States" under that regulation is whether the Site is "adjacent" to other "waters of the United States," id. § 328.3(a)(7) The Government alleges a chain of connections between the Site's wetlands and Ransom Creek and (ultimately) the Niagara River ("waters of the United States" as an interstate waters, see 33 C.F.R. § 328.3(a)(2)) to deem the Site "waters of the United States" (Docket No. 112, Am. Compl. ¶ 33; see Docket No. 26, Order, 2009 WL 2157005, at *7; see also Docket No. 365, Defs. Memo. at 4-5; Docket No. 375, Defs. Reply Memo. at 3-4).  The Site is connected to those natural waters by means of man-made ditches under and adjacent to Millersport Highway that discharge into Ransom Creek and, eventually, into the Niagara River.

While the NWPR now clearly exclude such man-made ditches as connecting bodies of water to satisfy the definition of "waters of the United States," 85 Fed. Reg. 22,251, codified at 33 C.F.R. § 328.3(b)(5) (2020); see also id. § 328.3(c)(2) (2020)), the previous edition of the regulations in effect in 2007 did not, cf., e.g., 40 C.F.R. § 232.2 (2014).  The first exclusion of ditches from the definition of "waters of the United States" was added in 2015, 80 Fed. Reg. 37,054, 37,073, 37,118 (June 29, 2015); 40 C.F.R. § 232.2, definition of "waters of the United States" (2)(iii) (2015).

### c.   Count One

On Count One against unauthorized discharges of dredged or fill materials, the Government alleged that "the wetlands and tributaries on the Property are 'waters of the United States' and 'navigable waters' under CWA Section 502(7), 33 U.S.C. § 1362(7)" (Docket No. 112, Am. Compl. ¶ 47).  The Government satisfies the pertinent regulatory definition (as of 2007) for "waters of the United States" by alleging the Site was adjacent to other waters of the United States, here (as held previously, Docket No. 349, Order, 2020 WL 3042673, at *20-21) Ransom Creek via a series of tributaries and ditches.

The parties differ whether man-made ditches are included in the definition of "waters of the United States," primarily upon whether the NWPR applies or not (compare Docket No. 363, Gov't Memo. re retroactivity at 11; Docket No. 370, Gov't Responding Memo. at 13 (under NWPR) with Docket No. 375, Defs. Reply Memo. at 5).  As of 2007, that version of CWA regulations allowed man-made ditches to be connectors to natural bodies of water for the body at the end of the ditch to be part of "waters of the United States."  That was be the case if subsequent amendments to those regulations (including the NWPR) were given retroactive effect.  While Defendants argue (as this Court initially

focused upon) the retroactivity of the NWPR, the elimination of man-made ditches from the definition arose earlier (in 2015, repealed in 2019 anticipating enactment of NWPR, but restored in the NWPR in 2020) version of the regulation.  No one here is contending that the 2015 changes apply retroactively (see Docket No. 363, Gov't Memo. re retroactivity at 8); in fact, precedent from other districts held that the 2015 regulations lacked retroactive effect, HVI Cat Canyon, supra, 314 F. Supp.3d at 1059 n.12; Jones Creek Investors, LLC, supra, 2016 WL 593631, at *4-6).

Applying the 2007 version of the EPA and Army Corps regulations, ditches can connect bodies of water or wetlands to navigable "waters of the United States."  As held the June 2020 Order (id. at *20), issues of fact remain if the Site meets the regulatory standard as set forth in 2007 for navigability (either the waters on the Site itself or Ransom Creek (id. at *20-21).  Thus, Defendants' Motion to Dismiss (Docket No. 365) Count One is denied.

### d.  Count Three

On Count Three, this Court granted the Government a preliminary injunction upon the premise that the Site was "waters of the United States" due to a series of connections of the Site to Ransom Creek based upon the evidence then presented by the Government (Docket No. 26, Order at 12-13, 2009 WL 2157005, at *7).  For under the pre-NWPR regulations (especially before 2015 amendments), man-made ditches could be seen as connectors to natural bodies of water to find that the waters were part of the system of "waters of the United States."  The Cease and Desist Order (Docket No. 375, Defs. Reply Memo. at 10-11, 11 n.4, Ex. A (Feb. 21, 2008, cease and desist order); Docket No. 9, Gov't Ex. 4, David Pohle Decl. Ex.) was premised on the then-current version of the

regulations that permitted ditches be included in connecting bodies of water deemed to be part of the "waters of the United States."

The parties next argue about Count Two and whether "waters of the United States" is dispositive of that claim (Docket No. 370, Gov't Response at 5; but cf. Docket No. 375, Defs. Reply Memo. at 10), with both sides tying this argument to whether the Government also states a claim in Count Three.  The Government, however, fails to realize that Defendants have not moved to dismiss Count Two.  The definition is thus not applicable for that Count.

Whether the permits at issue in Count Three arise under CWA § 404 or § 402, as contended by Defendants in their Reply (Docket No. 375, Defs. Reply at 10 & n.4, Ex. A) is not pertinent to whether the Government has stated a claim there.  Both statutes have application only for "waters of the United States."

Since under 2007 regulations, "waters of the United States" could include those bodies connected by man-made ditches (notwithstanding later regulations creating a contrary distinction), the Government has alleged a claim under Count Three for violation of a Cease and Desist Order based upon that period's regulations.  Defendants' Motion to Dismiss (Docket No. 365) Count Three also is denied.

D.  Bifurcation

1.   Parties' Contentions on Bifurcation

The Government argues that, under Tull v. United States, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), a CWA trial has to be bifurcated, with a jury trial on liability (when Defendants, as was done here, invoke their Seventh Amendment right) and penalty phase decided by this Court (Docket No. 364, Gov't Memo. re Bifurcation at 2-4).

Applying Federal Rule of Civil Procedure 42(b) bifurcation rationales, the Government argues that bifurcation is warranted because the evidence for penalty differs from liability evidence and the former should not be considered by a jury (id. at 4), leading to a more streamlined presentation of the evidence, with the jury only considering liability evidence. If Defendants are found liable by the jury, this Court during the penalty phase need not reconsider the liability evidence but can focus upon penalty evidence.  (Id. at 5.)  The Government then cited CWA cases that were bifurcated (id. at 6-7).

Defendants argue that Tull did not address bifurcation (Docket No. 371, Defs. Memo. at 6).  They refute the Government's arguments for the efficacy of bifurcation in this case (id. at 6-9).  Defendants emphasize the guarantee of their right to a jury trial and that bifurcation cannot infringe upon that right (id. at 9-12).

### 2.  Bifurcation in this Case

This Court rejects Defendants' contention that Tull did not require bifurcation.  The Tull Court held that the Seventh Amendment requires a jury trial for liability in a CWA action "but that the trial court and not the jury should determine the amount of the penalty," at 427.  While not a Rule 42(b) separation or bifurcation case, the dual fact finders for different aspects of the ultimate judgment makes separate proceedings appropriate.

Defendants argue that, under Rule 42(b), the most important factor is ensuring a party's jury trial rights (Docket No. 371, Defs. Memo. at 9-12).  They do not suggest, however, how a penalty phase would be conducted in a jury CWA trial.  Since the initial phase determining any liability would be by jury, Defendants' Seventh Amendment rights are being protected.  Such protection does not mean that the entire trial has to be a jury trial, especially if the jury has no role once it finds a Defendant liable in setting the penalty.

Defendants' Seventh Amendment rights are not infringed by bifurcating the trial here.  Their right to a trial by jury is recognized where appropriate in the liability phase. Unlike most civil litigation (as noted by Justices Scalia and Stevens in their dissent and concurrence in Tull, supra, 481 U.S. at 428), this jury does not assess any penalties.  By statute these penalties are assessed by this Court, see 33 U.S.C. § 1319(b), (d); Tull, supra, 481 U.S. at 414, 422, 425.  The legislative history for the amendments to CWA adding § 1319(d) shows "that Congress intended that trial judges perform the highly discretionary calculations necessary to award civil penalties after liability is found," id. at 425, citing 123 Cong. Rec. 39,190-91 (1977).  The Tull Court concluded "the assessment of civil penalties thus cannot be said to involve the 'substance of a common-law right to a trial by jury,' nor a 'fundamental element of a jury trial,'" id. at 426.  The Court then held Congress did not infringe on a party's Seventh Amendment right to jury trial by having this Court set penalties as a matter of delegation of congressional power to fix civil penalties, id. at 426-27.

There is a distinction, first suggested by Defendants here (Docket No. 371, Defs. Memo. at 6 n.6), between a separate trial under Rule 42(b) and "bifurcation" of the entire case.  Defendants discussed another Clean Water Act case, United States v. Mashni, No. 2:18-CV-2288-DCN, 2020 WL 6875598, at *2 (D.S.C. Nov. 23, 2020), also cited by the Government (see Docket No. 364, Gov't Memo. re bifurcation at 6), where this distinction is made.  In Mashni, the Government moved to compel discovery from defendant developers and defendants then moved to bifurcate (apparently the case). Defendants there claimed that penalty discovery should not commence until after the liability phase of the trial, which the Government opposed bifurcation.  Mashni, supra,

32

2020 WL 6875598, at *1.  The United States District Court for the District of South Carolina concluded that the trial of a Clean Water Act case must be conducted in two phases, a liability jury trial and a bench penalty phase (if necessary).  That court denied bifurcation of the case in its entirety, however, essentially denying defendants' request to bifurcate discovery.  Id. at *2-3 (Docket No. 371, Defs. Memo. at 6 n.6).  The court also found that "the trial is already bifurcated in the traditional sense," id. at *2, by having a jury liability trial and a bench penalty proceeding, that there was no potential prejudice if the court declined to bifurcate the case, and the jury would be limited to evidence as to liability and the penalty phase would only occur upon a verdict of defendants' liability, id.

This Court adheres to Tull and Mashni and holds that the trial of this case will be separated, with a liability jury trial followed (if necessary) by a bench proceeding to determine penalties.  Clearly in the case at bar, with two different fact finders for liability and penalty, separate trials or subsequent proceedings in this trial is in order, e.g., id. at *2.  Bifurcation ordered here is for the trial and not for the entire case.  Defendants' cases from this District denying bifurcation are distinguishable.  Both Moody, supra, 271 F. Supp.3d at 414-15, 433, and Chase ex rel. M.S.N. v. Near, No. 06CV685, 2007 WL 2903823, at *2 (W.D.N.Y. Oct. 1, 2007) (Curtin, J.), were personal injury actions in which defendants sought to bifurcate liability from damages.

### 3.  Discovery

Presumably, discovery to date included liability and penalty issues.  Bifurcation of the entire case, however, is not necessary.  What has not been expressly sought by either side is bifurcation of the entire case, that is, conducting discovery and other pretrial proceedings in phases, with separation of liability discovery from penalty phase discovery.

The Government at least implies that penalty discovery may be necessary (cf. Docket No. 364, Gov't Memo. re bifurcation at 5 n.4), but they have not sought it or indicated that discovery conducted to date was merely for liability.   The Government argued that the parties may need to confer about the scope of penalty discovery (Docket No. 370, Gov't Memo. at 13).

The civil penalty provision of the CWA, 33 U.S.C. § 1319(d), authorizes this Court to impose a civil penalty "not to exceed $25,000 per day for each violation," and lists several factors to consider in establishing the penalty.   These include "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require."   This differs in many respects from liability discovery where the issue is establishing (a) that the property contains "waters of the United States" and (b) that pollution or other violation of the Act occurred.   Obviously, the liability and penalty discovery would overlap.   The economic benefits to Defendants and the impact of any penalty are subjects probably not fully developed in discovery.

If penalty discovery is necessary, this Court expects all discovery (including that penalty discovery) must be completed by **July 14, 2021** (that is, one week prior to the Final Pretrial Conference).   The monitoring of discovery and considering any issues arising therefrom is within the referral to Magistrate Judge Foschio (see Docket No. 359).

## IV.   CONCLUSION

Therefore, this Court does not apply the Navigable Waters Protection Rule, 85 Fed. Reg. 22250, to Defendants' Site and Defendants' alleged activities in 2007 that

the Government claims violated the CWA.  As for Defendants' Motion to Dismiss (Docket No. 365) Counts One and Three of the Amended Complaint, that Motion is denied since the Government alleges claims as of the regulatory landscape in 2007.

This Court holds that the trial will be conducted in two separate parts, pursuant to Rule 42(b), with a jury trial for the liability phase and, if any Defendant is found liable, a bench hearing as to penalty and equitable relief.  The liability phase would address (among other elements of the Government's claims) material issues of fact whether the Site contains wetlands, whether those wetlands are covered by the CWA (because of  its adjacency to recognized "waters of the United States" or abandonment of prior converted cropland status or because of the topography the Site qualifies it as "wetlands" under the relevant regulations).  Any discovery necessary for a penalty phase is to be completed by July 14, 2021.

## V.    ORDER

For the reasons stated herein, Defendants' Motion to Dismiss Counts One and Three of the Amended Complaint (Docket No. 365) is denied.

FURTHER, this Court will not apply retroactively the Navigable Waters Protection Rule to the facts of this case.

FURTHER, trial of this action shall be bifurcated (Docket No. 364).

FURTHER, any remaining discovery (including for any penalty phase) shall be completed by July 14, 2021.

SO ORDERED.

Dated:          March 3, 2021
                Buffalo, New York

                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge